**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MARION DIAGNOSTIC CENTER, LLC; MARION HEALTHCARE, LLC; and ANDRON MEDICAL ASSOCIATES, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BECTON, DICKINSON, AND COMPANY; PREMIER, INC.; VIZIENT, INC.; CARDINAL HEALTH, INC.; OWENS & MINOR DISTRIBUTION INC.; MCKESSON MEDICAL-SURGICAL INC.; HENRY SCHEIN, INC.; and UNNAMED BECTON DISTRIBUTOR CO-CONSPIRATORS, <br><br> Defendants. | **AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Marion Diagnostic Center, LLC ("Marion Diagnostic"), Marion HealthCare, LLC ("Marion HealthCare"), and Andron Medical Associates ("Andron"), individually and on behalf of all those similarly situated, for their Complaint against Defendants Becton, Dickinson & Co. ("Becton"), Premier, Inc. ("Premier"), Vizient, Inc. ("Vizient"), Cardinal Health, Inc. ("Cardinal"), Owens & Minor Distribution, Inc. ("Owens & Minor"), McKesson Medical-Surgical Inc. ("McKesson"), Henry Schein, Inc. ("Henry Schein"), and other unknown Becton distributors, state as follows:

1

## NATURE OF THE ACTION

1.     Plaintiffs bring this action to restore competition in the relevant conventional and safety syringe and safety IV catheter markets and to hold a conspiracy responsible for its restraint of trade.

2.     This case arises out of the oppressive structure imposed on healthcare providers when purchasing medical devices and supplies in the United States.  Purchasing those medical devices and supplies is not like buying consumer goods, where a person can simply walk into a store or click on Amazon to compare prices.  Rather, a purchase must occur via a web of manufacturers, distributors, and "group purchasing organizations" (or "GPOs") that use interrelated contracts to drive up costs for healthcare providers.  At its most basic level, the purchase of medical devices by healthcare providers typically works as follows:

> Step One:   The healthcare provider becomes a member of a GPO that negotiates prices for devices and supplies with manufacturers.
>
> Step Two:   The GPO, representing many healthcare providers, negotiates pricing for medical devices and supplies with a manufacturer.
>
> Step Three:   A healthcare provider wishing to purchase medical devices and supplies then does so through a distributor authorized to sell the manufacturer's goods.

3.     Effecting these steps requires a series of contracts.  In this case, Becton, a manufacturer of devices and supplies, has abused its extraordinary market power to require the use of oppressive, anti-competitive contracts that effectively force above-competitive prices on the market.

4.     Defendants have exploited that network of contracts to enter into a vertical conspiracy to restrain trade in the nationwide markets for conventional and safety syringes and

2

safety IV catheters. Using those contracts, Becton has unlawfully conspired with GPOs and distributors to force healthcare providers into long-term exclusionary contracts that restrain trade and inflate the prices of certain Becton products to above-competitive levels.

5.     Defendants' exclusionary contracts effectively compel healthcare providers to buy Becton products or else face substantial economic punishment. Defendants hold tremendous market power in the nationwide markets for conventional and safety syringes and safety IV catheters. Defendants have profited greatly from the above-competitive pricing that they have charged for the relevant Becton products.

6.     Through their conspiracy, Defendants have suppressed competition by preventing Becton's rivals from obtaining sufficient market shares to bid Becton's prices down to economically efficient, competitive levels. The conspiracy has also suppressed conventional and safety syringe innovation and safety, placing patients and healthcare workers at needless risk of serious infectious diseases spread by needlesticks and blood-borne pathogens.

7.     Plaintiffs are healthcare providers who have purchased conventional and safety syringes and safety IV catheters directly from the conspiracy and paid above-competitive prices caused by the conspiracy. The proposed classes include healthcare providers nationwide.

## PARTIES

### Class Representative Plaintiff Health Care Providers

8.     Marion Diagnostic is a limited liability company formed under the laws of the State of Illinois with its principal place of business in Marion, Illinois.  Marion Diagnostic operates a multidisciplinary healthcare facility including an outpatient surgery practice, a diagnostic center, and a walk-in clinic.  Marion Diagnostic has purchased Becton conventional and safety syringes, as well as safety IV catheters, from co-conspirator Becton distributor McKesson during the period of the conspiracy.

3

9.     Marion HealthCare is a limited liability company formed under the laws of the State of Illinois with its principal place of business in Marion, Illinois.  Marion HealthCare, which is owned and operated by area physicians, operates a multi-specialty surgery center in Marion.  Marion HealthCare has purchased Becton conventional and safety syringes, as well as safety IV catheters, from co-conspirator and Becton distributor McKesson during the period of the conspiracy.

10.     Andron is a professional association formed under the laws of the State of New Jersey with its principal place of business in Englewood, New Jersey. Andron operates an outpatient clinic specializing in rheumatology. Andron has bought Becton conventional and safety syringes, as well as safety IV catheters, from co-conspirator Becton distributor Henry Schein during the period of the conspiracy under contracts brokered by GPO Med Assets, Inc., which has since been acquired, in part, by Vizient.

