**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**
**EAST SAINT LOUIS DIVISION**

| | | |
|---|---|---|
| MARION DIAGNOSTIC CENTER, LLC; | ) | |
| MARION HEALTHCARE, LLC; and | ) | |
| ANDRON MEDICAL ASSOCIATES, | ) | |
| individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | Case No. 3:18-cv-01059-NJR-RJD |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BECTON, DICKINSON, AND COMPANY; | ) | |
| PREMIER, INC.; VIZIENT, INC.; | ) | JURY TRIAL DEMANDED |
| CARDINAL HEALTH, INC.; OWENS & | ) | |
| MINOR DISTRIBUTION INC.; | ) | |
| MCKESSON MEDICAL-SURGICAL INC.; | ) | |
| HENRY SCHEIN, INC.; and UNNAMED | ) | |
| BECTON DISTRIBUTOR CO- | ) | |
| CONSPIRATORS, | ) | |
| | | |
| Defendants. | | |

**DEFENDANT BECTON, DICKINSON AND COMPANY'S MOTION TO**
**DISMISS AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

Defendant Becton, Dickinson and Company ("BD") moves under Federal Rule of Civil

Procedure 12(b)(6) to dismiss the Amended Class Action Complaint ("Complaint") of Plaintiffs

Marion Diagnostic Center, LLC, Marion Healthcare, LLC, and Andron Medical Associates

("Plaintiffs"), and respectfully submits this memorandum of law in support of its motion.

**<u>INTRODUCTION</u>**

Plaintiffs are healthcare facilities who claim that BD charges inflated prices for syringes

and IV catheters in violation of the antitrust laws. They admit, however, that they do not

purchase those products from BD directly. Instead, Plaintiffs buy those products from medical

supply distributors. Since Plaintiffs are not "direct purchasers" from BD, they have no standing

to sue BD for damages under the Sherman Act and their Complaint must be dismissed.  This is the third attempt by healthcare providers to sue BD for violation of the antitrust laws.  The prior two cases were dismissed because one federal district court and one Circuit Court of Appeals determined the healthcare providers lacked standing.  This case should be dismissed as well.

In fact, Plaintiffs' counsel in this case filed a nearly identical class action complaint against BD in 2015 in the Southern District of Georgia.  *Glynn-Brunswick Hosp. Auth.* v. *Becton, Dickinson & Co.*, 159 F. Supp. 3d 1361 (S.D. Ga. 2016) ("*Brunswick*").  That case was dismissed because the healthcare facility plaintiffs there, just like Plaintiffs here, were not direct purchasers from BD.  In a similar class action filed against BD in New Jersey, the Third Circuit ruled that "indirect purchasers" like Plaintiffs, who buy BD products from distributors, have no standing.  *In re Hypodermic Prods. Antitrust Litig.*, 484 F. App'x 669, 670–71 (3d Cir. 2012) ("*In re Hypo*").

Every court that has ruled on this issue in antitrust cases involving the supply of medical products has ruled that "only the distributors, as the direct purchasers" can sue for damages, not the healthcare facilities.  *Lakeland Reg'l Med. Ctr., Inc.* v. *Astellas US, LLC*, 763 F.3d 1280, 1289 (11th Cir. 2014); *Warren Gen. Hosp.* v. *Amgen Inc.*, 643 F.3d 77, 83–96 (3d Cir. 2011); *In re Hypo*, 484 F. App'x at 670–71; *Del. Valley Surgical Supply Inc.* v. *Johnson & Johnson*, 523 F.3d 1116, 1122–23 (9th Cir. 2008); *St. Francis Med. Ctr.* v. *C.R. Bard, Inc.*, 657 F. Supp. 2d 1069, 1105–06 (E.D. Mo. 2009), *aff'd sub nom. Se. Mo. Hosp.* v. *C.R. Bard, Inc.,* 642 F.3d 608 (8th Cir. 2011).  These cases simply applied the Supreme Court's long-established rule that only the "immediate buyer" from an alleged antitrust violator has standing.  *Kansas* v. *UtiliCorp United Inc.*, 497 U.S. 199, 207 (1990); *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720, 735 (1977); *Hanover Shoe, Inc.* v. *United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968).

2

As the court in *Brunswick* found, "*Hanover Shoe* and its progeny thus enunciat[e] a bright-line rule that only the purchaser immediately downstream from the alleged monopolist may bring an antitrust action."  159 F. Supp. 3d at 1370 (alteration in original) (internal quotation marks omitted).  Despite the dispositive decisions in *Brunswick* and *In re Hypo*, Plaintiffs hope for a different outcome here by invoking the "conspiracy exception" to the direct purchaser rule.  But the court in *Brunswick* already considered and rejected that argument.  *Id.* at 1375–77.  The exception applies only where the manufacturer and the distributor jointly determine the price at which the distributor will sell the manufacturer's product to the customer.  In that situation -- and only in that situation -- the manufacturer and distributor are viewed together as a single seller and the customer is viewed as the direct purchaser.  *See id.* at 1374–75.

