# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARION DIAGNOSTIC CENTER, LLC;
MARION HEALTHCARE, LLC; and
ANDRON MEDICAL ASSOCIATES,
individually and on behalf of all others
similarly situated,

                    Plaintiffs,

            v.                                          Case No.  3:18-CV-01059-NJR-RJD

BECTON, DICKINSON, AND COMPANY;
PREMIER, INC.;
VIZIENT, INC.;
CARDINAL HEALTH, INC.
OWENS & MINOR DISTRIBUTION INC.;
MCKESSON MEDICAL-SURGICAL INC.;
HENRY SCHEIN, INC.; and
UNNAMED BECTON DISTRIBUTOR
CO-CONSPIRATORS,

                    Defendants.

## THE DISTRIBUTOR DEFENDANTS' MOTION TO DISMISS
## AND MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

THE AMENDED COMPLAINT'S FACTUAL ALLEGATIONS ............................... 4

ARGUMENT ............................................................................................................ 5

I.      PLAINTIFFS' CONSPIRACY THEORY FAILS TO ALLEGE EITHER
        REQUIRED ELEMENTS OR A LEGALLY COGNIZABLE CLAIM. ........................ 5

        A.      Applicable Antitrust Pleading Standards. .............................................. 5

        B.      The Amended Complaint Fails to Allege The Distributors' Conscious
                Commitment to an Unlawful Scheme Because All Plaintiffs Allege Is
                a Common Distribution Arrangement. .................................................. 6

        C.      Plaintiffs' Claim of a Single Rimless-Wheel Conspiracy is Not
                a Viable Legal Theory. .......................................................................... 12

II.     BECAUSE PLAINTIFFS DO NOT ALLEGE THAT THEY PURCHASED
        PRODUCTS FROM CHI OR O&M, THEY CANNOT ALLEGE THE
        PROXIMATE CAUSE NECESSARY TO SUSTAIN AN ANTITRUST
        CASE AGAINST EITHER OF THEM. .................................................................. 17

CONCLUSION ........................................................................................................ 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Banks v. NCAA*,
    977 F.2d 1081 (7th Cir. 1992) ........................................................................... 5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................... 5, 6, 8, 9, 11, 12

*Bucks v. Mr. Bults Inc.*,
    218 F. Supp. 3d 776 (S.D. Ill. 2016) ............................................................. 9

*Car Carriers, Inc. v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) .................................................................... 5, 9

*Chamberlain Grp., Inc. v. Techtronic Indus. N. Am., Inc.*,
    2017 WL 4269005 (N.D. Ill. Sept. 26, 2017) .................................................. 6

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ................................................................. 15, 16

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006)............................................................................ 10

*Glynn-Brunswick Hosp. Auth. v. Becton, Dickinson & Co.*,
    159 F. Supp. 3d 1361, 1376 (S.D. Ga. 2016)...................... 2, 8, 10, 11, 12

*Goodloe v. Nat'l Wholesale Co., Inc.*,
    2004 WL 1631728 (N.D. Ill. July 19, 2004)................................................... 7

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    602 F.3d 237 (3d Cir. 2010).................................................... 13, 15, 17

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    801 F.3d 758 (7th Cir. 2015) ......................................................................... 9

*In re Hypodermic Prods. Antitrust Litig.*,
    484 F. App'x 669 (3d Cir. 2012) ............................................................ 11, 12

*In re K-Dur Antitrust Litig.*,
    2016 WL 755623 (D.N.J. Feb. 25, 2016) ..................................................... 14

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ............................................................... 13, 14

ii

*Kendall v. Visa U.S.A., Inc.*,
　　518 F.3d 1042 (9th Cir. 2008) ........................................................................ 5, 7

*Kotteakos v. United States*,
　　328 U.S. 750 (1946) ..................................................................................... 13, 14

*Marucci Sports, L.L.C. v. NCAA*,
　　751 F.3d 368 (5th Cir. 2014) ............................................................................... 6

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
　　465 U.S. 752 (1984) ................................................................................... 2, 5, 6

*Ohio v. Am. Express Co.*,
　　138 S. Ct. 2274 (2018) ...................................................................................... 15

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
　　615 F.3d 412 (5th Cir. 2010) ............................................................................. 15

*R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*,
　　462 F.3d 690 (7th Cir. 2006) ......................................................................... 3, 15

*Rocha v. FedEx Corp.*,
　　15 F. Supp. 3d 796 (N.D. Ill. 2014) ................................................................... 6

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*,
　　200 F.3d 307 (5th Cir. 2000) ............................................................................... 6

*Tamburo v. Dworkin*,
　　601 F.3d 693 (7th Cir. 2010) .......................................................................... 7, 9

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
　　552 F.3d 430 (6th Cir. 2008) ............................................................................. 13

*Toys "R" Us, Inc. v. FTC*,
　　221 F.3d 928 (7th Cir. 2000) ....................................................................... 13, 15

*United States v. Bustamante*,
　　493 F.3d 879 (7th Cir. 2007) ....................................................................... 3, 14

*United States v. Chandler*,
　　388 F.3d 796 (11th Cir. 2004) .......................................................................... 14

