# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

MARION DIAGNOSTIC CENTER, LLC;
MARION HEALTHCARE, LLC; and
ANDRON MEDICAL ASSOCIATES,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

BECTON, DICKINSON, AND
COMPANY; PREMIER, INC.; VIZIENT,
INC.; CARDINAL HEALTH, INC.;
OWENS & MINOR DISTRIBUTION
INC.; MCKESSON MEDICAL-
SURGICAL INC.; HENRY SCHEIN,
INC.; and UNNAMED
BECTON DISTRIBUTOR CO-
CONSPIRATORS,

Defendants.

No. 18 Civ. 1059

Hon.  Nancy J. Rosenstengel

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO BECTON'S MOTION TO DISMISS

R. Stephen Berry
Berry Law PLLC
(Admitted *Pro Hac Vice*)
1717 Pennsylvania Ave., N.W.
Suite 850
Washington, D.C. 20006

Steven F. Molo
*Counsel of Record*
Allison M. Gorsuch
MoloLamken LLP
300 N. LaSalle St.
Chicago, IL  60654

Justin M. Ellis
MoloLamken LLP
430 Park Ave.
New York,  N.Y. 10022

*Attorneys for Plaintiffs and Proposed Class Co-Counsel*

## INTRODUCTION

Plaintiffs brought this Sherman Act Section One suit to restore competition in the United States markets for safety syringes, conventional syringes, and safety IV catheters. The Defendants have filed three motions to dismiss.  Defendant Becton, Dickinson & Co. ("Becton"), the manufacturer of those products, moves to dismiss, arguing principally that Plaintiffs lack "antitrust standing."  Explicit Seventh Circuit precedent, however, recognizes Plaintiffs' standing as the first purchasers in the distribution chain who are not part of the Defendants' conspiracy. Becton's other arguments about pleading standards also fail.  The Court should deny Becton's motion to dismiss.

## BACKGROUND

Plaintiffs incorporate their consolidated statement of facts, also filed today.

## ARGUMENT

## I.      STANDARD OF REVIEW

Section Four of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor."  15 U.S.C. §15(a).  To be "injured," a plaintiff must be a "direct purchaser" – that is, an "immediate buyer[] from the . . . antitrust violator[]."  *Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 206-07 (1990); *see Cal. v. ARC America Corp.*, 490 U.S. 93, 97 (1989) (an "indirect purchaser[]" is one who "[does] not purchase [the monopolized product] directly from the [antitrust defendant]").

Antitrust complaints, like complaints generally, need only contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Where, as here, Plaintiffs allege a violation of Section One, no "heightened fact pleading of

specifics" is required.  *Twombly*, 550 U.S. at 570; *see* GPO MTD Opp. 2.  Instead, Plaintiffs need only provide "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement" or conspiracy.  *Twombly*, 550 U.S. at 556.

## II.   PLAINTIFFS HAVE ANTITRUST STANDING

Becton's primary argument is that Plaintiffs lack standing because they are not "direct purchasers" from Becton.  Dkt. 83 ("Becton Br.") 9-16.  Because Plaintiffs are direct purchasers *from the conspiracy* Becton has formed with other Defendants, that argument fails.

### A.   The Direct Purchaser Rule

The "direct purchaser" rule stems from *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  In *Hanover Shoe*, the Court "held . . . that an antitrust defendant would not be permitted to defend against a damages suit on the ground that the plaintiff had shifted the cost of the defendant's wrongdoing to the plaintiff's customers" in the form of passed-on overcharges.  *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) (citing *Hanover Shoe*, 392 U.S. 481).  "Such a defense would complicate antitrust enforcement by requiring an apportion-ment of damages between different tiers of purchasers" – a project of "[t]racing a price hike through successive resales" called "incidence analysis" that is "famously difficult."  *Id.*; *see UtiliCorp*, 497 U.S. at 208 ("[T]he direct purchaser rule serves, in part, to eliminate the complications of apportioning overcharges.").

The Court then "took the next step in *Illinois Brick*" and "held that the second or subsequent tiers, the indirect purchasers from the antitrust violators, couldn't sue; only the first tier could."  *In re Brand Name Prescription Drugs*, 123 F.3d at 605 (citing *Illinois Brick*, 431 U.S. 720).  That rule is a "logical corollary of the rejection of the passing-on defense in *Hanover Shoe*, since to determine the damages suffered by the subsequent tiers of purchasers would

require the very apportionment of damages that the Court had rejected in the past." *Id.* "[T]he *Illinois Brick* rule also serves to eliminate multiple recoveries" and to "promote the vigorous enforcement of the antitrust laws." *UtiliCorp*, 497 U.S. at 212, 214.

### B. Direct Purchasers from Conspiracies Have Standing

Standing doctrine, however, "does not stand for the proposition, as [Becton] would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not [directly] sell." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002). That is, Becton claims Plaintiffs lack standing because "they do not purchase [relevant] products from [Becton] directly" but "[i]nstead[] . . . buy those products from medical supply distributors." Becton Br. 1. But the Supreme Court and the Seventh Circuit "do[] not read *Illinois Brick* so broadly." *Loeb Indus.*, 306 F.3d at 481 (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 468-70 (1982)).

