# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| MARION DIAGNOSTIC CENTER, LLC; MARION HEALTHCARE, LLC; and ANDRON MEDICAL ASSOCIATES, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | No. 18 Civ. 1059 |
| BECTON, DICKINSON, AND COMPANY; PREMIER, INC.; VIZIENT, INC.; CARDINAL HEALTH, INC.; OWENS & MINOR DISTRIBUTION INC.; MCKESSON MEDICAL-SURGICAL INC.; HENRY SCHEIN, INC.; and UNNAMED BECTON DISTRIBUTOR CO-CONSPIRATORS, | Hon.  Nancy J. Rosenstengel |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DISTRIBUTORS' MOTION TO DISMISS

R. Stephen Berry
Berry Law PLLC
(Admitted *Pro Hac Vice*)
1717 Pennsylvania Ave., N.W.
Suite 850
Washington, D.C. 20006

Steven F. Molo
*Counsel of Record*
Allison M. Gorsuch
MoloLamken LLP
300 N. LaSalle St.
Chicago, IL  60654

Justin M. Ellis
MoloLamken LLP
430 Park Ave.
New York,  N.Y. 10022

*Attorneys for Plaintiffs and Proposed Class Co-Counsel*

## INTRODUCTION

Plaintiffs are small healthcare providers that brought this action to redress a restraint of trade in the United States markets for safety syringes, conventional syringes, and safety IV catheters.  Defendants – Becton, Dickinson & Co., a manufacturer; Becton's distributors; and the "group purchasing organizations" ("GPOs") that broker prices for Becton products – have formed a conspiracy affecting those markets.  They carry out their conspiracy through a set of anticompetitive contracts and concerted practices that make it difficult, if not impossible, for healthcare providers such as Plaintiffs to buy non-Becton products.  Their conspiracy drives up Becton's prices above competitive levels, suppresses innovation, and forecloses competition for quality and price.

This motion to dismiss is brought by Cardinal Health, Inc., Owens & Minor Distribution, Inc., McKesson Medical-Surgical, Inc., and Henry Schein, Inc. – distributors that sell Becton products directly to Plaintiffs (the "Distributors").  The Distributors play a key role in the conspiracy.  They act as Becton's cats-paws by monitoring and enforcing providers' compliance with Becton's exclusive-dealing terms.  They also maintain the conspiracy by making lucrative cash payments to GPOs to broker contracts in Becton's favor.

The Distributors mainly argue that Plaintiffs have not pleaded an unlawful conspiracy.  That argument is wrong.  The Distributors' claims about "conscious commitment" mis-understand basic Sherman Act principles.  And the Distributors' attempt to frame their arrangement as a "rimless wheel" does not absolve them from liability.  The Court should deny the Distributors' motion to dismiss.

## BACKGROUND

Plaintiffs incorporate their consolidated statement of facts, also filed today.[1]

## ARGUMENT

### I.   STANDARD OF REVIEW

A complaint need only allege a short and plain statement of "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see* Fed. R. Civ. P. 8(a)(2).  "[A] complaint . . . does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Instead, a motion to dismiss fails if the plaintiff's "[f]actual allegations [are] enough to raise a right to relief above the speculative level." *Id.*

In particular, antitrust claims do not require "heightened fact pleading of specifics." *Twombly*, 556 U.S. at 570; *see MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 976 (7th Cir. 1995).  A plausibility standard also "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.  All a Section One claim "requires [is] a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.*

### II.   THE AMENDED COMPLAINT STATES A SECTION ONE CONSPIRACY

The elements that a Section One plaintiff must plead plausibly are "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Deppe v. Nat'l Collegiate Athletic Ass'n*, 893 F.3d 498, 501

---

[1] Cardinal Health, Inc. ("Cardinal") has asserted that an affiliate – Cardinal Health 200, LLC – and not itself is the proper entity in the Cardinal corporate family to sue.  Distributors Br. 1 n.1.   As the Distributors relate, Plaintiffs have agreed with Cardinal to reserve this issue pending the motion to dismiss and will meet and confer with Cardinal on that issue if the Defendants' motions are denied. *Id.*

(7th Cir. 2018).   The Distributors largely attack the first element and claim that the Amended Complaint does not allege a conspiracy.   All of the Distributors' arguments fail.

### A.   The Amended Complaint Pleads Conscious Commitment to the Conspiracy

The Distributors argue that Plaintiffs do not plead their "'conscious commitment' to an unlawful scheme."  Distributors Br. 6-10 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  That argument misunderstands basic Sherman Act principles.

#### 1.   *The Distributors Consciously Committed To The Conspiracy*

As the Distributors' cases explain, the "conscious commitment" standard distinguishes between concerted activity and mere parallel conduct.   To prevail on a Section One claim, "[t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently."  *Monsanto*, 465 U.S. at 764; *see also Twombly*, 550 U.S. at 554.   "That is, the circumstances of the case must reveal 'a unity of purpose or a common design or understanding, or a meeting of minds in an unlawful arrangement.'"  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 810 (1946)); *see also Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 231 (7th Cir. 1983).   Evidence of an agreement can be either "direct or circumstantial."  *Monsanto*, 465 U.S. at 764.   All the Amended Complaint must plausibly suggest is that the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.*  (quotation omitted).

