## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

MARION DIAGNOSTIC CENTER, LLC;
MARION HEALTHCARE, LLC; and
ANDRON MEDICAL ASSOCIATES,
individually and on behalf of all others
similarly situated,

                        Plaintiffs,

    v.

BECTON, DICKINSON, AND
COMPANY; PREMIER, INC.; VIZIENT,
INC.; CARDINAL HEALTH, INC.;
OWENS & MINOR DISTRIBUTION
INC.; MCKESSON MEDICAL-
SURGICAL INC.; HENRY SCHEIN,
INC.; and UNNAMED
BECTON DISTRIBUTOR CO-
CONSPIRATORS,

                        Defendants.

No. 18 Civ. 1059

Hon.  Nancy J. Rosenstengel

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## THE GPOS' MOTION TO DISMISS

R. Stephen Berry
Berry Law PLLC
(Admitted *Pro Hac Vice*)
1717 Pennsylvania Ave., N.W.
Suite 850
Washington, D.C. 20006

Steven F. Molo
*Counsel of Record*
Allison M. Gorsuch
MoloLamken LLP
300 N. LaSalle St.
Chicago, IL  60654

Justin M. Ellis
MoloLamken LLP
430 Park Ave.
New York,  N.Y. 10022

*Attorneys for Plaintiffs and Proposed Class Co-Counsel*

## INTRODUCTION

Plaintiffs brought this Sherman Act Section One suit to restore competition in the United States markets for safety syringes, conventional syringes, and safety IV catheters.  Vizient and Premier are two "group purchasing organizations" ("GPOs") that were established to lower healthcare costs by combining the bargaining power of individual healthcare providers like Plaintiffs.  The GPOs' combined power was meant to allow providers to obtain fair prices from suppliers like Becton, Dickinson, & Co. for the relevant products.  Instead, the GPOs have conspired with Becton and Becton's distributors – from which Plaintiffs purchase directly – to raise prices for those products through exclusivity contracts that maintain Becton's monopoly.  Their conspiracy is played out through a web of anticompetitive agreements that drive up Becton's prices, suppress innovation, and foreclose competition for both quality and price.  The GPOs are central to this scheme.  By aggregating providers' purchasing power, the GPOs help empower Becton to maintain a dominant market share and charge prices above competitive levels.

Vizient and Premier now move to dismiss.  The GPOs do not deny that the Amended Complaint adequately alleges their agreement with the other Defendants, that the agreement restrains trade, and that the restraint of trade injures Plaintiffs.  Instead, the GPOs try to evade liability with fact-intensive arguments more suited for summary judgment or trial.

Each argument made by the GPOs fails.  Their claims about conspiracy law ignore basic Sherman Act principles.  Their claims about market power and substantial foreclosure mischaracterize the Amended Complaint and disregard pleading standards.  And Premier's arguments about proximate cause have no basis in law.

The Court should deny the GPOs' motion to dismiss.

## BACKGROUND

Plaintiffs adopt their consolidated statement of facts filed separately today.

## ARGUMENT

### I.  STANDARD OF REVIEW

A complaint need only allege a short and plain statement of "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 8(a)(2). A claim is plausible if it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "A complaint . . . does not need detailed factual allegations." *Twombly*, 550 U.S. at 555. Instead, a motion to dismiss fails if a complaint's allegations "raise a right to relief above the speculative level." *Id.*

These "general standards" apply fully to a Section One Sherman Act complaint. *Twombly*, 550 U.S. at 556. Antitrust claims do not require "heightened fact pleading of specifics." *Id.* at 570. All a plaintiff need do is state "enough factual matter (taken as true) to suggest that an agreement was made" and to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556, 570.

### II.  THE AMENDED COMPLAINT STATES A SECTION ONE CLAIM

A Section One claim has three elements: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Deppe v. NCAA*, 893 F.3d 498, 501 (7th Cir. 2018) (alteration in original). Because Plaintiffs plausibly allege each element, the GPOs' motion to dismiss must be denied.

