# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

MARION DIAGNOSTIC CENTER, LLC;
MARION HEALTHCARE, LLC; and
ANDRON MEDICAL ASSOCIATES,
individually and on behalf of all others
similarly situated,

                              Plaintiffs,

        v.

BECTON, DICKINSON, AND
COMPANY; PREMIER, INC.; VIZIENT,
INC.; CARDINAL HEALTH, INC.;
OWENS & MINOR DISTRIBUTION
INC.; MCKESSON MEDICAL-
SURGICAL INC.; HENRY SCHEIN,
INC.; and UNNAMED
BECTON DISTRIBUTOR CO-
CONSPIRATORS,

                              Defendants.

No. 18 Civ. 1059

Hon.  Nancy J. Rosenstengel

## PLAINTIFFS' CONSOLIDATED STATEMENT OF FACTS
## IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS

R. Stephen Berry
Berry Law PLLC
(Admitted *Pro Hac Vice*)
1717 Pennsylvania Ave., N.W.
Suite 850
Washington, D.C. 20006

Steven F. Molo
*Counsel of Record*
Allison M. Gorsuch
MoloLamken LLP
300 N. LaSalle St.
Chicago, IL  60654

Justin M. Ellis
MoloLamken LLP
430 Park Ave.
New York,  N.Y. 10022

*Attorneys for Plaintiffs and Proposed Class Co-Counsel*

## CONSOLIDATED STATEMENT OF FACTS

Plaintiffs respectfully submit this consolidated statement of facts in support of their briefs filed today in opposition to the Defendants' motions to dismiss.[1]

## INTRODUCTION

Health care costs in this country are far higher than any other. But the quality of care is the same as, or even worse than, the quality offered in other rich nations.[2] A major reason why is monopoly: The U.S. health care market is not competitive.[3] This case offers a striking illustration. Defendants – Becton, Dickinson, & Co. ("Becton"), a manufacturer; Becton's distributors ("Distributors"); and the "group purchasing organizations" ("GPOs"), which broker prices for Becton products – have formed a web of anticompetitive agreements that affect U.S. markets for conventional syringes, safety syringes, and safety IV catheters. Those agreements drive up the prices of Becton products, suppress innovation, and deter competition for both quality and price.

Plaintiffs are small healthcare providers that the conspiracy forces to buy Becton products at above-competitive prices. They have brought this Sherman Act Section One action to restore competition in the relevant markets. Defendants have filed three motions to dismiss. None have merit. The case should proceed.

---

[1] This Court may – and should – consider factual allegations stated in Plaintiffs' briefs in addition to the allegations in the Amended Complaint. "Facts alleged by a plaintiff in a brief in opposition to a motion to dismiss 'may be considered when evaluating the sufficiency of a complaint so long as they are consistent of the allegations in the complaint.'" *Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015) (collecting cases).

Pursuant to Local Rule 7.1(d), this consolidated statement of facts and Plaintiffs' briefs in opposition do not exceed 20 pages for each motion to dismiss that Plaintiffs oppose. Specifically, this consolidated statement of facts and Plaintiffs' brief in opposition to the GPOs' motion to dismiss do not exceed 20 pages in total. S.D. Ill. R. 7.1(d).

[2] Austin Frakt & Aaron Carroll, *Why the U.S. Spends So Much More Than Other Nations on Health Care*, N.Y. Times, Jan. 2, 2018, http://www.nytimes.com/2018/01/02/upshot/us-health-care-expensive-country-comparison-.html.

[3] Gerard F. Anderson, *It's The Prices, Stupid: Why The United States Is So Different From Other Countries*, 22 Health Affairs 3, 102 (2003), https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.22.3.89.

## I.   THE PARTIES AND RELEVANT MARKETS

Plaintiffs – Marion Healthcare, LLC, Marion Diagnostic, LLC, and Andron Medical Associates – are small healthcare providers that purchased Becton products through distributors. Am. Compl. ¶¶7-10. Providers do not typically purchase the syringes and catheters they need directly from manufacturers. *Id.* ¶¶2-3. Instead, providers rely on GPOs, which, by aggregating the purchasing power of many small buyers, are supposed to help providers get fairer prices. As a result, Plaintiffs' purchases of syringes and catheters must occur through a complicated web of contracts among GPOs, manufacturers, and distributors. *Id.* ¶¶2-3, 40-47.

Each Defendant plays a distinct role in the scheme, and each has power to help Becton inflate prices. Becton alone controls *55 to 60%* of the relevant markets. Am. Compl. ¶33. Likewise, the two GPOs here, Vizient and Premier, wield massive purchasing power – together, they control over *75%* of the annual spending in the United States on medical devices and supplies. *Id.* ¶34. And Becton's distributors also control a large swath of the distribution of medical devices and supplies. *Id.* ¶35. By throwing their combined weight behind the conspiracy, the Defendants enable Becton to charge prices far above competitive levels – prices from *11 to 36% higher* than what competitors are able to charge. *Id.* ¶¶29-39. Defendants are:

