```
1              IN THE DISTRICT OF THE UNITED STATES OF AMERICA
                   FOR THE SOUTHERN DISTRICT OF ILLINOIS
2     _____
                                      )
3     MARION DIAGNOSTIC CENTER, LLC;   )
      MARION HEALTHCARE, LLC; and      )
4     ANDRON MEDICAL ASSOCIATES,       )
      individually and on behalf of   )
5     all others similarly situated,  )
                                      )
6                     Plaintiff(s),   )
                                      )
7          vs.                        )  Case 18-CV-1059-NJR
                                      )
8     BECTON, DICKINSON, AND          )
      COMPANY; PREMIER, INC.;         )
9     VIZIENT, INC.;  CARDINAL        )
      HEALTH, INC.; OWENS & MINOR     )
10    INC.; HENRY SCHEIN, INC.; and   )
      UNNAMED BECTON DISTRIBUTOR      )
11    CO-CONSPIRATORS,                )
                                      )
12                    Defendant(s).   )
      _____)
13

14                         MOTION(S) HEARING

15

16    BE IT REMEMBERED AND CERTIFIED that heretofore on  10/17/2018,
      the same being one of the regular judicial days in and for the
17     United States District Court for the Southern District of
         Illinois, Honorable Nancy J. Rosenstengel, United States
18      District Judge, presiding, the following proceedings were
       recorded by mechanical stenography; transcript produced by
19                            computer.

20

21

22

23
      REPORTED BY:  Molly N. Clayton, RPR, FCRR, Official Reporter
24    for United States District Court, SDIL, 750 Missouri Ave., East
      St. Louis, Illinois 62201, (618)482-9226,
25              molly_clayton@ilsd.uscourts.gov
```

1                            **APPEARANCES**:

2    *FOR PLAINTIFF:*
          **Steven F. Molo** of MoloLamken LLP- Chicago, 300 N LaSalle
3    Street, Suite 5350, Chicago, IL 60654; **and**,

4         **Allison Mileo and Justin Ellis** of Gorsuch of MoloLamken
     LLP, 430 Park Avenue, New York, NY 10022 and
5    R. Stephen Berry of Berry Law PLLC, 1100 Connecticut Avenue NW,
     Suite 645, Washington, DC 20036.

6

7    *FOR DEFENDANT BECTON*: **Richard P. Cassetta** of Bryan Cave
     Leighton, et al. - St. Louis, One Metropolitan Square, 211
8    North Broadway, Suite 3600, St. Louis, MO 63102; **and**,
          **Robert A. Atkins and William B. Michael** of Paul, Weiss,
9    Rifkind, et al, 1285 Avenue of the Americas, New York, NY
     10019.

10

11   *FOR DEFENDANT PREMIER*:  **Terrence J. Dee** of McDermott, Will et
     al. - Chicago, 444 West Lake Street, Suite 4000, Chicago, IL
12   60606-0029.

13   *FOR DEFENDANT VIZIENT*:  **Bruce A. Blefeld** of Reed Smith, LLP -
     Houston, 811 Main Street, Suite 1700, Houston, TX 77002.

14   *FOR DEFENDANT McKESSON:*  **Daniel Thomas Fenske** of Jenner &
     Block-Chicago 2, 353 North Clark Street, Chicago, IL 60654.
15

16   *FOR DEFENDANT SCHEIN:*  **Barack S. Echols** of Kirkland & Ellis LLP
     - Chicago, 300 N. LaSalle Street, Chicago, IL 60654.

17   *FOR DEFENDANT CARDINAL*:  **Scott D. Quellhorst** of Jones Day -
     Chicago, 77 West Wacker Drive, Suite 3500, Chicago, IL 60601.
18

19   *FOR DEFENDANT OWENS*:  **Shari Lahlou and Luke Van Houwelingen** of
     Crowell & Moring LLP, 1001 Pennsylvania Avenue, N.W,
     Washington, DC 20004; **and**,
20        **Jordan L. Ludwig** of Crowell & Moring LLP, 515 S. Flower
     Street, 40th Floor, Los Angeles, CA 90071.

21

22

23

24

25

1

<u>**INDEX OF WITNESS EXAMINATION**</u>

2                                    <u>**DX**</u>      <u>**CX**</u>      <u>**R-DX**</u>     <u>**R-CX**</u>

3       No witness testimony.

4

5

6

7

<u>**INDEX OF EXHIBITS**</u>

8       <u>**EXHIBIT**</u>              <u>**DESCRIPTION**</u>          <u>**Id'D**</u>        <u>**Rcv'd**</u>

9       No exhibits identified or received.

10

11

12

13

<u>**MISCELLANEOUS INDEX**</u>

14                                              <u>**PAGE**</u>

15      No miscellaneous index entries.

16

17

18

19

20

21

22

23

24

25

1              *COURTROOM DEPUTY:*  The matter of *Marion Healthcare,*

2  *LLC, et al. versus Becton, Dickinson and Company, et al.*, Case

3  No. 18-CV-1059, is called for a motion hearing.

4              Would the parties please identify themselves for the

5  record?

6              *MR. MOLO:*  Good morning, your Honor, Steve Molo,

7  Justin Ellis, and Allison Gorsuch on behalf of the plaintiffs.

8              *THE COURT:*  All right.  Good morning, counsel.

9              *MR. BERRY:*  Steve Berry, Berry Law PLLC on behalf of

10  the plaintiffs.

11              *THE COURT:*  All right.  Good morning.

12              *MR. CASSETTA:*  Good morning, your Honor, Rick

13  Cassetta, Bryan Cave, on behalf of the Becton, Dickinson.  And

14  I've got with me my co-counsel, Mr. Bob Atkins and Mr. Bill

15  Michael from Paul, Weiss.

16              *THE COURT:*  Okay.  Good morning.

17              *MR. ATKINS:*  Good morning, your Honor.

18              *MR. MICHAEL:*  Good morning.

19              *MR. DEE:*  Good morning, your Honor, Terry Dee on

20  behalf of Premier.

21              *THE COURT:*  Okay.  Good morning.

22              *MR. BLEFELD:*  Good morning, your Honor, Bruce Blefeld

23  from Reed Smith from Houston for Vizient.

24              *THE COURT:*  Okay.  Good morning.

25              *MR. FENSKE:*  Good morning, your Honor, Dan Fenske for

1  McKesson.

2         *THE COURT:*  All right.  Good morning.

3         *MR. ECHOLS:*  Good morning, your Honor, Barack Echols

4  from Kirkland & Ellis on behalf of the Henry Schein, Inc.

5         *THE COURT:*  Okay.

6         *MR. QUELLHORST:*  Good morning, your Honor, Scott

7  Quellhorst on behalf of Cardinal Health.

8         *THE COURT:*  All right.  Good morning.

9         *MS. LAHLOU:*  And good morning, your Honor, Shari

10  Lahlou and Luke Houwelingen from Crowell & Moring on behalf of

11  Owens & Minor Distribution, along with Jordan Ludwig.

12         *MR. HOUWELINGEN:*  Good morning, your Honor.

13         *THE COURT:*  All right.  Good morning.

14         Well, you guys get the more comfortable seats.  You

15  back there are welcome to move into the jury box if you want

16  because those are not very comfortable.

17         So this is set, I think, at the request of the

18  defendants on the pending motions to dismiss.  Of course, the

19  district judges are generalists and have to know a little bit

20  about everything, and certainly we get to learn about things

21  that were never the reason we went to law school, which in my

22  book would be antitrust.  But I have reviewed everything -- the

23  pleadings here, and I have a general understanding of what the

24  arguments are and what the facts are underlying the complaint

25  and the motion to dismiss.  But I think probably at this

```
 1    point -- and I understand there was a presentation or

 2    something.  So whoever wants to proceed with just general

 3    arguments on the motions to dismiss, and hopefully you all have

 4    worked that out.  And then I have a few questions I want to

 5    ask.  I may jump in or wait until the end or whatever.

 6              So who wants to proceed on behalf of the defendants?

 7              MR. CASSETTA:  Mr. Atkins will argue it first, your

 8    Honor.

 9              THE COURT:  Okay.  Mr. Atkins, you may proceed.

10              MR. ATKINS:  Good morning, your Honor.  May it please

11    the Court.

12              Robert Atkins.  I represent the defendant Becton,

13    Dickinson.  With your Honor's permission, I will address

14    Becton's motion to dismiss for lack of standing under the

15    direct purchaser rule.  I will then pass the baton to Mr. Dee,

16    who will argue on behalf of the GPOs, and then Mr. Fenske will

17    argue on behalf of the distributors.  So we will proceed in

18    that order if that's acceptable to the Court.

19              THE COURT:  Okay.  Let me ask, Mr. Molo, will you be

20    arguing for plaintiffs?

21              MR. MOLO:  I will.

22              THE COURT:  So would you like to respond to each

23    different one or do it all at once?

24              MR. MOLO:  I'd like to do whatever you would find most

25    helpful.  So if you want us to respond, you know, with each,
```

1    that's fine, or if you would like to let the entire argument go

2    forth, then that's fine.

3           THE COURT:  Let's do it in response to each, that

4    might be helpful.

5           MR. MOLO:  And I may take, if it's okay, a little bit

6    of liberty going beyond that to address some of the broader

7    issues.

8           THE COURT:  Okay.  All right.  That's fine.

9           Okay.  Mr. Atkins.

10          MR. ATKINS:  All right, your Honor.

11          I do have some show-and-tell and I did it the

12   old-fashioned way.  They are just handouts.  So if could

13   approach the bench, I will give you a copy.

14          THE COURT:  Great.  Okay.  Yep.  Of course.

15          Thank you.

16          MR. ATKINS:  And one for the court.

17          THE COURT:  Deana, do you want to give that to Blaire

18   maybe?

19          MR. ATKINS:  So, your Honor, if you would indulge me

20   by turning to Page 2 of the presentation, I will kickoff there.

21   As you know, what brings us here today is the Supreme Court's

22   decision in *Illinois Brick*, as well as its companion cases

23   *Hanover Shoe* and *UtiliCorp*.

24          I thought I would tee up the issue by sharing with you

25   actually an excerpt from a brief that Mr. Molo's firm submitted

1    to the Supreme Court this month, in which they well articulated
2    what brings us here today.
3         For over 40 years, this Court's decision in *Illinois*
4    *Brick* has prohibited indirect purchasers, i.e., those who do
5    not transact directly with an alleged antitrust violator --
6    that would be my client BD -- from bringing treble damages suit
7    under the Clayton Act.  This bar to claims by downstream end
8    users like the plaintiffs in this case seeking to collect an
9    inflated or overcharged price from a supplier has been so
10   firmly established that the Supreme Court has decided three
11   cases.  It's probably the most thoroughly litigated and
12   decisively adjudicated issue in antitrust law.  The Supreme
13   Court has visited it three times and come out the same way,
14   stronger in each case.
15        Likewise, every court in every case that has
16   challenged the use of contracts as we have in this case,
17   contracts with group purchasing organizations, every case that
18   has challenged one of those contracts for resulting in
19   overcharges to hospitals or health care providers likewise has
20   held that the downstream indirect purchasers do not have
21   standing and cannot sue for damages.
22        And, of course, as I'm sure your Honor did not miss in
23   our briefs, the courts have twice already rejected for lack of
24   standing these same claims against BD; namely, health care
25   providers claiming to have been charged inflated or

1  anticompetitive prices, overcharges for BD's syringes and

2  catheters that they bought not from BD but from their

3  distributors.  And these decisions -- that is to say, the BD

4  decisions, the other cases involving GPO contracts, and, of

5  course, the Supreme Court decisions were not close calls.  They

6  were not equivocal.  They were clear and emphatic.

7         The Third Circuit in the *BD* case which involved

8  hospitals and downstream purchasers suing BD for alleged

9  overcharging under GPO contracts held that the Supreme Court

10  established a bright-line rule that only a purchaser

11  immediately downstream -- that is, the distributor -- may bring

12  an antitrust action.

13         The Ninth Circuit, in *Delaware Valley v. J&J*, another

14  GPO case, this is how they put it.  The Supreme Court closed

15  the door on the theory that the end user, like plaintiffs here,

16  who buy from a distributor should have standing.

17         And the Seventh Circuit in the brand name prescription

18  drug antitrust litigation said that granting standing to

19  downstream indirect purchasers -- in that case, pharmacies --

20  seeking to cover an overcharge is, and I quote, "just what the

21  Supreme Court in *Hanover Shoe*, *Illinois Brick*, and *UtiliCorp*

22  told the federal courts not to do.

23         I submit your Honor this is now the third bite at the

24  same apple.  It's the same antitrust allegations in the other

25  BD cases -- that is, exclusionary contracts -- with GPOs.  It

1    is the same contracts.  It is the same products, in syringes

2    and catheters, and it is the same purchasing and distribution

3    system at issue in all those cases.  It even is, in the case of

4    the *Brunswick* case, the same lawyers.  And with all respect, it

5    is not only the same apple, it is the same rotten apple.

6          These claims are claims that were tried by a

7    competitor called RTI against BD.  It went to trial and the

8    exclusionary contract claims were rejected by the jury and the

9    motion to overturn that verdict was rejected as a matter of

10   law.  Likewise, the claims that BD engaged in deceptive

11   anticompetitive conduct in violation of the antitrust law was

12   rejected by the Fifth Circuit as a matter of law.  Same case

13   and I submit, your Honor, the same result.

