IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARION DIAGNOSTIC CENTER, LLC; MARION HEALTHCARE, LLC; and ANDRON MEDICAL ASSOCIATES, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> BECTON, DICKINSON, AND COMPANY; PREMIER, INC.; VIZIENT, INC.; CARDINAL HEALTH, INC.; OWENS & MINOR DISTRIBUTION, INC.; MCKESSON MEDICAL-SURGICAL INC.; HENRY SCHEIN, INC.; and UNNAMED BECTON DISTRIBUTOR CO-CONSPIRATORS, <br><br> Defendants. | Case No. 18-CV-01059-NJR-RJD |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Pending before the Court are three motions to dismiss (Docs. 83, 84, & 85) filed by Defendants Becton, Dickinson, and Company ("Becton"); Premier, Inc. ("Premier"); Vizient, Inc. ("Vizient"); Cardinal Health, Inc. ("Cardinal"); Owens & Minor Distribution, Inc. ("Owens"); McKesson Medical-Surgical, Inc., ("McKesson"); and Henry Schein, Inc. ("Schein") (collectively "Defendants"). The Court heard arguments from counsel on October 17, 2018, and took the motions under advisement (*see* Docs. 112, 116). For the reasons set forth below, the Court now grants the motions to dismiss and dismisses the Amended Complaint (Doc. 52) with prejudice.

## Factual & Procedural Background

Plaintiffs Marion Diagnostic Center, LLC; Marion Healthcare, LLC; and Andron Medical Associates (collectively "Plaintiffs") are healthcare providers who assert that Defendants are part of a conspiracy to charge inflated prices for medical supplies, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (*see* Doc. 52).[1]

Generally, when a healthcare provider wants to purchase medical supplies, it becomes a member of a group purchasing organization ("GPO") (Doc. 52, p. 2). GPOs aggregate the purchasing power of healthcare providers and, ideally, negotiate significant discounts with medical supply manufacturers on behalf of its members.[2] Once the GPO and the manufacturer agree on the terms of a sale, the GPO notifies the healthcare provider of the proposed contract (Doc. 52, p. 2). The contract, referred to as a "net dealer contract," is not binding on the provider (*Id.* at p. 11). But if the provider decides to move forward with the net dealer contract, it enters into a "distributor agreement" with a medical supply distributor (*Id.* at p. 12). In that agreement, the distributor agrees to purchase the medical supplies from the manufacturer and resell them to the provider according to the terms of the net dealer contract, plus an additional cost (*Id.*). The distributor also enters into a "dealer notification agreement" with the manufacturer to sell the supplies under the terms of the net dealer contract

---

[1] The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337. Those statutes grant district courts original jurisdiction over actions "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and over "any civil action . . . arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." 28 U.S.C. § 1337.

[2] *GPOs and the Commoditization of Medical Devices*, DRG, https://decisionresourcesgroup.com/drg-blog/medtech-perspectives/gpos-and-the-commoditization-of-medical-devices/ (last visited Nov. 29, 2018).

(*Id.*).

According to the Amended Complaint, Plaintiffs have purchased hypodermic products[3] from Becton, a medical supply manufacturer, through the process described above (*Id.* at pp. 3-4). Premier and Vizient are GPOs involved in those transactions, and Cardinal, Owens, Schein, and McKesson are Becton distributors (*Id.* at p. 4). Plaintiffs allege Defendants are engaged in a conspiracy to prevent competition and restrain trade by negotiating and enforcing net dealer contracts that employ penalty pricing rebate provisions and sole or dual source provisions (*Id.* at pp. 11-13).[4] Plaintiffs also assert Becton has engaged in other anticompetitive acts in aid of the conspiracy, including deception, disparagement, patent infringement, and false advertising against one of its competitors (*Id.* at pp. 13-15).

Defendants now move the Court to dismiss Plaintiffs' Amended Complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6), arguing Plaintiffs do not have antitrust standing to bring their claims (Doc. 83).

## **RULE 12(B)(6) MOTION TO DISMISS**

The purpose of a Rule 12(b)(6) motion is to decide the adequacy of the complaint,

---

[3] Specifically, the sales at issue here involve safety catheters, safety syringes, and conventional syringes (Doc. 52, pp. 2-3).

