Case: 18-3735 Document: 00713589500 Filed: 08/05/2020 Pages: 16

CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 18-3735

MARION HEALTHCARE, LLC, *et al.*,

          *Plaintiffs-Appellants*,

*v.*

BECTON DICKINSON & COMPANY, *et al.*,

          *Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:18-cv-01059-NJR-RJD — **Nancy J. Rosenstengel**, *Chief Judge*.

_____

ARGUED SEPTEMBER 27, 2019 — DECIDED MARCH 5, 2020

_____

Before WOOD, *Chief Judge*, and KANNE and BARRETT, *Circuit Judges*.

WOOD, *Chief Judge*. Since the Supreme Court's decision in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), only those buyers who purchased products directly from the antitrust violator have a claim against that party for treble damages. "Indirect purchasers" who paid too much for a product because cartel or monopoly overcharges were passed on to them by middlemen must take their lumps and hope that the market will

Case 3:18-cv-01059-NJR   Document 130-1   Filed 03/30/20   Page 2 of 16   Page ID #592
Case: 18-3735   Document: 00713589500   Filed: 03/05/2020   Pages: 16

2 No. 18-3735

eventually sort everything out. See, *e.g.*, *Sharif Pharm., Inc. v. Prime Therapeutics, LLC*, Nos. 18-2725 and 18-3003, 2020 WL 881267 at *2 (7th Cir. Feb. 24, 2020). Matters are different, however, when a monopolist enters into a conspiracy with its distributors. In such cases, "the first buyer from a conspirator is the right party to sue." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631 (7th Cir. 2002).

The plaintiffs in this case ("the Providers") are healthcare companies that purchased medical devices manufactured by Becton Dickinson & Company. Healthcare providers often do not purchase medical devices directly from the manufacturer; instead, they join a group purchasing organization, known in the trade as a GPO. The GPO negotiates prices with the manufacturer on behalf of its members. It then presents the terms to the provider, which has the opportunity to accept them or reject them. If the provider agrees to the terms, it chooses a distributor to deliver the product. The distributor then enters into contracts with the healthcare provider and the manufacturer. These contracts obligate the distributor to procure the products from the manufacturer and to sell them to the provider. The distribution contracts with the providers incorporate the price and other terms of the agreements that the GPO negotiated, plus a markup for the chosen distributor.

Our Providers purchased medical devices in the manner just described. A GPO negotiated with Becton on the Providers' behalf, and a distributor delivered the devices. Had Becton acted alone, selling its products to an independent distributor, which then sold them to a healthcare provider, no one doubts that the *Illinois Brick* rule would bar the provider from suing Becton for any alleged monopoly overcharges. But these transactions were more complex. The Providers allege

No. 18-3735 3

that Becton, the GPOs, and the distributors (to whom we refer collectively as Becton unless the context requires otherwise) joined forces in a conspiracy and engaged in a variety of anti-competitive measures, including exclusive-dealing and penalty provisions. Becton moved to dismiss, arguing that the *Illinois Brick* rule barred the case despite the Providers' allegations of conspiracy.

The district court agreed with Becton that the *Illinois Brick* rule applied on these facts and that dismissal was therefore required. It found the conspiracy rule inapplicable not because of any failure to plead conspiracy adequately, but because this case did not involve simple vertical price-fixing. This, we conclude, was in error. At the same time, we conclude that as of now the Providers have failed adequately to allege the necessary conspiracy with the distributors, and perhaps with the GPOs. Because the district court's ruling depended so heavily on an error of law relating to *Illinois Brick*, we have decided to vacate the court's decision and remand for further proceedings.

I

We present the facts in the light most favorable to the Providers without vouching for anything. Each of the Providers has purchased conventional syringes, safety syringes, and safety IV catheters from Becton. They allege that Becton charges supracompetitive prices for these products. It is able to do so, they assert, because it has monopoly power in the relevant nationwide market and is unlawfully maintaining that power through anticompetitive contract arrangements among itself, the GPOs, and the distributors.

