## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARION DIAGNOSTIC CENTER, LLC and MARION HEALTHCARE, LLC, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | No. 18 Civ. 1059 |
| v. | Hon. Nancy Rosenstengel |
| BECTON, DICKINSON AND COMPANY; CARDINAL HEALTH, INC.; and MCKESSON MEDICAL-SURGICAL INC., | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiffs Marion Diagnostic Center, LLC ("Marion Diagnostic") and Marion HealthCare, LLC ("Marion HealthCare"), individually and on behalf of all those similarly situated, for their Complaint against Defendants Becton, Dickinson and Co. ("Becton"), Cardinal Health, Inc. ("Cardinal"), and McKesson Medical-Surgical Inc. ("McKesson"), state as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action to restore competition in the markets for conventional syringes, safety syringes, and safety IV catheters (the "Products"), and to hold Defendants responsible for their conspiracies in restraint of trade.

2.      This case arises out of the oppressive structure imposed on healthcare providers like Plaintiffs who purchase medical devices and supplies in the United States.  Purchasing medical devices and supplies is not like buying consumer goods, where a person can simply walk into a store or search online to compare prices.  Rather, a purchase must occur via a web of manufacturers, distributors, and "group purchasing organizations" (or "GPOs").  At its most basic level, the purchase of medical devices by healthcare providers typically works as follows:

Step One:   The healthcare provider becomes a member of a GPO that negotiates prices for medical products with manufacturers.

Step Two:   The GPOs agree to pricing and contract terms for medical products with a manufacturer.

Step Three:   Each healthcare provider purchases medical products subject to the terms agreed to by the GPO and manufacturer from a distributor authorized to sell the manufacturer's goods.

3.      The GPO system was originally designed to reduce providers' costs.  By aggregating providers' purchasing power, GPOs were supposed to negotiate better prices with manufacturers for medical devices and supplies.  But the complex GPO purchasing system provides manufacturers, distributors, and GPOs the opportunity to enter into corrupt arrangements that suppress competition for their own benefit.  By facilitating the restraint of trade, the GPO system has perversely caused providers to pay *higher* prices than they would have paid if they were able to buy outside the system.

4.      Trade in the markets for the Products in the United States has been restrained by just this sort of anticompetitive conduct.  Becton manufactures the Products and holds a commanding market share for each.  Becton pays lucrative administrative fees and provides other benefits to two of the country's largest GPOs, Vizient and Premier, in exchange for the GPOs locking their members into long-term contracts that effectively force those members to buy Becton Products.  Becton has conspired with Cardinal and McKesson, its main distributors, to enforce those restrictive contract terms, punish providers who buy from Becton's competitors, and steer their customers towards Becton's Products.

5.     Through its anticompetitive conduct, Becton has been able to amass tremendous power in the relevant markets.  Becton and its co-conspirators have wielded that power to suppress competition by preventing Becton's rivals from obtaining sufficient scale to bid Becton's prices down to economically efficient, competitive levels.

6.     Defendants have profited greatly from these conspiracies.  Becton is able to charge above-competitive prices for the Products, to exclude competitors from entering the market, and to reward Cardinal and McKesson with guaranteed volume, increased distribution fees, and other benefits.  By contrast, providers like Plaintiffs – and the class members that they represent – suffer from the higher prices that the conspiracies allow Becton to charge.  And Becton's conspiracies have also suppressed syringe innovation and safety, placing patients and healthcare workers at needless risk of serious infectious diseases spread by needlesticks and blood-borne pathogens.

7.     Plaintiffs and members of the proposed classes have been directly harmed by Becton's conspiracies with Cardinal and McKesson.  Both Plaintiffs have purchased conventional and safety syringes and safety IV catheters directly from a conspiracy between Becton and one of these distributors.  And both Plaintiffs have paid above-competitive prices caused by the Becton–distributor conspiracies' cumulative effect sustaining Becton's market power and dominance in the relevant markets.  The proposed classes include healthcare providers nationwide.

## PARTIES

### Class Representative Plaintiff Healthcare Providers

8.     Marion Diagnostic is a limited liability company formed under the laws of the State of Illinois with its principal place of business in Marion, Illinois.  Marion Diagnostic operates a multidisciplinary healthcare facility including an outpatient surgery practice, a diagnostic center, and a walk-in clinic.  Marion Diagnostic has purchased Becton conventional and safety syringes, as well as safety IV catheters, from co-conspirator and Becton distributor McKesson during the period of the conspiracies.

9.     Marion HealthCare is a limited liability company formed under the laws of the State of Illinois with its principal place of business in Marion, Illinois.  Marion HealthCare, which is owned and operated by area physicians, operates a multi-specialty surgery center in Marion.  Marion HealthCare has purchased Becton conventional and safety syringes, as well as safety IV catheters, from co-conspirator and Becton distributor McKesson during the period of the conspiracies.

### Defendant Manufacturer

10.     Becton is a corporation formed under the laws of the State of New Jersey with its principal place of business in Franklin Lakes, New Jersey.  Becton is the largest manufacturer of Products in the United States.

### Defendant Distributors

11.     Cardinal is a corporation formed under the laws of the State of Ohio with its principal place of business in Dublin, Ohio.  Cardinal is one of the largest distributors of Becton Products in the United States.  In 2017, Cardinal purchased Covidien, a leading manufacturer of the Products in the United States.  Cardinal is the sixteenth largest corporation by revenue in the United States.

12.     McKesson is a corporation formed under the laws of the Commonwealth of Virginia with its principal place of business in Richmond, Virginia.  McKesson is a major distributor of Becton Products in the United States and is the eighth largest corporation by revenue in the United States.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action arises under the laws of the United States regulating commerce and protecting trade and commerce against restraints and monopolies.

