# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARION DIAGNOSTIC CENTER, LLC; and MARION HEALTHCARE, LLC, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BECTON, DICKINSON, AND COMPANY; CARDINAL HEALTH, INC.; and MCKESSON MEDICAL-SURGICAL INC., <br><br> Defendants. | Case No. 3:18-CV-01059-NJR-RJD |

## **REPLY MEMORANDUM IN SUPPORT OF DISTRIBUTORS' MOTION TO DISMISS**

## I.   PLAINTIFFS FAIL TO STATE AN ANTITRUST CLAIM.[1]

Plaintiffs acknowledge they must allege a plausible conspiracy in which each defendant made a conscious commitment to restrain trade, and that the conspiracy affects competition, such as by increasing price. Opp. at 29-30. Plaintiffs allege the conspiracies affect competition by: (1) "enabl[ing] [BD] to charge above-competitive prices," and (2) "prevent[ing] [BD] competitors from obtaining sufficient market share or resources to bid down [BD]'s anticompetitive prices" (*id.* at 11), but plead no facts tying Cardinal's or McKesson's conduct to either alleged impact. Plaintiffs concede Distributors lack the market power required for such impact. *See id.* at 29.

**Price**. The price Plaintiffs pay for BD products is set by contracts between BD and the GPOs, who are *Plaintiffs' agents*. As the Seventh Circuit found, Cardinal and McKesson have nothing to do with those contracts or the prices for BD's products. MTD at 5. Nor do Cardinal and McKesson "enable" BD to charge a higher price. Plaintiffs state they face "inflated prices regardless of which distributor" they use (Opp. at 35), including those not in any alleged conspiracy: each distributor's price is the same regardless of whether it conspires with BD. Whether the GPOs were faithless agents who saddled Plaintiffs with a bum contract (*see id.* at 6) is not an antitrust claim against Distributors who had nothing to do with that contract.

**Eliminate Competitors**. Plaintiffs' assertion that Distributors prevent BD's competitors from obtaining market share or bidding down BD's prices is nonsensical. Plaintiffs contend the conspiracy is evidenced by "industry structure[s]" that "deter would-be competitors" to BD who "cannot obtain the scale to compete" with BD. Opp. at 17-19, 30. But Plaintiffs assert BD's competitors already have a robust 40-45% of the Product markets and sell at prices 11-36% *less*

---

[1] Exceptional circumstances justify this reply to correct the legal and factual mischaracterizations in Plaintiffs' opposition brief (Dkt. 162, "Opp."), and because granting the motion to dismiss ("MTD") will end this suit. *See* Local Rule 7.1(c). Capitalized terms have the same meanings as in the MTD (Dkt. 152).

than BD's. Opp. at 4-5, 8. Plaintiffs concede BD's competitors can sell through other distributors that are or are not in league with BD. SAC ¶ 61. It is thus implausible that a conspiracy prevented BD's competitors from entering the market to undersell BD. *They already do*.

**Without Market Power, Distributors Cannot Restrain Competition**.  Plaintiffs allege a two-level market:  BD sells Products it manufactures to Distributors, who resell the Products to hospitals at prices set in Net Dealer Contracts negotiated between BD and the hospital by its agent GPO. SAC ¶¶ 22-23. But when the Products can be obtained elsewhere, as Plaintiffs admit (*id.* ¶ 61), Distributors cannot restrain trade. Non-conspiring manufacturers and distributors would undercut them, take profits, and erode Distributors' sales. *See* MTD at 10-14, 18-19.

*Dickson*, which Plaintiffs fail to meaningfully distinguish (Opp. at 34), illustrates this point. The court found plaintiff's claims were not viable because Dell and Compaq lacked market power in their market, and thus even their exclusive agreements to feature Microsoft products were not "likely to foreclose a significant share of the relevant software markets." 309 F.3d 193, 209 (4th Cir. 2002). So too here. Without market power, Distributors' alleged separate conspiracies with BD cannot foreclose providers from purchasing competing Products at lower prices from other manufacturers or through other distributors, and do not bar BD's competitors from reaching customers. *Id.* at 208. That is true even if, as Plaintiffs suggest (Opp. at 34-36 & n.11), BD has market power at the manufacturing level. *See, e.g.*, *id.* at 209-10; *42nd Parallel N. v. E. St. Denim Co.*, 286 F.3d 401, 405-06 (7th Cir. 2002) (given allegations suggesting competition at retail level, plaintiff must allege facts showing downstream defendants have market power); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 397-98 (E.D. La. 2013) (claim dismissed for failure to allege agreement had "a substantial impact on the market, not just that one participant").