## Defendant Manufacturer

11.     Becton is a corporation formed under the laws of the State of New Jersey with its principal place of business in Franklin Lakes, New Jersey.  Becton is the largest manufacturer in the United States of conventional and safety syringes and safety IV catheters.

## Defendant Group Purchasing Organizations ("GPOs")

12.     Vizient is a corporation formed under the laws of the State of Delaware with its principal place of business in Irving, Texas.  Vizient is the nation's largest GPO, representing more than 50% of the annual spending of United States healthcare providers on medical devices and supplies, including Becton products. It brokers more than $100 billion in sales annually.

13.     Premier is a corporation formed under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina.  Premier is the second largest GPO, representing more than 25% of the annual spending of United States healthcare providers on

medical devices and supplies, including Becton products.

## Defendant Distributors

14.     Cardinal is a corporation formed under the laws of the State of Ohio with its principal place of business in Dublin, Ohio.  Cardinal is one of the largest distributors of Becton conventional syringes, safety syringes, and safety IV catheters in the United States.

15.     Owens & Minor is a corporation formed under the laws of the State of Virginia with its principal place of business in Mechanicsville, Virginia.  Owens & Minor is one of the largest distributors of Becton conventional syringes, safety syringes, and safety IV catheters in the United States.

16.     McKesson is a corporation formed under the laws of the State of Virginia with its principal place of business in Richmond, Virginia.   McKesson is a distributor of Becton conventional syringes, safety syringes, and safety IV catheters in the United States.

17.     Henry Schein is a corporation formed under the laws of the State of Delaware with its principal place of business in Melville, New York.  Henry Schein is a distributor of Becton conventional syringes, safety syringes, and safety IV catheters in the United States.

18.     Unknown Becton co-conspirators include Becton distributors facilitating the conspiracy's restraint of trade by distributing Becton products, including Becton conventional syringes, safety syringes, and safety IV catheters in the United States under the exclusionary contracts.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action arises under the laws of the United States regulating commerce and protecting trade and commerce against restraints and monopolies.

20.     This Court has personal jurisdiction over each of the Defendants under the Clayton Act, 15 U.S.C. §12, *et seq*., because (a) each Defendant has been or will be validly served with process within the United States; (b) each Defendant has transacted business in the United States, including in this District; (c) each Defendant has been incorporated in a United States jurisdiction and maintains its corporate headquarters in the United States; (d) each Defendant has directly or indirectly sold substantial quantities of Becton brand conventional and safety syringes and safety IV catheters in the United States, including in this District; and (e) each Defendant has had substantial aggregate contacts with the United States, including in this District.

21.     Each Defendant is also subject to personal jurisdiction under the laws of the State of Illinois because (a) it transacts business within this State and (b) it has joined in a conspiracy that was directed at, and had the direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in and located in the State of Illinois, including without limitation, Plaintiffs.

22.     Venue lies in this District pursuant to Sections Four and Twelve of the Clayton Act, 15 U.S.C. §§15, 22, because Defendants have each transacted substantial business in the Southern District of Illinois.

23.     Venue also lies in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to this claim arose in this District, including the formation and performance of Defendants' exclusionary contracts and the sale by the conspiracy of conventional and safety syringes and safety IV catheters at above-competitive prices.

## FACTUAL ALLEGATIONS

I.    **The Markets for Conventional and Safety Syringes and Safety IV Catheters**

A.    **The Relevant Product Markets**

24.    The relevant markets in this case are the markets for the sale in the United States of conventional syringes, safety syringes, and safety IV catheters.

25.    *Conventional syringes*. This market includes the conventional syringes manufactured and sold by Becton's competitors.

26.    *Safety syringes*.  Unlike conventional syringes, safety syringes have features that aim to prevent accidental needlesticks that can spread blood-borne pathogens. For example, Becton offers syringes with retractable needles and sliding safety guards that seek to shield patients and providers from being touched by the syringe needle.  Manufacturers, including Becton, typically sell safety syringes at substantially higher prices than conventional syringes. Because safety syringes offer additional features and are priced differently than conventional syringes, they are not reasonably interchangeable and thus form a distinct market.  The market for safety syringes includes those safety syringes manufactured and sold by Becton's competitors.

27.    *Safety IV catheters*.  As with safety syringes, safety IV catheters differ from conventional catheters in that they have features designed to reduce the risk of accidental needlesticks.  Safety catheters are typically priced at substantially higher prices than conventional catheters and are not reasonably interchangeable with conventional catheters because they have distinct safety functions. They thus form a distinct market.  The market includes safety IV catheters manufactured and sold by Becton and by Becton's competitors.

28.    For each of these three relevant product markets, the relevant geographical market is the United States. Becton and its competitors market their safety and conventional syringes

and safety IV catheters throughout the United States.  Those markets are limited to the United States because regulatory barriers prevent healthcare providers in the United States from purchasing safety and conventional syringes or safety IV catheters from manufacturers who lack approval to sell medical devices in this country.