Plaintiffs' own pleading forecloses that exception.  Although sprinkled with the word "conspiracy," the Complaint does not allege that BD's prices were fixed by an agreement between BD and the distributors.  To the contrary.  The Complaint alleges that the prices healthcare providers paid for BD's products were established by agreements between BD and Group Purchasing Organizations ("GPOs"), which represent hospitals and other healthcare providers.  The distributors are not even parties to those price agreements.  Plaintiffs are crystal clear about that:  it is BD's contracts with the GPOs, not with the distributors, that "control the pricing and other terms under which healthcare providers . . . buy Becton products."  (Am. Compl. ¶ 42 (emphasis added).)

That is precisely why the conspiracy exception was rejected in *Brunswick*.  Based on the same contracts and the same product distribution chain alleged here, the complaint in *Brunswick* "lack[ed] any suggestion that the distributors unlawfully combined with [BD], at any time, to fix the resale price charged to the providers."  159 F. Supp. 3d at 1375.  Just like here, the court in

3

*Brunswick* found that the prices "charged to the provider" were set by the contracts between BD and the GPOs, not the distributors. *Id.* at 1375–76. Thus, there is no exception to the Supreme Court's "bright-line" standing rule and "Plaintiffs are barred from pursuing their damages claims." *Id.* at 1377.

Like their standing argument, Plaintiffs' antitrust claims have been recycled from prior cases against BD -- cases that BD won. As the Complaint alleges, one of BD's competitors, named Retractable Technologies Inc. ("RTI"), also accused BD of making "exclusionary" contracts with GPOs and using "deception" to harm competition. What the Complaint leaves out, however, is that a jury rejected all those GPO contract claims and the Fifth Circuit rejected the deception claim, leaving RTI with a "take nothing" judgment. *Retractable Techs., Inc.* v. *Becton, Dickinson & Co.*, 842 F.3d 883, 893–97 (5th Cir. 2016); *Retractable Techs., Inc.* v. *Becton, Dickinson & Co.*, No. 2:08-CV-16, Dkt. 749 (Findings of Fact and Conclusions of Law) at 34 (E.D. Tex. 2017).

In short, as has been adjudicated already, Plaintiffs have no standing to try to revive antitrust claims that have no merit. The Complaint should be dismissed.

## BACKGROUND

### A.    THE AMENDED COMPLAINT

Plaintiffs Marion Diagnostic and Marion HealthCare operate surgery facilities in Illinois. (Am. Compl. ¶¶ 8–9.) Plaintiff Andron operates a rheumatology clinic in New Jersey. (*Id.* ¶ 10.) Defendant BD manufactures and sells medical devices, including syringes and IV catheters. (*Id.* ¶ 11.)

Defendants Vizient, Inc. ("Vizient") and Premier, Inc. ("Premier") are GPUs -- hospital membership organizations that negotiate discounted prices for medical supplies for their

4

members.[1]  (*Id.* ¶¶ 12–13; 30.)  Defendants Cardinal Health, Inc. ("Cardinal"), Owens & Minor

Distribution Inc. ("O&M"), McKesson Medical Surgical Inc. ("McKesson") and Henry Schein,

Inc. ("Henry Schein") are medical supply distributors that purchase medical supplies from

manufacturers like BD and re-sell them to healthcare providers like Plaintiffs.  (*Id.* ¶¶ 14–17,

35.)

Plaintiffs allege that Defendants conspired to restrain trade in three product markets:  (1)

safety syringes; (2) conventional syringes; and (3) safety IV catheters.  (*Id.* ¶¶ 24–26.)  Plaintiffs

do not buy these products from BD; they buy them from distributors.  (*Id.* ¶¶ 8–10, 44.)

Plaintiffs allege that contracts between BD and the GPOs "control the pricing and other terms

under which healthcare providers, which are members of the GPOs, buy Becton products."  (*Id.* ¶

42.)  The Complaint also alleges that BD entered into some pricing contracts "directly with

healthcare providers outside of the GPO system."  (*Id.* ¶ 51.)

The alleged method by which BD's products are purchased and distributed is the same

method as was alleged and explained by the court in *Brunswick*.  *See* 159 F. Supp. 3d at 1365–

67.  Healthcare facilities like Plaintiffs purchase BD products from distributors like Defendants

Cardinal, O&M, McKesson and Henry Schein, and are thus indirect purchasers.  The distributors

are the direct purchasers because they buy those products directly from BD.