*United States v. Orlando*,
　　819 F.3d 1016 (7th Cir. 2016) .......................................................................... 14

*United States v. Swafford*,
　　512 F.3d 883 (6th Cir. 2008) ............................................................................ 14

*United States v. Ulbricht*,
    31 F. Supp. 3d 540 (S.D.N.Y. 2014)................................................................ 14

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
    2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ................................................ 10

*W. Bend Mut. Ins. Co. v. Schumacher*,
    844 F.3d 670 (7th Cir. 2016) ............................................................................ 6

**Statutes**

15 U.S.C. § 1 ........................................................................................................................ 5

**Rules**

Fed. R. Civ. P. 12(b)(6).................................................................................................. 3, 18

## INTRODUCTION

Plaintiffs' liberal use of antitrust jargon and undifferentiated allegations of conduct attributed to all "defendants" collectively cannot save their Complaint from the self-defeating *facts* alleged as to the Distributors.[1]  Those dispositive facts, which Plaintiffs attempt to camouflage, are:

- Healthcare providers, such as Plaintiffs, can voluntarily join one or more group purchasing organizations ("GPOs") that act as representatives of their provider-members to negotiate contracts on their behalf for medical supplies with manufacturers, such as Becton, Dickinson and Company ("BD").  Compl. ¶¶ 2, 30.

- The GPOs, on behalf of providers, negotiate the terms of their agreement with BD— including the prices at which providers acquire BD products and any alleged "[s]ole sourcing" and "[d]isloyalty penalty" provisions—*before* a provider chooses a Distributor. *Id*. ¶¶ 2, 29-31, 41-45.

- The GPO agreements are not the only way a provider can buy products from BD or another supplier—the Complaint alleges that providers can buy "outside of the GPO system." *Id.* ¶ 51.

- The Distributors do not set the prices at which providers acquire BD supplies or any of the related terms.  *Id.* ¶¶ 2, 31.  Rather, the Distributor that each provider chooses is simply authorized to "resell the relevant Becton products directly to healthcare providers [such as Plaintiffs] pursuant to terms negotiated by [them or] the GPOs" and "deliver" these products to the buyer.  *Id.* ¶¶ 31, 44.  In other words, Distributors merely agree to honor the agreements that Plaintiffs and other providers negotiate with the manufacturer, directly or through a GPO.

No amount of creative labeling can transform those facts into an actionable conspiracy.  A federal court recently faced with substantially similar allegations regarding the same products and many of the same companies held that the healthcare provider plaintiffs did not sufficiently allege

---

[1]    "Complaint" refers to the Amended Complaint.  ECF No. 52.  The "Distributor" defendants are Cardinal Health, Inc. ("CHI"), Owens & Minor Distribution Inc. ("O&M"), McKesson Medical-Surgical, Inc., and Henry Schein, Inc. CHI is a holding company that does not engage in the distribution of medical supplies, and it appears that Cardinal Health 200, LLC, is the proper Cardinal Health defendant.  Plaintiffs and CHI conferred about this issue, and Plaintiffs stated that they do not object to CHI reserving its rights as to this issue in this motion to dismiss. Plaintiffs and CHI further agreed to meet and confer on this issue after any motions to dismiss are resolved, if necessary.

a vertical conspiracy by distributors to maintain BD's market power.  *Glynn-Brunswick Hosp. Auth. v. Becton, Dickinson & Co.*, 159 F. Supp. 3d 1361, 1376 (S.D. Ga. 2016).  That same result is mandated here for reasons discussed in BD's brief.  In addition, the *Glynn-Brunswick* court's analysis demonstrates that Plaintiffs have not alleged (and cannot allege) plausible *facts* pleading a "conscious commitment to a common scheme designed to achieve an unlawful objective," as required to show that the Distributors joined an unlawful conspiracy.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).  As the court that faced the prior alleged "vertical conspiracy" regarding these products, parties, and contracts explained, the alleged facts *disprove* any such conscious commitment by the Distributors because the "Complaint demonstrates, and expressly acknowledges, that the contracts linking [BD], the distributor, and the provider are essentially negotiated between [BD] and the GPO, not the distributor."  *Glynn-Brunswick*, 159 F. Supp. 3d at 1376.  Indeed, Plaintiffs expressly plead that Distributors have no effect on the prices and other contract terms that BD can negotiate with GPOs or providers because the Distributors have nothing to do with that process.  Compl. ¶¶ 31, 42-45.  And *all* the (illusory) anticompetitive effects about which Plaintiffs complain allegedly flow from those contracts.  In other words, if the Distributors did not exist, absolutely nothing of consequence to providers would change.  They would face the same contract terms.  Plaintiffs simply have no legitimate basis to involve the Distributors in this case.