In particular, the Seventh Circuit has held repeatedly that, if parties at different tiers of distribution conspire to restrain trade, "any indirect-purchaser defense would go by the board." *In re Brand Name Prescription Drugs*, 123 F.3d at 604; *see Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002); *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980) (refusing to apply *Illinois Brick* where "the manufacturer and the intermediary are both alleged to be co-conspirators"). Court after court applies the same rule.[1]

---

[1] *See, e.g.*, *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1232 (11th Cir. 1999) ("*Illinois Brick* does not apply to a single vertical conspiracy where the plaintiff has purchased directly from a conspiring party in the chain of distribution."); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212-13 (9th Cir. 1981) ("*Illinois Brick* do[es] not apply to . . . allegations of a conspiracy. . . ."); *see also, e.g.*, *In re Processed Egg Products Antitrust Litig.*, 881 F.3d 262, 275 (3d Cir. 2018) ("direct purchasers . . . have antitrust standing to sue conspirators, like Defendants, from whom they purchased" products); *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) (when a "complaint alleges conspiracies between [a manufacturer] and the Distributors and names the Distributors as defendants, [a plaintiff] has adequately established it has antitrust standing"); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 483 (S.D.N.Y. 2012); *In re Wyoming Tight Sands Antitrust Cases*, 695 F.

That "right to sue middlemen who joined the conspiracy is sometimes referred to a co-conspirator 'exception' to *Illinois Brick*, but it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages." *Paper Sys.*, 281 F.3d at 631-32.

For example, in *Paper Systems*, the plaintiffs sued paper manufacturers and other paper distributors for "conspiring to reduce output and raise price[s]." 281 F.3d at 631. The district court invoked *Illinois Brick* to dismiss one manufacturer, Nippon Paper, from the case, because the plaintiffs had not purchased from Nippon Paper directly. *Id.* Instead, Nippon Paper sold its paper through distributors and "trading houses," which then resold the paper to the plaintiffs. *Id.*

The Seventh Circuit reversed. *Paper Sys.*, 281 F.3d at 634. Because the complaint alleged that the "trading firms [we]re members of the conspiracy," the plaintiffs, "the first purchasers from **outside** the conspiracy," had standing to sue. *Id.* at 631-32 (emphasis in original). Moreover, the plaintiffs could recover from Nippon Paper, even though Nippon Paper's distributors had not joined the conspiracy, because Nippon Paper was jointly and severally liable for the conspiracy's entire output. *Id.* at 632. As the court noted, joint and several liability serves the same deterrence goals as *Illinois Brick* without risking double recoveries: Direct purchasers from the conspiracy are motivated to "recover on account of their own purchases" but can only recover once. *Id.* at 633. As a result, "any direct purchaser from any conspirator can collect its own portion of damages (that is, the damages attributable to its direct purchases) from any conspirator." *Id.* "That the plaintiffs did not buy from Nippon Paper directly, or at all, does not matter." *Id.* at 634.

*Paper Systems* applies squarely here. Plaintiffs buy directly from the distributors, which,

---

Supp. 1109, 1117 (D. Kan. 1988), *aff'd*, 866 F.2d 1286 (10th Cir. 1989), *aff'd sub nom. Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990); *In re Mid-Atl. Toyota Antitrust Litig.*, 516 F. Supp. 1287, 1295 (D. Md. 1981).

along with Vizient and Premier, have joined a conspiracy with Becton.  Dkt. 52 ("Am. Compl.") ¶¶ 4, 89.  As "the first purchasers from *outside* the conspiracy," Plaintiffs have standing to sue. *Paper Sys.*, 281 F.3d. at 631 (emphasis in original).  And whether Plaintiffs have bought from any given conspirator "directly, or at all, does not matter." *Id.* at 634.  Because the conspirators are jointly and severally liable, Plaintiffs can seek their "own portion of damages (that is, the damages attributable to [their] direct purchases) from any conspirator," regardless of with whom Plaintiffs directly dealt. *Id.* at 632.

In addition, Plaintiffs deal directly with the co-conspirator GPOs, Am. Compl. ¶ 4, who purportedly represent Plaintiffs and other healthcare providers when negotiating contracts with Becton, *id.* ¶¶ 2, 30, 31.[2]  In negotiating the prices and other terms under which Plaintiffs buy Becton products, the GPOs act as the Plaintiffs' agents, as Becton has admitted in other cases. *See, e.g.*, Letter at 5, *La. Wholesale Drug Co. v. Becton, Dickinson & Co.*, No. 05 Civ. 1602, Dkt. 22 (D.N.J. Aug. 24, 2005).[3]  And courts recognize that when an agent is a direct purchaser, the principal has standing to sue.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 7805628, at *14 (N.D. Cal. Aug. 4, 2016) (collecting cases).[4]  Plaintiffs' direct dealings with the GPOs further underscore that they deal directly with the conspiracy and are the proper parties to sue

### C.    Becton's Efforts To Limit Standing Fail

Becton attempts to evade the Seventh Circuit's clear rule according standing to direct

---

[3] "Courts may take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned."  *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017) (collecting cases).

[4] *See also In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 25 (D.D.C. 2001) (principals have standing on behalf of agents); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 505 (S.D.N.Y. 1996) (same); *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 149 (N.D. Cal. 1991) (same).

purchasers from conspiracies.  Its attempt falls flat.