The Amended Complaint pleads direct evidence of the Distributors' illegal agreements. The Distributors have entered into contracts that restrain trade by effectively forcing Plaintiffs to buy Becton products.   Am. Compl. ¶¶40-47.   Specifically, the Distributors agree to both "Distribution Agreements" and "Dealer Notification Agreements" in which they promise to distribute Becton products under the exclusive and long-term Net Dealer Contracts Becton

3

brokers with the GPOs, Premier and Vizient. *Id.* ¶45. They also agree to enforce Becton's penalty-pricing scheme that punishes healthcare providers with higher costs if those providers buy non-Becton products. *Id.* In addition, the Distributors make volume-based cash payments to the GPOs to reward them for setting anticompetitive terms with Becton. *Id.* And Becton both pays extra commissions to Distributors' sales personnel who sell Becton products and requires that the Distributors emphasize Becton as the preferred brand. *Id.* ¶46.

The Distributors do not deny that the Amended Complaint pleads their conscious commitment to those explicit anticompetitive contracts. Nor do they claim that they lacked a meeting of the minds with Becton over those contracts' terms. In fact, they ***admit*** that "[t]he Complaint simply alleges that [Becton] has entered into an agreement with each defendant." Distributors Br. 6. That dooms their argument that there was no "conscious commitment." There is no dispute that Plaintiffs have offered "enough factual matter (taken as true) to suggest that an ***agreement*** was made" instead of merely parallel conduct. *Twombly*, 550 U.S. at 556 (emphasis added); *see Omnicare*, 629 F.3d at 706; *Wilk*, 719 F.2d at 231.

### 2. *The Distributors' Conscious-Commitment Arguments Fail*

The Distributors claim that something more is required than conscious commitment to an anticompetitive agreement. Distributors Br. 6. But their claim confuses the standard for alleging an ***explicit*** agreement with the standard for inferring a ***tacit*** agreement from parallel conduct. "[W]hen allegations of ***parallel conduct*** are set out in order to make a §1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557 (emphasis added). Courts thus require "plus factor[s]" in that situation to suggest more than mere parallel behavior. *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1201 (7th Cir. 1981).

In contrast, "where, as here, the concerted conduct is not a matter of inference or dispute"

4

because of *explicit* agreements, "*Twombly*'s requirements with respect to allegations of illegal parallel conduct are inapplicable." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289-90 (4th Cir. 2012); *see also Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011) ("To plead unlawful agreement, a plaintiff may allege *either* an explicit agreement to restrain trade, *or* "sufficient circumstantial evidence tending to exclude the possibility of independent conduct" (emphasis added and quotation omitted)). "Plus factors" are therefore needed only when a plaintiff's claims of conspiracy rest on parallel conduct. Allegations of an explicit agreement are "independently adequate" to state a Section One claim. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010); *see also Twombly*, 550 U.S. at 564 (distinguishing between "descriptions of parallel conduct" and "independent allegation[s] of actual agreement"); *Hogan v. Cleveland Ave. Rest., Inc.*, No. 15 Civ. 2883, 2018 WL 1475398, at *4 (S.D. Ohio. Mar. 26, 2018) (where "[p]laintiffs have alleged a direct, explicit 'industry agreement,'" they "thus need not even show parallel conduct or plus factors").

The Distributors assert that "conscious commitment" to even an overt agreement *also* requires proof of tacit conspiracy. *See* Distributors Br. 6-7. But the cases they cite hold no such thing. Instead, those cases merely find that the agreements entered into *did not restrain trade*, so that the second element of a Section One claim (a restraint) was missing rather than the first (an agreement). *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc*., 200 F.3d 307 (5th Cir. 2000), affirmed a grant of summary judgment and "refuse[d] to find a violation based solely upon the existence of contracts between insurance companies and auto glass repair providers" because they were "nothing more than contracts between a supplier and a purchaser of a particular service for a negotiated price." *Id.* at 313 & n.7. And *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), found no restraint of trade when the defendants "charge[d] [each

5

other] a higher price than their cost of business to make a profit." *Id.* at 1049.   Likewise, the Distributors' cases about "conclusory" antitrust complaints, Distributors Br. 6-7, deal with plaintiffs that failed to plead a restraint of trade.[2]   Those cases do not hold that an explicit contract could ***never*** be a restraint of trade, as Distributors suggest.  Their suggestion is absurd. *See* 15 U.S.C. § 1 (prohibiting "contract[s]" in restraint of trade).

The Distributors also argue that there can be no conspiracy because they "play no role in setting the terms of the contracts under which Plaintiffs may have purchased [Becton] products." Distributors Br. 7-8.   They stress that they enter into Dealer Notification Agreements with Becton and healthcare providers only after the prices for Becton's products are set by Becton and the GPOs under the Net Dealer Contracts.   But Distributors do not deny that they ***still entered into*** the Dealer Notification Agreements consciously.   And the Distributors make payments to the GPOs who ***are*** setting prices, Am. Compl. ¶ 45, allowing at least a plausible inference that the GPOs would set prices in a way that benefits the Distributors.   As a result, the Amended Complaint alleges an anticompetitive agreement between Becton and the Distributors regardless of precisely when the Distributors contribute to the conspiracy.