#### A.   The Amended Complaint Pleads a Section One Conspiracy

The GPOs argue at length that the Amended Complaint fails to plead a "conspiracy." Dkt. 84, GPO Br. 5-9. But the first element of a Section One claim – a "contract, combination, or conspiracy" – merely requires pleading "concerted action." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705-06 (7th Cir. 2011). That is, Plaintiffs must "tend[ ] to exclude the

2

possibility that the manufacturer and [the] distributors were acting independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 660 (7th Cir. 1987) (similar).   There is no dispute that Plaintiffs allege concerted action.   The Amended Complaint details how Defendants have formed a web of contracts and concerted practices – including long term, sole-source, and penalty pricing contract terms, and cash payments from Becton and the distributors to the GPOs – that restrict healthcare providers' choices and enable Becton to charge above-competitive prices.  Am. Compl. ¶¶ 40-51.

The GPOs are thus wrong to claim that a Section One "agreement must be conspiratorial."  GPO Br. 5.[1]  "'[C]onspiracy' in section 1 is simply a pejorative term for a contract, both 'conspiracy' and 'contract' signifying an agreement, a meeting of minds." *United States v. Nunez*, 673 F.3d 661, 664 (7th Cir. 2012).  And "[a]llegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" to show concerted action.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010); *see also Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 289-90 (4th Cir. 2012) (document "establish[ing] that the defendants convened and came to an agreement" suffices); *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011) ("To plead unlawful agreement, a plaintiff may allege ***either*** an explicit agreement to restrain trade, ***or*** sufficient circumstantial evidence tending to exclude the possibility of independent conduct" (emphasis added and quotation omitted)).   Because Defendants' conspiracy is embodied in explicit

---

[1] The GPOs' citations for this proposition say no such thing.  *Monsanto Co. v. Spray-Rite Services Corp.* states merely that "[i]ndependent action is not proscribed."  465 U.S. 752, 760-61 (1984).  And *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, a summary-judgment case, only found that, where there was no explicit agreement, meetings that were not "conspiratorial" did not imply an implicit agreement.  822 F.2d 656, 660-61 (7th Cir. 1987).

3

contracts and concerted practices, Plaintiffs need not *also* allege tacit conspiratorial behavior to show that Defendants are acting in concert. *See id.*; Distributors MTD Opp. 4-6.[2]

The GPOs also quibble whether Plaintiffs allege one conspiracy or several conspiracies. GPO Br. 6-8. In fact, one conspiracy is alleged. *See* pp. 4-6, *infra.* But "whether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003) (quotation omitted); *see also United States v. Elam*, 678 F.2d 1234, 1245 (5th Cir. 1982) (similar). Thus, "courts have generally rejected attempts by defendants to recharacterize a plaintiff's theory of an overarching conspiracy" as several conspiracies. *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1212 (N.D. Cal. 2015) (collecting cases).[3] Likewise here, whether Defendants have created one or many conspiracies is a fact question this Court should not decide on the pleadings.

Even so, Plaintiffs have pleaded a single conspiracy between all Defendants that is organized by Becton at its center. Am. Compl. ¶¶40-47. The GPOs assert that a "single vertical conspiracy" cannot "involv[e] both of the GPO Defendants" without an agreement "***between*** Premier and Vizient." GPO Br. 6 (emphasis in original). But both the Supreme Court and the Seventh Circuit have expressly held that such a centrally-arranged scheme is a single conspiracy even if not all participants deal directly with each other. *See United States v. Masonite Corp.*,

---

[2] The GPOs claim Plaintiffs lack standing. GPO Br. at 5 n.1. As described in Plaintiffs' opposition to Becton's motion to dismiss, filed today, that claim fails because Plaintiffs purchased directly from the conspiracy. Becton MTD Opp. 3-6; *Paper Sys., Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-32 (7th Cir. 2002); p. 14 n.18, *infra.*

[3] *See United States v. Northcutt*, No. 07 Cr. 60220, 2008 WL 162753, at *6 (S.D. Fla. Jan 16, 2008) (indictment charging one antitrust conspiracy rather than several conspiracies was not duplicative, even if the defendant could "demonstrate the existence of multiple independent conspiracies at trial"); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *38 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (rejecting argument that many conspiracies barred class certification because "[w]hether the plaintiffs' proof of such a [single] conspiracy is more or less compelling than the defendants' alternative theory" of several conspiracies "is a question of fact for the jury"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 607 (N.D. Cal. 2010) (similar), *amended in part*, No. 07-1877, 2011 WL 3268649 (N.D. Cal. July 28, 2011); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 265 (D.D.C. 2002) (similar).