- ***Becton***: Becton sells over $500,000,000 of conventional and safety syringes and safety IV catheters in the United States every year. Am. Compl. ¶29. Becton's share of the relevant markets is overwhelming: Becton controls about 60% of the market for conventional syringes, 60% of the market for safety syringes, and 55% of the market share for safety IV catheters. *Id.* ¶33. Becton's share in each of these markets is at least twice as large as the share of its nearest competitor. *Id.*

- ***GPOs***: Group purchasing organizations such as Vizient and Premier stand at the center of the relevant markets for the sale of Becton syringes and catheters. GPOs represent large groups of healthcare providers, such as Plaintiffs. In that capacity, they broker with Becton the contracts under which Plaintiffs buy Becton's syringes and catheters. Am. Compl. ¶¶30, 42. Together, Vizient and Premier control over 75% of the annual spending in the United States by healthcare providers on medical devices and supplies. *Id.* ¶34.

- ***Distributors***:  Cardinal Health, Inc. ("Cardinal"), Owens & Minor Distribution, Inc. ("Owens & Minor"), McKesson Medical-Surgical, Inc. ("McKesson"), and Henry Schein, Inc. ("Henry Schein"), as well as unnamed co-conspirators, purchase the relevant products from Becton for resale to healthcare providers such as Plaintiffs.  Am. Compl. ¶¶ 14-18, 31, 45.  Those distributors control a massive share of the market for distribution of medical devices and supplies.  *Id.* ¶ 31.  In particular, Cardinal and Owens & Minor alone distribute 65% of the relevant Becton products in the market.  *Id.* ¶ 45.  As market observers have put it, Cardinal and other Becton distributors have erected "wide economic moats" that allow them to "keep new entrants at bay."  *Id.* ¶¶ 31-35.

The relevant markets' structure also bolsters Becton's power to increase prices.  Am. Compl. ¶¶ 36-39.  Healthcare providers rely heavily on GPOs such as Vizient and Premier to negotiate their purchasing contracts.  *Id.* ¶ 36.  These providers often lack their own in-house procurement capabilities, making it difficult to negotiate better terms with Becton's competitors.  *Id.*  In addition, Becton, which can produce billions of syringes and catheters each year, enjoys huge economies of scale that no competitor can plausibly hope to match.  *Id.* ¶ 37.  And regulatory barriers caused by patents and FDA approval requirements make it harder still for competitors meaningfully to enter the relevant markets controlled by Becton.  *Id.* ¶ 38.  Thus, high barriers to entry exist, further suppressing competition.

Together with Becton's dominant market shares, this market structure gives Becton the power to raise prices above competitive levels.  In the conventional syringe market, Becton charges prices that are 11% higher than the pricing charged by its nearest rival.  Am. Compl. ¶ 39(a).  In the safety syringe market, Becton charges 36% more than competitors for retractable safety syringes and 22-30% more for non-retractable safety syringes.  *Id.* ¶ 39(b).  And Becton charges 37% more for safety IV catheters than what competitors can charge.  *Id.* ¶ 39(c).

## II.   THE DEFENDANTS' CONSPIRACY TO RESTRAIN TRADE

Defendants have conspired to restrain trade by preventing healthcare providers from buying non-Becton products.  Am. Compl. ¶¶ 40-47, 48-51.  They have done so through a series

of long-term exclusionary contracts that make it difficult or impossible for healthcare providers to purchase syringes or catheters from Becton's competitors at competitive prices.  *Id.* ¶¶40-47. In particular, the contracts contain two key exclusionary terms that suppress competition.  First, "sole source" provisions directly bar purchases from Becton competitors.  *Id.* ¶41.  Second, penalty provisions punish providers with higher prices for Becton products if they buy even a small amount of syringes or catheters from Becton's competitors.  *Id.* ¶¶41, 43.  Because the contracts are typically long-term, they have the practical effect of preventing healthcare providers from being able to purchase non-Becton products for years.  *Id.*

Three types of contracts cement the conspirators' exclusionary scheme.  Am. Compl. ¶¶42-45.  First, the GPOs negotiate with Becton "Net Dealer Contracts" under which their members buy Becton products.  *Id.* ¶42.  These long-term contracts, which usually last three to five years, typically contain a penalty pricing rebate scheme that punishes healthcare providers with higher prices unless they keep buying a high percentage – often 80 to 95% – of their volume of Becton purchases in prior years.  *Id.* ¶¶42-43.  Those contracts also include sole-source or dual-source terms that allow Plaintiffs to buy either only Becton products or the products, at most, of only one other manufacturer.  *Id.* ¶42.  While GPOs are supposed to negotiate these contracts with their members' best interests in mind, Becton pays millions of dollars annually to the GPOs to ensure they instead serve the interests of Becton and the other conspirators.  *Id.* ¶42.