14         So now let me turn to some specifics, if you would

15   turn with me to Slide No. 3.  This is our attempt to depict

16   what basically is the purchasing of BD products at issue here.

17   BD is the manufacturer, obviously.  You have the four

18   distributors who are named as defendants, and, of course, there

19   are numerous other distributors.  They are the direct

20   purchasers from BD.  They then turn around and resell BD

21   products and, of course, all sorts of other medical devices to

22   hospitals and health care providers.  They are the indirect

23   purchasers.

24         Now, where the hospital, the health care provider, the

25   indirect purchaser is seeking recovery on the antitrust laws

 1    for having to pay prices passed through their distributor that

 2    were allegedly excessive and anticompetitive, for some

 3    reason -- in this case, exclusionary contracts -- it is the

 4    intermediary, a wholesaler, a distributor, a dealer, sometimes

 5    a retailer.  They are the only ones who have standing to bring

 6    a claim.

 7             Here's what the Seventh Circuit said in *Paper Systems*:

 8    The right to sue and the right to collect overcharged damages

 9    is, quote, concentrated in the hands of the initial buyer.

10             Why is that?  Well, the Supreme Court declared in

11    *Illinois Brick*, when it established this rule, that they had a,

12    quote, legislative purpose and that was to create a group of

13    private attorneys generals to enforce the antitrust laws.

14             Who were those private attorneys generals under this

15    scheme?  The direct purchasers.  In this case, it would be the

16    distributors.

17             Why?  The Court's reasoning was to maximize

18    enforcement and deterrence.  And the idea was it will avoid the

19    courts and juries and parties wrestling what could be difficult

20    questions of where did the overcharge go.  The distributor

21    sells to a pharmacy.  A pharmacies sells to a patient.  A

22    patient submits an insurance form, or in the case of bricks, it

23    goes from the brick maker, to the contractor, to the

24    subcontractor, to the consumer.  And the Court's said, We're

25    not going to allow that to go on because that's going to result

1    in fewer recoveries and less enforcement.  That was the policy.

2           Now, bear in mind, the Supreme Court also said in

3    *UtiliCorp*, when it was asked to revisit *Illinois Brick*, that

4    the Court is not going to countenance exceptions and deviations

5    just because maybe the policy prescription doesn't necessarily

6    imply in every case.  The Supreme Court shut the door on these

7    claims.  And the rule applies even if the intermediary passes

8    100 percent of the, quote, overcharge on to the end user.

9    That's *UtiliCorp* and that's *Brand Name Prescription Drug*.

10          The rule applies even if the intermediary makes a

11   profit.  The Courts have entertained arguments where a hospital

12   or a health care provider or an end consumer says, gee, the

13   distributor is actually coming out ahead here because they are

14   buying product from a monopolist or an exclusionary actor,

15   charging exorbitant prices, and then they are passing it on to

16   me with a markup.  Distributors are coming out ahead.  Why

17   should they be the plaintiffs?  Courts have held over and over

18   again even if 100 percent is passed on with a markup, the claim

19   belongs to the distributor.  That's *Brunswick*.  That's *In

20   Re: Hypodermic*.  That's every GPO case.

21          And it's true -- that is, the rule applies -- even if

22   the intermediary doesn't sue.  It was directly addressed by

23   *Illinois Brick* itself at the Supreme Court when it established

24   the rule.  It said direct purchasers may sometimes refrain from

25   bringing treble suits, but it held its legislative purpose is

1    better served by holding direct purchasers to be injured to the

2    full extent of the overcharge, including every cent of the

3    overcharge.

4              So turning to Slide No. 4, this very claim against

5    this very defendant has been twice litigated.  It was litigated

6    up to the Third Circuit in *In Re: Hypodermic Products*, and it

7    was litigated in the Southern District of Georgia in a case

8    brought by Mr. Berry involving the same contracts, the same

9    GPOs, the same products, the same distributors.  And as you can

10   see and as I'm sure you read, in each case the Court held that

11   because the hypodermic products -- that's BD's products --

12   passed through at least one other stage in the chain of

13   distribution before reaching the health care providers, like

14   plaintiffs here, the distributors, not the health care

15   providers are the direct purchasers, it says, in contract

16   sales.  That's a reference to sales under GPO contracts.

17             *Brunswick* reached the same outcome.

18             Now, as you probably already saw because we made much

19   of it, it is not just -- this was not just the holding in BD

20   cases.  And if you turn to Slide 5, I have laid out each of the

21   cases that we're aware of in which a court has been asked to

22   examine whether or not exclusionary contracts by a supplier

23   that are sold through a distributor give the health care

24   provider standing to sue.

25             Same case, same construct, same issues every single

1   time.   The courts, including the Third Circuit, the Eleventh

2   Circuit, and the Ninth Circuit, as well as several district

3   courts have ruled that health care provider has no standing.

4           So that takes us to the plaintiffs' case.

5           Slide No. 6, your Honor.

6           So this is a portrayal of what the claim is here.   The

7   claim is that the GPOs and BD enter into what they call --

8   obviously not what I call, but what they call exclusionary

9   contracts; that is, contracts that through various discount

10  regimes and pricing programs allegedly cause customers to buy

11  only BD.   That's the claim.   That's the claim that was tried in

12  Texas and rejected, but that's the claim.

13          What do those GPO and BD contracts provide for?   And

14  this is critical.   They do not set the price paid by the

15  hospital or health care provider.   What are negotiated between

16  the GPOs and BD are the prices that BD will charge the

17  distributors, what are called dealer prices.   That's what's

18  negotiated.

19          Of course, as I've indicated here on the dotted line

20  and is uncontested, it is the ultimate customers that the

21  health care providers, hospitals, who are represented by the

22  GPOs, that negotiate these prices.   But the price is to the

23  distributor.   And as I indicate on this chart, it is the sale

24  of BD products to distributors at those prices that constitutes

25  the alleged overcharge.   That is, that is allegedly an

1   anticompetitive, inflated price because BD is using allegedly

2   anticompetitive means.  That's the overcharge.

3         Separately and distinct from that, the distributors

4   then enter into contract arrangements with their end use

5   customers, health care providers like the plaintiffs,

6   hospitals, clinics, surgical centers, on and on, in which they

7   pass on the price that they paid BD as part of whatever it is

8   they charge to sell the BD products to their customers.

9         So this, your Honor, is the paradigm of the claims

10   that we saw described as prohibited by *Illinois Brick*.  It is

11   the same claims as in the prior BD cases and all the others.

12   Exclusionary anticompetitive conduct, No. 1, leading to

13   overcharges to the immediate buyer, the distributors, that are

14   then passed on to the indirect purchasers in whatever the

15   distributor charges.

16         So how is it possible, what is different about this

17   case from *Brunswick*, *In Re: Hypodermics*, and the other cases in

18   the line?

19         I submit nothing of any legal substance.

20         Obviously, it was not lost on us that the plaintiffs

21   have erased and whited out from their pleadings the words

22   "overcharge and pass on" -- we know why -- and they've inserted

23   liberally the word "conspiracy."  And I'm going to get to that

24   in a second.

25         I should tell you and I think you are aware of this.

1    They tried the exact same tact with Judge Wood in the *Brunswick*

2    case.  They argued in opposition to a motion to dismiss that

3    there was a conspiracy exception.  They argued it, she denied

4    the motion.

5          They then said, Well, let us amend, and that amended

6    pleading, which we've submitted to your Honor, looks like this

7    pleading.  They erased and whited out the words "pass on and

8    overcharge."  They sprinkled in conspiracy, and Judge Woods

9    said, No.  You are not entitled to amend.  It would be futile

10   because it would be dismissed because the legal substance is

11   the same.

12         That is the same here.  And, in fact, it is the same

13   with respect to adding as defendants the distributors and the

14   GPOs.  They are props in an argument for getting around the

15   law.

16         So how is it that I say that the substance of the

17   allegations and the substance of the alleged damages are the

18   same as in all the other cases?  Well, it is admitted in the

19   complaint itself.

20         Paragraph 42:  BD agrees with customers, the

21   plaintiffs, via their GPOs on what it will charge the

22   customer's distributor.  That's Paragraph 42.

23         Two, separate and distinct the consumer then selects a

24   distributor to buy from.  It's Paragraph 44.

25         Third, the consumer then negotiates a distribution

1    agreement.  It doesn't involve BD, nothing to do with BD.  The

2    consumer then negotiates a distribution agreement with the

3    distributor for the amount the distributor will charge to sell

4    its medical supplies, including BD products.

5         So we have separate -- we have two separate

6    transactions.  We have two separate purchases.  We have two

7    separate sales:  BD to the distributors, the distributors to

8    the hospitals.

9         Where do I find all this?  Slide No. 7, your Honor.

10        This is in Paragraph No. 2 of their complaint.  At the

11   very front, they lay out precisely what I just summarized for

12   you step by step.  What happens first in this marketplace?  The

13   health care provider -- that's the plaintiff -- becomes a

14   member of a GPO.

15        What's a GPO?  It is a voluntary buying group.  It

16   doesn't buy anything, it doesn't sell anything, it's a

17   negotiating agent.  Obviously, every clinic and hospital in the

18   country is not going to negotiate with every medical supply

19   company and pharmaceutical company for everything they need, so

20   they form buying groups.  The plaintiffs refer to them as the

21   agents of the plaintiffs and other members.

22        What do they do?  Step 1:  The GPOs negotiate prices

23   for the supplies with manufacturers.  Those are the ones that

24   establish the dealer price.

25        Step 2:  The GPOs, representing many health care

1    providers, negotiate pricing for devices and supplies.  Same

2    point.  And those are the prices, the servers.

3           Step 3:  A health care provider wishing to purchase

4    medical device and supplies -- obviously, not just BD -- then

5    does so through a distributor authorized to sell the goods.

6           That's the system.  That's exactly the same system as

7    in *Brunswick*, as in *In Re:  Hypodermics*.

8           Slide No. 8, your Honor, just to refine and emphasize

9    the point further.  And this will become critical to their

10   exception argument in a moment.  The distributors have nothing

11   to do with setting the price charged by BD.  These are their

12   words in the amended complaint, Paragraph 44:  Once a health

13   care provider decides to purchase Becton products, it

14   selects -- the health care provider selects a distributor, such

15   as Cardinal, Owens & Minor, McKesson, or Henry Schein to

16   deliver Becton's products.  GPO negotiates a price, health care

17   provider picks a distributor to buy from.

18           I didn't put it on the slide, but the next point, also

19   in Paragraph 44, is that the distributors and the health care

20   providers then enter into a distribution agreement.

21           And then as indicated on the slide, the distributors

22   then -- that is, the distributors -- purchase products from

23   Becton and then resell the relevant products directly to health

24   care providers pursuant to terms negotiated by the GPOs, the

25   exact same allegations in all the other claims.  The

1    distributors buy from BD.  They are the direct purchasers.

2    They then resell downstream to their customers and pass on the

3    cost of what BD charged, plus whatever else the distributors

4    charge.

5          Whatever the distributor charges not part of the BD

6    contract, not negotiated with BD, whatever BD charges to the

7    distributors, not part of the same contract.  Separate

8    transactions, separate sales, separate direct purchaser and

9    indirect purchaser.

10         So looking at Slide No. 10, I've summarized for your

11   Honor some of the cases that have addressed this very

12   distribution system.  And as the Ninth Circuit said in

13   valley -- *Delaware Valley Surgical Supply*, the Court has closed

14   the door on the theory that an end user who buys from an

15   independent distributor should have standing.

16         The Court in *Warren General Hospital* likewise

17   explained why indirect purchasers have no standing.  Quote, the

18   purchasers go through at least one other stage in the chain of

19   distribution before reaching *Warren General Hospital*, and,

20   therefore, the situation before us is akin to the facts in

21   *Utilicorp* and *Illinois Brick*.

22         Lastly, on this chart, the Eleventh Circuit, in

23   another health care medical supply case:  Although the

24   distributors may have passed on to the medical center some or

25   all -- or even all of the overcharge that they, the

1  distributors, paid to the manufacturer, the medical center

2  cannot recover damages from the manufacturer for that

3  overcharge because it was the second purchaser of the product.

4          And that takes us to plaintiffs' argument, its third

5  bite at this apple.

6          So it is the same admissions, your Honor, about how

7  these products are contracted for, priced, and purchased.  It's

8  these exact same admissions that close the door on what they

9  refer to as the conspiracy exception, which is what they're

10  here arguing today.

11          Of course, they argued it before, before Judge Wood in

12  the *Brunswick* case, and she rejected it.  And it should be

13  rejected for the very same reasons, that the distributors do

14  not participate with BD in fixing the price that they, the

15  distributors, resale the products to customers.  And that's

16  critical, and I'll get into it.  But, rather, the distributor

17  passes on the cost of BD products as part of its price that it

18  determines independently, not only independent of BD, but in

19  negotiation with the plaintiffs.

20          And so the pleading, your Honor, not only lacks the

21  allegations necessary to establish standing, it negates them.

22  So let me just explain for a moment what this exception is.  It

23  is a little bit of a misnomer.  I'm not running from the word.

24  But what the cases really hold is there are certain times when

25  *Illinois Brick* just doesn't apply.  It is not a carve out from

1    the rule.  It's that the rule doesn't apply.