[4] Penalty pricing rebate provisions require a provider to purchase a certain volume of products based on its Becton purchases from the year before (Doc. 52, pp. 11-12). For instance, a net dealer contract may state that a provider must make purchases equal to at least 80% of its purchases from the previous year (*Id.*). In return, the provider pays a lower cost per unit (*Id.*). The provider realizes the cost-savings through an end-of-year rebate payment (*Id.* at p. 12). If the provider does not meet the required amount of purchases, it must pay Becton's highest price for the products (*Id.*). Becton's net dealer contracts also usually contain sole or dual source provisions (*Id.* at p. 11). Sole source provisions require providers to purchase products only from Becton while dual source provisions permit providers to purchase from only one other approved non-Becton manufacturer (*Id.*). If the provider violates the source provision, it must pay higher prices (*Id.*).

not to determine the merits of the case or decide whether a plaintiff will ultimately prevail. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff only needs to allege enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff need not plead detailed factual allegations, but must provide "more than labels and conclusions, and a formulaic recitation of the elements." *Id.* For purposes of a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and draw all possible inferences in favor of the plaintiff. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 (7th Cir. 2012).

## DISCUSSION

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States. . ." 15 U.S.C. § 1. Section 4 the Clayton Act grants private citizens standing to enforce the Sherman Act. *See* 15 U.S.C. § 15(a) ("[A]ny person . . . injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."). Although the Clayton Act broadly defines the class of persons who can bring claims under the Sherman Act, the Supreme Court has set forth numerous doctrines that limit the circumstances under which someone may recover from an antitrust violator. *Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002). The "direct purchaser rule," a doctrine announced in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), forms the crux of Defendants' motion to dismiss.

In *Illinois Brick*, building owners brought antitrust claims against manufacturers of concrete blocks, based on allegations of price-fixing. *Id.* at 726-27. The defendants sold the blocks primarily to masonry contractors, who then submitted bids to general contractors for construction projects. *Id.* at 726. The general contractors, in turn, submitted bids to customers such as the plaintiffs. *Id.* The Supreme Court found the plaintiffs lacked standing to bring their antitrust claims because they were not direct purchasers of the blocks. *Id.* at 746-47. "The only way in which the antitrust violation alleged could have injured [the plaintiffs] is if all or part of the overcharge was passed on by the masonry and general contractors to [the plaintiffs], rather than being absorbed at the first two levels of distribution." *Id.* at 727. The Court explained that allowing indirect purchasers to assert "pass-on arguments" would lead to "uncertainties and difficulties" in tracing the economic adjustments made throughout the chain of distribution and leave antitrust defendants susceptible to double recovery. *Id.* at 731-32. "Permitting the use of pass-on theories under [§] 4 would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers." *Id.* at 737. Additionally, "potential plaintiffs at each level in the distribution chain are in a position to assert conflicting claims to a common fund the amount of the alleged overcharge by contending that the entire overcharge was absorbed at that particular level in the chain." *Id.*

The Seventh Circuit recognizes an exception to the direct purchaser rule in cases involving conspiracies, *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir.

1980); *Paper Systems Inc. v. Nippon Paper Industries Co., Ltd.*, 281 F.3d 629 (7th Cir. 2002), but here, the parties disagree as to what types of conspiracies qualify for the exception.

In *Fontana*, the plaintiff, Fontana, was a corporation that sold aviation aircrafts and performed custom installations of avionics equipment. *Fontana*, 617 F.2d at 479. Cessna, the defendant, manufactured aviation aircrafts and manufactured and sold its own line of avionics. *Id.* Fontana was a Cessna dealer, but it purchased its Cessna products from Aviation Activities, Inc., and not directly from Cessna. *Id.* Another relevant party, Cessna Finance Corporation, provided financing for distributors, dealers, and purchasers of Cessna products. *Id.* Fontana filed suit against Cessna, alleging it conspired with Aviation Activities, Inc. and Cessna Finance Corporation to unreasonably restrain trade via price-fixing and to monopolize the selling and installation of avionics equipment in Cessna aircrafts, in violation of the Sherman Act. *Id.* The trial court granted summary judgment in favor of Cessna, finding, in part, that *Illinois Brick* precluded Fontana from bringing antitrust claims as an indirect purchaser. *Id.* at 481. On appeal, the Seventh Circuit rejected this conclusion, stating, "[w]e are not satisfied that the Illinois Brick rule directly applies in circumstances where the manufacturer and the intermediary are both alleged to be co-conspirators in a common illegal enterprise resulting in intended injury to the buyer." *Id.* The Seventh Circuit also distinguished the facts of *Fontana* from *Illinois Brick*, pointing out that Fontana was not just an indirect purchaser of Cessna products; it was also a competitor alleging competitive injury that destroyed its avionics business. *Id.* The Seventh Circuit concluded that summary judgment was inappropriate and reversed and remanded the

case to the trial court. *Id.* at 482.