Case 3:18-cv-01059-NJR   Document 130-1   Filed 03/30/20   Page 4 of 16   Page ID #594
Case: 18-3735   Document: 00713589500   Filed: 08/05/2020   Pages: 16

4                                                           No. 18-3735

In order to accomplish its goals, Becton took several steps. The first addressed its relationship to the GPOs. Although the GPOs are supposed to negotiate at arms' length, with their members' best interests in mind, Becton ensured that their loyalty would run to Becton, by bribing them with millions of dollars annually in so-called administrative fees to include anticompetitive terms in the contract. These terms include penalty pricing for healthcare providers who fail to purchase a certain amount of their devices from Becton. Second, the Providers allege that the distributor agreements prop up the unfair terms of the contracts that the GPOs negotiate. Third, they allege that the agreements between Becton and the distributors include hidden commitments to make payments to the GPOs based on the volume of Becton products sold under the contracts. Becton pays distributors for selling more of its products, and in return, the distributors agree to promote Becton products above the products of competitors. The Providers allege that this network of contracts allows Becton to charge prices well above those of its competitors.

Following industry practice, the Providers did not buy directly from Becton. They relied upon the GPO system described above, unaware of the distortions Becton had introduced. The distributors purchased the medical devices from Becton at the rates negotiated by the GPOs, and the Providers then purchased the devices from the distributors. Because they did not purchase directly from Becton, the Providers may pursue Becton itself only if they have properly alleged a conspiracy.

II

Section 4 of the Clayton Act states that "any person who shall be injured in his business or property by reason of

Case 3:18-cv-01059-NJR   Document 130-1   Filed 03/30/20   Page 5 of 16   Page ID #595
Case: 18-3735   Document: 71   Filed: 08/05/2020   Pages: 16

No. 18-3735 5

anything forbidden in the antitrust laws may sue therefor," and is entitled to treble damages for the violation. 15 U.S.C. § 15. In this instance, however, the words "any person" cannot be taken literally. Instead, the Supreme Court has read them in the context of the statute as a whole and has inferred that certain limitations exist. One such limitation was announced in *Illinois Brick*, where the Court held that, in general, a downstream plaintiff cannot sue an alleged monopolist or cartel member on a theory that a middleman passed an anticompetitive overcharge on to her. Under *Illinois Brick*, only a purchaser who purchased goods directly from the monopolist (or cartel member) can claim damages. That purchaser is entitled to the full value of the damages stemming from the overcharge, even if it passed on some or all of the overcharge to downstream purchasers and consequently mitigated the damage it suffered. See *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). A plaintiff who asserts that it indirectly bore the brunt of an overcharge passed on by the direct purchaser has no claim.

The Supreme Court based its decision in *Illinois Brick* on several rationales. First, the Court concluded that "whatever rule is to be adopted regarding pass-on in antitrust damages actions, it must apply equally to plaintiffs and defendants." 431 U.S. at 728. It did so in part because it feared that an asymmetrical rule that prohibited a pass-on defense but permitted offensive use of passing-on "would create a serious risk of multiple liability for defendants." *Id.* at 730. Moreover, the Court suspected that the difficulties in analyzing price and output decisions would be prohibitive. *Id.* at 731–32. The direct purchaser is not necessarily free to pass on the full amount of a monopoly overcharge; its range of action will be constrained by the elasticity of demand in the downstream

Case 3:18-cv-01059-NJR   Document 130-1   Filed 03/30/20   Page 6 of 16   Page ID #596
Case: 18-3735   Document: 00713589500   Filed: 08/05/2020   Pages: 16

6                                                             No. 18-3735

market. Furthermore, the Court believed that enforcement of the antitrust laws would be better served "by concentrating the full recovery for the overcharge in the direct purchasers … ." *Id.* at 735.

Although *Illinois Brick* rejected "attempts to carve out exceptions … for particular types of markets," *id.* at 744, it did carry forward the limited carve-out that *Hanover Shoe* had recognized for "a pre-existing cost-plus contract." *Id.* at 736. Even that exception, however, has been interpreted narrowly, as the Court demonstrated when it found that a public utility's prices, by law passed on to final consumers, did not qualify. See *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990). The present case, however, does not depend on that exception or any other deviation from the general rule, as we will see.