14.     This Court has personal jurisdiction over each of the Defendants under the Clayton Act, 15 U.S.C. § 12, *et seq*., because (a) each Defendant has been or will be validly served with process within the United States; (b) each Defendant has transacted business in the United States, including in this District; (c) each Defendant has been incorporated in a United States jurisdiction and maintains its corporate headquarters in the United States; (d) each Defendant has directly or indirectly sold or brokered the sale of substantial quantities of Becton brand conventional and safety syringes and safety IV catheters in the United States, including in this District; and (e) each Defendant has had substantial aggregate contacts with the United States, including in this District.

15.     Each Defendant is also subject to personal jurisdiction under the laws of the State of Illinois because (a) it transacts business within this State and (b) it has joined in a conspiracy that was directed at, and had the direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in and located in the State of Illinois, including without limitation, Plaintiffs.

16.     Venue lies in this District pursuant to Sections Four and Twelve of the Clayton Act, 15 U.S.C. §§ 15, 22, because Defendants have each transacted substantial business in the

5

Southern District of Illinois.  Venue also lies in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to this claim arose in this District, including the formation, monitoring, performance, and enforcement of Defendants' exclusionary contracts and the sale, brokerage, and distribution by the conspirators of conventional and safety syringes and safety IV catheters at above-competitive prices.

## FACTUAL ALLEGATIONS

I.    **THE MARKETS FOR CONVENTIONAL AND SAFETY SYRINGES AND SAFETY IV CATHETERS**

   A.    **The Relevant Product Markets**

   17.    The relevant markets in this case are the markets for sale in the United States of conventional syringes, safety syringes, and safety IV catheters (the "Product Markets").

   18.    *Conventional syringes*. A conventional syringe is a medical device consisting of a cylindrical tube and a fitted needle used for injecting or extracting fluids. Becton and its competitors manufacture conventional syringes.  This market includes the conventional syringes manufactured and sold by Becton's competitors.

   19.    *Safety syringes*.  Unlike conventional syringes, safety syringes have features that prevent accidental needlesticks that can spread blood-borne pathogens.  For example, Becton offers syringes with retractable needles and sliding safety guards that seek to shield patients and providers from being touched by the syringe needle.  Manufacturers, including Becton, typically sell safety syringes at substantially higher prices than conventional syringes.  Because safety syringes offer additional features and are priced differently than conventional syringes, they are not reasonably interchangeable and thus form a distinct market.  The market for safety syringes includes those safety syringes manufactured and sold by Becton's competitors.

20.    *Safety IV catheters*.  IV catheters are medical devices used to administer fluids or medicine directly into patients' veins.  The IV catheter includes a small tube that is placed into a patient's vein using a syringe-style needle with an external valve that attaches to an IV tube and bag.  As with safety syringes, safety IV catheters differ from conventional catheters in that they have features designed to reduce the risk of accidental needlesticks.  Safety catheters are typically sold at substantially higher prices than conventional catheters and are not reasonably interchangeable with conventional catheters because they have distinct safety functions.  They thus form a distinct market.  The market includes safety IV catheters manufactured and sold by Becton and by Becton's competitors.

21.    For each of these three Product Markets, the relevant geographical market is the United States.  Becton and its competitors market their Products throughout the United States.  Those markets are limited to the United States because regulatory barriers prevent healthcare providers in the United States from purchasing safety and conventional syringes or safety IV catheters from manufacturers who lack approval to sell medical devices in this country.

**B.    The Conspirators' Roles in the Relevant Markets**

22.    *Becton*.  Becton manufactures the Products for sale to healthcare providers such as Plaintiffs.  Typically, these sales are made through distributors.  On average, Becton sells substantially more than $500 million of the Products in the United States every year.  Becton also sets the prices of the Products in coordination with the GPOs.  Becton and the GPOs also jointly determine the other contractual terms under which those Products are sold.

23.    *Becton Distributors*.  Cardinal and McKesson (the "Distributors") purchase Products from Becton and then resell those Products to healthcare providers, including pursuant to terms agreed to by the GPOs.  In many cases, once the GPOs have set the pricing and other terms of sale, their member healthcare providers purchase Becton Products by paying the

contract price plus a percentage markup to Distributors.  In other instances, these Becton Distributors resell the Becton Products under contracts entered into directly between Becton and the healthcare provider, typically a hospital, without the GPOs' direct participation.  Each of the two Distributors has entered into an independent conspiracy with Becton.

## II.    THE CONSPIRATORS' MARKET POWER

24.    Together, the conspirators have tremendous market power to control pricing or exclude competition in the Product Markets.

25.    Becton has dominant shares in the relevant Product Markets.

(a)    Becton controls approximately 60% of the market for conventional syringes, while its nearest competitor has only a 15% share.

(b)    Becton controls approximately 60% of the market for safety syringes, nearly double the share of its nearest competitor.

(c)    Becton controls approximately 55% of the market for safety IV catheters, approximately twice that of its nearest competitor.

26.    Co-conspirators Cardinal and McKesson also control a massive share of the distribution of medical devices and supplies.  As a market observer has described it, Cardinal and other Becton distributors have erected "wide economic moats" that allow them to "keep new entrants at bay."  Distributors' domination of the distribution for the Products gives them the power to assist Becton's restraint of trade in the relevant markets.

27.    High barriers to entering the relevant markets protect the conspirators' dominance.  First, the fact that healthcare providers rely heavily – if not exclusively – on GPOs has caused many larger healthcare providers to reduce their in-house procurement capabilities. Many smaller healthcare providers lack that capability altogether.  Thus, because most healthcare providers have little capacity to negotiate contracts for conventional and safety syringes or safety

8

IV catheters on their own, they must accept the long-term, exclusionary Becton contracts and above-competitive pricing offered by the conspiracies.

28.     Another barrier to entry is that providers must often go through complex processes to switch between manufacturers of different products.  Switching products often requires providers to conduct internal studies and seek approval from internal nursing review boards.  These processes make it difficult for providers to switch manufacturers, even for commodity products such as syringes and IV catheters.