Plaintiffs cannot cure their failure to allege Distributors' market power by focusing on the so-called "*market for selling* Products – *i.e.*, the market in which [BD] competes with other manufacturers." Opp. at 30 (emphasis in original).[2] Distributors do not participate in such a market and Plaintiffs do not allege McKesson or Cardinal influence the terms at which BD sells Products. *See* SAC ¶¶ 22-23. Plaintiffs do not claim Cardinal or McKesson has market power such that either can influence price. Each may distribute non-BD Products and each faces competition from other distributors. *See* SAC ¶¶ 26, 38, 61. Lacking market power over distribution, Distributors thus cannot constrain any "market for selling" the Products.[3]

**Distributors' Business Practices Are Not Antitrust Violations**. Plaintiffs group their (fantastical) business practice allegations into categories they contend show "circumstantial evidence" of a conspiracy. Opp. at 6-11, 16-18. The Seventh and Fifth Circuits rejected many of those allegations—including the terms of the GPO contracts, Distributors' supposed enforcement of those terms, BD's incentive payments, and BD's statements about competitors. *See* MTD at 15, 17-18. Plaintiffs concede the new "details" they allege are not "independent antitrust violations." Opp. at 25. Nor do those allegations support an inference that each Distributor separately conspired with BD to restrain trade, which Plaintiffs conclusorily label a "*quid pro quo*." *See id.* at 17, 22. The Seventh Circuit held Distributors' contracts with BD are not anticompetitive, 952 F.3d at 842, Distributors' actions advance their independent economic interests by increasing their sales, and

---

[2] In this Circuit, Plaintiffs cannot plead market power by aggregating McKesson's and Cardinal's shares. *Compare Paddock Publ'n, Inc. v. Chi. Tribune Co.*, 103 F.3d 42, 45-47 (7th Cir. 1996) to Opp. 37 & n.12.

[3] Plaintiffs contend Distributors' non-exclusive "long-term" distribution agreements show they have market power. Opp. at 34, 35-36 & n.9. But fixed-duration exclusive contracts are "common, and legal"; providers "are free to strike deals" with others when the contracts terminate. *Methodist Health Servs. Corp. v. OSF Healthcare Sys.,* 859 F.3d 408, 410-11 (7th Cir. 2017) ("competition-for-the-contract is a form of competition that antitrust laws protect'"). Supposed "one-sided termination clauses" (Opp. 7, 36), *which are not alleged in the SAC* and must be disregarded, are irrelevant anyway because Distributors lack market power to impose any contract term on Plaintiffs. *See Methodist*, 859 F.3d at 410-11.

3

Plaintiffs concede the Distributors lack the power to prevent a provider dissatisfied by Distributors' actions from buying elsewhere. The admission that non-conspiring distributors sell BD products at the same price the GPOs negotiated shows the alleged practices do not support an inference of conspiracy. Plaintiffs contend Distributors have acted against "self-interest" because they "*usually prefer* competition between upstream manufacturers" that "allows distributors to make more sales and earn higher profits" (Opp. at 16-18 emphasis added) but *plead* legitimate reasons the vertical distribution arrangements are in Cardinal's and McKesson's independent interests: "increased distribution fees" and "guaranteed volume." SAC ¶¶ 6, 43. Plaintiffs pled themselves out of court.

Companies commonly sell products through distributors. For example, State Farm sells insurance through agents, and gives them incentives to promote only its products. This "vertical" arrangement is not anticompetitive because the agent lacks market power. Customers can buy insurance from other companies (even if State Farm is a dominant insurer) that sell insurance directly or through other agents (who also receive incentives). And even if a policy is multi-year, the customer can choose among options now and/or later. The same is true here. A provider can get BD Products from distributors not involved in any alleged conspiracy, and non-BD products at a lower price from Distributors or their competitors. MTD at 6, 12. Unless Distributors can force customers to deal with them, and the SAC shows they cannot, there is no viable antitrust claim.