**B.**     **The Conspirators' Roles in the Relevant Markets**

29.     ***Becton*.** Each of the conspirators plays a distinct role in the relevant markets. Becton manufactures conventional and safety syringes and safety IV catheters for sale to healthcare providers such as Plaintiffs.  Typically, these sales are made through distributors.  On average, Becton sells substantially more than $500 million of conventional and safety syringes and safety IV catheters in the United States every year.

30.     ***Group Purchasing Organizations*.** Vizient and Premier are group purchasing organizations ("GPOs") that represent their member healthcare providers.  They do not purchase or sell medical devices from Becton or other manufacturers.  Rather, GPOs are intermediaries who negotiate contracts with vendors, such as Becton, for the sale of medical devices to the healthcare providers that they represent, such as Plaintiffs.  Nearly every healthcare provider in the United States is represented by a GPO.  The purpose of GPOs is, in theory, to save their member healthcare providers money by pooling the healthcare providers' purchasing power to obtain more favorable prices from vendors such as Becton.  Co-conspirators Vizient and Premier are responsible for approximately 75% of GPO-managed sales in the United States.

31.     ***Becton Distributors*.**  Cardinal, Owens & Minor, McKesson, and Henry Schein, as well as unnamed Becton distributor co-conspirators, purchase products from Becton and then resell the relevant Becton products directly to healthcare providers pursuant to terms negotiated by the GPOs.  In many cases, once the GPOs have negotiated contractual pricing and other terms of sale, their member healthcare providers purchase Becton products by paying the contract price

plus a percentage markup to distributors such as Cardinal, Owens & Minor, McKesson, Henry Schein, or unnamed Becton co-conspirator distributors.  In other instances, these Becton distributors resell the relevant Becton products under direct contracts entered into directly between Becton and the healthcare provider, typically a hospital, that are not negotiated by Vizient or Premier.

## II.    The Conspirators' Market Power

32.    Together, the conspirators have tremendous power to control pricing or exclude competition in the markets for conventional and safety syringes and safety IV catheters.

33.    Becton has dominant shares in the relevant product markets.

(a)    Becton controls approximately 60% of the market for conventional syringes, while its nearest competitor has only a 15% share.

(b)    Becton controls approximately 60% of the market for safety syringes, nearly double the share of its nearest competitor.

(c)    Becton controls approximately 55% of the market for safety IV catheters, approximately twice that of its nearest competitor.

34.    GPOs Vizient and Premier also have considerable power in the relevant markets. They are the two largest GPOs in the United States. Together, they control over 75% of the annual spending in the United States by healthcare providers on medical devices and supplies.

35.    Co-conspirators Cardinal, Owens & Minor, McKesson, and Henry Schein also control a massive share of the distribution of medical devices and supplies.  Distributors purchase medical supplies from a manufacturer, such as Becton, and then resell those supplies to healthcare providers, like Plaintiffs, on terms dictated by the Becton contracts.  As a market observer has described it, Cardinal and other Becton distributors have erected "wide economic moats" that allow them to "keep new entrants at bay."

36.     High barriers to entering the relevant markets protect the conspiracy's and Becton's dominance.  First, the fact that healthcare providers rely heavily – if not exclusively – on Vizient, Premier, and other GPOs has caused the larger healthcare providers to reduce their own in-house procurement capabilities.  Many smaller healthcare providers lack that sophisticated capability altogether.  Thus, because most healthcare providers have little capacity to negotiate contracts for conventional and safety syringes or safety IV catheters on their own, they must accept the long-term, exclusionary GPO contracts and above-competitive pricing offered by the conspiracy.

37.     In addition, the relevant markets manifest large economies of scale in which a market competitor must produce enormous amounts of conventional and safety syringes and safety IV catheters to reduce its costs to a level that would be competitive with Becton.  No competitors can match the output of Becton, which has the capacity to produce billions of conventional and safety syringes and safety IV catheters per year worldwide.  As a result, it is difficult for Becton's competitors to enter into, or expand in, the relevant markets and match the massive benefits that Becton enjoys from its economies of scale.

38.     Regulatory barriers caused by patents and FDA approval requirements also increase the barriers to entry in the relevant markets.

39.     The conspiracy's and Becton's market power is also demonstrated directly by the above-competitive pricing that Becton is able to charge, as well as the conspiracy's ability to exclude competition with long-term, exclusionary contracts and other overt acts.

        (a)     In the conventional syringe market, Becton has charged healthcare
        providers prices that are 11% higher than the pricing charged by its closest rival.

(b)     In the safety syringe market, Becton has charged healthcare providers prices that are 36% higher than the pricing charged by its competitors for retractable safety syringes, and prices that are 22-30% higher than the pricing charged by its competitors for non-retractable safety syringes.

(c)     In the safety IV catheter market, Becton has charged healthcare providers prices that are 37% higher than the pricing charged by its competitors.