The prices Plaintiffs pay to buy BD products from the distributors are established by

contracts between BD and GPOs like Defendants Vizient and Premier -- contracts to which the

distributors are not parties.  As alleged, GPOs act as negotiating agents for hospitals and other

healthcare providers.  According to Plaintiffs themselves, the price agreements between BD and

---

[1]    We note that GPOs Vizient and Premier argue in their Motion to Dismiss (the "GPO Motion") that there are no
allegations in the Complaint that any of the named Plaintiffs are or ever were members of Premier and, thus,
have failed to plead proximate cause.  *See* GPO Motion at Section II.

GPOs "control the pricing" for BD products.  (Am. Compl. ¶ 42.)  The Complaint alleges that it

is "a GPO that negotiates prices for devices and supplies with manufacturers."  (*Id.* ¶ 2.)

The distributors are *not* alleged to have any role in establishing the prices between BD

and the GPOs (or their members).  Plaintiffs allege that it is only afterwards, "[o]nce a healthcare

provider decides to purchase Becton products pursuant to the terms . . . negotiated by its GPO,"

that the healthcare provider "selects a distributor such as Cardinal, Owens & Minor, McKesson,

or Henry Schein to deliver Becton's products."  (*Id.* ¶ 44.)  According to Plaintiffs, "Becton *then*

enters into another exclusionary contract with distributors."  (*Id.* ¶ 45 (emphasis added).)  Based

on the "contractual pricing" negotiated by their GPOs, healthcare providers purchase products

from the distributors "by paying the contract price plus a percentage markup to distributors."

(*Id.* ¶ 31.)  As the court in *Brunswick* explained, the distributors "pass on" the GPO contract

price to the healthcare providers:  "the distributor agrees to buy Defendant's products at the

GPO-negotiated rates and sell the products to the provider at a price equal to the cost to procure

them plus a fixed percentage markup of that cost."  159 F. Supp. 3d at 1365–66.

In sum, *after* the price for the products has been established between BD and the GPO,

and *after* Plaintiffs have decided to buy those products from a particular distributor, the

distributor *then* enters an agreement with BD to sell the products to Plaintiffs by passing on the

GPO-negotiated price plus a markup.

It is BD's contracts with GPOs (referred to as "Net Dealer Contracts") that Plaintiffs

allege contain anticompetitive "sole or dual source" provisions and "disloyalty penalties" that

violate Section 1 of the Sherman Act.   Healthcare providers allegedly are injured by the

"anticompetitive price[s]" charged by BD and passed on by the distributors.  (Am. Compl. ¶¶ 47,

58.)  Plaintiffs also allege that BD engaged in two other anticompetitive acts:  infringing RTI's

6

patents (*id.* ¶¶ 48, 50) and using false advertising "to exclude [RTI] . . . from the safety syringe market" (*id.* ¶ 49).

These same antitrust claims were tried to a jury in the Eastern District of Texas.  *See Retractable Techs.*, 842 F.3d at 890.  Like Plaintiffs here, RTI alleged that BD used "penalty contracts" and "sole-source and dual-source arrangements with GPOs" to restrain trade in the markets for syringes and IV catheters.  *Retractable Techs.*, No. 2:08-CV-16, Dkt. 567 (Charge of the Court) at 21–22 (E.D. Tex. 2013).  The jury ruled *in favor of BD* on the anticompetitive contract claims and the Fifth Circuit held that the patent infringement and false advertising did *not* violate the antitrust law.  *Retractable Techs.*, 842 F.3d at 890, 893–97.  The Fifth Circuit thus rendered judgment for BD on the remaining antitrust claims, *id.* at 902, and the district court entered a "take nothing" judgment against RTI.  *Retractable Techs.,* No. 2:08-CV-16, Dkt. 750 (E.D. Tex. 2017).

## B.   THE PRIOR CLASS ACTIONS AGAINST BD

Plaintiffs' counsel in this case filed a putative class action against BD in 2015 in the Southern District of Georgia, on behalf of two local healthcare facilities.  Repeating RTI's allegations, the facilities alleged that BD had used "sole-source," "penalty contracts" with GPOs and hospitals, along with false advertising and patent infringement, to maintain a monopoly over syringes and IV catheters.  *Brunswick*, 159 F. Supp. 3d at 1367–68.  As a result, the facilities claimed that they "suffered antitrust price injury in purchasing Defendant's products -- not as direct purchasers, but as indirect purchasers under cost-plus distributor contracts."  *Id.* at 1367.  The district court granted BD's motion to dismiss with prejudice.  The court held that the healthcare facilities "are not direct purchasers of Defendant's products, and fail[ed] to plausibly show that any exception to the direct purchaser rule applies."  *Id.* at 1377.  After judgment, the

facilities sought leave to amend their complaint to try to bolster their argument that the "conspiracy exception" should apply, which the court had previously rejected.  The court denied the motion to amend.  *See Glynn-Brunswick Hosp. Auth.* v. *Becton, Dickinson & Co.*, 2016 WL 8200940 (S.D. Ga. Sept. 23, 2016) ("*Brunswick II*").