But they have nonetheless named the Distributors for the singular purpose of attempting to paper over the defects in this previously-rejected claim by purporting to allege a single, unified "vertical conspiracy" among BD, the GPOs, and the Distributors.  *Id.*¶¶ 3-4, 6, 89.  Their theory, however, rests on a fundamental legal infirmity: the singular "vertical conspiracy" alleged does not exist as a matter of law.  That is because where, as here, a single "vertical conspiracy" is alleged

to include horizontally-situated competitors—the four Distributors and the two GPOs—the complaint must also allege a *horizontal* agreement among those competitors to be legally cognizable. This is known as a hub-and-spoke conspiracy. Long-settled conspiracy law provides that "[f]or a hub and spoke conspiracy to function as a single unit, a rim must connect the spokes together, for otherwise the conspiracy is not one but many." *United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007); *see also R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 696-98 (7th Cir. 2006) (affirming dismissal of manufacturer-retailers vertical conspiracy antitrust claim where there was no horizontal agreement among the retailers). Without a horizontal agreement (a "rim") connecting the Distributors (the "spokes"), the single "vertical conspiracy" Plaintiffs allege simply cannot exist. Because Plaintiffs do not even purport to allege any such horizontal agreement—deliberately and repeatedly alleging *only* a "vertical conspiracy"—their claim is doomed from its inception. What remains in the Complaint is a series of individual bilateral agreements. But Plaintiffs do not directly challenge any of these individual, routine agreements (nor could they), resting instead on a single unified conspiracy claim. For that additional and independent reason, the Complaint should be dismissed.

In sum, the few, well-pled factual allegations of the Complaint concerning the Distributors establish that Plaintiffs cannot assert a viable antitrust claim against them. The Complaint should be dismissed with prejudice under Federal Rule of Civil Procedure 12(b)(6).[2]

---

[2]   The Distributors join in full the arguments for dismissal made in the concurrently filed motions to dismiss of BD and the GPOs, which provide independent grounds for dismissal. The Distributors do not repeat those arguments in this brief.

## THE AMENDED COMPLAINT'S FACTUAL ALLEGATIONS

With respect to the few well-pled factual allegations regarding the Distributors, the Complaint boils down rather simply:

- Healthcare providers, such as Plaintiffs, choose whether or not to buy syringes and catheters from BD. They buy these products under contracts and at prices they or their GPOs negotiate with BD. Compl. ¶¶ 2, 30. Sometimes these contracts have "sole or dual source provisions." *Id.* ¶ 42. Under some contracts, when a provider buys a sufficient volume of BD products, it is rewarded with "cost savings . . . realized through an end-of-year rebate" on its purchases. *Id.* ¶ 43.

- The Distributors do not play any role in negotiating the prices or volumes or rebates for BD products. The plaintiff providers simply pick whichever distributor they choose to "deliver Becton's products." *Id.* ¶ 44. The Distributors then purchase and resell the products to the providers at the prices and terms the providers negotiated on their own or through their GPOs. Distributors also keep track of product volumes purchased to ensure that providers that meet the volume targets get their contracted-for rebates. *Id.* ¶¶ 44-45.

- The Distributors here—like distributors generally—charge a "percentage markup" on the products sold to account for the sales distribution services they have provided. *Id.* ¶ 31. BD sometimes requires Distributors to promote its products "as the preferred brand" and rewards Distributor salespeople who do a good job selling its products with "extra commissions." *Id.* ¶ 46.

In sum and substance, those are the entirety of the well-pled factual allegations of the Complaint pertaining to the Distributors and their dealings with Plaintiffs.

Plaintiffs do *not* allege:

- Any facts suggesting a horizontal agreement among the Distributors with respect to any of the relevant conduct that is the subject of the Complaint. For instance, there are no allegations that the Distributors conspired regarding sourcing, pricing/markup, or anything at all with respect to the sale and distribution of BD (or any other) products.

- Any facts showing that any provider was required to buy BD products as opposed to any other brand. Nor do they allege that Plaintiffs were required to purchase through any GPO or from any Distributor, let alone through a particular GPO or Distributor.

- Any facts showing that providers have no viable alternatives to BD's products, or avenues to procure them. To the contrary, Plaintiffs acknowledge that there were numerous competitive alternative sources available to them, comprising 40% or more of the relevant product markets, who allegedly offer lower prices than BD. *Id.* ¶¶ 33, 39.

4

## ARGUMENT

**I.    PLAINTIFFS' CONSPIRACY THEORY FAILS TO ALLEGE EITHER REQUIRED ELEMENTS OR A LEGALLY COGNIZABLE CLAIM.**

Plaintiffs allege a single claim under Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs fail to state such a claim as a matter of law.

### A.    Applicable Antitrust Pleading Standards.

To join an antitrust conspiracy, a defendant must have had "a conscious commitment to a common scheme designed to achieve an *unlawful objective*."  *Monsanto*, 465 U.S. at 768 (emphasis added).  To plead such a "conscious commitment," *Twombly* requires a complaint to plead "enough factual matter (taken as true) to suggest that an [unlawful] agreement was made" and to "render a § 1 conspiracy plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  In assessing a complaint's allegations, "facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) (citing *Twombly*, 550 U.S. at 553-58, 557 n.5).