Becton first claims that standing should exist only where a manufacturer and distributor form a "single economic enterprise."  Becton Br. 11.  That is wrong:  Neither *Paper Systems* nor any other case Becton cites conditions the standing of purchasers from a conspiracy on whether the conspirators form a "single economic enterprise" (or in fact, says anything about "single economic enterprises" at all).  *See Paper Sys.*, 281 F.3d at 631-32 (cited at Becton Br. 11); *In re Brand Name Prescription Drugs*, 123 F.3d at 604-06; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶371f (noting "[s]uit has been allowed" when there is "functional economic or other unity," but not requiring that unity).[5]  Contrary to Becton's assertion, *Paper Systems* did not find that the manufacturers and distributors were so economically close that "there is only one purchase transaction."  Becton Br. 11; *cf. Paper Sys.*, 281 F.3d at 631-32.  And Becton's proposed rule makes no sense.  Whether conspirators form a "single economic enterprise" or a conspiracy would not affect the deterrence of antitrust conspiracies, the risk of double recoveries, or the other purposes of *Illinois Brick.  Cf. Paper Sys.*, 281 F.3d at 631-32.

Becton is also wrong to claim that purchasers from conspiracies have standing only if those conspiracies involve vertical price-fixing instead of other means of inflating prices above competitive levels.  Becton Br. 11-12, 14 n.5.  The Seventh Circuit has announced no such standard, stating unequivocally again and again that the "first buyer ***from a conspirator*** is the right party to sue."  *Paper Sys. Inc.*, 281 F.3d at 631 (emphasis added); *In re Brand Name Prescription Drugs*, 123 F.3d at 604 ("direct purchasers from the conspirators" have standing, without reference to the type of conspiracy); *Fontana Aviation*, 617 F.2d at 481 (purchasers from

---

[5] Becton appears to confuse the standing of direct purchasers from conspiracies with a different "exception" recognized by *Illinois Brick*:  "[T]he pass-on defense might be permitted . . . where the direct purchaser is owned or controlled by its customer."  431 U.S. at 736 n.16; *see* Becton Br. 11.

"a common illegal enterprise" have standing, without reference to the type of enterprise).

In fact, the Seventh Circuit has allowed direct purchasers from co-conspirator distributors to have standing although the conspiracy did not involve price-fixing.  *Fontana*, 617 F.3d at 481.  Fontana, an airplane-parts dealer, alleged that the Cessna distributor from whom it bought parts conspired with Cessna to drive dealers out of business through bundling schemes, false advertising, and other competitive "misdeeds."  *Id.* at 479-80.   It did not allege horizontal price fixing.  *See id.*  The district court granted summary judgment to the defendants under *Illinois Brick*, but the Seventh Circuit reversed:  "We are not satisfied," it held, "that the Illinois Brick rule directly applies in circumstances where the manufacturer and the intermediary are both alleged to be co-conspirators in a common illegal enterprise." *Id.* at 481.   *Fontana* refutes Becton's argument that only price-fixing conspiracies are outside *Illinois Brick*'s scope.

*Fontana* is no outlier.  Other courts have found that purchasers from distributors have standing to sue exclusive-dealing conspiracies like this one that do not involve price-fixing.  *See, e.g.*, *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) (exclusive-dealing conspiracy); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 482 (S.D.N.Y. 2012) (conspiracy to divide market into exclusive territories).  Like these cases, the Seventh Circuit has never limited the ***type*** of conspiracy that gives direct purchasers from a conspiracy standing.  Despite Becton's suggestions, this Court should not invent one itself.

Becton offers no rational reason for this Court to defy the Seventh Circuit.  The rationale for direct purchasers from conspiracies to have standing in no way depends on whether those conspiracies are "vertical" or "horizontal," let alone whether the means the conspiracy uses to restrain trade is "price-fixing" or some other anticompetitive device to raise prices above competitive levels.  The concern about the complexity of tracing damages through different

layers of distribution – which underlies the direct-purchaser rule – is inapposite when a dealer/distributor co-conspiracy is alleged because overcharges are "not passed on to the consumers through any other level in the distribution chain." *Ariz. v. Shamrock Foods Co*., 729 F.2d 1208, 1214 (9th Cir. 1984); *see Paper Sys.*, 281 F.3d at 633 (because direct purchasers from the conspiracy can only recover for their own purchases, "[t]he difficulty of tracing overcharges through the chain of distribution therefore is unimportant"); Areeda & Hovenkamp, *supra*, ¶371h (in conspiracies, "there is no tracing or apportionment to be done" because "[t]he court simply computes the retail price that would have prevailed absent the illegal contract").

Nor, as *Paper Systems* explained, is the ***type*** of conspiracy what prevents double recoveries. 281 F.3d at 633. Instead, because direct purchasers from a conspiracy "own the right to recover on account of their own purchases," "duplicative recovery has been blocked at the outset." *Id*. And allowing direct purchasers from ***all*** conspiracies to sue maximizes deterrence, *UtiliCorp United*, 497 U.S. at 212, 214; *Paper Sys.*, 281 F.3d at 633, because otherwise antitrust conspirators could simply choose means other than price-fixing to restrain trade and raise prices while insulating themselves from suit under *Illinois Brick*. Deterrence is better served if all direct purchasers from conspiracies have standing because all direct purchasers have been harmed and have the same motive to recover their share of the damages caused. *See Paper Sys.*, 281 F.3d at 633. Both *Fontana* and *Paper Systems* support standing for persons who directly deal with ***any*** conspiracy, rather than merely price-fixing conspiracies.

### D.    Becton's Cited Cases Do Not Undermine Plaintiffs' Standing

None of Becton's cited cases support a different result.

*Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson* merely recognizes standing for purchasers from price-fixing conspiracies. 523 F.3d 1116, 1123 n.1 (9th Cir. 2008). It does not assert that ***other*** conspiracies would not also qualify. *Id*. *Dickson v. Microsoft Corp.*, by

contrast, is not just incompatible with *Fontana*'s result:   It also cannot square with *Paper Systems* because it did not take joint and several liability into account.  309 F.3d 193, 214-18 (4th Cir. 2002).   *Dickson* refused to extend standing to non-price-fixing conspiracies because, it asserted, direct purchasers would then recover an "illegal overcharge that was allegedly passed on."   *Id.* at 215.   By contrast, *Paper Systems* recognized that "tracing overcharges . . . is unimportant" because, under joint and several liability, direct purchasers from the conspiracy only "recover on account of their own purchases."   281 F.3d at 633.   As the dissent noted, *Dickson* reached the opposite conclusion from *Paper Systems*, which the dissent would have followed instead.  *See* 309 F.3d. at 221-22 (Gregory, J., dissenting) (citing *Paper Sys.*, 281 F.3d at 631-32).   Because *Dickson* takes the other side of a circuit conflict, it offers no basis to disregard the clear rulings of *Fontana* and *Paper Systems*.

*In re Brand Name Prescription Drugs* (cited at Becton Br. 14 n.5), a summary-judgment decision, also does not support Becton.   That case – which never claims to overrule *Fontana* – states only that a direct purchaser from a non-price-fixing conspiracy still faces *Illinois Brick* problems if it seeks to recover passed-on overcharges that must be apportioned, requiring "the very incidence analysis that *Illinois Brick* bars."   123 F.3d at 606.   No apportionment – and thus no incidence analysis – is needed here because the distributors have not defected.   As *Paper Systems* explains, unless a distributor "snitch[es]" and  "defects and sues its former comrade," plaintiffs "are entitled to collect damages from both the manufacturers and their intermediaries if conspiracy and overcharges can be established."   281 F.3d at 632.   In *In re Brand Name Prescription Drugs*, by contrast, the middlemen **had** defected, raising the risk that "the court would have had to apportion the overcharge between the wholesalers" and consumers.  123 F.3d at 606.   It was **that** apportionment that *Illinois Brick* "told the federal courts not to do."   *Id*.  *In re*

*Brand Name Prescription Drugs* does not limit standing to price-fixing conspiracies.

*In re Hypodermic Products* (cited at Becton Br. 10) is even more afield. That case involved ***other*** Becton distributors which, unlike the distributors here, chose to defect from the conspiracy and sue Becton. 484 F. App'x at 675; *see* Becton Br. 11 n.3 (admitting that the defendants here were not named plaintiffs there). Nor did the healthcare providers in that case even allege that the distributors had conspired with Becton in violation of Section One. *See* Br. for Appellee Pls. at 2, *In re Hypodermic Products Antitrust Litig.*, No. 11-3122, (3d Cir. Dec. 5, 2011) (pursuing Section Two claims without allegations of conspiracy). As a result, the question of standing for direct purchasers from conspiracies did not even come into play.

In contrast, Plaintiffs here have alleged a Section One conspiracy ***including*** the Becton distributors and GPOs. The distributors ***could*** snitch and sue Becton in this case, like the other distributors did in *In re Hypodermic Products* or the wholesalers did in *In re Brand Name Prescription Drugs*. If the distributors defected, perhaps Plaintiffs' standing under federal law might be in question. But the distributors have ***not*** defected. Plaintiffs are thus the first "buyer[s] from a conspirator" and are the "right party to sue." *Paper Sys.*, 281 F.3d at 631.[6]

## III.   THE AMENDED COMPLAINT PLEADS A SECTION ONE VIOLATION

Becton's arguments that Plaintiffs fail to plead a conspiracy or a restraint of trade, Becton Br. 16-19, are as meritless as its arguments about standing.

---

[6] Becton's other cases about medical product manufacturers hardly "clos[e] the door" to standing, as Becton suggests (at 10): None of those cases involved a Section One conspiracy. *Lakeland Regional Med. Ctr, Inc. v. Astellas US LLC*, 763 F.3d 1280, 1284 (11th Cir. 2014) (discussing tying claim with no allegations of conspiracy); *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 80 (3d Cir. 2011) (same); *St. Francis Med. Ctr v. C.R. Bard, Inc.*, 657 F. Supp. 2d 1069 (E.D. Mo. 2009) (Section One and Two claims without allegation of conspiracy). Because Plaintiffs here allege that they have purchased directly from a conspiracy, it does not matter that ***other*** plaintiffs who chose not to pursue that allegation were found to lack standing.

### A.  The Amended Complaint Pleads a Conspiracy

1.  *The Amended Complaint's Conspiracy Allegations are Detailed and Plausible*

The Amended Complaint alleges that Becton and the other Defendants have restrained trade through a conspiracy embodied in a web of anticompetitive written contracts.  Am. Compl. ¶¶ 40-47.  It also details which terms in those contracts, such as sole-source provisions and penalty-pricing provisions, restrain trade and who is party to them.  *Id.*  And the Amended Complaint also alleges other details about how the distributors agree to aid Becton's dominance. For example:

- The Distributors also make cash payments to the GPOs based on their sales volumes, thus motivating the GPOs to maintain the conspiracy and to choose terms that further both the Distributors' and Becton's interests.  Am. Compl. ¶ 45.