Defendants are liable as co-conspirators even if they did not set the Net Dealer Contracts' exclusive-dealing terms.   " 'Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing

---

[2] In *Tamburo v. Dworkin*, 601 F.3d 693, 699-700 (7th Cir. 2010), "[t]he federal claim allege[d] only that the defendants possessed 'monopoly power in the relevant market of dog breeding data,' which they acquired 'by means of anticompetitive and/or predatory conduct,' and that this 'violated provisions of Federal Antitrust statutes including 15 U.S.C. [§§] 1, *et seq.*' "  In *Goodloe v. National Wholesale Co.*, No. 03 Civ. 7176, 2004 WL 1631728, at *7 (N.D. Ill. July 19, 2004), the sole allegations in the complaint were that defendants acted "to harm [plaintiff], to the benefit of all others, including non-clients" by charging high prices for bad service. *Bucks v. Mr. Bults*, *Inc.*, 218 F. Supp. 3d 776, 780 (S.D. Ill. 2016), concerns the irrelevant topic of pleading standards for claims under the Family and Medical Leave Act. *Id.*   And *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984), found that "the injury that [the plaintiff] ha[d] alleged appear[ed] to be the result of procompetitive activity." *Id.* at 1110.  The Distributors are not bold enough to argue that their contracts ***promote*** competition.

different tasks to bring about the desired result.'" *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 803 (N.D. Ill. 2017) (quoting *Beltz Travel Serv., Inc. v. Int'l Air Trans. Ass'n*, 620 F.2d 1360, 1367 (7th Cir. 1980)).  Here, instead of setting the Net Dealer Contracts' exclusive-dealing terms, the Distributors carry out the separate tasks of enforcing those terms, of discouraging healthcare providers from switching to competitors' products, and of making cash payments to the GPOs that give the GPOs an incentive to choose terms that are in both the Distributors' and Becton's interests.  Am. Compl. ¶¶31, 45-46.  Because they have agreed to perform ***those*** functions, they are liable even if they did not set prices directly.

Distributors next argue that they are "unnecessary" to the conspiracy.  Distributors Br. 9-10.  They claim that, if they did not exist, Becton "would still be able to insist upon the same sole/dual sourcing and price discounts about which Plaintiffs complain."  *Id.* at 10.  But Becton obviously benefits by selling its products through the Distributors instead of handling the difficulties and costs of retail sales itself.  And Becton can also use the Distributors to police compliance with the Net Dealer Contracts' anticompetitive terms.  The Seventh Circuit has recognized the "theory . . . that [] wholesalers" would join a Section One conspiracy with a manufacturer by acting as "the manufacturer's cats-paws."  *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 614 (7th Cir. 1997); Becton MTD Opp. 16.  The Distributors act as Becton's cats-paws:   Becton is given direct access to the Distributors' sales personnel by paying them extra commissions, Am. Compl. ¶46, offering Becton the opportunity to monitor the Distributors' compliance with Becton's exclusivity requirements.  Rather than being "unnecessary," the Distributors are central to the conspiracy.  In any event, whether the Distributors are "unnecessary" to the scheme is a question of fact that should not be decided at

the pleading stage.[3]

The Defendants also deem the terms they agreed to "unremarkable" and claim that those acts do not "suggest that an [unlawful] agreement was made." Distributors Br. 10-11 (quoting *Twombly*, 550 U.S. at 556). That makes no sense: Exclusive-dealing arrangements like those alleged here violate Section One if they "foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *see Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). The Distributors do not deny that the Amended Complaint pleads how the Defendants' scheme forecloses competition. And whether Distributors *wanted* to help Becton is irrelevant: "[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948); *see also Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001) ("Antitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy."). Instead, all Plaintiffs need allege is a "meeting of minds" on the *terms* that Plaintiffs allege restrain trade. *Omnicare*, 629 F.3d at 706 (quoting *Am. Tobacco*, 328 U.S. at 810); *see Wilk*, 719 F.2d at 231. Because Plaintiffs meet *that* standard, Distributors' arguments about their motives are beside the point.

---

[3] The Distributors' cited cases do not show that a co-conspirator can be dismissed at the pleading stage simply because it protests it is "unnecessary." *See* Distributors Br. 10 & n.5. As one case they cite explains, a distributor may not help a manufacturer expand market share when the manufacturer "deals exclusively with one downstream player." *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14 Civ. 804, 2015 WL 5693735, at *13 (N.D. Ill. Sept. 28, 2015). The other case they cite – *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23 (2d Cir. 2006) – deals with the same situation. *See VBR Tours*, 2015 WL 5693735, at *13. By contrast, when multiple "downstream buyers [are] purchasing exclusively from one upstream seller, threatening to foreclose opportunities to other sellers," the distributors' participation "threatens to expand the seller's market share." *Id.* (citing *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), and *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)). In any event, Distributors do not have to specifically increase Becton's market share to be jointly and severally liable as co-conspirators; they need merely agree to and carry out *some* task to help the conspiracy. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 803 (quoting *Beltz Travel Serv.*, 620 F.2d at 1367).