316 U.S. 265, 275 (1942); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000); Distributors MTD Opp. 12-18.[4]

For example, in *Masonite*, various distributors each conspired to fix prices with Masonite, a manufacturer, even though each distributor "acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others."  316 U.S. at 274-75.  But "as the arrangement continued each became familiar with its purpose and scope." *Id.*  The Court found that the arrangement was a single "price-fixing combination":  Even if the distributors did not coordinate with each other, "'[i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.'" *Id.* at 274-75 (quoting *Interstate Circuit*, 306 U.S. at 226).[5]

Likewise, in *Toys "R" Us*, the FTC had found that a scheme to boycott warehouse clubs, orchestrated by Toys "R" Us through a series of vertical agreements with manufacturers, was a single Section One conspiracy.  221 F.3d at 934.  Each manufacturer had agreed with Toys "R" Us to join the boycott, assuming its competitors would do the same. *Id.* at 935-36.  The Seventh Circuit held that the boycott was a single "horizontal agreement among the toy manufacturers, with [Toys "R" Us] in the center as the ringmaster." *Id.* at 934.

*Masonite* and *Toys "R" Us* are directly on point.  Whether or not the GPOs deal directly

---

[4] The GPOs suggest that *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 730 & n.4 (1988), requires "alleg[ing] either a horizontal or vertical conspiracy."  GPO Br. 6.  Not so.  That case merely notes that some restraints have "traditionally been denominated" as "horizontal" or "vertical;" it does not require Section One complaints to conform precisely to one or the other model. *Bus. Elecs.*, 485 U.S. at 730.

[5] Any argument that *Kotteakos v. United States*, 328 U.S. 750, 755 (1946), implicitly overruled *Masonite* must fail.  "[I]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," lower courts "should follow the case which directly controls, leaving to [the] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quotation omitted).

with each other, the Amended Complaint alleges that each GPO deals with every other partici-pant in the scheme – including negotiating with Becton, receiving payments from distributors, and representing consumers such as Plaintiffs. Am. Compl. ¶¶44-46. It is at least plausible that the GPOs would each become familiar with the conspiracy's "purpose and scope," *Masonite*, 316 U.S. at 275, including that any GPO that helped suppress competition for Becton products would receive similar benefits. In particular, Becton uses the GPOs to impose identical sole-source and penalty pricing terms on each distributor, Am. Compl. ¶42, showing that the GPOs knowingly joined in a common scheme. Distributors MTD Opp. 15-16. Because the GPOs were at least plausibly aware of – and agreed to – Becton's broader scheme, the Amended Complaint alleges a single conspiracy. *Masonite*, 316 U.S. at 275; *Toys "R" Us*, 221 F.3d at 934.[6]

The GPOs also insist they did not act with "an anticompetitive purpose." GPO Br. 7. To the contrary, this Court can plausibly infer that the GPOs agreed to help Becton raise prices. The GPOs have the motive to negotiate higher prices so they can receive higher volume-based fees, and the fact that their negotiated prices for Becton products are higher than competitors' prices show that they acted on that motive. Am. Compl. ¶¶39, 45. But Plaintiffs "need not prove intent to control prices or destroy competition to demonstrate the element of an agreement." *Paladin Assocs., Inc. v. Mont. Power Co*., 328 F.3d 1145, 1153-54 (9th Cir. 2003) (quotation omitted). Instead, "a civil violation" of Section One "can be established by proof of ***either*** an unlawful purpose ***or*** an anticompetitive effect." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436 n.13 (1978) (emphasis added).[7] Plaintiffs allege that the conspiracy inflates prices and suppresses

---

[6] While *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 1992) (cited at GPO Br. 6), rejects the "rimless wheel" model, the parties in that case did not assert, and the court did not consider, whether *Masonite* supports that model. *See* Distributors MTD Opp. 18 n.10. That case is therefore distinguishable.