Once a healthcare provider decides to buy Becton syringes or catheters under a Net Dealer Contract negotiated by its GPO with Becton, it selects a Distributor such as Cardinal, Owens & Minor, McKesson, or Henry Schein to deliver those products.  Am. Compl. ¶44.  The Distributors and healthcare providers enter into a "Distribution Agreement," which requires the Distributors to enforce the Net Dealer Contracts' penalty-pricing and sole-source terms.  *Id.*

The last links in the conspiratorial chain are "Dealer Notification Agreements" between the distributors and Becton.  Am. Compl. ¶45.  Dealer Notification Agreements further the conspiracy in three ways.  *Id.*  First, the Distributors agree to distribute Becton products under the Net Dealer Contracts' anticompetitive terms, including the sole-source and penalty-pricing provisions.  *Id.*  Second, the Distributors agree to enforce Becton's penalty-pricing system.  *Id.*  And, third, the Distributors agree to make cash payments to the GPOs based on the volume of Becton sales made under the Net Dealer Contracts.  *Id.* ¶¶45, 56. These payments are in addition to the large cash payments Becton gives the GPOs to induce them to offer the exclusionary contracts to their members.  *Id.* ¶42.  Like the other contracts, Dealer Notification Agreements are typically long-term, lasting three to five years.  *Id.* ¶45.

The conspirators have also undertaken additional anticompetitive acts to ensure that Becton products are the only real choice many consumers have in the relevant markets.  Am. Compl. ¶¶46-51.  The Distributors and Becton have agreed for Becton to pay extra commissions to Distributors' sales personnel who sell Becton products to the exclusion of competitors.  *Id.* ¶46.  Those commissions allow the Distributors to commit credibly to the conspiracy by providing Becton direct access to their employees, empowering Becton to monitor the Distributors' compliance with its exclusive-dealing terms.  Becton and the Distributors also agree for the Distributors to emphasize Becton products in their promotional materials.  *Id.* Cardinal and Becton, in particular, have agreed that Cardinal would not induce its customers to buy products of Becton's competitors.  *Id.*  And Becton has engaged in disparagement, false advertising, and patent infringement against competitors.  *Id.* ¶¶48-50.

The GPOs have strong motives to enter into this anticompetitive scheme.  Without the conspiracy, the GPOs would compete for members by charging lower prices and by negotiating

5

the best possible terms with manufacturers like Becton.  That competition would drive down the GPOs' profits.  But if the GPOs agree to impose exclusive contracts on the Distributors and healthcare providers, they can share in Becton's monopoly rents in the form of the volume-based cash payments they receive under both the Net Dealer Contracts and the Dealer Notification Agreements.  Am. Compl. ¶42.  With the GPOs' economies of scale, the volume-based monopoly profits they stand to earn from colluding with Becton easily outweigh whatever losses they might face from members that leave because of Becton's exclusive-dealing terms.

## III.   PLAINTIFFS' ANTITRUST INJURY

Each of the co-conspirators benefit from their collusion to restrain trade.  Am. Compl. ¶¶54-57.  By contrast, Plaintiffs have suffered antitrust price injury.  *Id.* ¶¶58-62.  Plaintiffs have paid far more for conventional and safety syringes and safety IV catheters – from 11 to 36% higher, in many cases.  *Id.* ¶¶39, 59.  This is consistent with findings from the Government Accountability Office that GPOs often broker terms that harm their members' interests:  As the GAO found, "GPOs' prices were not always lower and were often higher than prices paid by hospitals negotiating with vendors directly."[4]

The conspiracy has also prevented Becton's competitors from obtaining sufficient market shares and resources to bid down Becton's prices to competitive levels.  Am. Compl. ¶60.  And the conspiracy also prevents quality and safety competition, exposing healthcare providers to the needless risk of needlesticks and blood-borne diseases.  *Id.* ¶¶61-62.   To redress these injuries, Plaintiffs have brought this suit on behalf of themselves and all those similarly situated.  *Id.* ¶1.

---

[4] William J. Scanlon, U.S. Gov't Accountability Off.,  GAO-02-690T, *Group Purchasing Organizations:  Pilot Study Suggests Large Buying Groups Do Not Always Offer Hospitals Lower Prices*, (Apr. 30, 2002), https://www.gao.gov/products/GAO-02-690T.

Dated:   September 18, 2018                    Respectfully submitted,
           Chicago, Illinois


R. Stephen Berry                                            /s/ Steven F. Molo
Berry Law PLLC                                             Steven F. Molo
1717 Pennsylvania Avenue, N.W., Suite 850                  Allison M. Gorsuch
Washington, D.C.  20006                                    MoloLamken LLP
Telephone: (202) 296-3020                                  300 North LaSalle Street, Suite 5350
Facsimile: (202) 296-3038                                  Chicago, IL  60654
sberry@berrylawpllc.com                                    Telephone: (312) 450-6700
                                                           Facsimile: (312) 450-6701
                                                           smolo@mololamken.com
                                                           agorsuch@mololamken.com

                                                           Justin M. Ellis
                                                           MoloLamken LLP
                                                           430 Park Avenue
                                                           New York, New York  10022
                                                           Telephone: (212) 607-8160
                                                           Facsimile: (212) 607-8161
                                                           jellis@mololamken.com


*Attorneys for Plaintiffs and Proposed Class Co-Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on September 18, 2018, I caused the foregoing Consolidated Statement of Facts in Opposition to Defendants' Motion to Dismiss to be served on all counsel of record by filing it with the Court's CM/ECF system.


September 18, 2018
Chicago, Illinois

/s/ Steven F. Molo