2              And when is that?  That's where there is not a passed

3    on overcharge.

4              When is that?  If you turn to Slide 11, your Honor, we

5    have laid out in text and graphic form.  And I've quoted from

6    Areeda for two reasons.  One, it's the universally accepted

7    authority on antitrust law.  It's also cited on this subject by

8    the Seventh Circuit in *Paper Systems*, a case the plaintiffs

9    rely on to some extent.

10             And here's what it says, and this goes to my point

11   that it's not really an exception.  Areeda says, *Illinois Brick*

12   does not limit suits by consumers against a manufacturer who --

13   against a manufacturer who illegally contracted with its

14   dealers to set the latter's resale price.  That's the

15   exception, the carve out, the situation where *Illinois Brick*

16   doesn't apply.  That is, the manufacturer and distributor are

17   acting as a single economic entity.  And what are they doing?

18   They're determining what the price is that the end user will

19   pay.  Call that retail price fixing, call that resale price

20   maintenance, where the dealer and the manufacturer are in bed

21   setting the final price.  Then all you have here is basically

22   one transaction.  There's no passing on of the manufacturer's

23   cost as part of the distributor's charge.  They've already

24   decided what the distributor is charging because they got

25   together to fix that price.  So there's no overcharge being

1    passed on.  There are no two distinct sales.  There is

2    effectively one transaction the sale to the customer at the

3    already fixed agreed price.  And in that case, as the courts

4    hold, the consumers' damages, it's not the overcharge, it's the

5    fixed price.

6          And what's the policy reason for why *Illinois Brick*

7    wouldn't apply in that case?  Well, go back to the original

8    purposes of *Illinois Brick*.  There's no issue of tracing,

9    allocating, apportioning, discerning, discovering how much of

10   the manufacturer's overcharge got passed on to the customer

11   because it wasn't an overcharge.  It's because the price to the

12   customer was fixed and already agreed before the distributor

13   sold the product.  And in that case, a case of resale

14   price-fixing, there's only one party who's paid any illegal

15   price, and that's the customer.

16         So where do you find support for that?  I go back to

17   Areeda.  This, I haven't put on a slide for you, but I brought

18   copies and I'll leave it with the Court because I think it will

19   be helpful.  The rule at play here is explained by Areeda, and

20   it's cited by the Seventh Circuit in *Paper Systems*.  And here's

21   what Areeda says.  *Illinois Brick* does not limit suits by

22   consumers against a manufacturer who illegally contracted with

23   its dealer to set the latter's -- the dealer's -- resale price.

24   Why is that?  Again, I read, where the dealer and the

25   manufacturer agree in advance on the very price to be paid by

1   the consumer there is no problem of duplication or

2   apportionment because the consumer is the only party who has

3   paid an overcharge.

4          Now, that's in contrast to what is happening here and

5   has happened in all the other cases that have ruled on this

6   where the distributor or wholesaler is the party paying the

7   overcharge then turning around in a separate transaction, under

8   separate agreement to charge a price to the hospital or health

9   care provider a price that's a function of that agreement not

10  involving, in this case, BD.

11         So it is that situation -- again, I'm reading from

12  Areeda -- that is outside *Illinois Brick's* domain because,

13  quote, there is no tracing or apportionment.  And just to go

14  one step further to understand this, Areeda goes on to

15  explain -- I'm going to quote again:  Further emphasizing that

16  *Illinois Brick* does not apply where the dealer and the

17  manufacturer set the resale price is that were the distributor

18  to challenge the price imposed on it by the manufacturer, it

19  would not be seeking an overcharge.

20         So imagine a situation where -- which is different

21  from ours -- where there's a predetermined resale price to the

22  consumer.  If the distributor were to sue in that case, it

23  wouldn't be for the overcharge, it would be for having to

24  charge too much to a consumer and thus losing sales.  So in a

25  case -- which is not this case, but it is the only situation

1    where the indirect purchaser rule doesn't apply.  The end user

2    in that case has the overcharge claim, the distributor doesn't

3    even have an overcharge claim because they already agreed to

4    that price.

5           So every case that has looked at this issue, every

6    case that has applied either this exception or concluded that

7    *Illinois Brick* doesn't apply -- and there are not many -- has

8    been a resale price maintenance price-fixing case for the

9    reasons Areeda explained.  And on the facts, as admitted, as

10   alleged by the plaintiff, that exception, that principle does

11   not apply.

12          Why?  Because the price from BD, the price that -- the

13   price that's negotiated by BD and the GPOs does not involve the

14   distributor.  They admit that.  They don't show up until

15   after -- after when the health care provider selects its

16   distributor, after a health care provider negotiates a

17   distribution agreement.  The distributor has nothing to do with

18   BD's price other than paying it and passing it on.

19          And that occurs after the health care provider selects

20   the distributor and after they charge; that is, the

21   distributors charge the health care providers whatever it is

22   they charge under their own distribution agreements.  The

23   distributors have nothing to do with BD's prices, BD is not

24   involved in the distributors in setting their charges to their

25   customers.

1          So, Slide No. 12, your Honor, just to bring this full

2     circle, this very argument, your Honor, was made to Judge Wood

3     in the *Brunswick* case.  It was argued, it was rejected, and it

4     was based on the exact same agreement between BD and the

5     distributors, this dealer notification agreement.  That's the

6     agreement under which BD authorizes distributors to sell its

7     products.  That's what this agreement is.  That's what they

8     argued in that case and they're arguing in this case, means

9     that *Illinois Brick* doesn't apply.

10         Judge Wood found in a decision that we obviously have

11    provided, your Honor, that recognizing that they argued it

12    before her, that the dealer notification agreements between

13    defendant distributors supposedly bring this matter within the

14    vertical conspiracy doctrine, the complaint fails to provide

15    any plausible support.

16         Why?  In exactly the same reasons here.  This is what

17    Judge Wood found.  This is 159 F. Supp. 3rd 1361.  Crucially --

18    crucially -- plaintiffs assert that the two, BD and the

19    distributor, enter into an dealer notification agreement

20    defining their relationship pursuant to the terms of the net

21    dealer contract.  That's the GPO contract.  Exact same

22    allegation as here.  And they allege -- that is, the plaintiffs

23    then, as they do now, that the agreement between BD and the

24    distributor incorporates, and I'm quoting from her, the pricing

25    rebate bundling penalty and sole source provisions in the GPO

1    contracts.  Exact same allegation as here.  Thus, she

2    concluded, the plaintiff's complaint demonstrates and expressly

3    acknowledges that the contracts linking the defendant, the

4    distributor, and the provider are essentially negotiated

5    between the defendant and the GPO, not the distributor.

6    Therefore, the exception for resale price-fixing is

7    inapplicable and, in fact, is negated by the allegations.

8         Slide No. 13, your Honor, I've just put together.  I

9    won't read them all, but we've summed up in one place to

10   illustrate how the allegations here are substantively

11   indistinguishable from the allegations made in *Brunswick*, that

12   BD and the GPOs are the ones that set BD's prices, that the

13   distributors have no role in the setting of BD's prices, and,

14   therefore, the so-called conspiracy exception couldn't possibly

15   apply.  And critically essential to the application of *Illinois*

16   *Brick*, the distributors then pass on BD's prices through their

17   own distribution agreements and charges to the consumers.

18        And I'll close by coming back to *Utilicorp,* your

19   Honor.  *Utilicorp* was a case, the third in the line of the

20   trilogy where plaintiffs, that is, consumers of public

21   utilities argued that they should have standing to sue natural

22   gas suppliers because under statute and regulation 100 percent

23   of what the natural gas supplier charged the utility was passed

24   through the consumers.  And so the lawyers for the consumers

25   said there's no reason why the consumers shouldn't be allowed

1    to sue because the whole thing gets passed through.  There's no

2    tracing problem, there's no apportionment problem.

3          The Supreme Court said no.  They specifically said

4    that even if the principles and rationale and reasoning and

5    prudential concerns lying behind *Illinois Brick* do not apply,

6    quote, in equal force in every case.  They said the rule is

7    ironclad.  And they closed by saying our stated decision not to

8    carve out exceptions to the direct purchaser rule is immutable.

9          And for those reasons, as the courts have already

10   found over and over again, we respectfully submit that the

11   antitrust claims against BD be dismissed.

12         *THE COURT:*  All right.  Thank you, Mr. Atkins.  That

13   was helpful.

14         *MR. ATKINS:*  Thank you, your Honor.

15         *THE COURT:*  Now, Mr. Molo, if you would like to

16   respond as best you can just to those arguments.

17         *MR. MOLO:*  I would, your Honor, thank you very much.

18   And thank you for having us here this morning, setting aside

19   this much time for what is, indeed, a case that involves a lot

20   of parties.  I don't believe it is nearly as complex as is

21   being portrayed, and hopefully you will agree with me after we

22   finish the morning here with all of us speaking.

23         The question, by the way, I just want to start with is

24   that, you know, it's not a question of whether or not we've

25   proven an antitrust violation here.  We need only provide

1    enough detail about the subject matter to present a story that

2    holds together.  That's the pleading standard.  The question is

3    could these things have happened, not did they happen.  And

4    we've met that standard.

5         First of all, we have standing.  The plaintiffs here,

6    my clients, are health care providers who have purchased

7    Becton's syringes, catheters -- and catheters from the

8    defendant distributors, and they are a part of the class of the

9    first non-conspirators in the distribution chain, and that

10    gives them standing.

11         The Seventh Circuit law is absolutely crystal clear on

12    this.  The first purchaser outside the conspiracy has standing

13    to sue for damages.

14         And that's precisely what occurred here.  And when you

15    think about it, Judge, if you did not allow that, if you said

16    we did not have standing, the defendants' conduct could never

17    be redressed through a private action.  And that's contrary to

18    the Congressional intent, which has been affirmed many times by

19    the courts saying that we encourage private enforcement of the

20    antitrust laws.

21         I mean, what they are saying to you today is that

22    there can be a conspiracy among manufacturer, other middlemen,

23    intermediaries, and the first person that is outside of that

24    conspiracy can't bring a claim for damages.  And that just

25    can't be, and that's inconsistent with the law.  *Illinois Brick*

1  says nothing more than the first non-conspirator in the

2  distribution chain gets to recover against those who unlawfully

3  raise prices through anticompetitive conduct.

4         Now, the *Illinois Brick* case, Judge, I think it is

5  illustrative and illuminating to understand where it comes

6  from.  There was the *Hanover Shoe* case that preceded it, where

7  a defendant had argued, I shouldn't be liable for all of the

8  damages that this first purchaser is seeking from me because

9  that purchaser is passing those increases on to further people

10 that that purchaser sells to.  And the court just said, no,

11 that's too complicated.  The analysis is too complex.  We are

12 not going to go through and insist on this sort of

13 apportionment.  We are going to limit it and not allow that as

14 a defense.

15        *Illinois Brick* comes after that and applies that same

16 analysis of the plaintiff's side, and it says, We are not going

17 to allow there to be plaintiffs who are further down the

18 distribution chain bringing claims and requiring courts to go

19 through and apportion where the damage really lies, who is

20 really entitled to those damages.

21        So what *Illinois Brick* says is, if you are the first

22 purchaser outside the conspiracy, you are entitled to recover

23 100 percent of the damages.  And joint and several liability

24 again conspirators makes sense for that.  It is not a

25 complicated analysis.  You don't have to go through a great

 1    deal of struggle to get to a fair result.

 2          Now, the defendants are saying that *Illinois Brick*

 3    says that multiple parties at different tiers in the

 4    distribution claim -- chain cannot be held liable, and that

 5    result would be absolutely absurd.  The Seventh Circuit, on

 6    multiple occasions, has held that where manufacturers and

 7    intermediaries -- which is what we have here -- are alleged to

 8    be conspirators, *Illinois Brick* does not prevent the first

 9    non-conspirator in the distribution chain from recovering

10    damages.

11          The case that gets cited most often for this

12    proposition is the *Paper Systems v. Nippon Paper* case,

13    Judge Easterbrook's opinion.  And in that case, the plaintiffs

14    had alleged a conspiracy among manufacturers of paper,

15    distributors of paper, and something called trading houses.

16    And the district court dismissed and said, no, *Illinois Brick*

17    prevails, and the plaintiff can't -- it was a ultimate

18    purchaser -- couldn't bring the claim.  Seventh Circuit

19    reversed.  Judge Easterbrook very clearly said the first

20    purchaser outside the conspiracy may sue for damages.  There is

21    no tracing or apportionment issue in *Paper Systems* or here,

22    because, again, all of the conspirators are jointly and

23    severally liable.  It's fundamental, it makes perfect sense,

24    and its the law.

25          Now, Becton has come here, and they've invented some

1    limitations on how *Paper Systems* works or they're claiming how
2    it works that just are not the law. They claim that standing
3    is limited to when conspirators form a single economic
4    enterprise, whatever that means. And there's no such case.
5    There's no limitation on any case. And, in fact,
6    Professor Areeda, who we heard my friend from Paul, Weiss
7    citing repeatedly just a few moments ago, says there is no such
8    limitation.