The Seventh Circuit addressed *Illinois Brick* again in *Paper Systems Inc.* There, paper distributors brought antitrust claims against several paper manufacturers, who allegedly participated in a price-fixing conspiracy. *Paper Systems*, 281 F.3d at 631. Two of the manufacturers sold directly to distributors, like the plaintiffs. *Id.* The Seventh Circuit held that, even though the plaintiffs resold the paper to their own customers, the plaintiffs were entitled to collect damages from the manufacturers because "[t]he first buyer from a conspirator is the right party to sue." *Id.* Two other manufacturers sold exclusively to trading houses, who then resold to the plaintiffs. *Id.* The plaintiffs alleged that the trading houses were part of the conspiracy. *Id.* The Seventh Circuit found the plaintiffs could also recover damages in that instance because the plaintiffs were "the first purchasers from *outside* the conspiracy." *Id.* The Court went on to explain that *Illinois Brick* did not bar the plaintiffs from recovering against the conspiracy because all members of the conspiracy were jointly and severally liable for damages. *Id.* at 633. Thus, multiple recovery was a non-issue, and "[t]he difficulty of tracing overcharges through the chain of distribution therefore [was] unimportant." *Id.*

*Fontana* and *Paper Systems* both employed the conspiracy exception in the context of vertical price-fixing. Vertical price restraints are agreements involving actors at different levels of a distribution chain to set either minimum or maximum prices. WILLIAM B. RUBENSTEIN, 6 NEWBERG ON CLASS ACTIONS § 20:27 (5th ed. 2018). Applying the conspiracy exception in these instances avoids the potential conundrums recognized in *Illinois Brick*, namely, duplicative recovery and difficulties tracing overcharges.

2 P. AREEDA, R. BLAIR, & H. HOVENKAMP, ANTITRUST LAW 369 (2d ed. 2004). That is because, in practicality, there is only one true sale when the direct purchaser conspires with the manufacturer to fix the price of the sale. Thus, "the consumer is the only party who has paid any overcharge." *Id.*

Here, Plaintiffs do not allege a price-fixing conspiracy. Rather, they argue Defendants use exclusive-dealing provisions, penalty provisions, and other anticompetitive behavior to inflate prices. The parties disagree as to whether the conspiracy exception applies only to vertical price-fixing conspiracies or whether it encompasses other types of conspiracies as well.

Regardless of the semantics, Plaintiffs allege a conspiracy that implicates the same concerns expressed in *Illinois Brick*. The direct purchasers, the distributors, are passing on alleged overcharges already established in net dealer contracts they have no hand in negotiating. According to the Amended Complaint, the distributor defendants are not involved in determining the inflated prices. The distributors merely enforce the terms of net dealer contracts and then subject Plaintiffs to additional costs the distributors independently assess.[5] It would be infeasible to calculate with any certainty which portion of overcharges the distributors absorb or ascertain which portion of the distributors' upcharges are due to market force, rather than overcharges. In other words, unlike *Paper Systems* and *Fontana*, there is not, as a practical matter, a single transaction between Becton, the distributors, and Plaintiffs.

Plaintiffs cite the portion of *Paper Systems* where the Seventh Circuit opined that

---

[5] Notably, the contracts at issue here do not qualify for the "cost-plus" exception to the direct purchaser rule because the distributor agreements do not contemplate a strict purchasing requirement or pre-date the overcharge. *Illinois Brick*, 431 U.S. at 735-36.

principles of joint and several liability rendered the difficulty of tracing overcharges "unimportant." *Paper Systems*, 281 F.3d 629 at 633. But *Paper Systems* involved a price fixing conspiracy between the manufacturer and intermediary. Here, Plaintiffs allege that the distributors act independently to increase already-inflated prices—a classic "pass-on" theory prohibited by *Illinois Brick*. Apportioning overcharges in this case would lead to the complexities *Illinois Brick* sought to avoid. As such, Plaintiffs' claims fall within the direct purchaser rule, and no exception applies.

## CONCLUSION

Plaintiffs do not allege facts plausibly suggesting they have antitrust standing to proceed under the Sherman Act. Accordingly, the Court **GRANTS** Defendants' motions to dismiss (Docs. 83, 84, & 85). The Amended Complaint (Doc. 52) is **DISMISSED with prejudice**. The case is **CLOSED**, and judgment will be entered accordingly.

**IT IS SO ORDERED.**

**DATED: November 30, 2018**

**NANCY J. ROSENSTENGEL**
**United States District Judge**