Even the strictest application of the *Illinois Brick* rule requires the court to identify which entity is the seller and which the direct purchaser. The case of *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979), illustrates this point. In that case, Sonotone was vertically integrated, and so it sold its hearing aids directly to final consumers. One such consumer brought a class action against five companies, alleging illegal price-fixing and other antitrust violations. The defendants argued that the Clayton Act's requirement of injury in one's "business or property" did not encompass consumer harm, but the Court rejected that narrow reading, finding instead that the term "property" "comprehends anything of material value owned or possessed," *id.* at 338, and thus easily covered the consumer's loss of money. But the critical point here is that the consumer was the first direct purchaser from the cartel member, and so her suit was not barred by the recently announced *Illinois Brick* rule.

Case 3:18-cv-01059-NJR   Document 130-1   Filed 03/30/20   Page 7 of 16   Page ID #597
Case: 18-3735   Document: 00713589500   Filed: 08/05/2020   Pages: 16

No. 18-3735 7

Vertical integration can occur either by internalizing functions within one firm, as one sees in *Reiter*, or by contract. But contractual vertical integration presupposes independent firms. In that instance, as we explained in *Toys "R" Us v. Fed. Trade Comm'n*, 221 F.3d 928 (7th Cir. 2000), the manufacturer has an incentive to get the best deal it can from its distributors, both in terms of price and in terms of necessary services. *Id.* at 937. That will cause the manufacturer to sell its goods to whichever distributor will accomplish the distribution function as efficiently as possible. The manufacturer's interests thus align with those of the consumer who buys from the distributor, not with those of the distributor.

This dynamic breaks down if there is a conspiracy between the manufacturer and the distributor and the point of that conspiracy is to support supracompetitive prices for the ultimate consumer. Rather than keeping both its prices (inclusive of distribution costs) as attractive as possible (*i.e.* as low as possible) for consumers, as one would expect in a competitive market, the manufacturer/distributor conspiracy has a way to extract supracompetitive profits from consumers. Or at least it can do so if it has enough market power. But market power is a separate element of a plaintiff's claim. The only point here is that *Illinois Brick* is not a barrier to suit on behalf of a purchaser who dealt with a member of the conspiracy.

This is what we mean when we speak of a conspiracy "exception" to the *Illinois Brick* rule. It is not so much a real exception as it is a way of determining which firm, or group of firms collectively, should be considered to be the relevant seller (and from that, identifying which one is the direct purchaser) for purposes of the rule. We recognized this point in *Paper Systems*, 281 F.3d at 629. In that case, paper distributors

Case: 3:18-cv-01059-NJR   Document 130-1   Filed 03/30/20   Page 8 of 16   Page ID #598
Case: 18-3735   Document: 00713589500   Filed: 08/05/2020   Pages: 16

8                                                                No. 18-3735

sued paper manufacturers that had allegedly conspired to fix prices. The distributors had purchased some of the products through trading houses that allegedly had participated in the conspiracy. We found that the distributors had a claim under the antitrust laws, because they were "the first purchasers from *outside* the conspiracy." *Id*. at 631. They faced no *Illinois Brick* bar, because they dealt directly with the conspiracy and were thus entitled to the full amount of its overcharge. *Id*. at 633. See also *Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980) ("We are not satisfied that the *Illinois Brick* rule directly applies in circumstances where the manufacturer and the intermediary are both alleged to be co-conspirators in a common illegal enterprise resulting in intended injury to the buyer."); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 604–05 (7th Cir. 1997).

The fact that antitrust liability is joint and several reinforces the appropriateness of looking to the first sale outside the conspiracy. See *Paper Systems*, 281 F.3d at 632 ("Nothing in *Illinois Brick* displaces the rule of joint and several liability, under which each member of a conspiracy is liable for all damages caused by the conspiracy's entire output."). That is why we said in *Paper Systems* that it is better to think of the right to sue co-conspirators not as an exception to *Illinois Brick*, but instead as a rule inhering in *Illinois Brick* that allocates the right to collect 100% of the damages to the first non-conspirator in the supply chain. *Id*. at 631–32. A contrary rule that looked behind the conspiracy to the role each member played would render upstream antitrust violators effectively immune from suit through the simple expedient of conspiring with a middleman or distributor to pass on the inflated prices. Other circuits to consider the issue have come to the same conclusion. See *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,

Case 3:18-cv-01059-NJR   Document 130-1   Filed 03/30/20   Page 9 of 16   Page ID #599
Case: 18-3735   Document: 00713589500   Filed: 08/05/2020   Pages: 16

No. 18-3735 9

797 F.3d 538 (8th Cir. 2015); *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228 (11th Cir. 1999); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984).