29.     In addition, the relevant markets manifest large economies of scale in which a market competitor must produce enormous amounts of conventional and safety syringes and safety IV catheters to reduce its costs to a level that would be competitive with Becton.  No competitors can match the output of Becton, which has the capacity to produce billions of conventional and safety syringes and safety IV catheters per year worldwide.  As a result, it is difficult for Becton's competitors to enter into, or expand in, the relevant markets and match the massive benefits that Becton enjoys from its economies of scale.

30.     Cardinal and McKesson likewise enjoy large economies of scale.  Newer distributors will have difficulty competing with the lower distribution fees that larger and more established distributors like Cardinal and McKesson can charge because of the higher volume they already handle.

31.     Regulatory barriers caused by patents and FDA-approval requirements also increase the barriers to entry in the relevant markets.

32.     Lack of transparency in the GPO model also makes it challenging for hospitals to discern which products are being sold with a significant price markup over other comparable products from other manufacturers.

33.     The conspiracies' market power is also demonstrated directly by the above-competitive pricing that Becton is able to charge:

(a)     In the conventional syringe market, Becton has charged healthcare providers prices that are 11% higher than the prices charged by its closest rival.

(b)     In the safety syringe market, Becton has charged healthcare providers prices that are 36% higher than the prices charged by its competitors for retractable safety syringes, and prices that are 22-30% higher than the prices charged by its competitors for non-retractable safety syringes.

(c)     In the safety IV catheter market, Becton has charged healthcare providers prices that are 37% higher than the prices charged by its competitors.

## III.   DEFENDANTS' CONSPIRACIES IN RESTRAINT OF TRADE

### A.   The Restraint of Trade

34.     Through its independent vertical conspiracies with Cardinal and McKessson, Becton ensures that its competitors and potential entrants in the Product Markets cannot obtain the scale to pose a threat of competition substantial enough to force Becton to reduce prices to a competitive rate.

35.     Becton's conspiracies center on enforcing and promoting exclusionary and anticompetitive contracts called "Net Dealer Contracts."  GPOs arrange Net Dealer Contracts directly with manufacturers.  Each Product has a separate Net Dealer Contract.  Such Net Dealer Contracts set the pricing and other terms under which the GPOs' members buy Becton's Products.  Each Net Dealer Contract sets forth the "GPO contract price," or the baseline for the final price the provider pays to a distributor for each Product.

36.     The Net Dealer Contracts that Becton and Distributors enforce in the relevant markets contain four main elements that restrain trade:  (1) a penalty pricing scheme; (2) sole- or

10

dual-source provisions; (3) product "bundling;" and (4) long-term purchasing contracts.  Each of those contract terms reinforces Becton's dominance in the Product Markets by limiting providers' ability to buy the Products from Becton's competitors.

37.     The penalty pricing scheme directly punishes healthcare providers who switch from Becton Products to a competitor's Products.  The contracts under which providers buy the Products establish "tiers" of pricing that providers must pay for each syringe or catheter depending on their purchase volume.  Under those "tiers," providers pay more per unit unless they buy the same volume of products that they purchased the previous year.  If the providers meet that volume requirement for a given year – typically 85 to 95 percent of their previous year's purchases – they receive a rebate at the end of the year so that their per-unit cost will effectively be in a more favorable "tier."  But if the providers do not meet that requirement, they end up in a lower "tier" with punitively high per-unit costs, even if those providers buy a large volume of syringes or catheters in absolute terms.  Such penalty-pricing "tiers" in Product contracts squeeze providers into purchasing more Becton Products than they actually need.

38.     The sole-source and dual-source terms also restrain trade by limiting providers' ability to choose Products from Becton's competitors.  Under "sole-source" (sometimes called "single-source") terms, providers may purchase Products only from Becton.  "Dual-source" terms, by comparison, allow providers to purchase Products only from Becton and one other competitor.  While "dual-source" contracts grant providers some illusion of choice, the need for providers to also meet volume requirements ensures that such contracts are effectively sole-source in practice.

39.     "Bundling" terms also restrain trade by requiring providers to buy a "bundle" of multiple products from the same manufacturer in order to get the most favorable prices.  In other

11

words, a bundling term extends the penalty-pricing scheme by punishing a provider with higher prices for a number of different medical devices and supplies unless that provider meets volume requirements for all of those devices and supplies.  For example, if a provider failed to buy Becton's safety IV catheters, Becton might increase the price for conventional syringes under a separate contract to push that hospital to buy Becton safety IV catheters.

40.    Such bundling requirements reinforce the sole-source terms' and volume requirements' exclusive effects.  For example, if a given provider had a dual-source contract for safety IV catheters, but a sole-source contract for safety syringes, and had volume requirements that were "bundled" for both Products, the dual-source contract could be sole-source in practice because the provider would need to meet volume requirements aggregated across both Products. Bundling thus works to increase Becton's market share by pressuring providers to buy more Becton Products across multiple Product categories that the providers might have otherwise bought from a Becton competitor.

41.    The long-term nature of providers' purchasing contracts also serves to restrain trade.  The contracts through which providers buy the Products in the GPO system typically last between three and five years.  Locking providers into the same contracts for years at a time – with the same volume requirements, bundling features, and sole-source or dual-source terms – further denies Becton's competitors the chance to induce providers to switch away from Becton by offering lower prices or higher quality Products.

42.    These contractual terms restrain competition in the Product Markets.  Once providers start purchasing Products from Becton under such contracts, they are forbidden to buy from Becton's competitors on pain of paying punitive prices.  As a result, Becton's competitors know that they cannot obtain enough customers to compete with Becton, and thus cannot expand

their facilities so as to take market share from Becton.  Those protections ensure that Becton can maintain a dominant market share in the Product Markets, enabling Becton to charge above-competitive prices.

### B.   The Becton-Distributor Conspiracies

43.     Becton has conspired in restraint of trade with Cardinal and McKesson to protect Becton's dominance and market power in the relevant markets.  Cardinal and McKesson each independently agrees with Becton to enforce the anticompetitive Net Dealer Contracts and to undertake other concerted practices to monitor providers' purchases, dissuade providers from buying non-Becton Products, punish noncompliant providers, share information, promote Becton's dominance, and otherwise assist Becton in restraining trade.  In return, Becton rewards Distributors in the form of guaranteed volume, the opportunity to earn increased distribution fees, payments to Distributors' sales personnel, and other benefits.  This *quid pro quo* ensures that Distributors protect Becton's market power rather than attempt to find better deals for their provider customers.