## II.   PLAINTIFFS LACK STANDING TO SUE CARDINAL.

Plaintiffs do not dispute they must plead they suffered injury "fairly traceable to the challenged conduct of the defendant," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), and pled no harm traceable to purchases from the alleged BD-Cardinal conspiracy. Plaintiffs concede they bought no Products from Cardinal or BD. SAC ¶¶ 8-9. But Plaintiffs assert they may sue Cardinal because they "bought [BD] products at inflated prices" from a different conspiracy and Cardinal's conduct "helped drive those prices up." Opp. at 40. Plaintiffs are wrong.

4

In *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 641 F. 2d 457, 467-69 (7th Cir. 1981), the Seventh Circuit held a plaintiff lacks standing to bring a vertical conspiracy claim if it was not a customer of an alleged conspirator. Because Plaintiffs never bought from Cardinal or BD, their alleged injury is not traceable to the Cardinal-BD conspiracy, even if that conspiracy allegedly injured "other members of the [putative] class." Opp. at 40 n.15.[4] Plaintiffs' cases (*id.* at 39) all require traceability that is absent here[5]—and Plaintiffs argued before (as to the *single* conspiracy they pled) they had standing to sue any defendant from whom they did not buy Products *because they bought them from that defendant's alleged co-conspirator*. ECF 106 at 20 n.12. McKesson (Plaintiffs' seller) is not part of the *separate* Cardinal-BD conspiracy. SAC ¶¶ 70-72.

Plaintiffs may not claim standing based on purchases from other sellers because they plead the alleged BD-Cardinal conspiracy is separate from the alleged BD-McKesson conspiracy, and do not allege Cardinal and McKesson conspired together. Opp. 2, 13. Thus, any higher price they allegedly paid McKesson is not "fairly traceable" to any conduct of *Cardinal*. Plaintiffs' claim that they can rely on the purported *aggregate* effect of the two conspiracies they allege (*id.* at 40 & n.14) is wrong as a matter of law. *See* MTD at II.A.2; *supra* at n.2.

## CONCLUSION

Like its predecessors, the SAC is fatally deficient. It should be dismissed *with prejudice*.

---

[4] *See, e.g., Kjessler v. Zaappaaz, Inc.*, 2019 WL 3017132, *8 (S.D. Tex. 2019) (no standing where plaintiffs did not purchase product at issue from defendants); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, *6-*8 (N.D. Ill. 2013) (no standing to challenge purchases made by others outside plaintiffs' states); MTD at 8-9.

[5] The conspiracy in *Loeb Industries* raised copper prices on international exchanges, which "**necessarily and directly**" inflated the price of [copper] products purchased by the plaintiffs." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 474 (7th Cir. 2002) (emphasis added); *see also, e.g.*, *McGarry & McGarry, LLC v. Bankr. Mgmt Sols., Inc.*, 937 F.3d 1056, 1063 (7th Cir. 2019) (alleging price-fixing conspiracy *directly* reduced the pot from which plaintiff was paid); *accord Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 499 (7th Cir. 2005) (finding traceability); *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 921, 926 (7th Cir. 1995) (finding injury was "fairly traceable" to the specific conspiracy alleged). *See also* MTD at 8-9.

5

Dated: February 5, 2021                              Respectfully submitted,

/s/  Richard L. Stone

| | |
|---|---|
| Michelle K. Fischer (*pro hac vice*) | Richard L. Stone (*pro hac vice*) |
| Patricia A. Ochman (*pro hac vice*) | David R. Singer (*pro hac vice*) |
| Jones Day | Jenner & Block LLP |
| 901 Lakeside Avenue | 633 West 5th Street, Suite 3600 |
| Cleveland, OH 44114-1190 | Los Angeles, CA 90071-2054 |
| (216) 586-7096 | (213) 239-5100 |
| | |
| *Counsel for Cardinal Health, Inc.* | Michael T. Brody |
| | Jenner & Block LLP |
| | 353 North Clark Street |
| | Chicago, IL 60654-3456 |
| | (312) 222-9350 |
| | |
| | *Counsel for McKesson Medical-Surgical, Inc.* |

6

## CERTIFICATE OF SERVICE

      I, Richard L. Stone, an attorney, hereby certify that on February 5, 2021, I caused the **Reply Memorandum in Support of Distributors' Motion to Dismiss** to be served on all counsel of record listed in the Court's ECF system.

Dated: February 5, 2021                        /s/ *Richard L. Stone*
                                                    *Counsel for McKesson Medical-Surgical, Inc.*