## III.    Defendants' Conspiracy in Restraint of Trade

40.     Defendants have achieved and maintained their market power by entering into a series of long-term exclusionary contracts over many years that have restricted trade to their substantial benefit and at the expense of healthcare providers, and by engaging in other anticompetitive acts in restraint of trade.

41.     These long-term exclusionary contracts usually contain at least one of two key components: sole or dual sourcing provisions and disloyalty penalties.  Sole sourcing provisions require that a healthcare provider, which is a member of a GPO, purchase only Becton products.  Dual sourcing provisions allow purchasing from only one other approved non-Becton manufacturer.  Disloyalty penalty provisions punish healthcare providers with higher prices if they switch from Becton products to a competitor.  Because each contract is typically long term, these two contractual components together have the practical effect of preventing healthcare providers from being able to purchase non-Becton products for years.

42.     As an initial matter, Becton and the GPOs, Vizient and Premier, typically enter into "Net Dealer Contracts."  These contracts control the pricing and other terms under which healthcare providers, which are members of the GPOs, buy Becton products.  In exchange, Becton pays the GPOs, Vizient and Premier, millions of dollars annually in anticompetitive payments.  These Net Dealer Contracts often contain a penalty pricing rebate scheme that

punishes GPO-member healthcare providers that do not purchase a certain volume of their prior Becton purchases – typically 80-95%. These contracts also often contain sole or dual source provisions. These contracts are usually long term, lasting between three and five years.

43. The penalty pricing rebate scheme punishes healthcare provider purchasers who switch from Becton products to a competitor's products. Purchasers pay less per unit as the volume of purchases increases, but the cost savings is realized through an end-of-year rebate payment. Typically the purchaser must purchase 80-95% of its volume from the prior year to qualify for the rebate. If the purchaser does *not* meet the required percentage of prior purchases – perhaps by purchasing certain products from a competitor – there are no end-of-year rebates and the purchaser must pay the highest prices for products, even if it purchases a large volume.

44. Once a healthcare provider decides to purchase Becton products pursuant to the terms of a Net Dealer Contract negotiated by its GPO, it selects a distributor such as Cardinal, Owens & Minor, McKesson, or Henry Schein to deliver Becton's products. The distributors and healthcare providers enter into a related exclusionary contract, usually called a Distributor Agreement. Distributor Agreements typically require that distributors enforce the requirement that the healthcare providers buy a certain volume of Becton products or else pay the penalty pricing set forth in the Net Dealer Contract.

45. Becton then enters into another exclusionary contract with distributors, often called a "Dealer Notification Agreement," to further the conspiracy in three ways. *First*, the distributors agree to distribute Becton's products to healthcare providers pursuant to the Net Dealer Contract's anticompetitive terms. *Second*, the distributors agree to enforce Becton's penalty pricing system that punishes healthcare providers for switching from Becton products to competitors' products. *Third*, the distributors agree to make additional anticompetitive cash

12

payments to the GPOs, Vizient and Premier, based on the volume of Becton sales under the Net Dealer Contract. Dealer Notification Agreements are typically long term, lasting from three to five years. Approximately 65% of the relevant Becton products are distributed under Cardinal and Owens & Minor distributor contracts alone.

46.     Becton undertakes additional anticompetitive action to increase the exclusivity of these distributor contracts. Becton pays extra commissions to the distributors' sales personnel who sell Becton products to the exclusion of competitors' products. Becton also requires that distributors' promotional materials emphasize Becton as the preferred brand. Becton has also asked Cardinal, its largest distributor by far, to commit to not induce a Becton customer to purchase a competitor's products.

47.     Thus, this scheme of three interrelated exclusionary contracts keep Becton's market power securely in place: (1) Net Dealer Contracts, between Becton and the GPOs, that set the prices of Becton products and punish healthcare providers for switching to competitors; (2) Distributor Agreements, between the distributors and the healthcare providers, that enforce penalties for switching from Becton products; and (3) Dealer Notification Agreements, between Becton and the distributors, that require distributors to enforce Becton's anticompetitive pricing scheme and resale restrictions. Together, this web of contracts effects a conspiracy that results in higher prices, lowered competition, and less consumer choice.

## IV.     Becton's Other Anticompetitive Acts

48.     Becton has committed other anticompetitive acts in aid of the conspiracy, including deception, disparagement, patent infringement, and false advertising aimed against its most aggressive and innovative safety syringe competitor, Retractable Technologies, Inc. ("Retractable"). Those acts improperly diminish Retractable's market share in a concentrated market. Becton has also engaged in anticompetitive actions resulting in consent decrees and

13

fines.  And Becton likewise employs anticompetitive practices with healthcare providers that are not members of GPOs.  All of these actions have materially contributed – in combination with other overt acts – to the conspiracy's and Becton's market power in the relevant conventional and safety syringe markets, and allowed Becton to charge above-competitive pricing.