In 2005, another group of healthcare facilities had attempted to sue BD for similar claims in New Jersey, alleging that they had been overcharged on syringes and IV catheters as a result of supposedly anticompetitive contracts between BD and GPOs and other "anticompetitive practices."  *In re Hypo*, 484 F. App'x at 671.  Like Plaintiffs here and in *Brunswick*, the facilities in that case bought those products from distributors and not from BD directly.  *See id.* at 675.  Accordingly, the Third Circuit ruled as a matter of law that the facilities were indirect purchasers that lacked standing to sue for antitrust damages.  *Id.* at 675–76

## ARGUMENT

To survive a motion to dismiss, Plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiffs must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  It is especially appropriate for a court "to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed" in an antitrust case, where the costs of discovery are often "enormous."  *Id.* at 558–59 (quotation marks omitted).

A Rule 12(b)(6) motion is the appropriate means for dismissing this Complaint for lack of standing.  *See, e.g.*, *Warren,* 643 F.3d at 79; *Simon* v. *KeySpan Corp.*, 694 F.3d 196, 208 (2d

Cir. 2012); *Kloth* v. *Microsoft Corp.*, 444 F.3d 312, 317 (4th Cir. 2006).  And because the flaws

in the Complaint cannot be cured by amendment -- Plaintiffs' counsel has already had identical

claims against BD dismissed in another jurisdiction -- the Complaint should be dismissed with

prejudice.  *See Gonzalez-Koeneke* v. *West*, 791 F.3d 801, 807 (7th Cir. 2015) ("District courts

. . . have broad discretion to deny leave to amend . . . where the amendment would be futile.");

*Airborne Beepers & Video, Inc.* v. *AT & T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007).

## I.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS ARE NOT "DIRECT PURCHASERS" AND THEREFORE DO NOT HAVE STANDING

As Plaintiffs' own allegations demonstrate, Plaintiffs are "indirect purchasers" of BD

products.  *See In re Hypo*, 484 F. App'x at 675.  Plaintiffs claim they suffered an antitrust injury

when the "direct purchasers" (the distributors) passed on to them the allegedly anticompetitive

prices that were negotiated between BD and the GPOs.  The distributors "purchase products

from Becton and then resell the relevant Becton products directly to healthcare providers

pursuant to terms negotiated by the GPOs."  (Am. Compl. ¶ 31.)  Under the direct purchaser or

"*Illinois Brick*" rule, the Supreme Court has "closed the door on the theory that the end user who

buys from an independent distributor, rather than the manufacturer, should have standing."  *Del.*

*Valley*, 523 F.3d at 1123; *see UtiliCorp*, 497 U.S. at 207; *Illinois Brick*, 431 U.S. at 735.[2]

---

[2]   Indirect purchasers like Plaintiffs have no right to bring federal antitrust damages claims.  Some states have enacted their own "indirect purchaser laws," which may permit antitrust actions under *state* law.  *See California* v. *ARC Am. Corp.*, 490 U.S. 93, 103 (1989).  Illinois is one of the states that permits such actions.  *See* 740 Ill. Comp. Stat. 10/7(2) (2010) (providing that "[n]o provision of [the Illinois Antitrust] Act shall deny any person who is an indirect purchaser the right to sue for damages").  While Plaintiffs have not asserted any claims under Illinois state law, any such claims would be legally infirm for the same reasons that plaintiff's antitrust claims were rejected in *Retractable Technologies* and for the reasons forth in Section II, *infra*, and in the GPO Defendants' and Distributor Defendants' Motions to Dismiss.

**A.      As Indirect Purchasers, Plaintiffs Lack Standing to Sue for Antitrust Damages**

Applying the direct purchaser rule, the courts have time and time again "closed the door" to healthcare facilities accusing medical product manufacturers -- including BD -- of antitrust violations.  *See In re Hypo*, 484 F. App'x at 675; *Lakeland*, 763 F.3d at 1289; *Warren*, 643 F.3d at 87–91; *Del. Valley*, 523 F.3d at 1122–23; *St. Francis Med. Ctr.*, 657 F. Supp. 2d at 1105; *Brunswick*, 159 F. Supp. 3d at 1377.