Dressing up a complaint with antitrust buzzwords or jargon is no substitute for concrete factual allegations that outline a plausible conspiracy.  A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions."  *Twombly*, 550 U.S. at 555 (quotation and brackets omitted).  Thus, "invocation of antitrust terms of art does not confer immunity from a motion to dismiss; to the contrary, these conclusory statements must be accompanied by supporting factual allegations."  *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984) (cited in *Twombly*, 550 U.S. at 558, 562); *see also Banks v. NCAA*, 977 F.2d 1081, 1093-94 (7th Cir. 1992) (affirming dismissal where "at best [the plaintiff] has merely attempted to frame his complaint in antitrust language").  Accordingly, in reviewing Plaintiffs'

5

Complaint here, the Court should disregard conclusory allegations of "anticompetitive" conduct, "vertical conspiracy," "exclusionary" contracts, "penalty pricing," and the like, and focus only on the actual factual allegations. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (holding that a court should evaluate a complaint's factual allegations only after "disregard[ing] any portions that are no more than conclusions") (quotation omitted).

### B. The Amended Complaint Fails to Allege The Distributors' Conscious Commitment to an Unlawful Scheme Because All Plaintiffs Allege Is a Common Distribution Arrangement.

The Complaint contains no factual allegations showing how it is plausible that any Distributor had the required "conscious commitment" to an unlawful scheme to support Plaintiffs' claim. *Monsanto*, 465 U.S. at 768; *see also Twombly*, 550 U.S. at 570; *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 374-75 (5th Cir. 2014) (affirming dismissal of complaint where the plaintiff's "allegations do not make it plausible that [the defendants] adopted a conscious commitment to a common scheme designed to achieve an unlawful objective"); *Rocha v. FedEx Corp.*, 15 F. Supp. 3d 796, 809 (N.D. Ill. 2014) ("Plaintiffs must allege facts that, if true, demonstrate that the conspirators had a conscious commitment to a common scheme designed to achieve an unlawful objective. The Court was unable to locate any such facts within the complaint . . . .") (quotations and citations omitted). The Complaint simply alleges that BD has entered into an agreement with each defendant that has benefits to each party to the agreement.[3] Such routine, legitimate contracting is insufficient as a matter of law to support a conspiracy claim and withstand a motion to dismiss. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 313 (5th Cir. 2000) (declining to infer an antitrust conspiracy "based solely upon the existence

---

[3]     Plaintiffs must not only make plausible allegations of a conscious commitment to a scheme, but they must do so individually for each defendant. "A complaint must set forth what each person (or corporation) is accused of doing." *Chamberlain Grp., Inc. v. Techtronic Indus. N. Am., Inc.*, 2017 WL 4269005, at *3 (N.D. Ill. Sept. 26, 2017).

of contracts"); *see also Kendall*, 518 F.3d at 1049.  And Plaintiffs' repeated invocations of terms such as "vertical conspiracy" and "anticompetitive" are insufficient.  *Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010) (affirming a Rule 12 dismissal and stating, "Tamburo's antitrust claims are pleaded in a wholly conclusory fashion; as such, it is hard to tell what kind of antitrust violation he is trying to assert"); *Goodloe v. Nat'l Wholesale Co., Inc.*, 2004 WL 1631728, at *8 (N.D. Ill. July 19, 2004) (dismissing Section 1 claim where "Plaintiff adorns his § 1 claim with antitrust terminology—'contract,' 'combination,' and 'conspiracy,' for example—yet omits factual allegations that would even minimally support a § 1 claim").

Stripped of such antitrust jargon and conclusory allegations, the Complaint merely alleges that Distributors deliver products to providers pursuant to the terms of the contracts that GPOs and providers negotiate with BD.  Plaintiffs thus concede that the Distributors play no role in setting the terms of the contracts under which Plaintiffs may have purchased BD products.  More specifically, the Complaint alleges that BD negotiates contracts with GPOs called Net Dealer Contracts.  Compl. ¶ 42.  Those contracts "control the pricing and other terms under which healthcare providers, which are members of the GPOs, buy Becton products," and "often contain a penalty pricing rebate scheme" and "sole" or "dual" sourcing provisions.  *Id.*  Plaintiffs claim these Net Dealer Contracts are anticompetitive because they allegedly discourage providers from using non-BD products.  *Id.* ¶¶ 42-43.  Plaintiffs further allege that only *after* BD and the GPO negotiate a Net Dealer Contract, and only *after* a provider elects to purchase under that contract and chooses which Distributor to use, do the Distributors separately contract with BD and the relevant provider to distribute BD's products pursuant to the terms that BD and the GPO agreed.[4]

---

[4]    *See* Compl. ¶ 44 (alleging that the provider-distributor contracts "typically require that distributors enforce the requirement that the healthcare providers buy a certain volume of Becton products or else pay the penalty pricing set forth in the Net Dealer Contract"); *id.* ¶ 45 (in Becton-