- Becton pays extra commissions to the Distributors' sales personnel if they sell Becton products to the exclusion of competitors' products.  *Id.*  ¶ 46.  That arrangement both allows the Distributors to spend less on wages and allows Becton direct access to the Distributors' sales personnel to monitor the Distributors' compliance with Becton's exclusionary terms.

- Becton also requires that Distributors' promotional materials emphasize Becton as their preferred brand.  *Id.*

- Becton has asked Cardinal, its largest distributor, to commit to not induce Becton customers to buy competitors' products.  *Id.*

Becton, however, protests that Plaintiffs do not precisely "allege the name, date, prices, provisions, or term[s]" of the contracts that embody the conspiracy.  Becton Br. 16-17.  And it asserts that Plaintiffs should have given more detail because some contracts could be within their "personal knowledge."  *Id.* at 17.

That argument ignores basic pleading standards.  To survive a motion to dismiss, a plaintiff must provide only "enough details about the subject-matter of the case to present a story that holds together."  *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827, 834 (7th Cir. 2014)

(reversing grant of motion to dismiss).  "[T]he proper question to ask is still '*could* these things have happened, not *did* they happen.'" *Id.* at 827 (emphasis in original).  Becton does not deny that the Amended Complaint "present[s] a story that holds together" about what key terms the contracts contain and why they restrain trade.  *Cf. id.*  More fundamentally, Becton does not deny that the Amended Complaint gives it "fair notice of what the claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  And the specific language from many of these contracts is *not* within Plaintiffs' personal knowledge because they are between Defendants alone and are not publicly available.[7]

In any event, "[a] plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain pertinent documents if the plaintiff failed to do so."  *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).  Becton could have attached the relevant contracts to its motion if those contracts disproved claims in the Amended Complaint.  That it chose not to is revealing.  Becton's quibbling about the Amended Complaint's detail in no way warrants dismissal.

2.     Brunswick *Does Not Apply Here*

Becton heavily relies on *Glynn-Brunswick Hospital Authority v. Becton, Dickinson & Co.* ("*Brunswick*") to argue that the Amended Complaint does not plead a Section One conspiracy. 159 F. Supp. 3d 1361 (S.D. Ga. 2016).  That case does not control here.

Becton does not (and could not) argue that *Brunswick* has preclusive effect.  That, in *Brunswick*, one of Plaintiffs' counsel here represented *different plaintiffs* asserting *different antitrust claims* against Becton creates "no special representational relationship between the earlier and later plaintiffs" that might preclude this case.  *S. Cent. Bell Tel. Co. v. Alabama*, 526

---

[7] For that reason, Becton and other Defendants have agreed to produce some contracts in discovery pending this motion.  Dkt. 101 at 2.

U.S. 160, 168 (1999) (the fact that the same lawyer appeared for different plaintiffs did not support preclusion).  This case involves different named plaintiffs and classes, different allegations, and different markets.[8]  Moreover, no class was ever certified in *Brunswick*.  "Neither a proposed class action nor a rejected class action may bind nonparties."  *Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011).  The identity of the attorney adds nothing but improper *ad hominem*.[9]

In any event, critical differences make *Brunswick* inapplicable.  First, in *Brunswick*, plaintiffs, who sought to represent a class of acute-care providers, asserted Section **Two** monopolization claims "not as direct purchasers, but as **indirect** purchasers under cost-plus distributor contracts."  159 F. Supp. 3d at 1367 (emphasis added).  Critically, they did not allege that Becton, the GPOs, and the Distributors had conspired.  *See id.*  Nor did they name the GPOs or Distributors as defendants.  *See id*.  Here, Plaintiffs bought "**directly** from Becton, Cardinal, Owens & Minor, McKesson, Henry Schein or unnamed Becton distributor co-conspirators," Am. Compl. ¶70 (emphasis added), and allege that Becton, the distributors, and the GPOs are all liable for conspiring under Section **One**, *see id.* ¶¶ 11-13.

Because *Brunswick* involved Section Two claims, the plaintiffs there were required to allege a higher standard of intent.  As Section Two plaintiffs, they had to plead that the "distributors agreed to [contractual] provisions . . . with the specific intent of maintaining [Becton's] alleged monopolies."  *Brunswick*, 159 F. Supp. 3d at 1376; *see McCoy v. Iberdrola*

---

[8] *Compare* Am. Compl. ¶7 (Plaintiffs are healthcare providers seeking to represent a nationwide class), *with Brunswick*, 159 F. Supp. 3d at 1367 (plaintiffs were "acute care providers having purchased [Becton's] hypodermic syringes"); *compare* Am. Compl. ¶24 (relevant markets are "markets for the sale in the United States of conventional syringes, safety syringes, and safety IV catheters"), *with Brunswick*, 159 F. Supp. 3d at 1379 (market was syringes and IV catheters "sold by [Becton] and its competitors for use by acute care providers"); *compare* Am. Compl. ¶¶ 11-13 (alleging a "conspiracy" and agreement between Becton and distributors), *with Brunswick*, 159 F. Supp. 3d at 1375 (complaint had no "suggestion that the distributors unlawfully combined with [Becton]").

[9] *In re Hypodermic Products* also involved a different class (distributors) with claims over a different timespan.  *See In re Hypodermic Prod. Antitrust Litig.*, No. 05 Civ. 1602, 2013 WL 12156679, at *2 (D.N.J. Apr. 10, 2013).

*Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014). *Brunswick* explicitly noted that Section Two imposes a higher standard for showing a "conspiracy to monopolize" than Section One. 159 F. Supp. 3d at 1377.[10] Because the complaint did not suggest that "the distributors" acted "with the specific intent of maintaining [Becton's] alleged monopolies," the court found that the conspiracy allegations insufficient to provide standing for a Section Two claim. *Id.* at 1376-77.

In contrast, to allege a Section One conspiracy, Plaintiffs "need not prove intent to control prices or destroy competition." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1153-54 (9th Cir. 2003); *see also McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 243 (1980) (in "a civil action under the Sherman Act, liability may be established by proof of *either* an unlawful purpose or an anticompetitive effect" (emphasis in original)). It is also "not necessary to find a specific intent to violate the law." *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1104 (7th Cir. 1979) (approving jury instructions). Instead, to allege a Section One conspiracy, "[i]t [is] enough" to allege "that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (quoting *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939)); *see* GPO MTD Opp. 4-6.

As explained in Plaintiffs' opposition to the GPO's and Distributors' motion to dismiss, the Amended Complaint meets *that* standard by alleging how the distributors and GPOs knew of Becton's scheme to suppress competition and consciously chose to join it. GPO MTD Opp. 6;

---

[10] Becton also suggests that *Brunswick* limited the standing of purchasers from conspiracies to conspiracies involving price-fixing. Becton Br. 12-13. *Brunswick* says no such thing. Instead, as Becton acknowledges, *Brunswick* found that the *Brunswick* complaint's conspiracy allegations did not meet Section Two's demanding specific-intent requirement because it did not allege that the defendants did not "unlawfully combine[ ] . . . to fix the resale price charged by the providers, or to *otherwise construct the allegedly exclusionary schemes.*" Becton Br. 13 (emphasis altered) (citing *Brunswick*, 159 F. Supp. 3d at 1375). *Brunswick* never suggests that price-fixing was the *only* way the conspirators could "construct the allegedly exclusionary schemes." *Brunswick*, 159 F. Supp. 3d at 1375.

Distributors MTD Opp.  3-4.  Each of the GPOs and distributors, aware of Becton's and the other Defendants' activities, has worked with Becton to impose the same anticompetitive sole-source and penalty terms that effectively force healthcare providers to buy Becton's products.  GPO MTD Opp. 6; Distributors MTD Opp. 3-8; Am. Compl. ¶¶40-47.  As a result, Plaintiffs have standing because they have directly purchased from the antitrust violators that have joined in the conspiracy.  Whether the Amended Complaint *also* pleads specific intent under Section Two – the crucial question in *Brunswick* – is not relevant here.

Becton urges that the facts alleged here "about the pricing and distribution of BD's products are the same as in *Brunswick*."  Becton Br. 14-15.  But the Amended Complaint alleges new facts about *the conspiracy* that *Brunswick* did not.  *Compare* Am. Compl. ¶¶40-47 (conspiracy allegations) *with* Complaint, *Glynn-Brunswick Hosp. Auth. v. Becton, Dickinson & Co.*, No. 2:15 Civ. 91, Dkt. 1, ¶¶65-67, 75-89 (S.D. Ga. July 17, 2015) ("*Brunswick* Compl.") (allegations regarding distribution of Becton products).  *Brunswick* merely alleged that the distributors sold Becton products "pursuant to the terms of the [GPO] contract."  Becton Br. 15 (emphasis omitted) (quoting *Brunswick*, 159 F. Supp. 3d at 1375); *see also Brunswick* Compl. ¶117.  But the Amended Complaint here also alleges details about the Defendant's conspiracy – such as the distributors' anticompetitive cash payments to the GPOs, the sales commissions Becton pays to distributors' sales staff, and the distributors' agreement to emphasize Becton in advertising, Am. Compl. ¶¶45-46 – that the *Brunswick* complaint did not.

Likewise, the Amended Complaint describes how Vizient and Premier also negotiate with Becton to broker highly exclusionary contracts with the GPOs' members.  *See, e.g.*, Am. Compl. ¶¶42-43.  Thus, while the *price* that Becton charges is the same as in *Brunswick*, the Amended Complaint here alleges how Becton also negotiated with the distributors and GPOs

provisions that cement the conspiracy's dominance. *Id.* Far from merely "benefit[ting] from" the conspiracy, Becton Br. 15, the distributors have actively ***joined*** that conspiracy through agreeing to Dealer Notification Agreements. The distributors act as Becton's cats-paws by enforcing Becton's exclusivity terms on Becton's behalf. *In re Brand Name Prescription Drugs*, 123 F.3d at 614; Distributors MTD Opp. 4, 7. Becton's statement that the *Brunswick* plaintiffs "made the same conspiracy argument" as here, Becton Br. 15, is thus simply untrue.[11]

Becton also relies heavily on *Brunswick*'s statement that "'allegations of pass on run contrary'" to allegations of a conspiracy. Becton Br. 14 (quoting *Brunswick*, 159 F. Supp. 3d at 1375). Becton invokes repeatedly the fact that distributors sell to Plaintiffs after Vizient, Premier, and Becton establish a base price to claim that no conspiracy exists. *See, e.g.*, Becton Br. 13. *Brunswick*, however, merely held that the cost-plus theory advanced in that case was not consistent with an argument that the Becton distributors (who were not sued in that case) were part of a conspiracy. *See* 159 F. Supp. 3d at 1375 (allegations of "standing . . . under cost-plus distributor contracts . . . run contrary to . . . vertical-conspiracy allegations"). Plaintiffs here do not claim standing under a cost-plus theory, and Becton points to no such conflicting allegations that might support dismissal.