Finally, the Distributors urge that the Amended Complaint contains "contradictions." Distributors Br. 12.  They think it incompatible that Becton's penalty-pricing scheme deprives Plaintiffs of discounts if they switch from Becton products while Becton's prices are higher than competitors'.  *Id.*  That argument misreads the Amended Complaint.  Plaintiffs allege that Becton's sole-source, long-term contracts "have the practical effect of preventing healthcare providers from being able to purchase non-Becton products for years" and "prevent[ing] Becton's competitors from obtaining sufficient market shares and resources to bid down Becton's pricing."  Am. Compl. ¶¶41, 60.  Plaintiffs do not buy more non-Becton products, they allege, because the conspiracy prevents other manufacturers from obtaining the economies of scale necessary to compete with Becton, or even from coming into existence.  Whether the conspiracy in fact has that effect is a fact question not suitable for the pleading stage.

## B.    *Brunswick* Does Not Control Here

In arguing against a conspiracy, Distributors rely heavily on a district court decision that rejected **Section Two** monopolization claims against Becton.  Distributors Br. 8 (citing *Glynn-Brunswick Hosp. Auth. v. Becton*, 159 F. Supp. 3d 1361 (S.D. Ga. 2016)).  *Brunswick* does not apply here for multiple reasons.[4]

First, *Brunswick* is inapposite because that case involved Section **Two** Sherman Act monopolization claims, not Section **One** conspiracy claims.   159 F. Supp. 3d at 1367.  Having pleaded Section Two claims, the plaintiffs there had to show that the Distributors joined Becton's conspiracy with the **specific intent** to monopolize.  *Id.* at 1376.  To allege a Section One conspiracy, by contrast, Plaintiffs "need not prove intent to control prices or destroy competition."  *Paladin Assocs.*, *Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1153-54 (9th Cir.

---

[4] The Distributors do not argue that *Brunswick* has preclusive effect.  If they did, that argument would fail.  *See* Becton MTD Opp. 12-13.

2003); *see also McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 243 (1980) (in "a civil action under the Sherman Act, liability may be established by proof of ***either*** an unlawful purpose or an anticompetitive effect").   Instead, all a Section One agreement requires is "a meeting of minds in an unlawful arrangement.'"   *Omnicare,* 629 F.3d at 706 (quoting *Am. Tobacco Co.*, 328 U.S. at 810).   Because *Brunswick* required – and found lacking – a showing of specific intent not needed here, it is inapplicable to this case.

Moreover, *Brunswick* found that no conspiracy existed because there were no allegations that Becton "and the distributor[s] negotiate at any time."   159 F. Supp. 3d at 1375.   That is irrelevant here:   Even if the Distributors' participation in the conspiracy was merely passive or reluctant, they are still liable.   *Paramount Pictures*, 334 U.S. at 161.   But the Distributors are ***not*** passive in the Defendants' scheme.   They make volume-based cash payments to the GPOs that motivate the GPOs to negotiate terms that serve the Distributors' interests.   Am. Compl. ¶45.   And this Amended Complaint alleges separate formal and informal agreements that Becton and the Distributors negotiate apart from the Net Dealer Contracts.   Am. Compl. ¶¶45-46.[5]

Becton and each Distributor negotiate terms such as the enforcement of Becton's penalty pricing scheme and the Distributors' cash payments to the GPOs.   Am. Compl. ¶45.   And the Amended Complaint also describes informal arrangements that Becton and the Distributors reach to cement the conspiracy and share Becton's monopoly rents.   In addition to the cash payments the Distributors make to the GPOs, Becton pays extra commissions to Distributors' sales staff if they sell Becton products instead of competitors' products, providing Becton valuable direct

---

[5] These facts also distinguish *Brunswick*'s rejection of the pass-on theory under Section Two.   In *Brunswick*, the court found the allegations of pass-on incompatible with a vertical conspiracy.   159 F. Supp. 3d at 1375.   Here, it is not foregone that overcharges are "passed on" because the GPOs also set the prices with Becton, and the Distributors are paid by Becton in addition to the markup.   Am. Compl. ¶46. And even if overcharges are "passed on" to Distributors, *Illinois Brick* does not apply because all co-conspirators are jointly and severally liable.   As a result, "[t]he difficulty of tracing overcharges through the chain of distribution therefore is unimportant." *Paper Systems*, *Inc. v. Nippon Paper Indus.Co.*, 281 F.3d 629, 633 (7th Cir. 2002); *see* Becton MTD Opp. 4-5.

access to Distributor personnel that it can use to monitor compliance with Becton's exclusivity terms. *Id.* ¶46. Becton also requires that the Distributors' promotional materials emphasize Becton products. *Id.* And Becton has asked Cardinal, its largest distributor, to commit to not induce its customers to buy competing products. *Id.* Each of those allegations shows that Becton and the Distributors are involved in negotiating their own agreements that bolster a common anticompetitive scheme. Because those allegations are not in the *Brunswick* complaint, *Brunswick* does not apply.