[7] The GPOs' cases (at 7) are not to the contrary. *Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) states merely that conspirators must "join[ ] the conspiracy and kn[o]w of its scope" to be liable. In *Greater*

quality and safety competition.   Am. Compl.  ¶¶58-62.   Because the conspiracy has anticompetitive *effects*, Defendants' arguments about *purpose* are beside the point.

Finally, the GPOs cite *Glynn-Brunswick Hospital Authority v. Becton, Dickinson & Co.*, 159 F. Supp. 3d 1361, 1376-77 (S.D. Ga. 2016), to argue that the Amended Complaint does not allege an agreement.  GPO Br. 8-9.   But *Brunswick* has no bearing whatsoever on this issue. That case involved only Section *Two* claims for attempted monopolization, not Section *One* claims of illegal agreements.  159 F. Supp. 3d at 1377.  And Section *Two*, unlike Section One, requires a "specific intent to monopolize."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Because *Brunswick* does not address a Section One agreement, it is irrelevant to this case.  Distributors MTD Opp. 9-10.  And the Amended Complaint also offers much more detail about the conspiracy than did the *Brunswick* complaint.  *Id.* at 10-11.  *Brunswick* offers no reason to doubt that the Amended Complaint alleges a single Section One conspiracy.[8]

## B.    The Amended Complaint Plausibly Pleads Market Power

The GPOs also argue that the Court should dismiss the Amended Complaint for failure to plead market power.  GPO Br. 9-14.  The GPOs are wrong.

Market power is a "question[ ] of fact."  *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 363 (9th Cir. 1988).  In nearly all cases, "[r]esolution of the market power question on a Rule 12(b)(6) motion is therefore inappropriate."  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008) (reversing motion to dismiss); *see Town of Norwood v. New England Power Co.*, 202 F.3d 408, 421 (1st Cir. 2000).  Instead, "[d]ismissals for insufficient

---

*Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391 (7th Cir. 1993),  the arrangement had *neither* an "unlawful purpose" or "anticompetitive effect."  998 F.2d at 397.  And *Southeast Missouri Hospital v. C.R. Bard, Inc.*, No. 07 Civ. 31, 2008 WL 199567, at *6 (E.D. Mo. Jan. 22, 2008), *refutes* Defendants' arguments about conspiracy:  "[T]here is no need to infer a conspiracy if there is an agreement to engage in common action."  *Id.*

[8] Finally, if the Court finds that the single conspiracy was improperly pleaded, Plaintiffs respectfully request leave to amend to allege multiple conspiracies.

pleading of market power are rare pre-discovery and are generally reserved for complaints bereft of factual allegations or which contain market share or market power allegations that are purely conclusory." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 340 (D. Vt. 2010) (collecting cases); *see Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) (market power is "frequently . . . addressed in a motion for summary judgment or trial").

As long as a court can plausibly "infer . . . sufficient market power" in a relevant market, a motion to dismiss on that basis should be denied. *Endsley*, 230 F.3d at 282. "[T]here are two ways of proving market power." *Toys "R" Us*, 221 F.3d at 937. "One is through direct evidence of anticompetitive effect." *Id.* "The second, more conventional source of evidence is a market-structure analysis, which provides circumstantial evidence of market power." *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp.*, No. 11 Civ. 268, 2016 WL 6091244, at *7 (N.D. Ind. Oct. 19, 2016) (citing *Toys "R" Us*, 221 F.3d at 937). Circumstantial evidence includes market share, barriers to entry, and other factors showing power to control prices. *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 720 (7th Cir. 1987).