9         They also claim that there is a limitation to
10   situations where there is vertical price-fixing, where everyone
11   in the distribution chain gets together and says they are going
12   to charge the price, and that, too, is not the law. And,
13   again, that would not make sense. It would be contrary to this
14   fundamental point of *Illinois Brick* that the first purchaser
15   outside of the conspiracy can sue and can recover 100 percent
16   of the damages.

17        You know, Becton misstates the *Fontana* case, another
18   Seventh Circuit case, that one written by Judge Pell. And
19   *Fontana* did not announce a rule that standing is conferred on
20   the first purchaser outside the conspiracy only in cases
21   involving price-fixing conspiracies. The defendants, by the
22   way, rely on an incorrect cite to the district court opinion.
23   For the sake of completeness, I'll just give it to you. It's
24   460 F. Supp. 1151, 1660. That clearly does describe the
25   conspiracy there.

```
 1                And Fontana involved allegations by an airplane parts
 2      dealer, that Cessna, the manufacturer, and its distributor had
 3      conspired to drive dealers out of business through bundling
 4      schemes, false advertising, refusals to deal, and other
 5      anticompetitive conduct.  It was not a price-fixing case.  And
 6      other courts have recognized that the standing of the first
 7      purchaser outside the conspiracy cases is not limited to
 8      price-fixing cases.  We cite in our brief the Insulate case,
 9      which is an Eighth Circuit case, and the Lowman case, which is
10      a case out of the Southern District of New York, which is a
11      market allocation.  Both of those are market allocation cases.
12                Now, the defendants wrongly rely on this Brunswick
13      case.  If I can have -- I have some slides here that may aid
14      the discussion.
15                THE COURT:  If we can maybe put them on the ELMO.
16                Deana, do we have --
17                MR. MOLO:  Yeah.  We have them right there.  And we
18      have a hard set for you.
19                THE COURT:  Okay, sure.
20                MR. MOLO:  So the Brunswick case, which we've heard
21      about quite a bit already this morning, was not a Section 1
22      conspiracy to restrain trade case, which is the case that's
23      before you.  It's a Section 2 monopolization claim that
24      required proof and sufficient allegations of specific intent to
25      monopolize.
```

1          Here, a Section 1 case, a restraint of trade can be

2     proven through either unlawful purpose or anticompetitive

3     action if it is enough to allege that the parties knowingly and

4     through concerted action occurred -- the restraint of trade

5     occurred and it was contemplated and invited, and the parties

6     agreed to do it.

7          It was a case involving true indirect purchasers from

8     Becton.  It involved a cost-plus exception argument, which I

9     know this Court's familiar with from your case in *First*

10    *Impression Salon*.  So you, I think, are not being completely

11    candid in saying that you are unfamiliar with antitrust laws.

12    But that was a cost-plus exception case.  It was not a case

13    like this case where there was a conspiracy.  And there was no

14    conspiracy allegations involving the dealers.

15         So what we have here are detailed conspiracy

16    allegations involving every party in the distribution chain up

17    to us.  There is no cost-plus exception.  And we are, in fact,

18    the direct purchasers from the conspiracy.  So *Brunswick* was a

19    very different case.  And I also want to add, too, there was

20    different parties, different claims.  There is absolutely no

21    precedential or preclusive effect.

22         *THE COURT:*  Well, that's certainly even because it is

23    a district court decision.  But so I guess where can you point

24    to me in the amended complaint where the plaintiffs allege that

25    the GPOs and the distributors entered into agreements with a

1    meeting of the minds for an unlawful arrangement?

2           So you seem to be saying that this is different

3    because they're actually in a conspiracy, but it looks like

4    they just adopted the terms of the net dealer contract, that

5    that goes down the line.  So explain that to me.

6           MR. MOLO:  You take me to where I want to go, which is

7    a bit beyond where they left off and --

8           THE COURT:  Okay.

9           MR. MOLO:  -- and I'm glad you did because I want to

10   explain to you how this conspiracy works, and I think that's

11   what you are asking me, if I may.

12          THE COURT:  Yes.

13          MR. MOLO:  So let me start where it ends, okay.  Where

14   does it end?  It ends with the antitrust injury.  Becton sells

15   commodity products -- commodity products, syringes, catheters.

16   Their pricing is as much as 37 percent higher than what the

17   competitive pricing is.  That's alleged at Paragraph 39 of the

18   complaint.

19          They get that through market share of 60 percent of

20   the conventional syringe market, safety syringe -- 60 percent

21   in the safety syringe market, and 55 percent in the safety

22   catheter market.  This doesn't happen by accident.  The

23   commodity product like this, to have this kind of market share

24   and this kind of pricing is -- the only way this is happening

25   is through this conspiracy.

1          Now, there's three categories of participants, as we

2   talked about.  First, there's Becton, the supplier, which

3   manufactures this commodity product.  It contracts with the

4   group purchasing organizations for inflated prices at

5   restrictive terms.  It then -- Becton contracts with

6   distributors to sell at inflated prices and enforce those

7   restrictive terms.  It makes anticompetitive payments to the

8   group purchasing organizations that it calls administrative

9   fees, and it requires the distributors to make payments to the

10  GPOs, and it also pays the distributors as well.  And it reaps

11  tremendous profits as a result of both the volume and the

12  pricing that it's able to extract.

13         The group purchasing organizations are effectively the

14  dishonest brokers here.  Their job ostensibly is to negotiate

15  on behalf of the health care providers.  Now, you might think,

16  well, boy, that's really a tough job because you have got the

17  big bad manufacturer of Becton, you know, and they're just not

18  going to be a pushover.

19         In fact, these two GPOs who are defendants here, these

20  group purchasing organizations, they control 75 percent of the

21  health care spending in these markets in the United States.

22  They should be able to come in there like Jimmy Hoffa in a

23  labor negotiation and be able to -- you know, Becton should

24  leave the room weeping.

25         And what happens?

1          This is what happens:  As a result of that

2   negotiation, supposed negotiation, we result -- we end up with

3   prices that are 37 percent above market.  That doesn't happen

4   if the GPOs are actually in there and negotiating hard and not

5   being rewarded for laying off as they were.  They receive a

6   percentage of the sales as payment from Becton, and they get

7   these payments from the distributors.

8          The last party in this are the distributors, and

9   they're effectively the enforcers.  They agree to sell these

10  products at the inflated prices.  They agree to enforce these

11  restrictive terms, which are the sole source and dual source

12  terms and the penalty pricing.  And the way those work is, the

13  GPOs have negotiated these terms, and there's ostensibly some

14  kind of a discount.

15         In fact, if a customer buys from a competitor of

16  Becton, they are punished mercilessly by saying if it's a --

17  even where it is a dual source, if it's more than -- if they go

18  to a second source and it is more than 5 percent, they end up

19  having to pay extraordinary penalties that make this a very

20  unattractive economic proposition, so they are forced to limit

21  themselves to these contracts.

22         And the distributors receive -- they make their money

23  from both the volume of sales and an increased price, so an

24  increased price benefits them.  They're aware of those terms

25  because they're enforcing the terms that the group purchasing

1      organizations have negotiated.  And Becton actually pays the

2      distributors -- this is all alleged in the complaint -- pays

3      the distributors' employees so-called bonuses for providing

4      visibility for compliance with these restrictive terms, making

5      sure that things are being done as Becton wants them done, and

6      also for advertising Becton as opposed to competitors'

7      products.  And the distributors then make payments to the GPOs

8      as well.

9              So how does this conspiracy work?  You have there

10     Becton at the center engaged in these contracts, setting the

11     inflated prices in the restrictive terms with the GPOs, who are

12     supposed to be negotiating hard, but as we know are negotiating

13     prices that are 37 percent above the market and allowing Becton

14     to get 60 percent of the market share.  And then we have the

15     contracts between Becton and the distributors, and those

16     contracts are to enforce the inflated prices and the

17     restrictive terms.

18             This together results in what you see as the circle

19     here, inflated prices and restrictive terms that if the

20     providers, the health care providers, the purchasers, want to

21     purchase the Becton products they have to go through, accept,

22     whatever word you wish to use, be subject to the inflated

23     prices and the restrictive terms.  That's how the conspiracy

24     works.  These parties together.

25             Now, I think what you were asking me before was, what

1    it is the evidence or at least what's our allegation that they

2    all knew what each other was doing?  And that's not conspiracy

3    law.  Conspiracy law is that if there is, in this case, the

4    improper purpose by Becton to engage in the anticompetitive

5    conduct and it's contracted with the distributors or agreed

6    with the distributors to do the things that they are doing and

7    agreed with the GPOs, each need not know every detail of what

8    the other does.  It's no different than in a narcotics

9    conspiracy where, perhaps, the manufacturer of the narcotics --

10   and I'm not doing this in a disparaging way, but I'll just say

11   that's Becton, okay.  It may know what its distributors on the

12   street are doing, and it may also be paying off a dirty

13   policeman or a policewoman on the side as well.  And the

14   distributors need not know all of the details about that, and

15   the dirty policeman need not know all of the details about what

16   the distributors are doing for there to be a conspiracy.

17        And in a Section 1 conspiracy, antitrust conspiracy,

18   again, it's merely this anticompetitive conduct, and the law's

19   pretty clear on this too.  You need not even actually go out

20   there and aggressively engage in the conduct if you merely

21   acquiesce and you are aware of what's going on.

22        So at the worst case, I would say that's what happens

23   with the distributors, that they merely acquiesce, but they

24   actually do much more than that.  They act, as the case law

25   talks about, and we cite in our brief as a "cat's paw," a term

 1    I don't particularly like, but it's the term they use.  But

 2    they are the enforcer.  They go out and they make sure these

 3    things happen and the payments go around.

 4            And so talking about it -- and, by the way, here are

 5    these contracts.  The evidence goes beyond the contracts.  The

 6    Becton and the group purchasing organizations have what they

 7    call a net dealer contract, and that sets the prices, has the

 8    penalties, and has these requirements.  And these contracts, by

 9    the way, are all long-term.  They're usually for five years.

10    So this is really, really, you know, punitive.  You are locked

11    into that.

12            Then there is the dealer notification agreement

13    between Becton and the dealers, where the dealers agree to

14    enforce Becton's terms, and the dealers agree to pay the GPOs.

15    So there is contact and conduct between the group purchasing

16    organizations and the distributors.

17            And then there's the distribution agreement between

18    the distributors and the health care providers, the purchasers,

19    which subject the providers to the restrictive terms.  They

20    charge the -- you know, the inflated prices and they have these

21    long-term contracts.

22            So how does the money then work within the conspiracy?

23    So these inflated prices are paid by the health care providers.

24    Becton pays -- reaps these enormous profits.  They pay what

25    they call administrative fees, millions and millions of dollars

1    to the GPOs.  How someone who is supposed to be negotiating

2    with an iron fist on one hand is also paying money to the

3    opposing party in the negotiation, and that be competitive or

4    fair or honest is beyond me.  But there are these millions and

5    millions of dollars in administrative fees paid by Becton to

6    the GPOs.

7         Becton pays the distributors.  The distributors are

8    paid partly through the sales, but as I said, their employees

9    are paid as well these special bonuses.  And then Becton, for

10   some reason, requires the distributors to make a payment to the

11   group purchasing organizations.  So everybody gets a cut of the

12   action.  Everybody stays happy.  Becton gets the -- pays the

13   administrative fees to the group purchasing organizations.  The

14   distributors pay the group purchasing organizations per

15   Becton's requirement, and Becton pays the distributors, the

16   employees to monitor compliance with the scheme.

17        Everybody is happy except the people that are having

18   to pay 37 percent over what would be a competitive price had

19   there not been a conspiracy here.  These are rotten deals that

20   are negotiated with the sole purpose of defeating competition,

21   foreclosing other people from the marketplace.  That five-year

22   term makes it impossible for any competitor to come into the

23   marketplace and fairly compete, and Becton reaps huge, huge

24   sums, as do these other parties.

25        You know, they make some points in the briefs about

1   the nature of the conspiracy, whether it's a vertical

2   conspiracy, whether it should be a horizontal conspiracy.  The

3   Supreme Court law here is very clear, and it goes right to this

4   issue.  And I'm quoting from the *American Tobacco* case right

5   here, it's up on the screen before you, where it says it is not

6   the form of the combination or the particular means that's used

7   but the result to be achieved that the statute condemns.

8        And the result to be achieved here is that 37 percent

9   above competitive pricing that we've alleged.  There's no

10  formal agreement necessary to constitute an unlawful

11  conspiracy.  You don't have to sit down and, you know, write on

12  parchment paper and put wax and ribbons and say, you know,

13  we've all agreed to conspire, and we are going to restrain

14  trade.  And as the Court said, the Supreme Court said in

15  *American Tobacco*, where the circumstances are such as to

16  warrant a jury finding in that the conspirators had a unity of

17  purpose for a common design and an understanding or a meeting

18  of the minds in an unlawful arrangement.  And we allege that

19  throughout.

20       This conspiracy is plausible on its face, and that's

21  all we need to prove.  It's plausible in that there are, first

22  of all, these inflated prices for the commodity products.  It's

23  plausible because there is this extraordinary market share for

24  commodity products.  It's extraordinary -- and it's plausible

25  because the group purchasing organizations have gotten this

1    terrible, terrible deal, despite having 75 percent of the

2    market, having gotten this terrible deal.