The district court here recognized that *Illinois Brick* does not bar suits brought by direct purchasers from a conspiracy, but it thought nonetheless that the Providers' suit could not go forward. It found that the existence of a conspiracy mattered only for cases of price fixing, as opposed to other forms of anticompetitive activity; as we noted, it thus saw no need to delve into the adequacy of the conspiracy allegations. In its view, cases outside of the arena of price fixing implicated the same considerations that led the Supreme Court to adopt the *Illinois Brick* rule in the first place. In particular, it thought that it would be too difficult to calculate which portion of the overcharge the distributor had absorbed or to ascertain how much of the distributor's profits came from fair pricing rather than anticompetitive overcharges.

We see nothing in either the *Illinois Brick* line of cases or the conspiracy line that supports this distinction. The central point of *Illinois Brick* is to allocate the right to recover to one and only one entity in the market. It is just as easy to do that in the present case, where that entity is the Provider group and the mechanisms that the conspiracy uses to push up prices include exclusive dealing arrangements and bribes or kickbacks, as it is if the entity is the same Provider group but the anticompetitive activity is a more direct agreement to raise prices. Whatever difficulties there may be in calculating damages in a case such as this one, they are not enhanced by the complex downstream tracing that the Court rejected in both *Illinois Brick* and *UtiliCorp*. Indeed, *UtiliCorp* reinforced the need for one simple rule, when the Court stated that it would

Case: 3:18-cv-01059-NJR Document 130-1 Filed 03/30/20 Page 10 of 16 Page ID #600
Case: 18-3735 Document: 00713589500 Filed: 08/05/2020 Pages: 16

10 No. 18-3735

be "an unwarranted and counterproductive exercise to litigate a series of exceptions" to the *Illinois Brick* rule in cases where "economic assumptions underlying" the rule "might be disproved." 497 U.S. at 217.

The relevant inquiry in determining the applicability of *Illinois Brick* focuses on the relationship between the seller and the purchaser, not the difficulty of assessing the overcharge. The Supreme Court confirmed this in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019). There, consumers who had purchased "apps" from Apple's "App Store" sued, arguing that Apple had monopolized the retail market for the sale of iPhone apps and had used its power to overcharge consumers. Apple argued that the critical question was "who sets the price," *id.* at 1522, not who was the direct seller. It reasoned that because it did not set the retail price, it could not be sued under *Illinois Brick*, even though the consumers had purchased the apps directly from it. The Court rejected this argument, holding that *Illinois Brick* "established a bright-line rule where direct purchasers … may sue antitrust violators from whom they purchased a good or service." *Id*. While the details of *Apple* are different from the facts before us, the same rule applies. *Apple* confirms that *Illinois Brick* is a bright-line rule allocating the right to sue to direct purchasers alone, not a rule that requires analysis of competing policy justifications in each case. The relationship between the buyer and the seller, rather than the nature of the alleged anticompetitive conduct, governs whether the buyer may sue under the antitrust laws.

Becton has other arguments, however. It contends that when a manufacturer and a distributor have agreed to resell a product at a specific, anticompetitive price, there is no *Illinois Brick* "pass on," because the indirect purchaser is the first

Case 3:18-cv-01059-NJR Document 130-1 Filed 03/30/20 Page 11 of 16 Page ID #601
Case: 18-3735 Document: 00713589500 Filed: 03/05/2020 Pages: 16

No. 18-3735 11

party to have paid the overcharge. This eliminates the *Illinois Brick* concerns about tracing passed-on overcharges. But that says nothing about allocating the right to sue. If anything, it reinforces the conclusion that the Providers hold that right on these facts.