44.     Becton carries out this conspiracy with Cardinal and McKesson in part by entering into contracts called "Dealer Notification Agreements."   In a Dealer Notification Agreement, Distributors agree to distribute Becton's Products to healthcare providers pursuant to the GPO-negotiated Net Dealer Contracts' anticompetitive terms.  Distributors also agree to enforce Becton's penalty pricing system that punishes healthcare providers for switching from Becton Products to competitors' Products.  And Distributors also agree to make additional anticompetitive cash payments of "administrative fees" to the GPOs based on the volume of Becton sales under the Net Dealer Contracts.  Dealer Notification Agreements are typically long term, lasting from three to five years.

13

45.     Once a provider's GPO sets the terms of a Net Dealer Contract with Becton, the provider buys the Products from a Distributor pursuant to a Distribution Agreement.  If the provider is a member of a GPO, that Distributor will charge the provider the Net Dealer Contract price for that Product plus a markup, which is typically a percentage of the total purchase price. The Distributor then purchases the Products from Becton at a "stock price."  If the stock price and the GPO contract price are different, Becton and the Distributor periodically reconcile the difference.

46.     Distributors also enforce the terms of the exclusionary Net Dealer Contracts. Distributor Agreements typically require that Distributors enforce the requirement that the healthcare providers buy a certain volume of Becton Products or else pay the penalty pricing set forth in the Net Dealer Contract.  Distributors enforce these volume requirements by charging providers a higher price per unit if the provider does not purchase the required amount of Product.  Distributors also enforce any sole-source or dual-source provisions of the contract.

47.     However, Distributors do not merely enforce anticompetitive contract terms agreed to by Becton and the GPOs.  Instead, Distributors and Becton take numerous additional steps that demonstrate Distributors' agreement to restrain trade in the Product Markets.  First, Distributors agree to enforce volume requirements in ways that are not required by the Distribution Agreements or Dealer Notification Agreements.  If providers do not meet their volume requirements, Distributor sales personnel pressure those providers to buy more Becton Products.  If pressure tactics do not work, Distributors often cut off credit lines to noncompliant providers and increase their delivery fees.

48.     Distributor sales personnel have also lied to providers to dissuade them from buying non-Becton Products.  Distributor sales personnel have falsely claimed to providers that

non-Becton Products are on "back order" and thus unable to be sold.  Distributor sales personnel have also misrepresented to providers the prices that the Products would cost under Net Dealer Contracts, claiming that competitors' Products would be substantially more expensive than Becton's Products.  And Distributor sales personnel have also falsely claimed that providers would violate their volume requirements if they buy non-Becton Products.  These false statements are effective because providers often lack the in-house purchasing capabilities to accurately discern what volume requirements they must meet or what prices they would pay under the Net Dealer Contracts' complicated "tiered" pricing system.

49.    Distributors also promote Becton Products to the exclusion of other manufacturers, even though they have no obligation under the Dealer Notification Agreements or Distribution Agreements to do so.  Becton is a "preferred vendor" of both Cardinal and McKesson, meaning that Distributors provide preferential treatment to Becton Products in multiple ways.  Among other benefits, Distributors' sales personnel promote Becton Products over other manufacturers' Products and dissuade providers from purchasing non-Becton Products.  In addition, Becton requires that Distributors' promotional materials emphasize Becton as the preferred brand.  As a result, instead of Becton needing to market its Products directly to healthcare providers, Distributors often market Becton's Products for it.  Distributors also provide Becton with exclusive access to their sales personnel at national meetings.  And Distributors provide Becton the exclusive opportunity to train their sales personnel on the purported advantages of Becton Products.

50.    Distributors give Becton such "preferred" status even when doing so may seem to harm them economically.  For example, even though Cardinal had acquired Covidien, one of

Becton's largest competitors in the Product Markets, Cardinal still has marketed Becton Products in preference to its own Covidien Products.

51.     Such "preferred vendor" status is provided to Becton alone.  Other manufacturers have attempted to gain access to and "face time" with Distributors sales personnel, only to be told that such access is only allowed to Becton.  Likewise, competing manufacturers are not permitted to train Distributor sales personnel about the merits of their competing Products. Because Distributors themselves have a dominant role in the distribution of medical devices and supplies, Distributors' restriction on what information their sales personnel can receive about competitors' Products makes it difficult for providers in turn to learn about the availability or features of those Products.

52.     Distributors also have employees "embedded" in hospitals to assist Becton's dominance in the Product Markets.  Among other tasks, embedded Distributor personnel ensure that providers pay prices under the highest applicable "tier," monitor providers' compliance with the restrictive contracts, and promote the use of Becton Products.  Those employees sit in the hospitals' purchasing departments and steer the hospitals towards buying Becton Products even if other equivalent Products are available at lower cost.

53.     Distributors also provide Becton with valuable information that allows Becton to maintain its dominance.  Distributors regularly communicate with Becton and the GPOs about whether providers meet their volume requirements and whether penalty-pricing terms are being enforced.  Distributor sales personnel also share with Becton staff information about what prices other manufacturers charge.  Because Distributors have access to providers' purchasing history under a number of Net Dealer Contracts, they have unique insight into how many of which Products providers are purchasing from which manufacturers.  Distributors provide Becton that

information to help Becton maintain its dominance in the Product Markets.  For example, if Distributors learn that a competitor has made efforts to deliver Products to a provider, Distributors' sales personnel will inform Becton.  By comparison, Distributor sales personnel will not provide sales information or other data to Becton's competitors.

54.     Distributors have also spread false information about competitors' Products to dissuade providers from switching away from Becton.  As described below, Becton was found liable under the Lanham Act for falsely advertising that its competitors' syringes were duller than Becton's syringes and had more "waste space."  Becton incorporated this false information into a "cost calculator" on its website.  Distributor sales personnel used that "cost calculator" to falsely argue to providers that Becton's Products would save money compared to competitors' Products.