49.     Becton has at least twice been adjudicated to have engaged in anticompetitive conduct. First, Becton has been found liable for disparaging Retractable and engaging in false advertising.  Specifically, a jury found that Becton falsely claimed both that its needles were the world's sharpest and that Retractable's syringes did not inject a full dose of medicine.  *Retractable Tech., Inc. v. Becton, Dickinson and Co.*, No. 2:08-CV-16, 2014 WL 12596469 at *6 (E.D. Tex. Nov. 10, 2014), *rev'd and remanded on other grounds*, 842 F.3d 883 (5th Cir. 2016).  Becton engaged in these practices to exclude Retractable and other competitors from the safety syringe market, resulting in lowered quality and higher prices for safety syringes. Becton's false advertising and disparagement of its competitors helped coerce those competitors against participating in the relevant markets, further contributing to the unreasonable restraint of trade.

50.     Second, Becton unlawfully infringed patented Retractable technology and used it against Retractable by introducing a line of 1 mL "Integra" retractable syringes.  Becton rushed these infringing syringes to market in 2002 to impede Retractable's market entry, raising its competitor's costs, after the passage of the Needlestick Safety and Prevention Act.  A jury found that Becton infringed on Retractable's patents and that verdict was affirmed.  *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1307 (Fed. Cir. 2011).

51.     Becton also enters into exclusionary contracts directly with healthcare providers outside of the GPO system.  In these direct contracts, Becton will "bundle" the rebates offered to

14

the purchasing healthcare provider for many types of Becton products and require a healthcare provider to buy certain quotas to keep all of the rebates. Because other conventional and safety syringe and safety IV catheter manufacturers do not have broad product lines like Becton, healthcare providers will not choose a non-Becton conventional and safety syringe or safety IV catheter for fear of paying higher prices on other Becton medical supplies. As a result, other conventional and safety syringe or safety IV catheter manufacturers cannot compete because they are unable to offer discounts on conventional and safety syringes or safety IV catheters that could match the rebates Becton offers on *all* its products. Matching all Becton rebates would likely compel below-cost pricing, or sales at the very least with little or no profit.

## V.   The Conspiracy's Exclusionary Conduct Is Evaluated in its Entirety and Not Piecemeal

52.    A plaintiff need not demonstrate how each of the conspiracy's several exclusionary overt acts has individually and materially contributed to the conspiracy's maintenance of its market power and antitrust price injury in the relevant markets. As a matter of law, the combined effect of the conspiracy's exclusionary practices must be evaluated to determine whether in combination they materially contribute to market power and above-competition pricing. Each overt act or practice alone need not constitute a restraint of trade. Further, a plaintiff need not demonstrate how much each overt act alone has contributed to the above-competitive price premiums Becton has enjoyed in the relevant markets.

## VI.   Long-Term, Exclusionary Conduct Contributing to Antitrust Price Injury in the Damage Period Is Actionable

53.    All exclusionary overt acts before and after the beginning of the four-year damage period that materially contribute in combination to the conspiracy's market power and to antitrust price injury in the damage period are actionable. Much of the conspirators' exclusionary conduct continues until the present and occurs in the statutory damage period. Nonetheless, as a

matter of law, exclusionary overt acts occurring before the beginning of the statutory damage period in 2014 are also actionable if they materially contribute with other overt acts to the conspiracy's acquisition and maintenance of market power and its exaction of above-competitive pricing in the damage period.  As long as the conspiracy continues to use power it has gained unlawfully over time to overcharge hospitals and other purchasers, it has no claim on the repose that a statute of limitations is intended to provide.  The taint of anticompetitive origin does not dissipate after four years if the conspiracy continues to cause antitrust price injury.

### VII.  Benefits to the Conspirators

54.  The economic interests of the conspirators are closely aligned with the aims of the vertical conspiracy in restraint of trade.  All benefit substantially from the restraint of trade.

55.  As a result of the conspiracy, Becton enjoys above-competitive pricing for its products and protects and expands its market dominance.  Becton can rely on exclusive contracts with distributors and GPOs to ensure that healthcare providers will buy Becton products, including conventional syringes, safety syringes, and safety IV catheters.

56.  As a result of the conspiracy, the GPOs, Vizient and Premier, receive large anticompetitive payments from Becton amounting to tens of millions of dollars annually.  These payments are calculated as percentages of Becton's revenues realized under the anticompetitive contracts.  The higher Becton's pricing, the more the GPOs benefit.  This provides the GPOs lucrative and powerful incentives to protect and increase Becton's market shares for the relevant conventional and safety syringe and safety IV catheter products.

57.  As a result of the conspiracy, the distributors, Cardinal, Owens & Minor, McKesson, Henry Schein, and unnamed Becton distributor co-conspirators, are also well-rewarded.  First, the fees these distributors receive on their sales are computed based on Becton's above-competitive pricing.  Thus, as with the GPOs' contracts, the distributors are rewarded

when Becton prices are higher.  Second, Becton pays significantly higher sales commissions when the distributors sell the relevant Becton products instead of its rivals' products.  Third, the long-term nature of the anticompetitive contracts ensures the distributors stable business and discourages competition.