When Plaintiffs' counsel filed the same lawsuit against BD in Georgia, the court found that the healthcare facility plaintiffs -- who purchased BD products from distributors under the same contracts as alleged here -- fell "squarely within the ambit of [the direct purchaser] rule, such that Plaintiffs are barred from pursuing their damages claim against [BD]."  *Brunswick*, 159 F. Supp. 3d at 1377.  When another purported class of healthcare providers asserted similar antitrust claims against BD in New Jersey, the Third Circuit held that they had no standing: "because the [BD] hypodermic products pass through at least one other stage in the distribution before reaching the Healthcare Providers, the Distributors, not Healthcare Providers, are the direct purchasers."  *In re Hypo*, 484 F. App'x at 675.

Just like here, the plaintiffs in *In re Hypo* alleged that BD used "exclusionary" contracts to overcharge for syringes and IV catheters in violation of the Sherman Act.  *See id.* at 671–72.  Just like here, the plaintiffs in *In re Hypo* alleged that the prices for those products were set in allegedly anticompetitive contracts between BD and the GPOs.  *Id.* at 671.  Competing class actions were filed by a group of distributors and a group of healthcare facilities -- each claiming the right, to the exclusion of the other, to sue BD for damages under the federal antitrust laws as a direct purchaser.  *Id.* at 670–71.  The issue as to who has standing to sue BD for antitrust damages was thus fully vetted, argued by all interested parties, and decided by a federal Court of

10

Appeals.  The fact that the distributors -- having settled their claims in *In re Hypo* -- chose not to sue BD again here does not mean that the healthcare facilities, as indirect purchasers, now have standing.[3]  The distributors are still the only direct purchasers, and thus the only parties with standing to sue to recover any alleged overcharges.

This is therefore the third attempt by a putative class of healthcare facilities to sue BD for charging anticompetitive prices through "long-term exclusionary" contracts with GPOs.  Though the claims against BD are virtually the same as before, Plaintiffs have added the word "conspiracy" to the pleading and added the distributors and GPOs as alleged "co-conspirators" in an attempt to improve their "conspiracy exception" argument.  But on the same facts, the court in *Brunswick* already rejected that exception.  Plaintiffs' cosmetic changes cannot change the outcome.

**B.      The "Conspiracy Exception" Does Not Apply to Plaintiffs' Claims**

The conspiracy exception to the direct purchaser rule applies when a manufacturer and a distributor agree on the price that the distributor will charge to resell the manufacturer's product.  *See* P. Areeda & H. Hovenkamp, Antitrust Law ¶ 346h (4th ed. 2017).  The Supreme Court's standing decision in "*Illinois Brick* does not limit suits by consumers against <u>a manufacturer who illegally contracted with its dealers to set the latter's resale price</u>."  *Id*. (emphasis added).  In that limited circumstance, some courts treat the manufacturer and the distributor as if they were a single economic enterprise and the customer as if it were the "direct purchaser" because, in effect, there is only one purchase transaction.  *See id.*; *Paper Sys., Inc.* v. *Nippon Paper Indus.*

---

[3]      The distributors named as defendants here are not the only distributors of BD products and were not among the named plaintiffs in *In re Hypo* (though they were absent class members).  Plaintiffs do not even purport to allege that all distributors that purchased directly from BD were parties to a conspiracy

*Co.*, 281 F.3d 629, 631–32 (7th Cir. 2002); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 604–06 (7th Cir. 1997).

Vertical price-fixing is the prime example -- and some courts have held that it is the only example -- where the exception applies.  *Dickson* v. *Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002) ("[W]e interpret these cases," including *Paper Systems* and *Brand Name Prescription Drugs*, "as standing for the . . . narrow proposition that *Illinois Brick* is inapplicable to a particular type of conspiracy—price-fixing conspiracies."); *Del. Valley*, 523 F.3d at 1123 n.1 ("[T]his court has held that an indirect purchaser may bring suit where he establishes a price-fixing conspiracy between the manufacturer and the middleman.").  When a manufacturer and distributor act in concert to fix the resale price that the distributor charges to the consumer, "<u>no overcharge has been passed on to the consumer</u>."  *Dickson*, 309 F.3d at 215 (emphasis added).  Unlike the facts alleged here, where the distributors pass on the price separately negotiated between BD and GPOs, the distributor in a price-fixing conspiracy is directly involved in setting the alleged overcharge in the first place.  *See Paper Sys.*, 281 F.3d at 631–32 (applying "exception" to price-fixing conspiracy that involved manufacturers as well as distributors agreeing to reduce output and raise prices); *Fontana Aviation, Inc.* v. *Cessna Aircraft Co.*, 617 F.2d  478, 481 (7th Cir. 1980) (applying "exception" to conspiracy between manufacturer and distributor to fix minimum resale prices).[4]

---

[4]    In *Fontana*, plaintiffs alleged, *inter alia*, that a manufacturer and distributor conspired with respect to "price stabilization."  *Fontana Aviation, Inc.* v. *Cessna Aircraft Co.*, 460 F. Supp. 1151, 1160 n.28 (N.D. Ill. 1978), *rev'd,* 617 F.2d 478.  At the time, resale price maintenance conspiracies of the sort alleged were *per se* illegal. *See Chicago Bd. of Trade* v. *U.S.*, 246 U.S. 231, 238 (1918).  The Seventh Circuit in *Fontana* also found that *Illinois Brick* was not a bar for a reason inapposite here:  plaintiff was a competitor to the defendant, and thus claimed to have suffered a "competitive injury," not an overcharge.  *Fontana*, 617 F.3d at 480.