As noted above, another federal district court already rejected, as a matter of law and at the motion to dismiss stage, a theory of "vertical conspiracy" based on those contracts, similar to the one that Plaintiffs pursue here.  *See Glynn-Brunswick*, 159 F. Supp. 3d at 1374-75.  One reason that the court in *Glynn-Brunswick* declined to infer any conspiracy was the lack of any allegation that the distributors conspired with BD to set prices to providers "or to otherwise construct the allegedly exclusionary schemes."  *Id.* at 1375.  The court there found it notable that the complaint alleged only that (1) BD negotiated with the GPOs as to the prices paid by its members and other terms of sale; and (2) only *after* a provider notified BD of its intent to buy pursuant to the GPO-negotiated contract and the provider had selected a particular distributor, did BD then contract with that distributor directly.  *Id.*  And even then, the court observed, BD and the distributor did not negotiate terms of the sale; rather, they merely "enter[ed] into a dealer notification agreement defining their relationship pursuant to the terms of the net dealer contract [between BD and the GPO]—incorporating the pricing, rebate-bundling, penalty, and sole-source provisions therein."  *Id.*; *see* Compl. ¶¶ 44-45.  Given that fact, the complaint in *Glynn-Brunswick* demonstrated "that the contracts linking Defendant, the distributor, and the provider are essentially negotiated between Defendant and the GPO, not the distributor."  159 F. Supp. 3d at 1376.  That is exactly what Plaintiffs allege here, and their Complaint should suffer the same fate.  Compl. ¶¶ 42-45.

In hopes of satisfying the "conscious commitment" requirement, Plaintiffs continuously refer to a vague, overarching "vertical conspiracy."  But they offer no factual allegations about what that hypothesized conspiracy entails.  *See Twombly*, 550 U.S. at 565 n.10 (noting that it was

---

distributor contracts, "distributors agree to distribute Becton's products to healthcare providers pursuant to the Net Dealer Contract's anticompetitive terms.").

doubtful the complaint "would have given the notice required by Rule 8" where "the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies"). Rather, Plaintiffs have "pleaded [their claim] in a wholly conclusory fashion." *Tamburo*, 601 F.3d at 699. Plaintiffs' repeated use of conclusory and inflammatory labels—including "vertical conspiracy," "anticompetitive acts," "web of contracts," "restraint of trade," and "exclusionary contracts"— does not suffice. *Car Carriers*, 745 F.2d at 1110.

Plaintiffs are instead required to allege, and ultimately prove, a "conscious commitment to a common scheme" and a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 762-63 (7th Cir. 2015). Doing so requires facts, not labels, yet all Plaintiffs muster are labels. Indeed, they allege only that the Defendants "have entered into a vertical combination or conspiracy in restraint of trade." Compl. ¶ 89. But this is just a "formulaic recitation" of a Section 1 element, which fails to state a claim. *Twombly*, 550 U.S. at 555; *see Bucks v. Mr. Bults Inc.*, 218 F. Supp. 3d 776, 779 (S.D. Ill. 2016) (Rosenstengel, J.) (granting motion to dismiss where the plaintiff's "'[t]hreadbare recitals'" of the elements of the alleged claims were not supported by sufficient factual allegations (quoting *Ashcroft v. Iqbal*, 556 U.S 662, 678 (2009)).

The reason Plaintiffs have not alleged more is that they cannot. That is because all the Complaint alleges—and all Plaintiffs can allege—is that the Distributors honor the contracting terms the GPOs, providers, and BD independently negotiate. Simply distributing products pursuant to those terms cannot reflect any "conscious commitment" to an unlawful antitrust conspiracy. Imagine, for example, that under the facts alleged the Distributors did not exist and BD self-distributed its products to healthcare providers. In that situation, nothing competitively significant to the terms BD allegedly imposes on providers would change. By virtue of its alleged

market power in the syringe and catheter markets, BD would still be able to insist upon the same sole/dual sourcing and price discounts about which Plaintiffs complain.  *See VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *13 (N.D. Ill. Sept. 28, 2015) (holding that a party with market power over a product cannot enhance that power through how it uses distributors to sell the product).[5]

Under Plaintiffs' own pleading, the Distributors are simply unnecessary to further the supposed conspiracy Plaintiffs attack.  Constrained by this economic reality, Plaintiffs must allege (as they do) that BD, and not the Distributors, has insisted on the terms that Plaintiffs challenge as anticompetitive.  *See* Compl. ¶ 3 ("In this case, Becton, a manufacturer of devices and supplies, has . . . require[d] the use of oppressive, anti-competitive contracts that effectively force above-competitive prices on the market.").  And, as *Glynn-Brunswick* noted, the fact that it is *BD* who insists on the challenged contract terms undercuts any conclusion that *the Distributors* joined an unlawful conspiracy simply by agreeing to distribute BD's products. 159 F. Supp. 3d at 1376.

The plaintiffs in *Glynn-Brunswick* attempted (unsuccessfully) to conjure a conspiratorial motivation for the distributors by characterizing the distributors' relationships with BD as "mutually beneficial collusion" because the distributors receive a percentage of sales as compensation for their services.  *Id.*  Likewise, Plaintiffs here make allegations about unremarkable aspects of the Distributors' relationships with other Defendants, including: the Distributors receive a mark-up and commissions for their sales services; the Distributors have

---

[5]   *See also E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29, 30 (2d Cir. 2006) (noting that if an alleged monopolist terminated its distributors and "established its own in-house distribution system with the same monopoly that [the monopolist] is alleged to possess, there would have been no" additional anticompetitive effects "because the alleged single source and price increase, even if monopolistic, is something [the monopolist] can achieve without the aid of a distributor").

agreed to market BD as their "preferred" brand; and the Distributors make payments to GPOs if providers hit their sales volume targets set forth in the Net Dealer Contract negotiated by BD and the GPO. Compl. ¶¶ 45-46. But Plaintiffs identify nothing about any of these practices that might "suggest that an [unlawful] agreement was made." *Twombly*, 550 U.S. at 556.