If, however, *Brunswick* purported to hold that conspiracy standing could ***never*** exist when conspiring distributors pass on overcharges, that holding would defy *Paper Systems*. The court does not have to apportion Becton's overcharge between distributors and Plaintiffs because

---

[11] Becton also cites *Twombly* to claim that no conspiracy exists between Becton and its distributors because they "had agreed among themselves to do what was only natural anyway." Becton Br. 15 (quoting *Twombly*, 550 U.S. at 556). But *Twombly* concerns how "[w]ithout more, ***parallel conduct*** does not suggest conspiracy." 550 U.S. at 556-57 (emphasis added). Plaintiffs do not allege parallel conduct: They allege Defendants made explicit ***agreements*** reflecting their conspiracy. "[W]here, as here, the concerted conduct is not a matter of inference or dispute," "*Twombly*'s requirements with respect to allegations of illegal parallel conduct are inapplicable." *Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 289-90 (4th Cir. 2012); *see also* GPO MTD Opp. 3.

the distributors are jointly and severally liable for the conspiracy's entire output.  *Paper Sys.*, 281 F.3d at 633.  "[T]he difficulty of tracing overcharges through the chain of distribution therefore is unimportant" and *Illinois Brick* does not apply.  *Id.*; *see* Areeda & Hovenkamp, *supra*, ¶371h.  Plaintiffs have standing to sue both Becton and the distributors for Becton's overcharge whether or not the distributors "pass on" the overcharge.

### B.      The Amended Complaint Pleads a Restraint of Trade

Like Vizient and Premier, Becton argues that the Amended Complaint lacks allegations about how its practices are exclusionary or how those practices restrain trade by foreclosing competition.  Becton Br. 17-18.  Like those GPOs, Becton is wrong:  The Amended Complaint easily pleads enough detail to infer that the conspiracy substantially forecloses Plaintiffs from buying competitors' products.  *See* GPO MTD Opp. 12.  The sort of detail Becton and the GPOs demand is, at most, an issue for summary judgment or trial, not the pleading stage.  *Id.* at 11-13.

Becton's arguments do not prove otherwise.  *See* Becton Br. 17-18.  Becton claims that Plaintiffs must plead that its products were "priced below cost" to show substantial foreclosure.  *Id.* at 17.  But its cited cases say no such thing.  *Schor v. Abbott Laboratories* (cited at 17), a Section Two monopolization case, deals with an irrelevant "monopoly leveraging" claim that a manufacturer priced complementary products differently to capture the market.  457 F.3d 608, 611-12 (7th Cir. 2006).  And *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, a summary-judgment case, involved irrelevant claims of "predatory pricing."  821 F.3d 394, 407 (3d Cir. 2016).  Neither case establishes that a firm must price products below cost to be liable under Section One – let alone that such proof is required on a motion to dismiss.

Likewise, the Amended Complaint, far from alleging mere "labels," Becton Br. 17, alleges in detail how Becton forecloses competition through long-term sole-source contracts, revoking discounts for disloyal purchasers, and other anticompetitive acts.  Am. Compl. ¶¶41-

43, 49-50; GPO Br. Opp. 12.   The result is above-competitive prices for Becton products, competitors' inability to build sufficient economies of scale to challenge Becton's dominance, and suppressed quality competition.   Am. Compl. ¶¶39, 60, 62.   Becton addresses none of those allegations.   And while Becton asserts that some healthcare providers buy non-Becton products, Becton Br. 17, that in no way justifies dismissal.   At most, Becton shows that its foreclosure of competition is merely **substantial**, not **total**.   The precise amount of foreclosure is a question of fact for trial, not the pleadings.   *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 958 (N.D. Ill. 2018) (citing *In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*, No. 12 Civ. 711, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013)); GPO MTD Opp. 13.

Plaintiffs at least plausibly show "that the agreement[s] in question result[] in a substantial foreclosure of competition in an area of effective competition."   *Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1352 (7th Cir. 1982); GPO MTD Opp. 8,12.   The Amended Complaint alleges that Becton has shares of **55% to 60% of each market**, Am. Compl. ¶33, and also explains how the Vizient and Premier contracts' long-term duration also forecloses competition, *id.* ¶¶4, 39-40, 42.   As cases cited by these GPOs recognize, both the "share of the market foreclosed" and "the duration of the contracts" requiring exclusive dealing can show that competition has been foreclosed.   *Methodist Health Servs. Corp. v. OSE Healthcare Sys.*, No. 13 Civ. 1054, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016), *aff'd*, 859 F.3d 408 (7th Cir. 2017).

Becton notes that "more than 40% of healthcare providers actually **did** buy their syringes and IV catheters from [its] competitors."   Becton Br. 17 (emphasis in original).   But the Amended Complaint's allegations of a 55% to 60% share of each market comfortably exceed what is typically considered a baseline.   The "test is not **total** foreclosure, but whether the

challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *McWane, Inc. v. FTC*, 783 F.3d 814, 838 (11th Cir. 2015). Only a "roughly 40% or 50% share" is "usually required in order to establish a § 1 violation." *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); *see McWane*, 783 F.3d at 837 ("Traditionally a foreclosure percentage of at least 40% has been a threshold for liability in exclusive dealing cases."). Because Plaintiffs' allegations meet ***that*** standard, Becton's nitpicking about foreclosure offers no basis to dismiss.[12]