The Distributors also cite *Brunswick* to argue that the benefits they receive from the scheme "do not support an argument that the Distributors joined a conspiracy." Distributors Br. 11 (citing *Brunswick*, 159 F. Supp. 3d at 1376 n.9). That is wrong. The Court can infer the Distributors' purpose to aid Becton's conspiracy from both the benefits the Distributors receive and from the specific tasks they carry out to further that conspiracy, such as paying the GPOs or giving Becton access to their sales personnel. *See* Am. Compl. ¶¶ 45-46; pp. 3-7, *supra.* Those allegations were not present in *Brunswick*. 159 F. Supp. 3d at 1376. Once again, however, *Brunswick* was addressing the plaintiffs' **Section Two** claims, which required the Distributors to be "motivated to maintain [Becton's] monopoly power." *Id.* at 1377 & n.9. To allege commitment to a Section One agreement, Plaintiffs need only allege that the Distributors **agreed to the terms they agreed to** in the Dealer Notification Agreements. *Omnicare,* 629 F.3d at 706 (quoting *Am. Tobacco Co.*, 328 U.S. at 810). As long as those terms have an anticompetitive effect, Plaintiffs do not **also** need to show that the Distributors had an anticompetitive motive. *McLain*, 444 U.S. at 243.

Finally, Distributors cite *Brunswick* to assert that they could be harmed by Becton's higher prices. Distributor Br. 11. They do not assert that they are actually harmed by their

11

arrangements with Becton – nor have they defected and sued Becton, as other distributors have. *Cf. In re Hypodermic Prods. Antitrust Litig.*, 484 F. App'x 669 (3d Cir. 2012) (distributors who sued Becton had standing). And their argument does not make sense. If the Distributors found their arrangement with Becton unprofitable, they could always leave it. In any event, whether the contracts "harm" the Distributors – or give them a share of Becton's monopoly rents – is a factual question that cannot be resolved at the pleading stage. *Brunswick* offers no support for dismissing this Amended Complaint because the Distributors were purportedly "harmed."

## C.   Distributors' "Rimless Wheel" Arguments Fail

Distributors also argue that the Amended Complaint must be dismissed for alleging a "rimless wheel" conspiracy. Distributors Br. 12-17. They claim that Section One simply cannot reach the Defendants' combined scheme without an explicit "horizontal agreement among the Distributors." *Id.* at 13. But their claim defies Supreme Court and Seventh Circuit precedent. And the out-of-Circuit cases they cite are not persuasive.

### 1.   *Supreme Court Precedent and Circuit Precedent Refute the Distributors' Arguments*

The Amended Complaint alleges that the Distributors each knowingly joined a scheme to restrain trade that was centrally organized by Becton. Am. Compl. ¶¶ 40-51. Both the Supreme Court and the Seventh Circuit have expressly held that such a centrally-arranged scheme is a single Section One conspiracy. *United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000); *see also Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 146 (6th Cir. 1972) (standards for "rimless wheel" conspiracy); *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1279 n.14 (8th Cir. 1983) (similar); GPO MTD Opp. 2-6. Contrary to the Distributors, "[a]cceptance by competitors, **without previous agreement**, of an invitation to

participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." *Interstate Circuit*, 306 U.S. at 227 (emphasis added).

The Distributors' argument is directly contrary to *Masonite*.   In that case, various distributors had each independently agreed with Masonite, a manufacturer, to fix prices.  316 U.S. at 275.   Just like here, no explicit horizontal agreement was alleged between the distributors.  Each "acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others."  *Id.*  Moreover, "Masonite alone fixed the prices," and the other distributors "never consulted with Masonite concerning them."  *Id.* at 275-76.  The only allegation about the distributors' relationship with each other was that, "as the arrangement continued each became familiar with its purpose and scope."  *Id.* at 275.

If the Distributors were right, the Supreme Court would have entered judgment for the defendants in *Masonite* for failure to prove the distributors' explicit agreement with each other. But the Court did the opposite:  It found that the scheme was a single "price-fixing combination."  316 U.S. at 274.  Even if the distributors did not explicitly agree with each other to fix prices, "'[i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.'"  *Id.* at 275 (quoting *Interstate Circuit*, 306 U.S. at 226).  *Masonite* disproves the Distributors' claim that they cannot be liable for conspiracy simply because they did not directly deal with each other.

*Interstate Circuit* reached the same result.  There, the United States alleged that movie distributors and exhibitors had conspired to raise ticket prices and limit showings.  306 U.S. at

214-15. But the government was "without the aid of direct testimony that the distributors entered into any agreement with each other." *Id.* at 221. Instead, the evidence showed that the exhibitors had sent a separate letter to each of the distributors, "naming all of them as addressees," and making demands to restrain trade. *Id.* at 216-17. The distributors then each separately agreed to the exhibitors' demands. *Id.* at 218-19. Just like here, the distributors argued that they had only acted independently, but the Supreme Court rejected that argument. *Id.* at 221-27. Even if there was some evidence of agreement between the distributors, it held, "such agreement . . . was not a prerequisite to an unlawful conspiracy." *Id.* at 226. Instead, because "each distributor early became aware that the others had joined," and "[w]ith that knowledge they renewed the arrangement," the distributors were liable for joining a single conspiracy. *Id.* at 227. As the Court noted, "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Id.*