The Amended Complaint offers both direct and circumstantial evidence of market power. First, it alleges direct evidence that Becton can raise prices in each of the three relevant markets: Becton's prices for the relevant products are 11% to 36% higher than its rivals. Am. Compl. ¶39. Plaintiffs also allege that the conspiracy suppresses quality competition. *Id.* ¶¶61-62.

Second, Plaintiffs allege substantial circumstantial evidence of market power. Am. Compl. ¶¶32-38. Not only does Becton have dominant shares in the relevant markets, *id.* ¶¶33, 35, but high barriers of entry protect that dominance, including healthcare providers' reliance on GPOs, Becton's large economies of scale, and regulatory barriers, *id.* ¶¶36-38. The distributors also control a massive share of the distribution of medical devices and, in the words of a leading

investment firm, have erected "wide economic moats" that "keep new entrants at bay." *Id.* ¶35.[9] And Vizient and Premier control 75% of annual medical device spending in the United States, *id.* ¶¶12-13, allowing Becton to control a huge swath of sales by reaching anticompetitive agreements with those GPOs. The Defendants' combined power over different aspects of the medical device purchasing process allows Becton to raise prices in the relevant markets above competitive levels. These allegations bolster direct evidence of higher prices to show that the conspiracy aids Becton's market power. *Toys "R" Us*, 221 F.3d at 937.

The GPOs argue that Plaintiffs must allege how they ***individually*** have market power. GPO Br. 9, 12-13. That is wrong. "[I]nquiries into market definition and market power . . . determine whether ***an arrangement*** has the potential for adverse effects on competition," not whether an individual conspirator by itself has market power. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) (emphasis added). "The relevant focus of the §1 inquiry . . . is the anti-competitive effects of the conspiracy qua conspiracy." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4h Cir. 2002); *see Spectators' Commc'ns Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001) (similar). Thus, courts aggregate market shares in exclusive-dealing cases to show the conspiracy's anticompetitive effects as a whole. *See, e.g.*, *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 395 (1953) (aggregating market shares in exclusive-dealing case).[10] By contrast, the GPOs' cases are irrelevant because they do not

---

[9]  Morningstar, *Healthcare Observer* (Apr. 2014), http://corporate1.morningstar.com/WorkArea/DownloadAsset.-aspx?id=9217.

[10]  *See also, e.g.*, *Std. Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 357 (1922) (aggregating market share in exclusive-dealing case); *Genicon, Inc. v. Ethicon, Inc.*, No. 04 Civ. 229, 2006 WL 7134667, at *3 (E.D. Tex. Mar. 23, 2006) (same); *Masimo Corp. v. Tyco Health Care Grp.*, No. 02 Civ. 4770, 2004 WL 5907538, at *17 (C.D. Cal. June 10, 2004) (same).

involve the single coordinated scheme alleged here.[11]

There is no dispute that Plaintiffs allege how the conspiracy helps Becton to charge above-competitive prices. Nor is there any dispute that barriers to entry and the Defendants' economies of scale are indirect evidence of how the conspiracy aids Becton's market power. Because the relevant question is whether the conspiracy as a whole had anticompetitive effect, Plaintiffs need not also show that the GPOs, by themselves, have market power. *Ind. Fed'n of Dentists*, 476 U.S. at 460; *Dickson*, 309 F.3d at 210; *Colonial Country Club*, 253 F.3d at 225.[12]

In any event, Plaintiffs also allege that the GPOs' dominant 75% share of medical device spending nationwide, Am. Compl. ¶¶ 12-13, is circumstantial evidence of how the conspiracy aids Becton's power to set prices in the relevant markets. Because GPOs offer the most practical channel for providers to buy from suppliers like Becton, providers rarely contract with suppliers individually, Am. Compl. ¶ 36, helping to block Becton's competitors from entering the market. The GPOs assert that their control over the sale of medical devices and supplies generally says nothing about their share of the specific markets here. GPO Br. 11-12. It is obvious, however, that controlling a super-majority of ***all*** medical devices and supplies could plausibly mean that the GPOs also control a ***subset*** of medical devices in the relevant markets. The GPOs' cited