3          The contracts are long-term.  The contracts impose

4    these extraordinary disloyalty penalties.  There are

5    overlapping participants.  There are common contracts that

6    these parties have.  These distributors are using the same

7    source of contracts.  They have the identical goal of stifling

8    competition and lining their own pockets.  These contracts

9    require Becton to be the sole or one of two sources.  And they

10   require the distributors to make the payments to the GPOs, the

11   payments of millions and millions of dollars in so-called

12   administrative fees that I just mentioned, the payments of

13   these bonuses, and that Becton requires the distributors to

14   advertise these products over the competitors.

15         So I want to make clear that it is not just these

16   contracts that we are claiming are the conspiracy, they're

17   evidence of the conspiracy.  But the conspiracy is this

18   agreement, this system that these folks have landed on through

19   much effort and calculation, and it's rewarding them.  And what

20   they are trying to say is that notwithstanding the fact that

21   the GPOs, Becton, and the distributors are all connected in

22   this, they're all reaping huge dollars from this.  They've all

23   entered into this with a clear intention of foreclosing

24   competition and driving up and getting these extraordinary

25   prices; that not withstanding that, the health care providers

1    cannot sue.  And that's wrong.

2         *Illinois Brick* just doesn't say that.  *Illinois Brick*

3    says that the health care provider, the first purchaser outside

4    the conspiracy has standing.  That's us here.  We've stated a

5    claim for a conspiracy.  We have standing to bring that claim,

6    and we would like the case to move forward to discovery.

7         *THE COURT:*  Okay.  One question I had --

8         *MR. MOLO:*  Sure.

9         *THE COURT:*  -- when I came in, and I think you have

10   answered it.  But so the Supreme Court says that at the motion

11   to dismiss stage, the determination turns on whether the

12   defendants had any rational motive to join the alleged

13   conspiracy and whether the conduct alleged was consistent with

14   the defendants' independent interests.

15        So what you are saying here is that their motive is

16   that everybody is making money, and the health care provider is

17   paying more.

18        *MR. MOLO:*  That's right.

19        *THE COURT:*  Okay.

20        *MR. MOLO:*  And we know what health care costs are in

21   the United States, and this is why these things are happening.

22   Right there, the slide that's before you -- excuse me -- the

23   slide that's before you indicates the money that each of them

24   is getting and which is all alleged, as we say, it's got

25   citations to each paragraph of the complaint where it's there.

```
 1              But that's how the conspiracy works.  That's why we
 2      have standing.  And, again, if we didn't have standing here,
 3      you would be saying that this kind of conduct could not go
 4      redressed absent a government enforcement action, and that is
 5      not what the antitrust laws were designed to allow.
 6              THE COURT:  Well, but he put up a whole bunch of cases
 7      where -- that all go against you, so how is this --
 8              MR. MOLO:  No, they don't.  No, they don't.
 9              THE COURT:  Okay.
10              MR. MOLO:  And the reason they don't is the cases that
11      he's citing are monopolization cases.  They're Section 2 cases.
12      They're not cases like the case that we've brought, this
13      Section 1 case, which is this restraint of trade case.  And
14      Mr. Ellis, my partner, will address the other two arguments.
15      Some of it will probably have been addressed by what I've
16      talked about.
17              Okay.
18              I'm happy to come up and answer any more questions
19      that you have whenever you'd like.
20              Thank you.
21              THE COURT:  Okay.  All right.  Well, let's move on
22      to --
23              MR. ATKINS:  Your Honor, can I respond --
24              THE COURT:  You can respond briefly.
25              MR. ATKINS:  Yes.  And we can take care of standing.
```

1          As to this, I suppose it is a policy argument about if

2     this goes unlitigated, there is not going to be anybody to

3     redress this conduct.  Well, first of all, let's set aside the

4     fact that there was a trial about these very contracts and

5     these practices so -- by a competitor.  So there's absolutely

6     not only in concept a mechanism for alleging redressing it,

7     but, in fact, it happened, it just turned out that Becton,

8     Dickinson prevailed.

9          No. 2, to the extent that Marion Healthcare really

10    wants to bring a claim and relitigate that case, they

11    absolutely have recourse to the courts under Illinois law

12    because Illinois, like 25 other states and the District of

13    Columbia, has what's called an *Illinois Brick* repealer statute.

14    So there is a -- they could sue.  If they want, they can sue BD

15    and bring a claim, exact same claim, treble damages, under

16    Illinois antitrust law because the Illinois legislature said we

17    are going to create a state law to give folks like that

18    standing because -- precisely because -- precisely because the

19    federal law under *Illinois Brick* does not give them standing.

20    So they're not out of court.

21          The only reason we're here, your Honor, is because

22    somebody other than these named plaintiffs wants a nationwide

23    federal antitrust case.  We can all speculate as to why, why

24    Georgia wasn't the end of this.  But if Marion wants its day in

25    court, it can have it, and, you know, I'm happy to set a trial

1    schedule.

2            So that's on the policy issue.

3            On the issue of whether or not uttering and arguing,

4    making these jury arguments about a conspiracy grants standing,

5    I didn't hear a citation to any authority for that.  And I

6    didn't hear an answer to the law that says the only time

7    *Illinois Brick* doesn't prevail, doesn't govern is when the

8    retail resale price to the end user is set between the

9    manufacturer and the distributor.  For all the slides and

10   arguments and pictures, there was no answer to my assertion and

11   the fact based on the -- and based on the pleading that this is

12   about a passed on overcharge.  Cases about passed on overcharge

13   are prohibited by *Illinois Brick*.

14           Now, he cited *Paper Systems*.  *Paper Systems* is useful

15   for several reasons.  One, as I said before, *Paper Systems*, in

16   discussing the so-called conspiracy exception cites to as

17   authority the Areeda provision I read to you.  I now have

18   copies I will leave with the Court.  I will not reread it.  But

19   *Paper Systems*, at 281 F.3d 632, in discussing it cites that.

20   And, of course, it is a resale price maintenance case.

21           Let me -- if, your Honor -- if I could, how do I

22   activate this?

23           *COURTROOM DEPUTY:*  I will take care of that, just a

24   moment.

25           *MR. ATKINS:*  Thank you.

1          Your Honor, rather than taking time to pass these

2   out -- although I think I will because the color is important.

3   If I might, your Honor.

4          THE COURT:  Mmm hmm.

5          MR. ATKINS:  *Paper Systems* is like a seminar in the

6   direct purchaser rule.  It involved a price-fixing conspiracy,

7   as do all the other cases that apply this so-called exception.

8   The entities in red and connected by the red lines were the

9   parties to this price-fixing conspiracy.  If there was any

10  doubt, they pled guilty to criminal price-fixing, which, of

11  course, invited this lawsuit, not the one we are here on today

12  but *Paper Systems*.  And each of these three columns represents

13  a different sort of species of the direct purchaser rule.

14          Nippon sold to distributors, Japan Pulp and Mitsui.

15  Those distributors were deemed to be the direct purchasers, and

16  the indirect customers of Nippon had no standing.  Kanzaki and

17  Appleton, also price-fixing conspirators, they happened to sell

18  directly to the customers.  So those customers, unlike Nippon's

19  ultimate customers, they had standing as direct purchasers

20  because they brought directly from Kanzaki and Appleton.

21          And then here's where it gets interesting.  Oji and

22  Mitsubishi sold to trading houses, but the trading houses were

23  part of the price-fixing conspiracy.  The trading houses pled

24  guilty to price-fixing along with the other companies.

25          And so *Paper Systems* citing Areeda found that in the

1  case of the customers of Oji and Mitsubishi, because the price

2  to them was fixed by an agreement between the intermediary and

3  the suppliers, acting, in effect, as a single economic

4  enterprise predetermining, prefixing the price to the

5  customers, there the consumers had direct purchaser standing.

6          So *Paper Systems* is perfectly illustrative of the

7  reasons why the claim here should be dismissed, because there

8  is no allegation and no argument that the distributors had

9  anything to do with setting BD's prices or that BD was involved

10  in what the distributors charged, ultimately charged their

11  customers under their separately negotiated distributor

12  agreements.

13          As for *Fontana*, it also helps illustrate why this

14  claim should be dismissed.  In *Fontana*, the "intermediary"

15  buying these avionic equipment, it sued not as a purchaser but

16  as a competitor and therefore was not seeking overcharge

17  damages.  So the court found that the intermediary does not fit

18  within *Illinois Brick*.

19          Why?  Because it claims to be a competitor, not a

20  customer.  Therefore, it said *Fontana* -- that's the customer --

21  does not seek damages for an illegal indirect overcharge passed

22  on to it as it is prohibited by *Illinois Brick*, but it sues on

23  the basis of the fact that it was a competitor and was

24  allegedly driven out of the market.  And its damages it was

25  seeking for being driven out of business by another competitor

1    were lost sales and lost profits.  It wasn't even suing for a

2    passed on overcharge.  Because as *Fontana* says, that would have

3    been, quote, prohibited by *Illinois Brick*.

4         Now, as to *Brunswick* being different, *Brunswick* was

5    about the exact same exclusionary conduct.  There, it said BD

6    became a monopoly as a result of that conduct.  Here, they're

7    arguing the exact same conduct results in the exclusion of

8    competitors.  The antitrust injury -- you saw the slide with

9    the supposedly higher prices.  It's the exact same claim, and

10   the basis is exactly the same.

11        I'm reading from the *Brunswick* complaint.

12   Paragraph 7, it's in the materials we submitted.  It reads just

13   like the litany of alleged wrongdoing by BD here.  There were

14   allegedly six schemes, it says, in Paragraph 7.  Exclusionary

15   bundled rebates -- here we go -- penalty contracts, sole source

16   contracts -- it's the same claim -- the theft of RTI's patented

17   innovative technology -- same claim -- six years of

18   competitive, deceptive, and false advertising -- same claim.

19   Same claim, same conduct, same injury, different section of the

20   Sherman Act.

21        And as to whether or not the conspiracy exception was

22   argued, I'm holding in my hand their opposition brief to

23   Judge Wood.  You can probably see a section of their brief,

24   conspiracy exception.  Hard to miss.  Then it goes -- and it

25   makes the argument of why the so-called conspiracy exception

1    applies.  It is the same argument we just heard.  The complaint

2    alleges that Becton fixes its alleged monopoly pricing --

3    that's those, you know, high prices we saw -- in the

4    exclusionary net dealer contracts with the GPOs.  You just

5    heard that was on the charts.

6          After a hospital decides to accept these prices and

7    other terms, it executes a cost-plus agreement with the

8    distributor.  There's the distributor agreement.  The

9    distributor, in turn, executes a dealer notification agreement.

10   We saw that as well with Becton.  It is the dealer notification

11   agreement between Becton and Becton distributor that brings

12   this within the conspiracy exception.  Same argument, same

13   alleged facts, and I submit requires the same outcome.

14         Finally, your Honor, one, as I wrote by hand,

15   *Brunswick*.  The exact same conduct alleged here as giving rise

16   to standing is exactly the same conduct as in *Brunswick*.  I

17   just read it -- the net dealer contract, the dealer

18   notification agreement, and the distribution agreement -- like

19   it was taken out of the *Brunswick* pleading.

20         The other thing is that alleging a series of formal

21   agreements in connection with the sale of medical products is

22   not an allegation of a conspiracy.  Mr. Molo read it from the

23   DOJ's guidelines that you don't need a formal agreement to

24   prove a conspiracy, that's true.  But conversely, the existence

25   of formal agreements for the sale and distribution of profit --

1    products doesn't sufficiently allege the existence of a

2    conspiracy.  It says the existence of commercial contracts.

3              And let me close by saying -- and I hope at this point

4    it wasn't lost.  I can't imagine it was.  Whether or not they

5    have alleged some kind of conspiracy involving the

6    distributors, we don't believe they did.  The pleading is

7    sorely lacking.  My colleagues will explain why.  That doesn't

8    overcome the need to allege the type of conspiracy, the type of

9    conduct that would in the rare, rare case create an exception

10   to *Illinois Brick*.  And that is the need to allege that the

11   dealer and the manufacturer got together and set the price at

12   which the dealer is going to sell to the end user.

13             I've read to you from Areeda.  Every case that's

14   covered this has been about vertical resale price maintenance

15   or price-fixing because it is the only argument that makes

16   sense, it is the only arguments that they acknowledge.  This

17   case is about a passed on overcharge, and that is barred by

18   *Illinois Brick*.

19             THE COURT:  Okay.  Thank you.

20             MR. MOLO:  May I just two very short points?

21             THE COURT:  Very short.

22             MR. MOLO:  Very short.  On this -- on this Illinois

23   Brick repealer issue, this is --

24             COURT REPORTER:  Would you please move the microphone?

25             MR. MOLO:  This *Illinois Brick* repealer issue, this

1    is -- I mean, we have a right to enforce the antitrust laws.

2    And what about the other 25 states?  They should -- those

3    people should just go ahead and pay the 37 percent overcharge

4    that these conspirators have had; and, secondly, on this issue

5    of this very long-winded explanation of how *Brunswick* is so

6    definitely foreclosing our case is just not true.  As I said,

7    it is a Section 2 case; and, secondly, the dealers were not

8    named as defendants; and, thirdly, this cost-plus issue was

9    being raised, it is a very, very different case.

10          Thank you.

11          *THE COURT:*  Okay.  Thank you.