Becton also claims that treating the conspiracy as the relevant entity in cases involving anticompetitive conduct other than price fixing would swallow the *Illinois Brick* rule entirely. It argues that allowing the conspiracy exception in cases such as this one would permit plaintiffs to circumvent *Illinois Brick* by asserting in every case that the defendant and the middleman had formed a conspiracy together. But plaintiffs would do so at their peril: Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927 (counsel's liability for costs incurred from vexatious and unreasonable conduct), and the court's inherent authority all protect against such abuses. Furthermore, a complaint that does not lay out a plausible case for relief will be dismissed. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). A plaintiff is not entitled to resort to frivolous accusations of conspiracy to evade the *Illinois Brick* rule; the allegation must still reach the level of baseline plausibility.

We recognized in *Paper Systems* that a different problem might arise in some cases: "[p]erhaps if a conspirator defects and sues its former comrade, that snitch would come to own the right to damages." 281 F.3d at 632. Until that happens, however, we held that the plaintiffs "are entitled to collect damages from both the manufacturers and their intermediaries if conspiracy and overcharges can be established." *Id*. Nothing in this case even hints at a distributor who defected and then sued, and so we have no need to explore this possibility further.

Case 3:18-cv-01059-NJR Document 130-1 Filed 03/30/20 Page 12 of 16 Page ID #602
Case: 18-3735 Document: 00713589500 Filed: 08/05/2020 Pages: 16

12                                                                  No. 18-3735

The district court thus erred in holding that the *Illinois Brick* rule bars the first purchasers outside of a conspiracy from suing under the antitrust laws except in cases where vertical price fixing is alleged. Provided that our plaintiffs have properly alleged a conspiracy, they may sue for whatever form of anticompetitive conduct they are able plausibly to allege.

### III

The mere fact that the Providers are proper antitrust plaintiffs from the *Illinois Brick* standpoint does not resolve the question whether they have adequately alleged a conspiracy. We turn therefore to that question, beginning with their accusation that Becton conspired with its distributors.

The role of the distributors is critical to the Providers' case. That is because the distributors are the entities from which the Providers purchased the products at issue. If the distributors were not part of the alleged conspiracy, then Providers' case falls apart: no conspiracy, no direct purchaser status, no right to recover. The distributors would be the proper plaintiffs in such a situation and could sue Becton, as other distributors have done in other cases against Becton. See, *e.g.*, *In re Hypodermic Prods. Antitrust Litig.*, 484 F. App'x 669 (3d Cir. 2012).

In order to show an antitrust conspiracy, the Providers must prove that "the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 768 (1984). In a case such as this one, where the plaintiffs allege that participants in a market at different levels of the distribution chain entered into a conspiracy, the plaintiffs must show that similarly situated members of the

Case 3:18-cv-01059-NJR Document 130-1 Filed 03/30/20 Page 13 of 16 Page ID #603
Case: 18-3735 Document: 00713589500 Filed: 08/05/2020 Pages: 16

No. 18-3735 13

conspiracy coordinated not only with the manufacturer, but also with each other. If the plaintiffs do not adequately allege this type of coordination, they have made, at best, an allegation of a number of different conspiracies, not of a single conspiracy.

The Providers allege that Becton and the distributors were members of a "hub-and-spokes conspiracy." This type of conspiracy requires a plaintiff to allege both that there was a central coordinating party (the "hub"), and that each participant (along the "rim") recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group. In other words, a "hub-and-spokes conspiracy" requires a "rim" connecting the various horizontal agreements. See, *e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015). As applied to our case, the Providers must allege that the distributors, in addition to coordinating with Becton, would not have attempted to inflate prices without assurance that each distributor was abiding by the agreement and behaving in the same way.

The complaint before us does not accomplish this. The Providers allege only that the distributors "enforce" the terms of the contracts that the GPOs negotiated and then assess the Providers an additional fee for the distributors' services. The complaint has nothing to say about any involvement that the distributors may have in inflating the prices, or whether they coordinate among each other or with Becton or the GPOs as part of the conspiracy. The Providers ask us instead to find that the distributors are members of the conspiracy because they buy and sell the devices according to the terms of contracts that the GPOs allegedly negotiated in a crooked

Case 3:18-cv-01059-NJR   Document 130-1   Filed 03/30/20   Page 14 of 16   Page ID #604
Case: 18-3735   Document: 00711539500   Filed: 08/05/2020   Pages: 16

14                                                          No. 18-3735

fashion. But this allegation is insufficient to find a conspiracy between the distributors and Becton.