55.     Distributors also impose restrictions on providers in their Distribution Agreements.  Similar to the volume requirements in Net Dealer Contracts, Distribution Agreements may require providers to buy a certain percentage of their medical devices and supplies from a single distributor.  By effectively dividing up markets between Distributors, such volume requirements enforce Becton's dominance by making it less likely that Distributors would compete with each other by offering their customers non-Becton Products.

56.     At Becton's request, Distributors' sales personnel also routinely pressure providers into only joining or using one GPO's contracts at a time.  Such efforts help Becton both prevent providers from "cherry-pick[ing]" lower prices and assist Becton's own efforts to aid the GPOs who cooperate with it.

57.     Distributors also monitor their own employees to make sure that those employees are effective in enforcing Becton's exclusive-dealing terms.   Distributors evaluate the

performance of their sales personnel on the basis of whether those personnel were successful in inducing providers to meet volume requirements, and they give better evaluations to personnel who did so.

58.     Distributors are aware of Becton's anticompetitive motives when they assist Becton.  As large-scale market participants, Distributors are aware of Becton's practices in the Product Markets.  Distributors' sales personnel are also in regular communication with Becton staff and have ample opportunity to know about Becton's exclusive-dealing schemes.   In addition, because the Distributors' sales personnel are also in regular contact with employees of GPOs, Distributors also have the opportunity to learn about cooperation between the GPOs and Becton in the same markets.  And employees of Distributors, Becton, and GPOs regularly meet at industry events, further creating opportunities for cooperation and collusion.   Distributors' knowledge of Becton's anticompetitive motives further demonstrates that Distributors have knowingly agreed to assist Becton in restraining trade.

59.     In exchange for Distributors' enforcement and marketing efforts, Becton rewards Distributors with a series of payments and other benefits.  In exchange for promoting Becton Products, Distributors' sales personnel are paid bonuses by Becton.  Becton also shares with Distributors the cost of "incentive" programs that reward Distributor sales personnel with gifts, vacations, and other perks based on the amount of Becton products that they sell.   These payments reduce Distributors' labor costs, and thus are effectively compensation for Distributors' agreement with Becton to restrain trade.  Such efforts also allow Distributors to further their conspiracies with Becton by allowing Becton to directly monitor whether their sales personnel are effectively enforcing Becton's exclusive-dealing scheme.

60.     Distributors also benefit directly from the restrictive contract terms that Becton imposes on the providers through its contracts with the GPOs.  Because Distributors charge a markup calculated as a percentage of the price the providers pay, Distributors benefit when Becton is able to raise its prices under the Net Dealer Contracts for the Products above competitive levels.  Distributors also benefit because, as a result of the long-term exclusive-dealing contracts they enforce, they are able to enjoy more guaranteed purchasing volume than they otherwise would have.

61.     Distributors' actions are inconsistent with independent, self-interested commercial behavior.  Distributors' actions both inside and outside the Net Dealer Contracts and Distribution Agreements cost Distributors the chance to profit by selling non-Becton Products.  Rather, enforcing long-term exclusive-dealing schemes like the ones Becton has perpetrated puts Distributors at risk of losing profits and market share to other distributors who are willing to give their customers more freedom to choose non-Becton Products.  It is unlikely that Distributors could gain any competitive advantage through these actions because the Products are commodities, and because both Cardinal and McKesson, two of the country's largest distributors of the Products, engage in the same behavior.  The best inference from Distributors' behavior is that they have agreed to assist Becton in restraining trade in the Product Markets in exchange for anticompetitive rents and other benefits from Becton.

### C.     Becton's Use of the GPOs

62.     Becton's use of the GPOs further demonstrates its overall anticompetitive scheme.  Two of those GPOs, Vizient and Premier, account for approximately 75% of hospital spending in the United States.  Becton pays the GPOs administrative fees and other benefits in exchange for GPO members being locked into exclusionary Net Dealer Contracts.  Additionally, GPOs are paid administrative fees from Distributors at Becton's direction.

63.     The administrative fees that the GPOs receive are central to their economic model.  For example, Premier has explained in public securities filings that it "rel[ies] on the administrative fees [it] receives from [its] GPO suppliers" such as Becton for "a substantial amount of [its] revenue."  Premier received 50 to 55% of its net revenue each year from 2017 to 2019 from administrative fees paid by vendors.  The GPOs' reliance on administrative fees gives them a powerful incentive to take anticompetitive actions that increase those fees, even if such actions do not ultimately benefit their members.

64.     Becton also makes payments to the GPOs outside of the Net Dealer Contracts.  Becton has paid the GPOs "growth incentives" based on the quarter-to-quarter increases in Becton sales under Net Dealer Contracts.  Becton has paid the GPOs fees to have its products placed in the GPO catalogs from which providers choose their products.  Becton has paid fees to the GPOs for access to annual meetings with GPO members.  And GPOs have charged Becton "marketing fees" for participating in GPO "private label" programs.

65.     In exchange for these payments, the GPOs consistently impose sole-source, penalty pricing, bundling, and other restrictive terms on their members, even though they publicly claim to be serving their members' interests.  For example, although Vizient has claimed in public disclosures that it awards sole-source contracts only in the rare circumstances where a product is unique, where only one manufacturer offers to sell that product, or where a sole-source term could "provide substantial member value," the opposite is true.  The GPOs frequently award sole-source contracts to Becton for commodity products.

## IV.   BECTON'S OTHER ANTICOMPETITIVE ACTS

66.     Becton has committed other anticompetitive acts in aid of its conspiracies, including deception, disparagement, patent infringement, and false advertising aimed against its most aggressive and innovative safety syringe competitor, Retractable Technologies, Inc.