### VIII.    Antitrust Price and Quality Injury

#### A.    The Conspiracy Has Materially Contributed to the Antitrust Price Injury Inflicted on Plaintiffs and Other Healthcare Providers

58.    Plaintiffs and all those similarly situated have suffered antitrust price injury because of the conspirators' conduct.

59.    As a result of Defendants' anticompetitive conduct, Plaintiffs and other purchasers of conventional and safety syringes and safety IV catheters have paid more than they would have in a truly competitive market.  They have paid above-competitive pricing when they bought the relevant products directly from the conspiracy through Becton, Cardinal, Owens & Minor, McKesson, Henry Schein or unnamed Becton distributor co-conspirators.  Because the conspiracy has enabled Becton to charge above-competitive pricing throughout the nationwide relevant markets, the healthcare providers have suffered antitrust injury.

60.    The conspiracy has also prevented Becton's competitors from obtaining sufficient market shares and resources to bid down Becton's pricing to competitive levels in these highly-concentrated relevant markets. The conspiracy has also prevented competitors from innovatively and effectively challenging Becton's sales of lower-quality and less-safe conventional and safety syringes.

#### B.    The Conspiracy Has Also Suppressed Syringe Innovation and Safety

61.    Nurses and other healthcare professionals have experienced as many as 600,000 needlesticks a year. These needlesticks spread HIV, hepatitis B, and hepatitis C.   As a

consequence, syringes are among the most dangerous devices purchased by healthcare providers. The Occupational Health and Safety Administration has estimated that up to 5.6 million healthcare workers are at risk of occupational exposure to bloodborne pathogens from needlesticks.  But the conspiracy's market power has discouraged attempts to develop and market new conventional and safety syringes that could reduce needlestick risk.   The conspiracy's exclusionary practices have also discouraged healthcare providers from switching to Becton competitors' conventional and safety syringes even when doing so might be safer for healthcare workers and patients.

62.    Julia Nauheim Hipps, a nurse and needlestick victim from Missouri, has testified that healthcare provider-GPO contracts have "critically discouraged" the use of safer syringes by healthcare providers:  "Even if the healthcare providers want to utilize safer devices, they are bound by agreements they entered into years ago, never believing that they would lose all control on purchasing equipment for their patients and healthcare workers.  Newer and safer medical treatment and safety devices that have proven to be safer and more cost effective have been locked out by larger corporations that have the market share contractually, providing financial incentives to some and penalizing those who breach these contracts, making it difficult for the healthcare industry to make the necessary changes to save lives of both patients and those who provide care, including nurses, firefighters, policemen, EMTs and other frontline workers."

## CLASS ACTION ALLEGATIONS

I.    **Class of Purchasers of Becton Conventional Syringes**

A.    **Federal Rule of Civil Procedure 23(a) Prerequisites**

63.    Plaintiffs Marion Diagnostic Center, LLC, Marion HealthCare, LLC and Andron Medical Associates ("Class Representatives") are representatives of a Class of United States

healthcare providers who purchased Becton conventional syringes on or after May 3, 2014 directly from Becton, Cardinal, Owens & Minor, McKesson, Henry Schein or unnamed Becton distributor co-conspirators ("Becton Conventional Syringe Class").  The Becton Conventional Syringe Class includes acute care providers or hospitals, hospital systems, clinics, physician groups, pharmacies, wholesale drug companies, home care firms, and other purchasers that offer inpatient or outpatient medical care.  For ease of reference, Class purchasers are referred to herein as "healthcare providers or other purchasers."

64.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class is, at a minimum, in the hundreds, and the Class members are therefore so numerous that joinder of all members of the Class is impracticable.  Joinder also is impracticable because of the geographic diversity of the Class members, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identities and addresses of all Class members.

(b)     There are common questions of law and fact arising from the conspirators' restraint of trade.  These include, but are not limited to, common issues as to (1) whether there is a vertical conspiracy; (2) whether the conspirators have engaged in restraint of trade; and (3) whether the conspiracy's anticompetitive conduct and overt acts have caused antitrust price injury to be inflicted on Class members.  In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the Class members.

65.     The claims of each Class Representative are typical of the claims of the Class members and fairly encompass the claims of the Class members.  Each Class Representative and

the Class members are similarly or identically harmed by the same systematic and pervasive concerted action.

66.     Each Class Representative and its counsel will fairly and adequately protect the interests of the Class members.  There are no material conflicts between the claims of each Class Representative and the Class members that would make class certification inappropriate.  Counsel for the Class will vigorously assert the claims of the Class Representative and the other Class members.

### B.     Federal Rule of Civil Procedure 23(b)(1) Prerequisites

67.     Plaintiffs' claims also meet the requirements of Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards for Defendants.   Defendants continue to market and sell Becton conventional syringes, safety syringes, and safety IV catheters, and varying adjudications could establish incompatible standards with respect to whether Defendants' conduct is permissible under the federal antitrust laws.  Prosecution of separate actions by individual Class members would also create a risk of individual adjudications that would be dispositive of the interests of other Class members not parties to the individual adjudications, or would substantially impair or impede the ability of Class members to protect their interests.