For that reason, and based on the same facts as alleged here, the court in *Brunswick*, rejected the conspiracy exception.  As discussed above, at pp. 5–7, *supra*, Plaintiffs do *not* allege that BD's prices are established by an agreement between BD and the distributors.  Rather, Plaintiffs allege that BD's prices are negotiated between BD and GPOs -- healthcare providers' own contracting agents.  Only *after* BD's "contractual pricing" has been negotiated by GPOs, do healthcare providers select a distributor and, *then*, the distributors pass-on "the contract price plus a percentage markup."  (Am. Compl ¶ 30.)  Thus, the court in *Brunswick* found that the essential requirement for the conspiracy exception is missing:  the facts alleged do not show "that the distributors unlawfully combined with [BD], at any time, to fix the resale price charged to the providers, or to otherwise construct the allegedly exclusionary scheme." *Brunswick*, 159 F. Supp. 3d at 1375 (emphasis added); *see Brand Name Prescription Drugs*, 123 F.3d at 604–05; *Dickson*, 309 F.3d at 215.

Indeed, the *Brunswick* court found that the system by which BD's prices are set and by which BD's products are purchased and distributed, forecloses the application of the conspiracy exception:  instead of conspiring with BD to fix BD's prices, the distributors pass on the allegedly inflated pricing (the "overcharge") that was previously agreed to between BD and GPOs.  159 F. Supp. 3d at 1375.  As the Seventh Circuit has explained, the conspiracy exception does *not* apply when plaintiffs complain that a middleman distributor "passed on to them" an overcharge imposed by the manufacturer.  *Brand Name Prescription Drugs*, 123 F.3d at 606.  Rather, that "is just the kind of complaint that *Illinois Brick* bars."  *Id.*; *see also Lowell* v. *Am. Cyanamid Co.*, 177 F.3d 1228, 1228 (11th Cir. 1999).

Plaintiffs try to get around *Brunswick* and the other case law by eliminating the words "pass on" from their Complaint.  Plaintiffs' counsel tried the same tactic in *Brunswick* by moving

13

to amend the complaint there to drop "pass on" and add "conspiracy," but the court rejected that attempt to "re-style" the pleading.  *Brunswick II*, 2016 WL 8200940, at *1–2.  Regardless of what labels or buzzwords Plaintiffs use, the "allegations of pass on run contrary" to the conspiracy exception.  *Brunswick*, 159 F. Supp. 3d at 1375.  Here, Plaintiffs allege that "once the GPOs have negotiated contractual pricing and other terms of sale" with BD, Plaintiffs then "purchase [BD] products by paying the [GPO] contract price plus a percentage markup to distributors."  (Am. Compl. ¶ 31.)  Just as in *Brunswick*, Plaintiffs are claiming that they suffered "antitrust price injury . . . as indirect purchasers of [BD's] products under cost-plus distributor contracts requiring the passing on of all overcharges."  159 F. Supp. 3d at 1375.[5]

Likewise, adding the distributors and the GPOs as defendants does not change the analysis.  The facts as alleged by Plaintiffs about the pricing and distribution of BD's products are the same as in *Brunswick*:

- In *Brunswick*, plaintiffs alleged that the "overcharge <u>first</u> appeared in the . . . contracts between [BD] and the GPOs, . . . which set forth the pricing and discounts available for the sale of [BD's] products to GPO members."  159 F. Supp. 3d at 1371 (emphasis added).  Here, Plaintiffs allege that "<u>[a]s an initial matter</u>, Becton and the GPOs . . . enter into . . . contracts [that] control the pricing and other terms under which healthcare providers, which are members of the GPOs, buy Becton products."  (Am. Compl. ¶ 42 (emphasis added).)