As the court in *Glynn-Brunswick* explained, *every* distributor "whose resale price is calculated on a cost-plus basis is in a position to profit from an increase in the cost of the good," and therefore, the mere fact that the distributor so benefits "does not, by itself, suggest that the intermediary engaged in anticompetitive behavior to influence such cost in its favor." 159 F. Supp. 3d at 1376. The same is true of Plaintiffs' allegations that the Distributors may make additional cash payments to the GPOs if the providers meet the volume targets in the BD-GPO contracts and the supposed requirement that the Distributors market BD as their "preferred" brand. Compl. ¶¶ 45-46. *Glynn-Brunswick* squarely held that such additional terms do not support an argument that the Distributors joined a conspiracy with BD. *See* 159 F. Supp. 3d at 1376 n.9. The court there further discounted any benefit to Distributors from higher BD prices because those prices could also *harm* a distributor by reducing the quantity demanded of those products, resulting in a loss of sales to the distributor, *id.* at 1377, who "warehouse[s] these fungible products in their inventory without knowing whether any will be the subject of a contract sale," *In re Hypodermic Prods. Antitrust Litig.*, 484 F. App'x 669, 675 n.9 (3d Cir. 2012). In sum, "the Court [could not] find that the potentially beneficial prospects of the distribution agreements alone support an inference that the distributors were motivated to maintain Defendant's monopoly power." *Glynn-Brunswick*, 159 F. Supp. 3d at 1377. The same conclusion is required here.

In sum, the facts the Complaint does allege do not plausibly show that the Distributors had a conscious commitment to any unlawful scheme. All the Complaint alleges is that each

Distributor independently decided to distribute BD's products, pursuant to terms Plaintiffs and other providers, often through GPOs, negotiated.  *See Twombly*, 550 U.S. at 554 (citing *Monsanto*, 465 U.S. 752); *id.* at 556 ("In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit of the prior rulings . . . that lawful parallel conduct fails to bespeak unlawful agreement.").   Further, the Complaint is plagued by fatal contradictions.  On the one hand, the Complaint alleges that the contracts of which Plaintiffs complain harm competition because if providers switch to a supplier other than BD, they lose certain discounts.  Compl. ¶¶ 41-43.  But the Complaint elsewhere admits that the prices that providers, including Plaintiffs, pay for BD products are substantially *higher* than its competitors, and Plaintiffs claim that at least some competitors' products are *safer.  Id.*  ¶¶ 33-39, 61.  In other words, the Complaint irreconcilably posits "harm" to providers if they are unable to get certain discounts and so must switch to other suppliers—*whom the Complaint alleges offer lower prices and safer products than BD.  Id.* ¶¶ 39, 61.  Such an implausible, incoherent theory renders the Complaint fatally defective, and renders it implausible Distributors would join such a conspiracy.  *See Twombly*, 550 U.S. at 570.

### C.     Plaintiffs' Claim of a Single Rimless-Wheel Conspiracy is Not a Viable Legal Theory.

It is no surprise that Plaintiffs do not and cannot put forth plausible allegations supporting a conspiracy:  the only reason they named the Distributors and GPOs and posit their non-existent single "vertical conspiracy" is to contrive a solution to the standing problems that plagued the complaints in *Glynn-Brunswick* and similar cases.  *See Hypodermic Prods.*, 484 F. App'x at 675, 675 n.9 (holding, in a case involving BD, that the Distributors are "the direct purchasers in contract sales" to healthcare providers, would be the first party to bear any alleged overcharge, and so are the appropriate plaintiffs in any suit against BD).  But the effort fails on the face of the Complaint

because the conspiracy claim as alleged is not cognizable as a matter of law in the absence of a horizontal agreement among the Distributors, which Plaintiffs do not and cannot plead.

The Complaint alleges that BD's individual contracts with each of the other Distributors (and GPOs) make up a "web" of contracts that somehow constitute a single conspiracy.  Compl. ¶¶ 2, 47.  A conspiracy among a dominant manufacturer and its dealers (or other market participants at different levels of the distribution chain) is often referred to as a hub-and-spoke conspiracy in antitrust cases.  *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 254-55 (3d Cir. 2010).[6]  The characteristics of a hub-and-spoke conspiracy are: "(1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes."  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015).