### C.   Becton Misunderstands the Amended Complaint's Allegations About Exclusionary False Advertising and Patent Infringement in Aid of Restraint of Trade

Finally, Becton objects to the Amended Complaint's allegations that it aided the conspiracy by engaging in false advertising and patent infringement against its competitors in the relevant safety syringe market. Becton Br. 18-19 (citing Am. Compl. ¶¶ 48-51). As the Amended Complaint relates, a jury established that Becton made false statements about the safety syringes of Retractable, its largest competitor. Am. Compl. ¶ 49 (citing *Retractable Tech., Inc. v. Becton, Dickinson and Co.*, No. 08 Civ. 16, 2014 WL 12596469 at *6 (E.D. Tex. Nov. 10, 2014), *rev'd and remanded on other grounds*, 842 F.3d 883 (5th Cir. 2016)). Another jury also found that Becton infringed Retractable's patents – a verdict affirmed on appeal. Am. Compl. ¶ 50 (citing *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011)).

Becton calls the claims of exclusionary false advertising "meritless" and "false[ ]"

---

[12] Becton also asserts that the Amended Complaint is missing "allegations to infer what portion of the relevant product markets is foreclosed by the contracts at issue." Becton Br. 18 (citing GPO Br. §1(C)). As explained in Plaintiffs' opposition to the GPOs' motion to dismiss, that argument is not proper on a motion to dismiss: A lack of "exact percentage [of] foreclosure in [the] pleadings" is not an "appropriate" basis to dismiss "under Rule 12(b)(6)." *Methodist Health Servs. Corp.*, No. 13 Civ. 1054, 2015 WL 1399229, at *7 (C.D. Ill. Mar. 25, 2015); GPO MTD Opp. 13.

because the Fifth Circuit held on appeal that false advertising and infringement, by themselves, do not violate Section Two of the Sherman Act. *Becton*, 842 F.3d at 896. That is wrong: The Fifth Circuit **affirmed** a Lanham Act judgment against Becton where it had made multiple false statements aimed at its primary safety syringe competitor Retractable. *Id.* at 902; Am. Compl. ¶49. And Becton also ignores that the Federal Circuit has affirmed a judgment against it for patent infringement: Becton stole Retractable's innovative safety syringe technology and used it against Retractable. Am. Compl. ¶50. Such anticompetitive acts in furtherance of Becton's dominance in the relevant markets plausibly support a showing of restraint of trade.[13]

Further, while intent is not necessary to state a Section One claim, GPO MTD Opp. 7, Becton's anticompetitive acts show its purpose or intent to restrain trade under Federal Rule of Evidence 404(b). Courts routinely admit evidence of anticompetitive acts under Rule 404(b) to show that the defendant "acted with the intent" to restrain trade. *E.g.*, *United States v. Bi-Co Pavers, Inc.*, 741 F.2d 730, 737 (5th Cir. 1984); *United States v. Suntar Roofing, Inc.*, 709 F. Supp. 1526, 1540 (D. Kan. 1989), *aff'd*, 897 F.2d 469 (10th Cir. 1990) (in an antitrust case, evidence of similar conduct is "properly admitted to establish the defendants' intent").

## CONCLUSION

Becton's motion to dismiss should be denied.[14]

---

[13] Becton's cited cases do not hold otherwise. To the contrary, they recognize that false advertising towards a competitor can support a Section One claim if "accompanied by some sort of 'enforcement mechanism' designed somehow to coerce or compel that competitor to heed the admonition." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 851 (7th Cir. 2011); *see also Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005). Plaintiffs have obviously pled such an "enforcement mechanism" – the exclusive contracts that prevent the potential customers of Becton's competitors from buying their products.

[14] If the Court grants any portion of Becton's motion, Plaintiffs respectfully request leave to replead. Becton claims that an amendment would be "futile" because Plaintiffs' **counsel** brought similar Section Two claims against Becton in *Brunswick*. Becton Br. 9. But **Plaintiffs themselves** have never tried to sue Becton before. Nor have Section One claims been brought against Becton in this context by healthcare providers. Just as the identity of Plaintiffs' counsel does not give *Brunswick* preclusive effect, it is also no reason to bar Plaintiffs from amending their complaint based on what other plaintiffs have done.

Dated:     September 18, 2018                    Respectfully submitted,
           Chicago, Illinois


R. Stephen Berry                                 /s/ Steven F. Molo
Berry Law PLLC                                   Steven F. Molo
1717 Pennsylvania Avenue, N.W., Suite 850        Allison M. Gorsuch
Washington, D.C.  20006                          MoloLamken LLP
Telephone: (202) 296-3020                        300 North LaSalle Street, Suite 5350
Facsimile: (202) 296-3038                        Chicago, IL  60654
sberry@berrylawpllc.com                          Telephone: (312) 450-6700
                                                 Facsimile: (312) 450-6701
                                                 smolo@mololamken.com
                                                 agorsuch@mololamken.com

                                                 Justin M. Ellis
                                                 MoloLamken LLP
                                                 430 Park Avenue
                                                 New York, New York  10022
                                                 Telephone: (212) 607-8160
                                                 Facsimile: (212) 607-8161
                                                 jellis@mololamken.com


*Attorneys for Plaintiffs and Proposed Class Co-Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 18, 2018, I caused the foregoing memorandum of law to be served on all counsel of record by filing it with the Court's CM/ECF system.

September 18, 2018
Chicago, Illinois

<u>/s/ Steven F. Molo</u>