The Seventh Circuit, too, has applied this principle in a similar case. In *Toys "R" Us*, Toys "R" Us entered into separate agreements with several manufacturers to limit the products they would sell to competitor "warehouse clubs." 221 F.3d at 932. Like the Distributors here, Toys "R" Us argued that the scheme was "nothing more than a series of separate, similar vertical agreements between itself and various toy manufacturers." *Id.* at 935. The Seventh Circuit held otherwise. Even though there was no explicit agreement between manufacturers, the court noted that the "only condition" by which each toy manufacturer would agree with Toys "R" Us "was if it could be sure its competitors were doing the same thing." *Id.* at 936. "That," the Seventh Circuit held, "is a horizontal agreement." *Id.*[6]

---

[6] The Distributors claim that *Toys "R" Us* found a conspiracy "only because of evidence of a horizontal agreement at the manufacturer level." Distributors Br. 15 n.10. But *Toys "R" Us* never says that "evidence of a horizontal agreement" is the **only** way that actors at the same level of distribution can be liable for joining a larger conspiracy.

On a motion to dismiss, even less is required than what was shown in *Masonite*, *Interstate Circuit*, and *Toys "R" Us*: Those opinions all came after trials or hearings on the merits, while this case is merely at the pleading stage. *Interstate Circuit*, 306 U.S. at 213 ("final decree" after bench trial); *United States v. Masonite Corp.*, 40 F. Supp. 852, 854 (S.D.N.Y. 1941), *rev'd*, 316 U.S. 265 (1942) (case "tried largely on agreed facts," plus testimony); *Toys "R" Us*, 221 F.3d at 930 (case decided on "extensive administrative record"). To survive a motion to dismiss, Plaintiffs need only plausibly allege that, "'knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.'" *Masonite*, 316 U.S. at 275 (quoting *Interstate Circuit*, 306 U.S. at 226); *see Twombly*, 550 U.S. at 556. Both the identity of the terms agreed to by each Distributor and the Distributors' economic motives suggest the Distributors knowingly joined a common scheme.

First, just as in *Toys "R" Us*, Distributors acted against their own economic interests by agreeing to enforce "sole-source" or "dual-source" contracts and to pay fees based on volume to the GPOs. Am. Compl. ¶¶41, 45. Common sense would suggest that distributors would prefer free rein to sell many brands to healthcare providers. Moreover, Distributors would prefer the chance to offer a mix of some Becton syringes or catheters and some lower-priced non-Becton products without their customers being constrained by penalty-pricing schemes and sole-source contracts. Those actions contrary to the Distributors' economic motives suggest their agreement to a common anticompetitive scheme. *See Toys "R" Us*, 221 F.3d at 932 (fact that conspiring distributors' actions "ran against their independent economic self-interest" supported inference of conspiracy).

---

Any argument to that effect would contradict *Masonite* and *Interstate Circuit*. Instead, all the Plaintiffs need show is that other distributors knowingly joined in the same scheme, not that the distributors either implicitly or explicitly agreed with each other independent of Becton.

Other allegations reinforce the Distributors' knowing participation in a larger scheme controlled by Becton.  Each Distributor, the Amended Complaint alleges, agreed in the Dealer Notification Agreements to make the same volume-based cash payments, under the same types of Net Dealer Contracts, to the same GPOs.  Am. Compl. ¶¶41-45.  That common assent to a single type of agreement involving overlapping parties shows that, "as the arrangement continued, each [Distributor] became familiar with its purpose and scope."  *Masonite*, 316 U.S. at 275.  It is at least plausible that each Distributor would become aware that other Distributors had agreed to identical terms with Becton and were carrying out similar acts in furtherance of Becton's market dominance.  And the fact that each Distributor takes identical actions to support the scheme outside the scope of the Dealer Notification Agreements – such as having Becton pay Distributors' staff bonuses – reinforces that inference.  *See Interstate Circuit*, 306 U.S. at 218-19; *Toys "R" Us*, 221 F.3d at 932.  It is thus unnecessary to show that the Distributors made explicit agreements **with each other** when they each agreed to a common scheme with Becton.[7]

The Seventh Circuit cases Distributors cite about metaphorical "rims," "hubs," and "spokes" **support** that outcome.  If a "hub-and-spoke" conspiracy requires a "'rim' connecting the spokes," the only "rim" required is that "the spokes 'must have been aware of each other and must do something in furtherance of some single, illegal enterprise.'"  *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 860 (N.D. Ill. 2010) (quoting *United States v. Haynes*, 582 F.3d 686, 699 (7th Cir. 2009)); *see also United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007) (similar).  A "rim" is merely "an agreement to further a single design or purpose."  *United States v. Orlando*, 819 F.3d 1016, 1022 (7th Cir. 2016).  Under these standards, Plaintiffs easily

---

[7] While *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002) (cited at Distributor Br. 15), rejects the "rimless wheel" model, the parties in that case did not assert, and the court did not consider, whether *Masonite* supports that model.  *See* p. 18 n.10, *infra.*  That case is therefore distinguishable.

allege that the Distributors joined a single conspiracy.  There is no dispute the Distributors knew of each other and that Plaintiffs allege they each did something to support the restraint of trade. And the Distributors each also made agreements with one of the GPO defendants – Vizient and Premier – further connecting Becton to the Distributors.  As a result, a "rim" exists whether or not the Distributors explicitly agreed with, or even communicated with, each other.