---

[11] *Dickson*, 309 F.3d at 204 (plaintiff "alleged . . . separate vertical conspiracies"); *Zinser v. Rose*, 868 F.2d 938, 939 (7th Cir. 1989) (the "essence of the charge here [was] that each individual contract" was a separate "vertical conspiracy"); *Se. Mo. Hosp.*, 2008 WL 199567, at *6 (plaintiff "fail[ed] . . . to allege with any specificity that [the competitors] ha[d] an agreement to act as one"); *Paddock Publications, Inc. v. Chicago Tribune Co.*, No. 93 Civ. 7493, 1995 WL 632031, at *4 (N.D. Ill. Oct. 25, 1995)  (plaintiffs alleged only "individual exclusive licenses or contracts lawfully and independently entered into").

[12] The GPOs' citation to *Dickson*, GPO Br. 9-10, reads that case out of context.  There, plaintiffs had alleged that two computer manufacturers had each entered into separate vertical conspiracies with Microsoft to tie Microsoft's software to the manufacturers' computers. 309 F.3d at 200.  While plaintiffs alleged that the arrangement affected prices in the software market, the Fourth Circuit also required proof of the manufacturers' individual ability to affect prices in the PC market:  For the tying scheme to work, the manufacturers' "ability to influence competition in the relevant software markets through their separate agreements with Microsoft is dependent on their ability to influence competition in the PC market." *Id.* at 207 n.18.  By contrast, Plaintiffs here allege ***one*** conspiracy that does not involve tying claims.  *Dickson* thus provides no support for requiring the GPOs individually to have market power.

cases do not prove otherwise.[13]   And the GPOs' ability to help Becton raise prices is even more obvious when considering barriers to entry, as the GPOs fail to do.  Am. Compl. ¶¶ 36-38.

The GPOs also use creative math to deem their individual shares "insufficient as a matter of law."  GPO Br. 11-12.  But what matters is the conspiracy's effect as a whole on Becton's power to set prices.  *See* pp. 9-10, *supra*.  Even if the GPOs' math were right, it would show that Vizient and Premier together control purchasing decisions for 57.5% of the relevant markets – a fact that ***supports*** the conspiracy's anticompetitive effects.  But the GPOs' math is wrong.   That Vizient controls 50% of all medical devices does not mean Vizient controls exactly 50% of Becton's 60% share in the relevant markets (when, in fact, it may control far more).

Finally, the GPOs urge the Court to take judicial notice that, in 2016, Vizient bought MedAssets, another GPO.  GPO Br. 14.  They draw the speculative inference that Vizient's share of healthcare spending was therefore "necessarily lower" from 2014 to 2016.  *Id*.  That argument is not proper on a motion to dismiss, where the Court must draw all reasonable inferences in Plaintiffs' favor.  Nor would it warrant dismissal even if it were true.  Vizient's share of healthcare spending over time, and how much it added to the conspirators' market power, are fact questions that should not be addressed on the pleadings.  The GPOs' motion must be denied.

## C.    The Amended Complaint Pleads Substantial Foreclosure

The GPOs also wrongly argue that the Amended Complaint fails to plead how the conspiracy substantially foreclosed competition in the relevant markets.  GPO Br. 14-19.

---

[13] In *Rheumatology Diagnostics, Lab v. Aetna, Inc.*, No 12 Civ. 5847, 2014 WL 524076, at *12-14 (N.D. Cal. Feb. 6, 2014), a case about markets for laboratory testing, plaintiffs' allegations about the number of patients with a certain insurance carrier failed to state market power where allegations included the market for certain lab tests. That total mismatch between the relevant market and market share does not affect this case, in which the relevant markets are a subset of the nationwide market for medical devices and supplies.  And *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1031-32 (N.D. Cal. 2015), deals with the ***opposite*** situation – one where allegations from a smaller market could not be used to infer market power in a broader market.