12          Well, let's take a short break.  I'm sure Molly needs

13   a break, and we can -- I'll hear from the GPOs next.  We will

14   resume at 11:35.

15                      *(Recess)*

16          *THE COURT:*  Be seated.

17          *MR. DEE:*  Thank you, your Honor.  What we talked about

18   at the break, we are going to be focusing primarily on the

19   conspiracy claims for the GPOs.  And the law for that is the

20   same for the distributors, and they are going to just basically

21   talk about how it applies to them.

22          *THE COURT:*  Okay.

23          *MR. DEE:*  The thought was that we would -- that I

24   would go on behalf of the GPOs and Mr. Fenske would talk

25   about -- go on behalf of the distributors, and then the

1    plaintiffs would address both of us.

2         MR. MOLO:  These are going to be short, Judge.

3         THE COURT:  Okay, great.

4         MR. DEE:  So I thought what might make sense -- your

5    Honor, Terry Dee on behalf of -- representing Premier and on

6    behalf of the GPOs -- talk a little bit about just very briefly

7    the GPO process, make sure the Court understands how a GPO

8    works, and then get into the conspiracy claims.  I do also have

9    a handout, which I -- could I approach the Court?

10        THE COURT:  Yep.  You can pass that up.  Did you have

11   one to put up on the screen?

12        MR. DEE:  I don't.

13        THE COURT:  Okay.

14        If you would hand that to my law clerk too.

15        MR. DEE:  The slide deck has a couple of slides

16   relating to market power and foreclosure.  I don't intend to go

17   through those unless the Court has any questions.

18             First, in terms of the background of the GPOs -- and

19   this is on Slide 2 -- so group purchasing organizations,

20   they're a membership organization.  Their members are health

21   care providers and they -- what the GPOs do is pool membership

22   purchasing power of their health care providers to get better

23   prices and services from vendors like Becton on behalf of their

24   health care provider members.  They get better prices and they

25   lower administrative expenses than those individual health care

1    providers could get on their own.

2         GPOs do not manufacture the relevant products in this

3    case.  They do not purchase or sell the relevant products in

4    this case.  And the GPO agreements are voluntary.  The amended

5    complaint makes clear that there are purchases that occur

6    outside of these agreements between GPOs and vendors.

7         So in terms of the standing argument that Mr. Atkins

8    presented, that standing argument applies with even more force

9    to the GPOs than it does to BD because like BD the GPOs do not

10   sell directly to anyone, any of the defendants.  And unlike BD,

11   GPOs don't even sell indirectly to anyone.  They don't sell the

12   relevant products to anyone.  So, again, the standing applies

13   to them with even more force.

14        Now, the only way that the plaintiffs can include the

15   GPOs as defendants in this case is to allege a conspiracy, and

16   they acknowledge that their claims rise and fall with respect

17   to the GPOs and the distributors based on the conspiracy

18   claims.

19        So turning to Page 3 in their complaint, they allege a

20   single conspiracy.  In their briefing, they elaborate more on

21   what that conspiracy is and they describe it as a

22   "hub-and-spoke conspiracy."  And a couple points about that.

23   First of all, it's not enough just to allege a conspiracy.  You

24   must have a link between the members of that conspiracy.  And

25   with respect to the conspiracy that the plaintiffs have alleged

1    as "hub-and-spoke conspiracy," there has to be horizontal links

2    between the competitors in this conspiracy.

3          So in other words, there has to be a horizontal link

4    between the GPOs Premier and Vizient for them to be included in

5    the conspiracy, and separately there has to be a link between

6    the distributors, a horizontal link, in order to make that

7    conspiracy work.

8          In this case, the "hub-and-spoke conspiracy" doesn't

9    work with the GPOs.  There is no allegation of any connection

10   between Vizient and Premier, no express agreement, certainly,

11   that's acknowledged.  And they're only -- what they've

12   acknowledged are only separate agreements between BD and

13   Vizient and BD and Premier.

14          *Twombly* is clear, though, that parallel agreements --

15   that's all we have here -- parallel agreements between the GPOs

16   and a common vendor do not -- are not sufficient to present

17   horizontal conspiracies.  And there's other cases we've cited

18   in our briefs that stand for that same proposition.  Payment of

19   money is not sufficient, in and of itself, to present a

20   horizontal agreement or any conspiracy.

21          And what essentially plaintiffs' allegations of this

22   "hub-and-spoke conspiracy" amount to, because they lack the

23   horizontal link, is a rimless wheel.  And courts have

24   addressed -- and here, I'm turning to Page 4.  The courts have

25   addressed the viability of rimless wheel "hub-and-spoke

1    conspiracies" as a single conspiracy.

2         And, again, they require a rim.  It doesn't work

3    without a rim.  That was the holding of the Fourth Circuit in

4    *Dickson v. Microsoft*, that a wheel without a rim is not a

5    single conspiracy.  And there are other cases we have cited,

6    including in the Seventh Circuit, that stand for that very same

7    proposition.

8         And just as in *Dickson*, no allegation exists in the

9    complaint that Vizient and Premier agreed to participate in a

10   single conspiracy.  All they allege, that it is plausible that

11   Premier and Vizient knew about each other's agreements because

12   they both had similar agreements with Becton, Dickinson.

13        But, again, this is where the case law comes in and

14   says that's not enough.  *Twombly*, you could have parallel

15   agreements with identical terms.  That does not establish a

16   conspiracy.  You must have more to show that it's plausible.

17   And the plaintiffs say, Okay, that's fine.  We've had a bunch

18   of cases that support our position.  But those cases don't say

19   anything different than *Twombly*, and they're distinguishable

20   from our cases.  And this is Page 5.

21        In fact, looking at those cases, the key cases --

22   *Toys"R"Us*, *United States v. Masonite*, *Interstate Circuit v.*

23   *United States* -- those actually support our position because

24   none of the factors that existed in that case exist here.  For

25   example, in *Toys"R"Us*, a Seventh Circuit case, the facts were

1    that Toys"R"Us acted as a ringmaster of a manufacturer group

2    boycott of wholesale clubs.

3         And this boycott of these manufacturers was an abrupt

4    change, departure for these toy manufacturers.  And it was

5    clear, the facts showed, that the manufacturers would only

6    agree to the boycott -- even though they were independent and

7    separate agreements, they would only enter into those

8    agreements with Toys"R"Us if Toys"R"Us assured them that their

9    competitors -- quote, competitors were doing the same thing.

10         It is a far cry from what we have here.  There is no

11    allegation that Vizient and Premier agreed to do anything or

12    knew about each other's contracts or conducted in any way, in

13    any kind of -- as the court said conduct that could be inferred

14    as a meeting of the minds on anything related to the claims in

15    this case.

16         *THE COURT:*  But what do you say to his argument that

17    you just have to look at the inflated prices and that the GPOs

18    come into this with all this power, and yet we end up with a

19    situation where the health care provider is paying whatever he

20    said --

21         *MR. DEE:*  37 percent.

22         *THE COURT:*  -- 37 percent higher than the market

23    price.

24         *MR. DEE:*  That -- all he is -- all he is talking about

25    there are nothing that really engages both Vizient and Premier.

1    There is nothing there that suggests that Vizient and Premier

2    agreed.  Those are just the -- there are agreements they have

3    with Becton, Dickinson.  There's no suggestion of any collusion

4    or any discussions or any meeting of the minds or anything.

5    The fact that there are higher prices is just a product of the

6    agreements they have with BD.  It doesn't mean anything between

7    Vizient and Premier.  There has to be more than just higher

8    prices, or there has to be more than a payment, or more than

9    parallel agreements.  Those aren't sufficient under the case

10   law we cited in our briefs.

11           THE COURT:  Okay.  Go ahead.

12           MR. DEE:  And *United States v. Masonite*, again, where

13   each competitor in that conspiracy, in that case, knew that

14   Masonite proposed to make substantially identical agreements

15   with the others.  They knew that.  They knew that with each

16   agency agreement they are sent copies of those agreements.

17   When those agreements were modified, each of the competitors

18   received copies of those modified agreements, and they only

19   became effective when each party had signed identical

20   agreements.  That's the kind of activity where there is express

21   knowledge of what the others are doing.  Maybe you negotiate

22   your agreement differently, but if you have express knowledge

23   of what the others are doing and you -- and in concert agree to

24   the same terms, then that's what's the distinction between our

25   case and *Masonite*.

```
1              There is no allegation that would suggest any kind of

2    concerted action between the GPOs.  And the Interstate Circuit

3    case from 1939 has the same -- essentially, the same types of

4    agreements.  Each distributor, in that case, was advised that

5    the others were asked to participate.  Each knew that

6    cooperation was essential to successful operation of the plan.

7    So, again, the plan itself was assented to by each of the

8    distributors in that case.

9              No allegation of BD as a ringmaster here.  No

10   allegation that there is mutual assent between Vizient and

11   Premier.

12             So with that, I'm going to turn it over to the

13   distributors to talk about the allegations against them.

14             THE COURT:  Okay, great.  Thank you.

15             And you are Mr. Fenske?

16             MR. FENSKE:  I am, your Honor.

17             THE COURT:  Okay.

18             MR. FENSKE:  Good morning.

19             THE COURT:  Good morning.

20             MR. FENSKE:  I have not prepared slides, but I do have

21   just copies of the complaint with a few of the key pages and

22   I --

23             THE COURT:  I have the complaint here, so if you want

24   to just refer to the paragraph.

25             MR. FENSKE:  Understood.  We'll do.
```

1          Your Honor, for the reasons Mr. Atkins explained, the

2     distributors are only in this case for one reason.  And that's

3     to contrive an end run around the standing issues that have

4     plagued similar cases in the past.  And contrived plaintiffs'

5     claim is, as the complaint makes clear.

6          The plaintiffs' own allegations plead them out of

7     court.  And I'll start your Honor with Paragraph 4, which

8     describes the nature of the alleged conspiracy here.

9          And it straddles the two pages that Paragraph 4

10    straddles.

11         And the conspiracy is this.  Becton has unlawfully

12    conspired with GPOs and distributors to force health care

13    providers into long-term exclusionary contracts that restrain

14    trade and inflate the prices of certain Becton products to

15    above competitive levels.  So the conspiracy is to force health

16    care providers into long-term contracts containing the

17    exclusionary terms that the plaintiffs are challenging.  But

18    the complaint makes clear that the setting of the exclusionary

19    terms begins and ends before any distributor enters the

20    picture.

21         If you look at Paragraph 42, your Honor -- and some

22    are paragraphs that Mr. Atkins also pointed out, so I'll try to

23    be brief.  But Paragraph 42 reads [as read]:  As an initial

24    matter, Becton and the GPOs, Vizient and Premier, typically

25    enter into net dealer contracts.  These contracts control the

1  pricing and other terms under which health care providers,

2  which are members of the GPOs, buy Becton products.  There's no

3  allegation that the distributors have any role in that.

4      The next key paragraph, your Honor, is Paragraph 44.

5  And in Paragraph 44, what the complaint alleges is that once a

6  health care provider decides to purchase Becton products

7  pursuant to the terms of a net dealer contract negotiated by

8  its GPO.  So the provider makes an affirmative decision to

9  purchase through its GPO.  As Mr. Dee mentioned, they have

10  other options.  It selects a distributor.  The provider picks a

11  distributor, such as Cardinal, Owens & Minor, McKesson, or

12  Henry Schein to deliver Becton's products.

13      Later in that paragraph [as read]:  The distributors

14  and health care providers enter into a related exclusionary

15  contract called a distributor agreement.  Distributor

16  agreements typically require that the distributors enforce the

17  requirement that health care providers buy a certain volume of

18  Becton products or else pay the penalty pricing set forth in

19  the net dealer contract.

20      So what we have here, your Honor, are two paragraphs

21  that demonstrate that the distributors have nothing to do with

22  the exclusionary terms that the plaintiffs are challenging.

23  And your Honor asked Mr. Dee a question about the higher price

24  allegations in the complaint.  Again, these paragraphs make

25  clear.  As Mr. Dee mentioned, the higher prices don't suffice

1    to state a conspiracy as to anyone, but particularly as to the

2    distributors, the complaint makes clear that we have nothing to

3    do with those prices.

4         Now, the -- in their briefing, the plaintiffs and

5    Mr. Molo alluded to this, the "cats paw" argument, the idea

6    that we're somehow enforcing the conspiracy.  But as the

7    paragraphs that I just read to your Honor make clear, again,

8    it's the plaintiffs' choice to select the distributor.  It's

9    the plaintiffs' choice to purchase through its GPO, and

10   those -- and the plaintiffs -- those contracts, the contracts

11   between Becton and the GPO are the ones that are supposedly

12   anticompetitive.

13        Mr. Atkins discussed the *Glynn-Brunswick* case quite a

14   bit, and so I'm not going to discuss that in any detail, your

15   Honor, other than to simply point out that it supports our

16   argument that the plaintiffs here have not plausibly alleged a

17   conspiracy because there the Court rejected any notion that

18   there was a conspiracy based on these same contracts between

19   the distributors and the GPOs.

20        And on Page 1375 of that opinion, the Court noted that

21   plaintiffs do not allege that BD and the distributor negotiate

22   at any time; rather, they assert that the two enter into a

23   dealer notification agreement defining their relationship

24   pursuant to the terms of the net dealer contract, incorporating

25   the pricing, rebate bundling, penalty, and sole source

1  provisions therein.  Just as here, the plaintiffs' complaint

2  demonstrates and expressly acknowledges that the contracts

3  linking defendant, the distributor, and the provider are

4  essentially negotiated between defendant and the GPO, not the

5  distributor.