The Providers argue that we should not demand such direct evidence, and that there is enough here to infer an agreement among the distributors. They rely heavily upon *Toys "R" Us*, 221 F.3d 928, but that case does not support their position. We held in *Toys "R" Us* that in certain circumstances, an agreement between horizontally situated market participants can be inferred for the purpose of an antitrust conspiracy, even in the absence of an express agreement. In that case, Toys "R" Us had sent letters to major toy manufacturers, indicating that it would not carry the manufacturers' toys unless the manufacturers agreed to withhold certain highly desirable toys from warehouse clubs. The FTC found that it would not have made economic sense for any individual manufacturer to capitulate to these demands, unless it knew that its competitors would also play along. *Id.* at 935. That finding, we concluded, was supported by substantial evidence. It was thus permissible to infer that even if the manufacturers did not expressly agree to join a conspiracy with one another, they had functionally joined the conspiracy because they were assured that their competitors would all follow the same anticompetitive strategy.

Here, by contrast, the Providers have not alleged that the distributors engaged in parallel conduct, much less that they coordinated their actions to engage in illegal activity. In their complaint, the Providers list three activities they say the distributors have undertaken "in furtherance of the conspiracy." First, the distributors agree to distribute Becton's products pursuant to anticompetitive contractual terms. Second, the distributors enforce Becton's penalty pricing system, which

No. 18-3735 15

penalizes the healthcare providers if they switch to a different manufacturer. Third, the distributors make payments to the GPOs based on the volume of sales under the contracts.

These allegations, whether taken alone or together, do not suffice to describe a hub-and-spokes conspiracy. All the Providers have alleged is that the distributors buy and sell the devices in accordance with the terms of the contracts that the GPOs have negotiated. They have made no argument that the distributors played any role in setting the anticompetitive pricing or that there was any *quid pro quo* according to which Becton compensated them for participating in the alleged antitrust conspiracy. The fact that the distributors pay a fee to the GPOs for the latter's role in negotiating the contracts is not anticompetitive conduct on its own; indeed, it is to be expected. Without an allegation that the distributors have participated in the conspiracy or knowingly engaged in parallel anticompetitive conduct, the Providers cannot sue the distributors under the antitrust laws.

As the complaint now stands, the Providers have not shown that the distributors made a conscious commitment to participate in an illegal scheme. Without any allegation that the distributors coordinated with Becton to profit from the anticompetitive scheme, their case is barred under *Illinois Brick*.

In a last-gasp effort, the Providers argue that they should be given a chance to amend their complaint, given the legally flawed and relatively unexplored reason that underlay the district court's ruling. The United States, appearing as *amicus curiae*, agrees that the district court's *Illinois Brick* analysis was incorrect and supports vacating the district court's judgment and remanding for further proceedings. The distributors contend in response that the Providers have waived the

Case 3:18-cv-01059-NJR Document 130-1 Filed 03/30/20 Page 16 of 16 Page ID #606
Case: 18-3735 Document: 00713589500 Filed: 03/05/2020 Pages: 16

16 No. 18-3735

opportunity to amend their complaint, because they did not focus on *Illinois Brick*'s application to conspiracies in their opening brief. But the opening brief did cite *Paper Systems*, it did discuss the rule that direct purchasers from antitrust conspiracies are entitled to sue under *Illinois Brick,* and it stressed the conspirators' joint and several liability. This is more than enough to avoid waiver in this court. The district court, too, extensively discussed what it called a conspiracy exception, and so there was no waiver at that level either.

What the Providers could not have foreseen was the district court's categorical rejection of *Illinois Brick* for the type of anticompetitive activity they were alleging—a rejection that did not depend on any additional detail about the structure of the conspiracy. Now that we have straightened out the *Illinois Brick* side of things, we conclude that the Providers should have an opportunity to file an amended complaint, provided that they believe they can adequately plead that the distributors were part of the putative conspiracy. Any such amended complaint should also plausibly indicate (if possible) how, if at all, the GPOs might be liable.

### IV

We VACATE the judgment of the district court and REMAND for further proceedings in accordance with this opinion.