("Retractable"), all of which improperly diminish Retractable's market share in a concentrated market. Becton has also engaged in anticompetitive actions resulting in antitrust consent decrees and fines. All this has materially contributed – in combination with other overt acts – to the conspiracies' and Becton's market power in the relevant conventional and safety syringe markets, and allowed Becton to charge above-competitive pricing.

67.     Becton has at least twice been adjudicated to have engaged in anticompetitive conduct in the Product Markets. First, Becton has been found liable for disparaging Retractable and engaging in false advertising. Specifically, a jury found that Becton falsely claimed both that its needles were the world's sharpest and that Retractable's syringes did not inject a full dose of medicine. *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, No. 08 Civ. 16, 2014 WL 12596469 at *6 (E.D. Tex. Nov. 10, 2014), *rev'd and remanded on other grounds*, 842 F.3d 883 (5th Cir. 2016).

68.     Second, Becton unlawfully infringed patented Retractable technology and used it against Retractable by introducing a line of 1 mL "Integra" retractable syringes. Becton rushed these infringing syringes to market in 2002 to impede Retractable's market entry, raising its competitor's costs, after the passage of the Needlestick Safety and Prevention Act. A jury found that Becton infringed on Retractable's patents, and its verdict was affirmed. *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1307 (Fed. Cir. 2011).

69.     Becton also enters into exclusionary contracts directly with healthcare providers outside of the GPO system. In these direct contracts, Becton will "bundle" the rebates offered to the purchasing healthcare provider for many types of Becton products and require a healthcare provider to meet certain quotas of products to keep all of the rebates. Because other conventional and safety syringe and safety IV catheter manufacturers do not have broad product

lines like Becton, healthcare providers will not choose a non-Becton conventional and safety syringe or safety IV catheter for fear of paying higher prices on other Becton medical supplies. As a result, other conventional and safety syringe or safety IV catheter manufacturers cannot compete because they are unable to offer discounts on conventional and safety syringes or safety IV catheters that could match the rebates Becton offers on *all* its products.  Matching all Becton rebates would likely compel below-cost pricing, or sales at the very least with little or no profit.

## V.     ANTITRUST PRICE AND QUALITY INJURY

### A.     Becton's Conspiracies Have Caused Antitrust Price Injury

70.     Plaintiffs and all those similarly situated have suffered antitrust price injury because of Defendants' conduct.

71.     As a result of Defendants' anticompetitive conduct, the plaintiffs and other purchasers of conventional and safety syringes and safety IV catheters have paid more than they would have in a truly competitive market.  They have paid above-competitive pricing when they bought the relevant Products directly from the conspiracies through Becton, Cardinal, or McKesson.  Whether a provider has bought from Cardinal, McKesson, or Becton itself, Becton's conspiracies with each of Cardinal and McKesson have, in the aggregate, sustained Becton's market power and dominance and enabled Becton to charge above-competitive pricing throughout the nationwide relevant markets.

72.     The conspiracies have also prevented Becton's competitors from obtaining sufficient scale and resources to bid down Becton pricing to competitive levels in these highly-concentrated relevant markets. The conspiracies have also prevented competitors from innovatively and effectively challenging Becton's sales of lower-quality and less-safe conventional and safety syringes.

22

**B.     Becton's Conspiracies Have Suppressed Syringe Innovation and Safety**

73.     Defendants' actions have also caused antitrust injury by suppressing quality competition and innovation in the Product Markets.

74.     Nurses and other healthcare professionals have experienced as many as 600,000 needlesticks a year.   These needlesticks spread HIV, hepatitis B, and hepatitis C.   As a consequence, syringes are among the most dangerous devices purchased by healthcare providers. The Occupational Health and Safety Administration has estimated that up to 5.6 million health-care workers are at risk of occupational exposure to blood-borne pathogens from needlesticks. But the conspirators' market power has discouraged attempts to develop and market new conventional and safety syringes that could reduce needlestick risk.   The conspirators' exclusionary practices have also discouraged healthcare providers from switching to Becton competitors' conventional and safety syringes even when doing so might be safer for healthcare workers and patients.

75.     Julia Nauheim Hipps, a nurse and needlestick victim from Missouri, has testified that healthcare provider–GPO contracts have "critically discouraged" the sale of safer syringes to healthcare providers: "Even if the healthcare providers want to utilize safer devices, they are bound by agreements they entered into years ago, never believing that they would lose all control on purchasing equipment for their patients and healthcare workers.   Newer and safer medical treatment and safety devices that have proven to be safer and more cost effective have been locked out by larger corporations that have the market share contractually, providing financial incentives to some and penalizing those who breach these contracts, making it difficult for the healthcare industry to make the necessary changes to save lives of both patients and those who provide care, including nurses, firefighters, policemen, EMT's and other frontline workers."

## CLASS ACTION ALLEGATIONS

**I.      Class of Direct Purchasers of Becton Conventional Syringes**

**A.      Federal Rule of Civil Procedure 23(a) Prerequisites**

76.     Plaintiffs Marion Diagnostic Center, LLC and Marion HealthCare, LLC ("Class Representatives") are representatives of a Class of United States healthcare providers who purchased Becton conventional syringes on or after May 3, 2014 directly from Becton, Cardinal, or McKesson ("Becton Conventional Syringe Direct Purchaser Class").   The Becton Conventional Syringe Direct Purchaser Class includes acute care providers or hospitals, hospital systems, clinics, physician groups, pharmacies, wholesale drug companies, home care firms, and other purchasers that offer inpatient or outpatient medical care.   For ease of reference, Class purchasers are referred to herein as "healthcare providers or other purchasers."

77.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)      The number of persons in the Class is, at a minimum, in the hundreds, and the Class members are therefore so numerous that joinder of all members of the Class is impracticable.   Joinder also is impracticable because of the geographic diversity of the Class members, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identities and addresses of all Class members.

(b)      There are common questions of law and fact arising from the conspirators' restraint of trade.   These include, but are not limited to, common issues as to (1) whether there are conspiracies; (2) whether the conspirators have engaged in restraint of trade; and (3) whether the conspiracies' anticompetitive conduct and overt acts have caused antitrust

price injury to be inflicted on Class members.  In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the Class members.