### C.     Federal Rule of Civil Procedure 23(b)(2) Prerequisites

68.     The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because the conspirators have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

**D.     Federal Rule of Civil Procedure 23(b)(3) Prerequisites**

69.     In addition, the prosecution of the claims of the Class as a class action is appropriate under Rule 23(b)(3) because:

(a)     Questions of law or fact common to the Class members predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

**II.     Class of Purchasers of Becton Safety Syringes**

**A.     Federal Rule of Civil Procedure 23(a) Prerequisites**

70.     Plaintiffs Marion Diagnostic Center, LLC, Marion HealthCare, LLC and Andron Medical Associates ("Class Representatives") are representatives of a Class of United States healthcare providers who purchased Becton safety syringes on or after May 3, 2014 directly from Becton, Cardinal, Owens & Minor, McKesson, Henry Schein or unnamed Becton distributor co-conspirators ("Becton Safety Syringe Class").  The Becton Safety Syringe Class includes acute care providers or hospitals, hospital systems, clinics, physician groups, pharmacies, wholesale drug companies, home care firms, and other purchasers that offer inpatient or outpatient medical care. For ease of reference Class purchasers are referred to herein as "healthcare providers or other purchasers."

71.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class is, at a minimum, in the hundreds, and the Class members are therefore so numerous that joinder of all Class members is impracticable.  Joinder also is impracticable because of the geographic diversity of the

21

Class members, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all Class members.

(b)    There are common questions of law and fact arising from the pattern of conspirators' restraint of trade.  These include, but are not limited to, common issues as to (1) whether there is a vertical conspiracy; (2) whether the conspirators have engaged in restraint of trade; and (3) whether the conspiracy's anticompetitive conduct and overt acts have caused antitrust price injury to be inflicted on Class members.  In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the Class members.

72.    The claims of each Class Representative are typical of the claims of the Class members and fairly encompass the claims of the Class members.  Each Class Representative and the Class members are similarly or identically harmed by the same systematic and pervasive concerted action.

73.    Each Class Representative and its counsel will fairly and adequately protect the interests of the Class members.  There are no material conflicts between the claims of each Class Representative and the Class members that would make class certification inappropriate.  Counsel for the Class will vigorously assert the claims of the Class Representative and the other Class members.

**B.    Federal Rule of Civil Procedure 23(b)(1) Prerequisites**

74.    Plaintiffs' claims also meet the requirements of Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards for Defendants.  Defendants continue to market and sell Becton conventional syringes, safety syringes, and safety IV catheters, and varying adjudications could establish incompatible

standards with respect to whether Defendants' conduct is permissible under the federal antitrust laws.  Prosecution of separate actions by individual Class members would also create a risk of individual adjudications that would be dispositive of the interests of other Class members not parties to the individual adjudications, or would substantially impair or impede the ability of Class members to protect their interests.

### C.      Federal Rule of Civil Procedure 23(b)(2) Prerequisites

75.     The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because the conspirators have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### D.      Federal Rule of Civil Procedure 23(b)(3) Prerequisites

76.     In addition, the prosecution of the claims of the Class as a class action is appropriate under Rule 23(b)(3) because:

(a)     Questions of law or fact common to the Class members predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

## III.    Class of Purchasers of Becton Safety IV Catheters

### A.      Federal Rule of Civil Procedure 23(a) Prerequisites

77.     Plaintiffs Marion Diagnostic Center, LLC, Marion HealthCare, LLC, and Andron Medical Associates ("Class Representatives") are representatives of a Class of United States healthcare providers who purchased Becton safety IV catheters on or after May 3, 2014 directly from Becton, Cardinal, Owens & Minor, McKesson, Henry Schein, or unnamed Becton

distributor co-conspirators ("Becton IV Catheter Class").   The Becton IV Catheter Class includes, without limitation, acute care providers or hospitals, hospital systems, clinics, physician groups, pharmacies, home care firms, and other purchasers that offer inpatient or outpatient medical care.  For ease of reference Class purchasers are referred to herein as "healthcare providers and other purchasers."

78.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class is, at a minimum, in the hundreds, and the Class members are therefore so numerous that joinder of all Class members is impracticable.  Joinder also is impracticable because of the geographic diversity of the Class members, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identities and addresses of all Class members.

(b)     There are common questions of law and fact arising from the pattern of conspirators' restraint of trade.  These include, but are not limited to, common issues as to (1) whether there is a vertical conspiracy; (2) whether the conspirators have engaged in restraint of trade; and (3) whether the vertical conspiracy's conduct and overt acts, taken as a whole, have caused antitrust price injury to be inflicted on Class members.  In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the Class members.

79.     The claims of each Class Representative are typical of the claims of the Class members and fairly encompass the claims of the Class members.  Each Class Representative and the Class members are similarly or identically harmed by the same systematic and pervasive concerted action.