---

[5]   For the same reason, it is no use for Plaintiffs to try to argue that the conspiracy exception extends beyond just price-fixing conspiracies.  As noted above, the Seventh Circuit has only ever applied the exception to cases that involved price fixing.  *Supra* pp. 12–14 & n.4.  To the extent that other kinds of vertical restraints of trade could, theoretically, be subject to the exception, that is only in cases where the plaintiffs are *not* seeking to recover for an alleged overcharge.  The Court in *Brand Name Prescription Drugs* thus gave the example of a hypothetical group boycott case in which plaintiffs who were not direct purchasers might nonetheless "be permitted to prove up whatever damages they could show had flowed from the boycott, <u>provided they weren't seeking to recover overcharges</u>."  123 F.3d at 606 (emphasis added).  In such a case, "the *Illinois Brick* rule, which is a rule concerning overcharges, would fall away."  *Id.*  By contrast, Plaintiffs in this case are clearly suing to recover a passed-on overcharge, which is precisely what *Illinois Brick* prohibits.  *See id.*

- In *Brunswick*, plaintiffs alleged that "[o]nly after" these contract terms are set, and the "provider notifies [BD] of its interest and contracts with a middleman distributor, do [BD] and the distributor enter into" an agreement with each other. 159 F. Supp. 3d at 1375 (emphasis added).  Here, Plaintiffs allege that "[o]nce a healthcare provider decides to purchase Becton's products pursuant to the terms . . . negotiated by its GPO, it selects a distributor," and "Becton then enters into" an agreement with that distributor.  (Am. Compl. ¶ 44–45 (emphases added).)

- In *Brunswick*, plaintiffs did "not allege that [BD] and the distributor negotiate at any time; rather they assert[ed] that the two enter into a dealer notification agreement defining their relationship pursuant to the terms of the [GPO] contract -- incorporating the pricing, rebate-bundling, penalty, and sole-source provisions therein." 159 F. Supp. 3d at 1375 (emphasis added).  Here, Plaintiffs do not allege that BD and the distributors negotiate pricing or other terms of resale to the healthcare facilities; rather, they allege that BD and the distributors enter into "a 'Dealer Notification Agreement'" under which "the distributors agree to distribute Becton's products to healthcare providers pursuant to the [GPO] Contract's anticompetitive terms."  (Am. Compl. ¶ 45 (emphasis added).)

Although the distributors were not named as "co-conspirator" defendants in *Brunswick*, Plaintiffs' counsel made the same conspiracy argument and the court rejected it.  Plaintiffs claim that the distributors "benefit" from BD's alleged overcharges because the higher the prices BD charges, the higher the markup fees the distributors collect.  (*Id.* ¶ 57.)  As a matter of law, that is not sufficient to allege any antitrust conspiracy.  *See Twombly*, 550 U.S. at 566 ("[T]here is no reason to infer that the companies had agreed among themselves to do what was only natural anyway.").  And, it does not allege the particular type of conspiracy (setting BD's prices) required to invoke the exception to the direct purchaser rule.  As the *Brunswick* court explained,

the same allegation could be made against "any intermediary in a chain of distribution whose resale price is calculated on a cost-plus basis." 150 F. Supp. 3d at 1376. Such middlemen are always arguably "in a position to profit from an increase cost of the [manufacturer's] good." *Id.* That does not, however, "suggest that the intermediary engaged in anticompetitive behavior to influence such cost in its favor." *Id.*[6]

This lawsuit is a do-over, but the alleged facts and binding precedents are the same. The courts already have ruled that healthcare providers like Plaintiffs are *not* direct purchasers and do *not* have standing to sue BD for antitrust damages. Like the indirect purchaser plaintiffs in *Brunswick* and *In re Hypo*, Plaintiffs allege that they were overcharged for the BD products they bought through a middleman distributor. As the Seventh Circuit has held, this "is just the kind of complaint that *Illinois Brick* bars." *Brand Name Prescription Drugs*, 123 F.3d at 606.

## II.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO PLEAD AN ANTITRUST CLAIM

Even if it were brought by a party with standing, the Complaint is not one that could survive a motion to dismiss. Plaintiffs fail to plead facts establishing a restraint of trade or any other anticompetitive conduct.

Plaintiffs allege that defendants "effect[ed]" a conspiracy through a "web of contracts," including Net Dealer Contracts between BD and GPOs, that allegedly establish an "anticompetitive pricing scheme." (Am. Compl. ¶ 47.) But the Complaint does not allege the identity or actual terms of those contracts. Despite claiming a nationwide "conspiracy" impacting every consumer of medical devices and involving some of the most prominent names in the medical products industry, the Complaint does not allege the name, date, prices,

---

[6]   The *Brunswick* court also found that the same reasoning applied to the other supposed benefits to distributors that Plaintiffs allege here (*see* Am. Compl. ¶ 57), such as "financial incentives paid to the distributor" and "compensation for promoting [BD's] products over others." *Brunswick*, 159 F. Supp. at 1376 n.9.

provisions, or term of a single contract.  That pleading failure is especially egregious given that (a) Plaintiffs purport to buy BD products under offending contracts, and (b) this case is a copy of numerous other cases, including a trial and appeal of the same claims.  Plaintiffs should not be given latitude for making such threadbare allegations when the basic facts are within their personal knowledge and a matter of public record.