The problem for Plaintiffs, however, is that a hub-and-spoke conspiracy is not a single conspiracy as a matter of law unless the spokes of the wheel have conspired with each other—that is, the "wheel" must have a "rim."  Even if Plaintiffs have alleged a "hub" (BD) and "spokes" (distributors or GPOs), they have not alleged any sort of agreement among the Distributors or among the GPOs—in other words, they do not allege any rim.  And without a "rim," there is no single conspiracy.  *See, e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 755 (1946) (holding that "without the rim of the wheel to enclose the spokes . . . [t]he proof . . . made out a case, not of a

---

[6]    *Accord Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 n.3 (6th Cir. 2008); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015); *see also Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 932 (7th Cir. 2000) (recognizing hub-and-spoke conspiracy, without using the term, in which Toys "R" Us "orchestrated a horizontal agreement" between toy manufacturers that each agreed to join a group boycott of discount clubs only on the understanding that their competitors would do the same).

single conspiracy, but of several"); *United States v. Orlando*, 819 F.3d 1016, 1022 (7th Cir. 2016) ("[T]o prove a single conspiracy in the hub-and-spoke context, the government must show that 'a rim connects the spokes together, for otherwise the conspiracy is not one but many.' The 'rim' is an agreement to further a single design or purpose.'" (citation, brackets, and ellipses omitted)); *Bustamante*, 493 F.3d at 885 ("For a hub and spoke conspiracy to function as a single unit, a rim must connect the spokes together, for otherwise the conspiracy is not one but many."). Federal and state courts throughout the country apply this basic tenet of conspiracy law both inside the antitrust context[7] and outside of it.[8]

Plaintiffs here do not even purport to allege any kind of agreement—a "rim"—among the Distributors or the GPOs. There is not a single factual allegation suggesting any such agreement. To the contrary, the Complaint repeatedly and consistently characterizes the alleged violation as a "vertical conspiracy," effectively conceding that no horizontal agreement is alleged, much less exists. *See* Compl. ¶¶ 4, 54, 64, 71, 78, 84; *see also id.* ¶¶ 89-90 (pleading "a vertical combination or conspiracy in restraint of trade"). That Plaintiffs have disclaimed the notion of any horizontal

---

[7] *Musical Instruments*, 798 F.3d at 1192 n.3 ("The extension of the wheel metaphor here may mislead: a rimless hub-and-spoke conspiracy is not a hub-and-spoke conspiracy at all (for what is a wheel without a rim?); it is a collection of purely vertical agreements."); *In re K-Dur Antitrust Litig.*, 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016) ("For a single conspiracy to exist, a 'rim' must connect the spokes . . . ."); *see infra* pp. 15-16.

[8] *Kotteakos*, 328 U.S. at 755; *Orlando*, 819 F.3d at 1022; *Bustamante*, 493 F.3d at 885; *United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008) ("As the Supreme Court described in *Kotteakos*, 'without the rim of the wheel to enclose the spokes,' a single, wheel conspiracy cannot exist but instead is a series of multiple conspiracies between the common defendant and each of the other defendants." (citation omitted)); *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004) ("Thus, where the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes."); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014) ("In the absence of such a 'rim,' the spokes are acting independently with the hub; while there may be in fact multiple separate conspiracies, there cannot be a single conspiracy.").

agreement is further evidenced by the fact that they plead their single "vertical conspiracy" claim for relief to be evaluated under the rule of reason.[9]  *See* Compl. ¶¶ 24-28 (alleging relevant markets); ¶¶ 32-39 (alleging combined market power); ¶¶ 89-92 (alleging that anticompetitive effects are not offset by procompetitive justifications).

Where plaintiffs have attempted to plead single, multi-level conspiracies without a rim— or tried to allege a rim but lacked facts to plausibly do so—courts have properly dismissed those claims on Rule 12 motions.  *See, e.g.*, *Howard Hess*, 602 F.3d at 255 (affirming Rule 12 dismissal of an alleged hub-and-spoke conspiracy where "the amended complaint lacks any allegation of an agreement among the Dealers themselves"); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) (affirming dismissal and explaining, "[W]e agree with the district court that [the plaintiff's] attempt in its FAC to plead a single, rimless wheel conspiracy between the OEM Defendants and Microsoft must be rejected. . ." because "a wheel without a rim is not a single conspiracy."); *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 420 (5th Cir. 2010) ("In the absence of an assertion that retailers agreed to [resale price maintenance] among themselves, there is no wheel and therefore no hub-and-spoke conspiracy, and that allegation was therefore properly dismissed.").[10]  Here, it is not a question of whether Plaintiffs have alleged a

---

[9] "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure to assess the restraint's actual effect' on competition.'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (citation, brackets, and ellipses omitted).  The Supreme Court just recently noted that "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market."  *Id.* at 2285 n.7.

[10]  *See also R.J. Reynolds*, 462 F.3d at 696-98 (affirming summary judgment on an alleged hub-and-spoke conspiracy claim where there was insufficient evidence to "infer that there was any horizontal agreement" among the dealer defendants (the spokes)); *cf. Toys "R" Us*, 221 F.3d at 935-36 (unlawful conspiracy found only because of evidence of a horizontal agreement at the manufacturer level).

*plausible* agreement among the Distributors or GPOs because, as discussed above, they have affirmatively foregone any suggestion of any horizontal agreement, plausible or not.  Dismissal therefore is warranted.