*Orlando* shows that a "rim" means far less than what the Distributors claim it means.  In that case, a Hobbs Act prosecution, the government charged the defendants with conspiring to extort several companies; they had made trips to different firms' offices to threaten violence if debts owed them were not repaid.  819 F.3d at 1019.  One defendant, McManus, argued that he had not joined the overarching conspiracy because he had only made one trip to extort one company.  *Id.* at 1021.  He thus argued that the conspiracy was a "hub-and-spoke" and that "he had no connection, or 'rim,' to the other 'spokes.'"  *Id.*   The Seventh Circuit disagreed and found that "McManus agreed to join the overarching conspiracy, rather than just a smaller conspiracy.   Even though McManus did not participate in the previous extortion attempts, those attempts involved the same individuals, a common method, and an identical goal.   These similarities, in particular the same goal, supply the 'rim' connecting the New Jersey trip" McManus went on "to the previous two trips."  *Id.* at 1022.

Here, like *Orlando*, the different Distributors' contracts involve the same, overlapping persons – Becton and the two conspiring GPOs, Vizient and Premier.   They also involve a common method – the penalty-pricing, sole-source, and long-duration terms in the contracts the Distributors make.  And each contract, the Amended Complaint alleges, has the identical goal of restricting healthcare providers' ability to choose non-Becton products and allowing all members of the conspiracy to share in Becton's monopoly rents.  *See* Am. Compl. ¶¶ 54-57.   That is

enough to show a "rim."  *Orlando*, 819 F.3d at 1021.  The Distributors' other cases about this "basic tenet of conspiracy law," Distributors Br. 14 & nn. 7-8, likewise either require only knowing agreement to a larger scheme to supply the "rim"[8] or do not address requirements for pleading a "rim" at the motion to dismiss stage.[9]  Because it is at least plausible that the Distributors have knowingly joined a larger scheme with Becton, knowing of the participation of other Distributors and GPOs, this Court can easily infer the "rim" that the Distributors demand.

### 2.    *The Distributors' Out-of-Circuit Cases Are Not Persuasive*

The Distributors also rely heavily on out-of-circuit cases to suggest that proof of explicit agreement between the "spokes" is required at the pleading stage.  Distributors Br. 15 (citing *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002); *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 420 (5th Cir. 2010)).  Those cases are not relevant here.  None of the plaintiffs in those cases even argued, as Plaintiffs do here, that under *Masonite* and *Interstate Circuits,* they could show a "rim" in the form of knowing agreement to the conspiracy.[10]  When

---

[8] *United States v. Lekacos*, 151 F.2d 170, 172 (2d Cir. 1945), *rev'd sub nom. Kotteakos v. United States*, 328 U.S. 750 (1946) (no single conspiracy because evidence did not show that each conspirator took "steps in furtherance of a purpose common to him and them"); *Bustamante*, 493 F.3d at 886 (one drug dealer's phone call with, and agreement to store drugs for, his supplier showed that he "agreed to participate in the larger conspiracy"); *United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008) (no "rim" where the government "failed to prove a common goal as between the customers"); *United States v. Chandler*, 388 F.3d 796, 808 (11th Cir 2004) (no single conspiracy where the "spokes knew nothing about each other or, indeed about" the hub's "overall scheme").

[9]*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (not deciding on whether a "rim" can be proved without horizontal agreement "because Plaintiffs made it clear before the district court and on appeal that their theory of the case depends on establishing those horizontal agreement"); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 557 (S.D.N.Y. 2014) (stating that a "rim" was required but finding that whether a "rim" was required was "not an issue the Government need address at [the pleading] stage"); *In re K-Dur Antitrust Litig.*, No. 01 Civ. 1652, 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016) (granting summary judgment for failure to show single conspiracy, without addressing pleading requirements); *cf. In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 537 (D.N.J. 2004) (finding that plaintiffs had stated a single-conspiracy claim because they "alleged facts sufficient to show that each party knew of the unlawful nature of the conspiracy, from which knowledge of other co-conspirators' role in the conspiracy can be inferred").

[10] *See* Br. for Appellant Dental Labs, *Howard Hess Dental Labs Inc. v. Dentsply Int'l, Inc.*, Nos. 08-1693 & 08-1694, at 66-69 (3d Cir. Dec. 15, 2008) (asserting single conspiracy without citing *Masonite, Interstate Circuit*, or

a point is "not argued in" a case, that case "simply is not persuasive authority" on that point. *Simer v. Rios*, 661 F.2d 655, 678 (7th Cir. 1981). Nor did those cases involve the situation here, where the Distributors are connected to each other both through Becton and the GPOs.