Those arguments are improper. "'[W]hether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage.'" *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 958 (N.D. Ill. 2018) (quoting *In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*, No. 12 Civ. 711, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013)).[14]

Moreover, Plaintiffs have amply pled how Defendants foreclose competition. The Net Dealer Contracts routinely contain "sole-source" or "dual-source" provisions requiring providers to "purchase only Becton products" or the products of only one other competitor. Am. Compl. ¶41. Those contracts also contain disloyalty penalties that punish providers with higher prices if they switch from Becton products, making even dual-source contracts exclusive in practice. *Id.* ¶¶41, 43. The agreements are long-term, restricting providers' ability to switch brands. *Id.* ¶¶41-42. Becton has used false advertising and patent infringement to exclude competitors. *Id.* ¶¶49-50. And the conspiracy suppresses quality competition. *Id.* ¶¶60, 62.

Such practices allow Becton to exclude its rivals from a large share of the relevant market. Am. Compl. ¶39. This Court can infer substantial foreclosure from the Defendants' market shares. *Omega Envtl, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) ("[F]oreclosure . . . depends on the market share involved" (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶570b1)); *Marion Healthcare, LLC v. So. Ill. Healthcare*, 12 Civ. 871, 2015 WL 3466585, at *6 (S.D. Ill. May 29. 2015) (inferring foreclosure from market share). Becton's dominant share of the relevant markets, Am. Compl. ¶33, easily implies that the conspiracy can suppress competition. The GPOs' 75% share of U.S. medical-device spending,

---

[14] *See also Kentucky v. Marathon Petroleum Co*., *LP*, 191 F. Supp. 3d 694, 702 (W.D. Ky. 2016) (similar); *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1229 (D. Kan. 2013) (similar). The GPOs' citation of *Ohio v. American Express Co*. (GPO Br. 12 n.9) is similarly unhelpful: That case addresses how to **prove** anticompetitive effects of vertical restraints at trial. *See* 138 S. Ct. 2274, 2283, 2285 n.7 (2018).

*id.* ¶34, also shows the conspiracy's power to exclude competitors.  And the GPOs' attempt to recalculate their share using creative math, GPO Br. 18, works no better in the substantial-foreclosure context than it does in the market-power context.  *See* p. 11, *infra.*

The GPOs also complain that Plaintiffs "do[ ] not allege how many contracts were sole-source or dual-source, or contained rebate 'penalty' provisions," claiming that some "providers have ample alternatives" to Becton.  GPO Br. 15, 17.  Those "alternatives" are illusory when the penalty-pricing provisions that punish buying from Becton's competitors make even "dual-source" contracts sole-source in practice.  But the "test is not ***total*** foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."  *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 838 (11th Cir. 2015) (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)).  Just how many contracts are dual source and how much dual source contracts promote competition are fact questions this Court should not decide at the pleading stage.  *Dealer Mgmt. Sys.*, 313 F. Supp. 3d at 958.[15]

Similarly, the GPOs complain that Plaintiffs do not set forth the precise "threshold percentages of foreclosure" caused by the conspiracy.  GPO Br. 17-18.  At most, however, their cited cases might require specific figures about exclusivity at ***summary judgment*** or ***trial***.[16]  At the ***pleading*** stage, the same courts are clear:  A lack of "exact percentage [of] foreclosure in

---

[15] Defendants' cases do not hold otherwise.  *Cf.* GPO Br. at 15-16.  In *Abbyy USA Software House, Inc. v. Nuance Communications Inc.*, No. 08 Civ. 1035, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008), plaintiffs did not "allege that the [defendants'] dominance . . . has the effect of restricting competition."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 996 (9th Cir. 2010), a summary-judgment case, involved short-term contracts that consumers "could choose at anytime" to terminate.  And *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996), does not say ***how much*** competition must be foreclosed.