6      The plaintiffs point to two other things that they

7  claim show we joined a conspiracy; that we have supposedly

8  agreed to market Becton as a preferred brand, and that Becton

9  has agreed to pay higher sales commissions to distributor sales

10  personnel.  If you look at Footnote 9 of the *Glynn-Brunswick*

11  decision, your Honor, the Court there rejected the argument

12  that the same types of agreements and incentives show a

13  conspiracy.  And they don't because as we described in our

14  reply brief, those sorts of incentives are routinely held to be

15  procompetitive and not anticompetitive.  And they have nothing

16  to do with the conspiracy alleged in Paragraph 4 of the

17  complaint.

18      Paragraph 4 says the agreement is to force

19  exclusionary terms into the contracts that the GPOs and Becton

20  negotiate.  None of these incentives have anything to do with

21  that.

22      And because Mr. Dee discussed the hub-spoke,

23  horizontal conspiracy issue, your Honor, I won't argue that any

24  further other than simply to note that it applies fully to the

25  distributors.  And because the plaintiffs have not alleged any

1  agreement among the distributors, they have not alleged a

2  viable conspiracy as a matter of law.

3          Thank you, your Honor.

4          *THE COURT:*  All right.  Thank you.

5          All right, Mr. Molo, briefly --

6          Oh, I'm sorry.  Mr. Ellis, you may respond briefly to

7  those arguments.

8          *MR. ELLIS:*  Okay.  Good morning, your Honor.

9          *THE COURT:*  Good morning.

10         *MR. ELLIS:*  I'm Justin Ellis for the plaintiffs.

11         I'd like to make three brief points that I think will

12 lay out the context here for why most, if not all of the

13 distributors, the GPOs, and, in fact, Becton's arguments about

14 conspiracy are wholly besides the point.

15         The first one is simply the same point that Mr. Molo

16 had already laid out in the slide about the *American Tobacco*

17 case, which is that the form of the conspiracy simply does not

18 matter.  As long as there is some concerted action, some

19 meeting of the minds, that is sufficient to show a conspiracy,

20 contract or combination restraint of trade in violation of the

21 Section 1 of the Sherman Act.

22         The second point:  Whether there are one or many

23 conspiracies, whether those conspiracies are vertical or

24 horizontal, that is a jury question.  That is laid out in the

25 cases that we have cited in Page 4 of our opposition, the GPOs

 1    brief.  And it shows that we are not required to prove it at

 2    this stage.  We are merely to show, as the Supreme Court has

 3    said, enough evidence that tends to exclude the possibility

 4    that the various actors in this conspiracy were merely acting

 5    independently.  And as I'll explain in just a minute, we have

 6    done more than enough to plausibly so allege.

 7             Finally, the third and important point here is that

 8    the defendants are not entitled to recharacterize our

 9    allegations of our conspiracy.  We have the allegations in the

10    complaint.  We are entitled to stick by them.  Those are the

11    ones that will stand or fall on this motion to dismiss.

12             So with that in mind, we should turn to the question

13    of the rim, whether this is a rimless wheel conspiracy that we

14    have alleged here, or is that a hub-and-spoke?  And, again,

15    that does not matter.  But it is more than enough to show that

16    we have a rim at this stage in the form of a knowing agreement

17    to a broader scheme that was made by each of the individual

18    defendants.  Each of the distributors and each of the GPOs have

19    at least plausibly been shown to be aware that there is a

20    broader screen being orchestrated by Becton and that knowing of

21    that scheme, they have joined it.

22             And the question is, then, what does a rim mean?

23    They're trying to suggest that a rim requires an explicit

24    agreement between, say, Vizient and Premiere or, say, between

25    each of the distributors.  And this is why the metaphor that

1   Mr. Molo was using about drug conspiracy cases is so important.
2   Because if you had a defendant come in here who was indicted
3   for selling crack on the streets of East St. Louis, it would be
4   no defense for him to say that he could not be part of a
5   conspiracy with another street dealer because the two of them
6   had not gotten together and shook hands on how to sell their
7   crack.  Rather, it would be enough to say that the street
8   dealer joined in a scheme with his wholesaler or with his
9   enforcer or with his dirty cop, knowing that there was
10   something broader afoot.  And that's what we have here.
11          And this is, in particular, why the *Orlando* case that
12   we've cited in our opposition to the distributors' brief -- and
13   just for your reference, it's at 819 F.3d 1016.  It shows that
14   a rim means a lot less than what the distributors and the GPOs
15   would have you believe.
16          In that case, again, that was a scheme by several
17   defendants to go around the country visiting various businesses
18   and trying to extort money from them.  There is one defendant
19   McManus, McManus said that he had only gone on one trip, and
20   therefore he couldn't be part of a broader scheme.  He said
21   that he was merely part of a rimless wheel because he didn't,
22   you know, agree with the other conspirators to extort all these
23   other businesses to whom he had not visited.
24          The Seventh Circuit rejected that argument.  They said
25   that there was a rim because there was a knowing agreement to a

common scheme.  McManus had in his trip overlapping
participants, overlapping methods, and an overlapping purpose.
And because he had those overlapping features, that was enough
to apply a rim.

So, too, here.  Here, we have each of the distributors
are dealing with the same GPOs, and they're dealing with
Becton.  The GPOs, likewise, are dealing with the same
distributors and with Becton.  There are overlapping
participants.  There are overlapping methods.  These contracts
that are restraining trade happen ever so conveniently to be
the same and to have the same methods that restrain trade by
imposing exclusive dealing terms on the plaintiffs.

And, indeed, the distributors are also taking the same
schemes outside of the contract to also further Becton's
restraint of trade.  They are also each agreeing to say allow
Becton to pay their distributors' employees bonuses, which in a
way allows Becton to monitor the distributors' compliance with
the conspiracy by giving them direct access to their employees.
And they're both all -- in fact, they're all helping Becton by
also emphasizing Becton in their advertising to the exclusion
of other competitors.

And because of these overlapping practices, you can
plausibly allege -- we have plausibly alleged that these
various participants are all aware of the broader scheme that
is being orchestrated by Becton.  And, again, that's all we

1    need to allege.  The defendants, in essence, are asking, as

2    Mr. Molo pointed out, for us to prove our claims like we would

3    to a jury.

4            But *Twombly* is clear.  What we need at this stage is

5    merely to raise a reasonable expectation that discovery will

6    undercover evidence of an illegal agreement.  And that is what

7    we think we can do in discovery.  And that's also what ties

8    this case to the three Supreme Court and Seventh Circuit cases

9    we cited in the our case about the need or lack of a need for

10   an explicit agreement between the spokes:  *Interstate Circuit*,

11   *Masonite*, and *Toys"R"Us*.  None of those cases involved an

12   explicit agreement between the various spokes, and yet the

13   Supreme Court and the Seventh Circuit still held that a single

14   Section 1 conspiracy was alleged.

15           Now, the distributors had just made an argument that

16   you need -- I'm sorry -- the GPOs had just made an argument

17   that in each of those cases you would need an explicit or at

18   least tacit understanding between the defendants; that, for

19   instance, in *Interstate Circuit*, each of the various

20   participants in the scheme were copied on it, and so they would

21   know that the others were involved.  Or, say, in *Masonite*,

22   that -- I'm sorry -- in *Toys"R"Us*, that each of the various

23   manufacturers had at least an expectation that the other

24   manufacturers would be in on the scheme.

25           But that's what discovery is going to undercover.

1    Here, we have enough facts that show that they are acting

2    contrary to their normal economic motives and in suspicious

3    ways that would suggest that they are, in fact, acting in

4    concert.

5         And so we can show from the distributors and the GPOs'

6    action what those concerted actions are, in particular, for the

7    distributors.  As Mr. Molo said, they're the enforcers.  They

8    are the "cat's paws."  And they have both the motive to act on

9    in a concerted faction, and they, in fact, act on that motive.

10   So their motive is, of course, that they receive payments based

11   on volume.  The more money that goes towards Becton products

12   under these conclusive dealing contracts, the more money that

13   the distributors stand to make.  And they act on that motive by

14   taking actions that are otherwise hard to explain.

15        In particular, as we allege in Paragraph 46 of the

16   amended complaint, the distributors are making cash payments to

17   the GPOs based on volume.  And they agree to do that in their

18   contracts with Becton, the dealer notification agreements.  And

19   it's very hard to find an innocent explanation as to why they

20   would do that.  Why are the distributors paying off a GPO that

21   has nothing to do with them?  Likewise, why are the

22   distributors allowing Becton direct access to their employees,

23   other than to allow the Becton to credibly monitor the

24   distributors' compliance with the illegal scheme?

25        Likewise, for the GPOs, they also have the motive to

1    enter into a concerted action, and they act on that motive.

2    The GPOs are, in fact, being paid off by the counter-party on

3    the other side of the table.  The GPOs are meant to represent

4    our clients, the health care providers, honestly and to get the

5    best possible deal they can by negotiating those prices down.

6          But the facts show that they don't, and this is a

7    nationwide problem.  As we cited a study from the GAO, on

8    Page 6 of our statement of facts, GAOs and GPOs, in fact, tend

9    to have higher prices than what you can get on the retail

10   market, which is very suspicious.  Because the whole point of a

11   GPO, after all, is to aggregate large numbers of providers that

12   they can hopefully use that purchasing power to bid down

13   prices, and instead the prices are going up.  And that's just

14   what's happening here.  The GPOs are supposed to be negotiating

15   lower prices for Becton, for Becton's products, for their

16   consumers.  Instead, they're getting prices that are 11 to

17   36 percent higher than what they could get on the open market.

18         And the GPOs, again, have full motive because if the

19   GPOs were not part of a conspiracy, they would compete against

20   each other.  They would have to negotiate more aggressively

21   with Becton, and they would have to bid down prices.  But that,

22   in turn, would lower the amount of money that GPOs get,

23   because, again, the payments that the GPOs are getting from

24   Becton are volume-based.  And so if the GPOs drive down the

25   prices, they're, in fact, going to get less money.

1              To the contrary, they act in a way that's going to

2     help Becton and help themselves.  They are going to act in a

3     way that's going to raise prices and thus allow them to get

4     more money in terms of the administrative fees.

5              And even then, the distributors are paying off the

6     GPOs to further align the GPOs' incentives.  The distributors

7     make payments that give the GPOs the incentive to actually

8     distribute -- set prices that are in Becton's favor and the

9     conspiracy's favor rather than in the favor of their clients.

10             COURT REPORTER:  Mr. Ellis, may I have just one

11    moment?

12             MR. ELLIS:  Oh, of course.

13             COURT REPORTER:  Thank you, sir.

14             MR. ELLIS:  Sure.

15             Now, the defendants had made a lot of *Dickson* case,

16    the case out of the Fourth Circuit, which did purport to

17    require an explicit agreement between the defendants.  But

18    *Dickson* is directly contrary not only to the Seventh Circuit's

19    ruling in *Toys"R"Us*, but also to the Supreme Court's rulings in

20    *Interstate* and *Masonite* circuit [sic].  And, in fact, all you

21    have to do is look at the dissent in *Dickson* to see how that

22    case had gone wrong.  That dissent, Judge Gregory on the Fourth

23    Circuit had explicitly said, under *Interstate* and *Masonite*

24    circuit, is very clear that an explicit agreement is not

25    required.  All you have to have is some tacit understanding

1    that they have joined a broader scheme.

2           And that, in turn, is the same answer to the question

3    your Honor had raised about the meeting of the minds.  This is

4    not as the GPOs and the distributors have suggested in their

5    briefs and here today that they have to have an evil intent or

6    that they have to specifically intend to help Becton raise

7    prices or maintain a monopoly.  That's not the case, because as

8    you see, for instance, in the *United States v. United States*

9    *Gypsum* case that we cited our briefs, you can show a Section 1

10   conspiracy either -- either -- by proof of an anticompetitive

11   intent or an anticompetitive effect.

12          Now, we believe that discovery will show

13   anticompetitive intent because of the motives we have laid out

14   here for them to raise prices and benefit themselves.  But by

15   itself the anticompetitive effect, the higher prices that they

16   have to pay, that our clients have to pay, is by itself a

17   violation of Section 1.  And so the meeting of the minds is

18   not, again, some sort of evil intent.  And it is certainly not

19   the specific intent to help Becton maintain a monopoly that was

20   required in the Section 2 case in *Brunswick*.  Rather, they have

21   to agree to the terms that they agreed to, and they have to

22   know what they're getting into; and that, what we allege, is

23   the case.

24          And so, again, I just close and say all we need to

25   show is a reasonable expectation that discovery will uncover

1    evidence of our illegal scheme, and we believe we have more

2    than plausibly done that.

3            Thank you.

4            *MR. MOLO:*  One minute.

5            *THE COURT:*  All right.  Thank you.

6            *MR. ELLIS:*  Oh, sure.

7            Sure.  There's one final point I think I'd like to

8    make, actually.  And if I could use the ELMO for a second,

9    please.

10           *THE COURT:*  Mmm hmm.