78.     The claims of each Class Representative are typical of the claims of the Class members and fairly encompass the claims of the Class members.  Each Class Representative and the Class members are similarly or identically harmed by the same systematic and pervasive concerted action.

79.     Each Class Representative and its counsel will fairly and adequately protect the interests of the Class members.  There are no material conflicts between the claims of each Class Representative and the Class members that would make class certification inappropriate.  Counsel for the Class will vigorously assert the claims of the Class Representative and the other Class members.

### B.     Federal Rule of Civil Procedure 23(b)(1) Prerequisites

80.     Plaintiffs' claims also meet the requirements of Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards for Defendants.  Defendants continue to market and sell Becton conventional syringes, safety syringes, and safety IV catheters, and varying adjudications could establish incompatible standards with respect to whether Defendants' conduct is permissible under the federal antitrust laws.  Prosecution of separate actions by individual Class members would also create a risk of individual adjudications that would be dispositive of the interests of other Class members not parties to the individual adjudications, or would substantially impair or impede the ability of Class members to protect their interests.

### C.      Federal Rule of Civil Procedure 23(b)(2) Prerequisites

81.     The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because the conspirators have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### D.      Federal Rule of Civil Procedure 23(b)(3) Prerequisites

82.     In addition, the prosecution of the claims of the Class as a class action is appropriate under Rule 23(b)(3) because:

(a)      Questions of law or fact common to the Class members predominate over any questions affecting only its individual members; and

(b)      A class action is superior to other methods for the fair and efficient resolution of the controversy.

## II.     Class of Direct Purchasers of Becton Safety Syringes

### A.      Federal Rule of Civil Procedure 23(a) Prerequisites

83.     Plaintiffs Marion Diagnostic Center, LLC and Marion HealthCare, LLC ("Class Representatives") are representatives of a Class of United States healthcare providers who purchased Becton safety syringes on or after May 3, 2014 directly from Becton, Cardinal, or McKesson ("Becton Safety Syringe Direct Purchaser Class").  The Becton Safety Syringe Direct Purchaser Class includes acute care providers or hospitals, hospital systems, clinics, physician groups, pharmacies, wholesale drug companies, home care firms, and other purchasers that offer inpatient or outpatient medical care.  For ease of reference Class purchasers are referred to herein as "healthcare providers or other purchasers."

84.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class is, at a minimum, in the hundreds, and the Class members are therefore so numerous that joinder of all Class members is impracticable.  Joinder also is impracticable because of the geographic diversity of the Class members, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all Class members.

(b)     There are common questions of law and fact arising from the pattern of conspirators' restraint of trade.  These include, but are not limited to, common issues as to (1) whether there are conspiracies; (2) whether the conspirators have engaged in restraint of trade; and (3) whether the conspiracies' anticompetitive conduct and overt acts have caused antitrust price injury to be inflicted on Class members.  In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the Class members.

85.     The claims of each Class Representative are typical of the claims of the Class members and fairly encompass the claims of the Class members.  Each Class Representative and the Class members are similarly or identically harmed by the same systematic and pervasive concerted action.

86.     Each Class Representative and its counsel will fairly and adequately protect the interests of the Class members.  There are no material conflicts between the claims of each Class Representative and the Class members that would make class certification inappropriate.  Counsel for the Class will vigorously assert the claims of the Class Representative and the other Class members.

**B.      Federal Rule of Civil Procedure 23(b)(1) Prerequisites**

87.     Plaintiffs' claims also meet the requirements of Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards for Defendants.   Defendants continue to market and sell Becton conventional syringes, safety syringes, and safety IV catheters, and varying adjudications could establish incompatible standards with respect to whether Defendants' conduct is permissible under the federal antitrust laws.  Prosecution of separate actions by individual Class members would also create a risk of individual adjudications that would be dispositive of the interests of other Class members not parties to the individual adjudications, or would substantially impair or impede the ability of Class members to protect their interests.

**C.      Federal Rule of Civil Procedure 23(b)(2) Prerequisites**

88.     The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because the conspirators have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

**D.      Federal Rule of Civil Procedure 23(b)(3) Prerequisites**

89.     In addition, the prosecution of the claims of the Class as a class action is appropriate under Rule 23(b)(3) because:

(a)      Questions of law or fact common to the Class members predominate over any questions affecting only its individual members; and

(b)      A class action is superior to other methods for the fair and efficient resolution of the controversy.

III.   **Class of Direct Purchasers of Becton Safety IV Catheters**

    A.   **Federal Rule of Civil Procedure 23(a) Prerequisites**

90.   Plaintiffs Marion Diagnostic Center, LLC and Marion HealthCare, LLC ("Class Representatives") are representatives of a Class of United States healthcare providers who purchased Becton safety IV catheters on or after May 3, 2014 directly from Becton, Cardinal, or McKesson ("Becton IV Catheter Direct Purchaser Class").   The Becton IV Catheter Direct Purchaser Class includes, without limitation, acute care providers or hospitals, hospital systems, clinics, physician groups, pharmacies, home care firms, and other purchasers that offer inpatient or outpatient medical care.   For ease of reference Class purchasers are referred to herein as "healthcare providers and other purchasers."

91.   Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

    (a)   The number of persons in the Class is, at a minimum, in the hundreds, and the Class members are therefore so numerous that joinder of all Class members is impracticable.   Joinder also is impracticable because of the geographic diversity of the Class members, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identities and addresses of all Class members.

    (b)   There are common questions of law and fact arising from the pattern of conspirators' restraint of trade.   These include, but are not limited to, common issues as to (1) whether there are conspiracies; (2) whether the conspirators have engaged in restraint of trade; and (3) whether the conspiracies' conduct and overt acts, taken as a whole, have caused antitrust price injury to be inflicted on Class members.   In addition, there are

common issues as to the nature and extent of the injunctive and monetary relief available to the Class members.

92.     The claims of each Class Representative are typical of the claims of the Class members and fairly encompass the claims of the Class members.  Each Class Representative and the Class members are similarly or identically harmed by the same systematic and pervasive concerted action.