80. The Class Representatives and their counsel will fairly and adequately protect the interests of the Class members. There are no material conflicts between the claims of each Class Representative and the Class members that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representatives and the other Class members.

**B.     Federal Rule of Civil Procedure 23(b)(1) Prerequisites**

81. Plaintiffs' claims also meet the requirements of Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards for Defendants. Defendants continue to market and sell Becton conventional syringes, safety syringes, and safety IV catheters, and varying adjudications could establish incompatible standards with respect to whether Defendants' conduct is permissible under the federal antitrust laws. Prosecution of separate actions by individual Class members would also create a risk of individual adjudications that would be dispositive of the interests of other Class members not parties to the individual adjudications, or would substantially impair or impede the ability of Class members to protect their interests.

**C.     Federal Rule of Civil Procedure 23(b)(2) Prerequisites**

82. The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because the conspirators have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

**D.    Federal Rule of Civil Procedure 23(b)(3) Prerequisites**

83.    In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)    Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy.

## STANDING TO ASSERT ANTITRUST PRICE INJURY

84.    The members of the proposed Classes have purchased directly from the unlawful vertical conspiracy in restraint of trade by buying directly from Becton, Cardinal, Owens & Minor, McKesson, Henry Schein, or unnamed Becton distributor co-conspirators.

85.    As a consequence, the Class members have as a matter of law constitutional and statutory standing to pursue damages inflicted by the conspiracy under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

## STANDING TO SEEK INJUNCTIVE RELIEF

86.    The proposed Classes also have standing to seek injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, because the conspiracy has inflicted or has threatened to inflict harm on the Classes alleged, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Classes as a whole.

## COUNT I

### Restraint of Trade in the Relevant Markets
### (Section 1 of the Sherman Act)

87.     All foregoing paragraphs are incorporated herein by reference.

88.     Becton and its co-conspirators have market power in the relevant markets in the United States for the sale of safety and conventional syringes and safety IV catheters.

89.     Conspirators Becton, Vizient, Premier, Cardinal, Owens & Minor, McKesson, Henry Schein and unnamed Becton distributor co-conspirators have entered into a vertical combination or conspiracy in restraint of trade and committed several overt acts in aid of this conspiracy.

90.     This conspiracy restrains trade in interstate commerce.

91.     The restraint of trade is unreasonable and has had substantial anticompetitive effects on price and quality competition in the relevant markets for the sale of conventional and safety syringes and safety IV catheters.

92.     The anticompetitive effects of the conspiracy are not offset by procompetitive effects in these markets.

93.     Members of the proposed Classes purchasing directly from Becton, Cardinal, Owens & Minor, McKesson, Henry Schein, or unnamed Becton distributor co-conspirators have paid above-competitive prices for the relevant Becton conventional and safety syringes and safety IV catheters and have been denied quality and safety competition in the relevant markets for the sale of syringes.  The conspirators' conduct is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs individually and as members of the proposed Classes pray that:

A.       This Court declare that named Defendants' conduct constitutes a violation of the Sherman Act, 15 U.S.C. § 1, allowing treble damage relief to the proposed Classes under Section 4 of the Clayton Act., 15 U.S.C. § 15.

B.       This Court permanently enjoin Defendants and unnamed Becton distributor co-conspirators from continuing the conspiracy and unlawful actions described herein under Section 16 of the Clayton Act, 15 U.S.C. § 26.

C.       Plaintiffs recover reasonable attorneys' fees and costs as allowed by law;

D.       Plaintiffs recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.       Plaintiffs be granted such other and further relief as the Court deems just and equitable.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: June 15, 2018                              Respectfully submitted,
New York, New York

Steven F. Molo                                    /s/ R. Stephen Berry
Allison M. Gorsuch                                R. Stephen Berry
MoloLamken LLP                                    Berry Law PLLC
300 North LaSalle Street                          R. Stephen Berry
Chicago, IL 60654                                 *(Pro Hac Vice Petition Pending)*
Telephone:  (312) 450-6700                        1717 Pennsylvania Avenue, N.W.
Facsimile:  (312) 450-6701                        Suite 850
smolo@mololamken.com                              Washington, D.C. 20006
agorsuch@mololamken.com                           Telephone: (202) 296-3020
                                                  Facsimile: (202) 296-3038
                                                  sberry@berrylawpllc.com
Justin M. Ellis
MoloLamken LLP
430 Park Avenue                                   Lee Goldsmith, J.D.-M.D.
New York, NY 10022                                Goldsmith & Goldsmith, LLP
Telephone: (212) 607-8160                         *(Pro Hac Vice Petition  Pending)*
Facsimile: (212) 607-8161                         Park 80 West, Plaza One
jellis@mololamken.com                             250 Pehle Avenue, Suite 401
                                                  Saddle Brook, NJ 07336
                                                  Telephone: (201) 429-7892
                                                  Facsimile: (201) 291-9428
                                                  lee@goldsmithlegal.com


*Attorneys for Plaintiffs and Proposed Class Co-Counsel*