For the reasons set forth in The Distributor Defendants' Motion to Dismiss, Plaintiffs' conspiracy "allegations" are just labels and legal conclusions, not the allegations of fact required to state a claim.  *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

Further, the Complaint includes no factual allegations that would establish that any of the unidentified and unspecified contracts were or are "exclusionary" under the antitrust law.  For example, there are no allegations that BD's products were priced below cost.  Absent such allegations, calling the discounts that GPOs negotiate -- on behalf of healthcare facilities like the Plaintiffs -- "penalties" is just semantics.  *See, e.g.*, *Schor* v. *Abbott Laboratories*, 457 F.3d 608 (7th Cir. 2006) (rejecting package discount or "monopoly leveraging" claim where plaintiff did not allege that the products at issue were priced below cost); *Eisai, Inc.* v. *Sanofi Aventis U.S., LLC*, 821 F.3d 394, 399 (3d Cir. 2016).  Such labels do not substitute for factual allegations showing that Plaintiffs were actually foreclosed from buying syringes and IV catheters from BD's competitors.  *See Republic Tobacco Co.* v. *North Atlantic Trading Co., Inc.,* 381 F.3d 717, 737–38 (7th Cir. 2004) (alleged exclusive "dealing arrangements violate antitrust laws only when they foreclose completion in a substantial share of the line of commerce at issue"); *Eisai*, 821 F.3d at 407–408.  Here, the Complaint not only lacks such allegations, it fails to explain how -- despite the supposedly "exclusionary" contracts -- more than 40% of healthcare providers actually *did* buy their syringes and IV catheters from BD's competitors.  (*See* Am. Compl. ¶ 33

17

(alleging that BD's market share in conventional and safety syringes was 60% and its market share in IV catheters was 55%).)

Nor are there any allegations about how the features of BD's contracts with GPOs could or did substantially foreclose competition -- *i.e.*, no allegations to infer what portion of the relevant product markets is foreclosed by the contracts at issue.  *See* GPO Motion at Section I.C. The absence of any such allegations is particularly stark given that the contracting claims that Plaintiffs assert here are the same ones that the jury rejected in the RTI case, finding that the evidence did *not* support a claim that BD's contracts were anticompetitive.  *See supra* p. 7.

Plaintiffs also allege that BD engaged in false advertising and patent infringement, and that such acts constitute "other anticompetitive acts in aid of the conspiracy."  (Am. Compl. ¶ 48.)  That claim already was determined by the Fifth Circuit to be meritless as a matter of law. The Fifth Circuit reversed a jury verdict of antitrust liability based on such conduct and rendered judgment for BD.  With respect to the false advertising, the Fifth Circuit determined that "no facts adduced at trial indicated that BD's advertising in fact harmed competition."  *Retractable Techs.*, 842 F.3d at 896.  With respect to the patent infringement, the Fifth Circuit held that because such conduct "causes competing products to enter the market, and thereby *increases* competition," it could not serve as the basis for an antitrust claim.  *Id.* at 893 (emphasis added).

Thus, the Complaint falsely alleges that BD was "adjudicated to have engaged in anticompetitive conduct."  (Am. Compl. ¶ 49.)  The Fifth Circuit not only held that this alleged conduct was not a violation of the antitrust law, it rendered judgment *for BD*.  If Plaintiffs mean to suggest that the result would be different in the Seventh Circuit, they have chosen the wrong jurisdiction.  The Seventh Circuit is even more unwelcoming of such would-be antitrust claims. As the Fifth Circuit recognized, "[t]he Seventh Circuit does not recognize Sherman Act claims

18

based on false advertising." *Id.* at 894; *see Mercatus Grp., LLC* v. *Lake Forest Hosp.*, 641 F.3d 834, 851 (7th Cir. 2011); *Sanderson* v. *Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005) ("Commercial speech is not actionable under the antitrust laws . . . .There can be no restraint of trade without a restraint.").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/Richard P. Cassetta*
Richard P. Cassetta
Richard.cassetta@bclplaw.com
Stefani L. Rothermel
Stefani.rothermel@bclplaw.com
211 N Broadway #3600,
St. Louis, MO 63102
(314) 259-2000
Fax: (314) 259-2020

PAUL, WEISS, RIFKIND WHARTON
   & GARRISON LLP

Robert A. Atkins*
Jacqueline P. Rubin*
William Michael*
1285 Avenue of the Americas
New York, NY  10019
(212) 373-3000
*Admitted pro hac vice*

*Attorneys for Becton, Dickinson
and Company*

Date:  July 20, 2018

## CERTIFICATE OF SERVICE

I certify that on July 20, 2018, I electronically filed the foregoing Defendant Becton, Dickinson and Company's Motion to Dismiss and Memorandum of Law in Support Thereof with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

*/s/Richard P. Cassetta*