Given their failure to allege any horizontal agreement, Plaintiffs are left effectively alleging what is sometimes called a legally defective rimless-wheel conspiracy.  Such a conspiracy is "one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson*, 309 F.3d at 203.  Though they attempt to hide the fact with the repeated "vertical conspiracy" label, that is precisely what Plaintiffs have alleged: each distributor and each GPO is alleged to have separate agreements with BD, but are not alleged to have any connection to one another beyond a common involvement with BD.  As "the Supreme Court [has] made clear [however], a rimless wheel conspiracy is not a single, general conspiracy but instead amounts to multiple conspiracies between the common defendant and each of the other defendants." *Id.*  But Plaintiffs have neither alleged multiple conspiracies nor challenged the individual agreements; they have alleged an improper "single, general" conspiracy. *Id.*; *see, e.g.*, Compl. ¶¶ 1, 4, 6, 7, 84, 89, 90, 92 (referring to the alleged conspiracy in the singular).

The Court's analysis should end here.  A "vertical conspiracy" like the one Plaintiffs allege—that involves multiple vertical agreements with no allegations of agreement between the horizontally-situated Defendants—is not a single "conspiracy."  Because the only claim Plaintiffs have alleged is premised on the existence of a single conspiracy, the Complaint should be dismissed for failing to allege a cognizable legal theory.

To the extent Plaintiffs improperly seek to argue in their opposition what they do not allege in their Complaint—i.e., that they are in fact challenging some (or all) of the individual vertical

agreements referenced in their Complaint—their argument should go the way of the plaintiffs' in *Howard Hess*.  There, the plaintiffs tried and failed to allege a hub-and-spoke conspiracy, and in trying to "hedge their bets," argued that they had "adequately alleged several bilateral, vertical conspiracies."  602 F.3d at 256.  The Third Circuit quickly dispensed with this argument, declining to even consider it where "the amended complaint cannot be fairly understood to allege the existence of several unconnected, bilateral, vertical conspiracies between Dentsply and each Dealer."  *Id*.  No reasonable reading of the Complaint suggests that Plaintiffs are challenging the separate vertical agreements here.  Plaintiffs unambiguously plead their claim is premised on the existence of a singular vertical conspiracy.  *See* Compl. ¶¶ 89, 90, 92.  Their Complaint therefore must be dismissed.

## II.   BECAUSE PLAINTIFFS DO NOT ALLEGE THAT THEY PURCHASED PRODUCTS FROM CHI OR O&M, THEY CANNOT ALLEGE THE PROXIMATE CAUSE NECESSARY TO SUSTAIN AN ANTITRUST CASE AGAINST EITHER OF THEM.

As explained above, because Plaintiffs have not alleged a horizontal conspiracy, they must plead facts sufficient to plausibly allege that each vertical agreement with each defendant is unlawful.  Thus, there is an additional reason that the Complaint against CHI and O&M should be dismissed:  none of the Plaintiffs purchased anything from either of these distributors so none of the alleged harm about which Plaintiffs complain can be traced to anything that either CHI or O&M have done.  Because Plaintiffs have not pled the requisite proximate cause, the Complaint against CHI and O&M warrants dismissal for this independently sufficient reason as well.  *See* GPO Br. § II.

17

## **CONCLUSION**

For the foregoing reasons, the Distributors respectfully request that the Court grant their

Motion and dismiss the Complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,


*/s/ Richard L. Stone*

Richard C. Godfrey, P.C. (*pro hac vice*)          Richard L. Stone (*pro hac vice*)
Barack S. Echols (*pro hac vice*)                  David R. Singer (*pro hac vice*)
Kirkland & Ellis LLP                               Jenner & Block LLP
300 North LaSalle                                  633 West 5th Street, Suite 3600
Chicago, IL 60654                                  Los Angeles, CA 90071-2054
312.862.2000                                       (213) 239-5100

*Counsel for Henry Schein, Inc.*                   Daniel T. Fenske
                                                   Jenner & Block LLP
                                                   353 North Clark Street
                                                   Chicago, IL 60654-3456
                                                   (312) 222-9350


                                                   *Counsel for McKesson Medical-Surgical, Inc.*

Shari Ross Lahlou (*pro hac vice*)                 Michelle K. Fischer (*pro hac vice*)
Luke van Houwelingen (*pro hac vice*)              Jones Day
Crowell & Moring LLP                               North Point
1001 Pennsylvania Avenue, N.W.                     901 Lakeside Avenue
Washington, DC  20004-2595                         Cleveland, OH 44114-1190
202.624.2500                                       (216) 586-7096

Jordan L. Ludwig (*pro hac vice*)                  Paula W. Render (*pro hac vice*)
Crowell & Moring LLP                               Jones Day
515 South Flower Street, 40th Floor                77 West Wacker Drive
Los Angeles, CA  90071                             Chicago, IL 60601-1692
213.622.4750                                       (312) 269-1555

*Counsel for Owens & Minor Distribution,*          *Counsel for Cardinal Health, Inc.*
*Inc.*


Dated: July 20, 2018

## <u>CERTIFICATE OF SERVICE</u>

I, Richard L. Stone, an attorney, certify that on July 20, 2018, I caused **The Distributor Defendants' Motion to Dismiss and Memorandum in Support** to be served on all counsel of record listed via the Court's ECF system.


_/s/ Richard L. Stone_