Those cases also are not compatible with *Masonite, Interstate Circuit*, and *Toys "R" Us*. As the dissent in *Dickson* noted, "[t]he law has been clear that there need not be an express agreement between every conspirator in order for a single conspiracy to be formed." *Dickson*, 309 F.3d at 217 (Gregory, J., dissenting (citing *Masonite*, 316 U.S. at 275, and *Interstate Circuit*, 306 U.S. at 227)). If *Dickson*, *Howard Hess*, and *Leegin* require an explicit agreement between conspirators, that defies the Seventh Circuit's recognition of a single conspiracy in *Toys "R" Us*. *Cf. Toys "R" Us*, 221 F.3d at 992 (no explicit agreement required). At best, *Dickson*, *Howard Hess*, and *Leegin* represent the other side of a circuit conflict that, unlike the Sixth, Seventh, and Eighth Circuits, incorrectly requires explicit agreement between conspirators. *See id.*; *Elder-Beerman*, 459 F.2d at 146; *Impro Prods.*, 715 F.2d at 1279 n.14. Those cases offer no reason to deviate from the Supreme Court's and Seventh Circuit's clear rulings.[11]

## III.   THE DISTRIBUTORS' PROXIMATE CAUSE ARGUMENTS FAIL

Finally, two of the defendants – Cardinal Health and Owens & Minor – make the same causation argument as one of the GPOs, Premier. Distributors Br. 17; GPO Br. 18-19. They

---

*Toys "R" Us*); *Dickson*, 309 F.3d at 203 (noting that the plaintiff did "not argue that it [was] able to meet the test for establishing a 'rim' between" different defendants); Br. for Appellant, *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, No. 09-40506, at 38-40 (5th Cir. Aug. 10, 2009) (arguing for a "hub-and-spoke" conspiracy without alleging any "rim" or citing *Masonite* or *Interstate Circuit*).

[11] Finally, if the Court finds that the single conspiracy was improperly pleaded, Plaintiffs respectfully request leave to amend to allege multiple conspiracies. The Distributors ask for a dismissal "with prejudice," Distributors Br. 18, but do not explain why. They are wrong. "Ordinarily . . . a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) (collecting cases); *see* Fed. R. Civ. P. 15(a)(2) (leave to amend should be "freely give[n]"). Leave should be denied only when "it is ***certain*** from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Runion*, 786 F.3d at 519-20. (citation omitted). Because Distributors do not even try to meet that standard, leave should be given to amend the Amended Complaint if the Court finds any deficiency.

claim that, because "none of the Plaintiffs purchased anything from either of these distributors," "none of the alleged harm about which Plaintiffs complain can be traced to anything that either [Cardinal] or [Owens & Minor] have done."  Distributor Br. at 17.

That argument is as meritless as it is when pressed by Premier.  *See* GPO MTD Opp. 14. "An antitrust violation need not be the sole cause of the alleged injuries" – it must merely be "a material element of, and substantial factor in producing, the injury."  *Greater Rockford Energy & Tech. Co. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993); *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).  Thus, if a defendant's acts helped cause antitrust injury, whether the defendant sold to plaintiffs directly does not matter.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) (purchaser of hearing aid from one manufacturer could sue manufacturers as a group "because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct"); *see also Sanner v. Bd. of Trade*, 62 F.3d 918, 928 (7th Cir. 1995) (soybean sellers in spot market could pursue claims against price manipulation in a futures market that caused them injury).  The Distributors contributed materially to Plaintiffs' injuries by joining an agreement that raised the prices they paid.  That is more than enough causal connection for this case to proceed.[12]

## CONCLUSION

The Court should deny the Distributors' motion to dismiss.

---

[12] The Distributors' argument also fails if framed in terms of "standing."  *See* GPO Br. 5 n.1.  Standing doctrine "does not stand for the proposition . . . that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase)."  *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002).  Here, because Cardinal and Owens & Minor "participated in a cartel" to inflate prices, Plaintiffs, "[t]he first buyer[s] from a conspirator[,] [are] the right part[ies] to sue."  *Paper Sys., Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631 (7th Cir. 2002).  "That the plaintiffs did not buy from [them] directly, or at all, does not matter."  *Id.* at 634; *see also Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 923 (7th Cir. 2016).

Dated:    September 18, 2018                     Respectfully submitted,
          Chicago, Illinois


R. Stephen Berry                                /s/ Steven F. Molo
Berry Law PLLC                                  Steven F. Molo
1717 Pennsylvania Avenue, N.W.                  Allison M. Gorsuch
Suite 850                                       MoloLamken LLP
Washington, D.C. 20006                          300 North LaSalle Street
Telephone: (202) 296-3020                       Chicago, IL  60654
Facsimile: (202) 296-3038                       Telephone: (312) 450-6700
sberry@berrylawpllc.com                         Facsimile: (312) 450-6701
                                                smolo@mololamken.com
                                                agorsuch@mololamken.com

                                                Justin M. Ellis
                                                MoloLamken LLP
                                                430 Park Avenue
                                                New York, New York  10022
                                                Tel.: (212) 607-8160
                                                Fax: (212) 607-8161
                                                jellis@mololamken.com


*Attorneys for Plaintiffs and Proposed Class Co-Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on September 18, 2018, I caused the foregoing memorandum of law

to be served on all counsel of record by filing it with the Court's CM/ECF system.


September 18, 2018
Chicago, Illinois

/s/ Steven F. Molo