[16] *Hyde v. Jefferson Par. Hosp. Dist. No. 2*, 686 F.2d 286, 287 (5th Cir. 1982) (trial), *rev'd*, 466 U.S. 2 (1984); *Dillon Materials Handling, Inc. v. Albion Indus.*, 567 F.2d 1299, 1300, 1305 n.19 (5th Cir. 1978) (trial); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13 Civ. 1054, 2016 WL 5817176, at *6 (C.D. Ill. Sept. 30, 2016) (summary judgment).  In Defendants' pleading-stage cases, the plaintiff's claims were dismissed because they had "not pled ***any foreclosure whatsoever*** in the relevant market."  *Abbyy USA*, 2008 WL 4830740, at *2 (emphasis added); *see also Eastman v. Quest Diagnostics, Inc.*, 108 F. Supp. 3d 827, 836 (N.D. Cal. 2015) (dismissing complaint with zero "allegations regarding th[e] competitors' prior market shares").

[the] pleadings" is not an "appropriate" basis to dismiss "under Rule 12(b)(6)." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13 Civ. 01054, 2015 WL 1399229, at *7 (C.D. Ill. Mar. 25, 2015); *see* pp. 11-12, *supra*.

### D.     Premier is a Proper Defendant

Finally, Premier's causation argument (GPO Br. 19) also fails.  Premier observes that Plaintiffs "never have purchased the relevant products using a GPO contract negotiated by Premier."  GPO Br. 20.  But "[a]n antitrust violation need not be the sole cause of the alleged injuries" – it must merely be "a material element of, and substantial factor in producing, the injury."  *Greater Rockford Energy*, 998 F.2d at 401.  Courts thus reject causation challenges by defendants whose acts raised prices but who did not sell to plaintiffs directly.  *See*, *e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) (purchaser of hearing aid from one manufacturer could sue manufacturers as a group "because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct"); *see also Sanner v. Bd. of Trade*, 62 F.3d 918, 928 (7th Cir. 1995).  Premier contributed materially to Plaintiffs' injuries by joining an agreement that raised the prices they paid.[17]  That is more than enough causal connection for this case to proceed.[18]

### CONCLUSION

The GPOs' motion should be denied.

---

[17] *Rubloff Development Group v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 741 (N.D. Ill. 2012), does not disagree: There, plaintiffs offered "**no** causal connection between the antitrust violation (restraining competing grocery stores in the Chicagoland area to raise grocery prices) and the Plaintiffs' injury (loss of a shopping center or its devaluation)."  *Id.* at 741 (emphasis added).

[18] Premier's complaint fares no better framed in terms of "standing."  *See* GPO Br. at 5 n.1.  Because Premier "participated in a cartel" to inflate prices, Plaintiffs, "[t]he first buyer[s] from a conspirator[,] [are] the right part[ies] to sue."  *Paper Sys.*, 281 F.3d at 631, 634.  "That the plaintiffs did not buy from [Premier] directly, or at all, does not matter."  *Id.* at 634; *see also Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 923 (7th Cir. 2016).  Premier claims that *Nippon Paper* does not apply because "there is no allegation of a conspiracy linking all defendants."  GPO Br. 19 n.14.  That is wrong.  *See* pp. 4-6, *supra*.

Dated:    September 18, 2018                          Respectfully submitted,
          Chicago, Illinois


R. Stephen Berry                                     /s/ Steven F. Molo
Berry Law PLLC                                       Steven F. Molo
1717 Pennsylvania Avenue, N.W., Suite 850            Allison M. Gorsuch
Washington, D.C.  20006                              MoloLamken LLP
Telephone: (202) 296-3020                            300 North LaSalle Street, Suite 5350
Facsimile: (202) 296-3038                            Chicago, IL  60654
sberry@berrylawpllc.com                              Telephone: (312) 450-6700
                                                     Facsimile: (312) 450-6701
                                                     smolo@mololamken.com
                                                     agorsuch@mololamken.com

                                                     Justin M. Ellis
                                                     MoloLamken LLP
                                                     430 Park Avenue
                                                     New York, New York  10022
                                                     Telephone: (212) 607-8160
                                                     Facsimile: (212) 607-8161
                                                     jellis@mololamken.com


                    *Attorneys for Plaintiffs and Proposed Class Co-Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 18, 2018, I caused the foregoing memorandum of law to be served on all counsel of record by filing it with the Court's CM/ECF system.


September 18, 2018
Chicago, Illinois

/s/ Steven F. Molo