11           *MR. ELLIS:*  And this is the chart that Mr. Atkins made

12   quite a bit of to suggest that some wall of authority had

13   somehow foreclosed our ability to rely on the conspiracy

14   exception.  But the crucial point is, all but one of these

15   cases did not involve allegations of conspiracy.  All these

16   cases -- *Lakeland*, *Hypodermic Products*, *Warren General*,

17   *St. Francis*, *Delaware Valley* -- none of those involved any

18   allegations of conspiracy.

19           And, in fact, as we lay out in our opposition to

20   Becton, Dickinson's motion to dismiss, many of those cases are

21   not even the same type of exclusive dealing claim we have here.

22   They are tying cases, they're Section 2 cases, they are things

23   that are fully afield.  And *Brunswick* did involve arguments in

24   the briefing as far as a conspiracy allegation.

25           But the point remains that the complaint in *Brunswick*

1    did not allege the same detailed allegations of conspiracy that

2    we allege here.

3         And, in particular, while the allegations about the

4    scheme are the same as in *Brunswick*, because, of course,

5    *Brunswick* -- Becton's practices are the same as they were two

6    years ago in the *Brunswick* case, the allegations about the

7    conspiracy are very different.

8         And so the *Brunswick* complaint did not involve

9    allegations of the cash payments from -- that are going between

10   the different parties.  It didn't involve the commissions that

11   were being made by Becton to the distributors, and it did not

12   involve the advertising allegations.

13        And so, once again here, this is not so much wall of

14   authority.  This is merely saying that in other cases where

15   plaintiffs did not allege the conspiracy doctrine, there was no

16   standing.  Here, we have plausibly alleged a conspiracy;

17   therefore, we have standing.

18        THE COURT:  Okay.  Do you think that if I applied the

19   conspiracy exception here, would that be expanding that

20   exception beyond where it has been before now?

21        MR. ELLIS:  No.  I do not believe so.  You would

22   not -- you would not be expanding it any further than what the

23   Seventh Circuit has already done in *Paper Systems*, in *Brand*

24   *Name*, and in *Fontana*.  And it's important there to show that in

25   *Fontana*, in particular, that case is covering the same ground

1    that you would be covering here because *Fontana*, like this

2    case, involved types of anticompetitive conduct other than

3    vertical price-fixing.

4          Mr. Atkins pointed out that there was some allegations

5    of resale price maintenance, but as he cannot deny, there were

6    also allegations of other conduct, such as territory allocation

7    and other anticompetitive schemes.  And if he were right, that

8    price-fixing is the only way that you can avoid an overcharge

9    or enjoy a passed on overcharge, then *Fontana* would have had to

10   dismiss those defendants for lack of standing because they

11   would be seeking damages that were based on market allocation

12   and other schemes not involving price-fixing, but it did not.

13         And the reason why, as *Paper Systems* explains, is

14   joint and several liability.  We are not seeking a passed on

15   overcharge because we can go after any defendant for the entire

16   output of the conspiracy.  That's what joint and several

17   liability means.  And so we don't ever have to apportion some

18   overcharge, say, between the distributor that sells to us and

19   Becton.  There's no way in which, say, the distributor absorbs

20   some part of the overcharge and then passes on some to us.

21   Rather, we can go after every defendant for every bit of the

22   damages.  And because of that, there is no overcharge, there is

23   no *Illinois Brick* problem, and this falls squarely within the

24   conspiracy doctrine, as laid out in *Paper Systems* and *Fontana*.

25         *THE COURT:*  Okay.  So would those be -- I was going to

1    go ask you, what's your best case for applying the exception to

2    this case?

3             MR. ELLIS:  Yes, *Paper Systems* and *Fontana*.

4             THE COURT:  Would you say *Paper Systems* and *Fontana*?

5             MR. MOLO:  *Paper Systems* and *Fontana*, yes.

6             THE COURT:  Okay.  All right.  Thank you.

7             Very briefly, if you want to make a point.

8             MR. DEE:  Sure.

9             Your Honor, I just want to say that -- a couple of

10   things.  But, first of all, they're the ones who have to -- who

11   decide on what the conspiracy that they -- that they're

12   alleging.  They can't just throw up a bunch of stuff at you and

13   say you decide what kind of conspiracy its alleged.  They have

14   said in their papers that they are claiming, they are alleging

15   a "hub-and-spoke conspiracy."  And you can not have a

16   "hub-and-spoke conspiracy" unless you have the horizontal

17   connections between the two GPOs and the -- between them and

18   between the distributors.

19           Absent horizontal allegations that would tend to

20   support an agreement between those two, a meeting of the minds

21   of those two, on the GPOs and of the distributors, you don't

22   have a "hub-and-spoke conspiracy."

23           And all they're relying on are basically the

24   commercial agreements that the GPOs have with BD and which the

25   distributors have with BD.  That's not enough.

1    Their argument that distributors and GPOs knew that

2  something was afoot, what was that?  What is it that they're

3  claiming was afoot?  Is it that BD's contracts have allegedly

4  higher prices?

5    Having higher prices is not illegal.  Selling products

6  to customers who want them is not illegal.  Everything that was

7  just described is consistent with independent, rational

8  economic behavior.  GPOs earn fees.  That's how they make

9  money.  Distributors make more money selling BD's products.

10  There's nothing wrong with that from an antitrust perspective.

11  *Twombly* requires allegations showing that the conduct cannot be

12  explained absent a conspiracy, and that's what's lacking here.

13    *THE COURT:*  Well, I noted -- I mean, throughout the

14  briefing, all these terms are thrown out of "vertical

15  conspiracy," "hub-and-spoke," "horizontal," but I think -- and

16  I'll go back and read it again carefully.  The amended

17  complaint talks about a vertical conspiracy, regardless of

18  whatever else is argued.  And so, you know, following through

19  with that, what the plaintiffs are saying is, We don't know

20  what will ultimately be proven, but there's enough here to get

21  past Rule 12.  What do you say to that?

22    *MR. DEE:*  Well, I'd say that initially we thought they

23  were alleging a vertical conspiracy as well until we got their

24  briefing, and their briefing described the conspiracy as a

25  "hub-and-spoke conspiracy."  And they have to do that, for they

1    know they have a problem -- and I'll -- for example, with the

2    GPOs, they know that you can't -- if you have a vertical

3    conspiracy without any horizontal connection between the two

4    GPOs, you can't aggregate their market share.  They make a big

5    deal about this 75 percent combined market share.  They can

6    only make use of that combined market share if they have a

7    horizontal conspiracy between the two GPOs.  And they admit,

8    you know, they have a problem because if they are -- for

9    example, with Premier, there's only a 25 percent market share,

10   even under their sort of twisted analysis of market share,

11   their proxy of what is market share.  And that, under Seventh

12   Circuit law, is not sufficient.  They can't state a claim for a

13   vertical conspiracy with respect to the GPOs if they don't have

14   a "hub-and-spoke."  We pointed that out in our briefing, and

15   that's why they came back with, No, it is a "hub-and-spoke," it

16   is a "hub-and-spoke."  It is not a vertical.

17          So they're saying it is a single conspiracy, and you

18   can't have -- in this context, you can't have a single

19   conspiracy without it being "hub-and-spoke."  I mean, GPOs are

20   not in the chain of distribution.  They're outside of that.

21   They just negotiate the price.  It's a separate, sort of, part

22   of the whole transaction.

23          And so you can't have a single vertical conspiracy

24   under these -- with these parties, you have to have a

25   "hub-and-spoke."  And they can't plead it because they can't

1   show those facts that are outside the contracts that would

2   suggest that -- outside the contracts with BD that would

3   suggest that there's any kind of tacit agreement or mutual

4   assent between the GPOs, the two GPOs, or between each of the

5   distributors.

6          THE COURT:  Okay.

7          MR. ATKINS:  Your Honor, can I have 30 seconds to

8   respond to the standing question?

9          THE COURT:  You may.

10          MR. ATKINS:  Thank you, your Honor.

11          With respect to these cases, every one of them besides

12   *Brunswick* involved a Section 1 conspiracy or contract in

13   restraint of trade.  You just have to look at the cases, every

14   one of them.  Okay?

15          THE COURT:  Okay.

16          MR. ATKINS:  No. 2, the critical thing is the conduct

17   is led -- the conduct alleged in *Brunswick*, as it was here, is

18   not unilateral behavior by BD but conduct involving the same

19   contracts -- sole source contracts, bundling contracts,

20   et cetera, et cetera.  I read those to you.  So it is the same

21   conduct.  Obviously, instead of bringing a monopolization

22   claim, now they say it is a Section 1 claim, but it is the same

23   alleged anticompetitive conduct.

24          Secondly, the argument that there were -- there are

25   different allegations here about the benefits provided to the

1 distributors that was not alleged in *Brunswick*, not true.  If

2 you look at Judge Wood's decision, in Footnote 9 she addresses

3 this very issue head-on, and she says she rejects the argument

4 that there is the kind of conspiracy alleged to take us outside

5 of *Illinois Brick*.  That's what she was addressing, the

6 standing question.  And she says the same can be said of the

7 other purported benefits cited by plaintiffs, financial

8 incentives paid to the distributor, markups on products other

9 than syringes, and compensation -- referring to compensation to

10 distributors -- for promoting defendants' products.

11 　　　　So the exact same argument was made about the

12 distributors having additional benefits to supposedly

13 participate in some kind of conspiracy.  It's in Paragraph 86

14 of the *Brunswick* complaint.  Same allegation, same argument, it

15 should be rejected for the same reasons.

16 　　　　And to just finish on the point I've made several

17 times about the kind of conspiracy required to get out from

18 under *Illinois Brick*, I will fulfill my promise and leave you

19 with copies of Areeda.

20 　　　　Thank you, your Honor.

21 　　　　THE COURT:  Okay.  Mr. Fenske, you get the last word

22 briefly.

23 　　　　MR. FENSKE:  Happy to, your Honor, and I will be very

24 brief.

25 　　　　Your Honor, in Mr. Ellis' presentation, I didn't hear

1    any argument as to how it makes sense that the distributors

2    entered into a conspiracy to force exclusionary terms into

3    contracts with providers that are set and negotiated before the

4    distributors ever enter the picture.

5           Mr. Ellis relies upon sort of, I think, two things

6    primarily to try to argue that the distributors joined the

7    conspiracy.

8           The first is, again, that our contracts with Becton

9    are supposedly similar.  And I just point your Honor to the

10   case that we cite on Page 4 of our reply briefs, the *United*

11   *States v. CIBA* case.  It reads [as read]:  Even when one

12   company has put together a series of similar agreements with

13   other companies in the course of marketing its product, this

14   similar conduct on the part of those other companies is not

15   necessarily equivalent to an illegal combination or conspiracy.

16   Some evidence, in addition to that fact, that the companies

17   acted in a similar manner is ordinarily required to establish

18   an existence of a combination or conspiracy.

19          And that's just applying the rule that the Supreme

20   Court then applied in *Twombly*, that parallel conduct does not

21   bespeak unlawful agreement.

22          Now, Mr. Ellis talked about the distributors supposed

23   motive to join the conspiracy.  And he asked, well, why are the

24   distributors making cash payments to the GPOs?  Well, the

25   reason is all the distributors do is say, We will abide by

1    whatever terms Becton and the GPOs negotiate, whatever they

2    are.   And the Becton and GPO contracts require these payments.

3    The complaint in Paragraph 44 expressly alleges that those

4    payments are made when the GPOs hit the volume targets in the

5    Becton-GPO agreements.

6         And Mr. Ellis also asked why the distributors' sales

7    personnel would accept higher commissions for selling Becton

8    products.   In the very footnote that Mr. Atkins just mentioned,

9    the *Glynn-Brunswick* court made clear that those sort of common

10   incentive provisions do not show an unlawful conspiracy.

11        And I'll close, your Honor, with a response to

12   Mr. Ellis on the supposed need for more discovery.   The Supreme

13   Court has made clear in antitrust cases that courts, when

14   they're considering 12(b)(6) motions, need to be mindful of

15   that kind of request.   The Supreme Court, in *Twombly*, quoting

16   the Seventh Circuit's *Car Carriers* decision said as follows [as

17   read]:   The cost of modern federal antitrust litigation and the

18   increasing case load of the federal courts counsel again

19   sending the parties into discovery when there is no reasonable

20   likelihood that the plaintiffs can construct a claim from the

21   events related in the complaint.

22        That principle applies equally here.   Thank you, your

23   Honor.

24        *THE COURT:*  All right.   Thank you.

25        Thank you, everyone.   This was very helpful.   I

1    appreciate the arguments.  I am going to go back and take a

2    look at all the cases and read the complaint carefully, and

3    I'll get you an order as soon as I can.  The motions are under

4    advisement.  Thank you.

5                              -oOo-

6                      REPORTER'S CERTIFICATE

7         I, Molly N. Clayton, RPR, FCRR, Official Court Reporter
     for the U.S. District Court, Southern District of Illinois, do
8    hereby certify that I reported with mechanical stenography the
     proceedings contained in pages 1 - 83; and that the same is a
9    full, true, correct and complete transcript from the record of
     proceedings in the above-entitled matter.

10

             DATED this 8th day of November, 2018.

11

12

                         s/Molly Clayton, RPR, FCRR
13                       _____

14

15

16

17

18

19

20

21

22

23

24

25