93.     The Class Representatives and their counsel will fairly and adequately protect the interests of the Class members.  There are no material conflicts between the claims of each Class Representative and the Class members that would make class certification inappropriate.  Counsel for the Class will vigorously assert the claims of the Class Representatives and the other Class members.

**B.     Federal Rule of Civil Procedure 23(b)(1) Prerequisites**

94.     Plaintiffs' claims also meet the requirements of Federal Rule of Civil Procedure 23(b)(1) because prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards for Defendants.  Defendants continue to market and sell Becton conventional syringes, safety syringes, and safety IV catheters, and varying adjudications could establish incompatible standards with respect to whether Defendants' conduct is permissible under the federal antitrust laws.  Prosecution of separate actions by individual Class members would also create a risk of individual adjudications that would be dispositive of the interests of other Class members not parties to the individual adjudications, or would substantially impair or impede the ability of Class members to protect their interests.

### C. Federal Rule of Civil Procedure 23(b)(2) Prerequisites

95.     The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because the conspirators have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

### D. Federal Rule of Civil Procedure 23(b)(3) Prerequisites

96.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

### STANDING TO SEEK RELIEF

97.     The members of all proposed Classes have purchased directly from a conspiracy in restraint of trade between Becton and a Distributor independently conspiring with Becton by buying directly from Becton, Cardinal, or McKesson.  As a consequence, the members of all Classes have as a matter of law constitutional and statutory standing to pursue damages inflicted by the conspiracies under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a).

98.     All proposed Classes also have standing to seek injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, because the conspiracies have inflicted or threatened to inflict harm on the Classes alleged, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Classes as a whole.

99.     All proposed Classes also have standing to seek declaratory relief under 28 U.S.C. §§ 2201 and 2202 because there is an actual, present, and justiciable controversy that has arisen

between members of the proposed Classes and all Defendants concerning whether Defendants have conspired in restraint of trade.

## COUNT I

### Restraint of Trade Involving Becton and Cardinal
### (Section 1 of the Sherman Act)

100.    All foregoing paragraphs are incorporated herein by reference.

101.    Becton and its Distributor co-conspirators have market power in the relevant markets in the United States for the sale of safety and conventional syringes and safety IV catheters.

102.    Becton has entered into a contract, combination, or conspiracy in restraint of trade with Cardinal.  Both Becton and Cardinal have committed several overt acts in aid of each respective conspiracy.

103.    The conspiracy restrains trade in interstate commerce.

104.    The restraint of trade is unreasonable and has had substantial anticompetitive effects on price and quality competition in the relevant markets for the sale of conventional and safety syringes and safety IV catheters.

105.    The anticompetitive effects of the conspiracy are not offset by procompetitive effects in these markets.

106.    Members of the Direct Purchaser Classes purchasing directly from Becton or Cardinal have paid above-competitive prices for the relevant Becton conventional and safety syringes and safety IV catheters and have been denied quality and safety competition in the relevant markets for the sale of syringes.  The conspirators' conduct is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT II

### Restraint of Trade Involving Becton and McKesson
### (Section 1 of the Sherman Act)

107.    All foregoing paragraphs are incorporated herein by reference.

108.    Becton and its Distributor co-conspirators have market power in the relevant markets in the United States for the sale of safety and conventional syringes and safety IV catheters.

109.    Becton has entered into a contract, combination, or conspiracy in restraint of trade with McKesson.  Both Becton and McKesson have committed several overt acts in aid of each respective conspiracy.

110.    The conspiracy restrains trade in interstate commerce.

111.    The restraint of trade is unreasonable and has had substantial anticompetitive effects on price and quality competition in the relevant markets for the sale of conventional and safety syringes and safety IV catheters.

112.    The anticompetitive effects of the conspiracy are not offset by procompetitive effects in these markets.

113.    Members of the Direct Purchaser Classes purchasing directly from Becton or McKesson have paid above-competitive prices for the relevant Becton conventional and safety syringes and safety IV catheters and have been denied quality and safety competition in the relevant markets for the sale of syringes.  The conspirators' conduct is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and as members of the proposed Classes pray that

this Court:

A.     Declare that Defendants' conduct violates Section 1 of the Sherman Act, 15

U.S.C. § 1;

B.     Award treble damages to all Classes under Section 4 of the Clayton Act., 15

U.S.C. § 15;

C.     Permanently enjoin Defendants from continuing the conspiracies and unlawful

actions described herein under Section 16 of the Clayton Act, 15 U.S.C. § 26;

D.     Award Plaintiffs reasonable attorneys' fees and costs as allowed by law;

E.     Award Plaintiffs recover pre-judgment and post-judgment interest at the highest

rate allowed by law; and

F.     Grant such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Dated: August 21, 2020                                    Respectfully submitted,
Chicago, Illinois

Steven F. Molo                                            /s/ R. Stephen Berry
Allison M. Gorsuch                                        R. Stephen Berry
MoloLamken LLP                                            Berry Law PLLC
300 North LaSalle Street                                  R. Stephen Berry
Chicago, IL  60654                                        (Admitted *Pro Hac Vice*)
Telephone:  (312) 450-6700                                1100 Connecticut Avenue NW
Facsimile:  (312) 450-6701                                Suite 645
smolo@mololamken.com                                      Washington, DC  20036
agorsuch@mololamken.com                                   Telephone: (202) 296-3020
                                                          Facsimile: (202) 296-3038
                                                          sberry@berrylawpllc.com

Justin M. Ellis
MoloLamken LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160
Facsimile: (212) 607-8161
jellis@mololamken.com

Lee Goldsmith, J.D.-M.D.
Goldsmith & Goldsmith, LLP
*(Pro Hac Vice* Pending*)*
Park 80 West, Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07336
Telephone: (201) 429-7892
Facsimile: (201) 291-9428
lee@goldsmithlegal.com

*Attorneys for Plaintiffs and Proposed Class Co-Counsel*