IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARION DIAGNOSTIC CENTER, LLC, and MARION HEALTHCARE, LLC, individually and on behalf of themselves and all those similarly situated,<br><br>**Plaintiffs,**<br><br>v.<br><br>BECTON, DICKINSON & CO., CARDINAL HEALTH, INC., and MCKESSON MEDICAL-SURGICAL, INC.,<br><br>**Defendants.** | Case No. 3:18-CV-1059-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the court is a Motion to Dismiss (Doc. 151) by Defendant Becton, Dickinson and Company ("BD"), and a Motion to Dismiss filed by Defendants Cardinal Health, Inc. ("Cardinal) and McKesson Medical-Surgical, Inc. ("McKesson") (collectively, "Distributors"). For the reasons set forth below, the Court grants the Motions and dismisses this action with prejudice.

### FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs filed their initial complaint in May 2018 (Doc. 1). As amended in June 2018, Plaintiffs named as defendants BD, two group purchasing organizations ("GPOs"), and a number of named and unnamed distributors, alleging that these defendants were co-conspirators in an effort to impede competition in the market for safety syringes and

catheters (Doc. 52, "First Amended Complaint"). This anti-competitive behavior, Plaintiffs alleged, was effectuated through a hub-and-spokes conspiracy involving coordination both vertically between BD, the GPOs, and the distributors, as well as horizontal coordination between the distributors. Plaintiffs alleged that they were forced to accept noncompetitive pricing as a result of the anti-competitive conspiracy and sought damages and an injunction against further conspiracy under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 16 of the Clayton Act, 15 U.S.C. § 26.

On November 30, 2018, this Court granted motions to dismiss the amended complaint, finding that Plaintiffs had failed to plausibly suggest that they had antitrust standing (Doc. 117). Specifically, the Court noted that the "direct purchaser rule" announced in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1978), required plaintiffs to show that they were direct purchasers of the goods in question to have standing for a claim under Section 4 of the Clayton Act. While certain exceptions to the direct purchaser rule have been found by the Seventh Circuit in cases alleging conspiracies, the Court expressed its understanding that those exceptions depended on the allegation of a price-fixing conspiracy, whereas Plaintiffs in this action made no such allegation.

Plaintiffs appealed the dismissal, and the Seventh Circuit vacated the Court's judgment, finding that the Court had erred in reading the conspiracy exception to the direct purchaser rule as requiring an allegation of a price-fixing conspiracy. *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832 (7th Cir. 2020). Rather, the Seventh Circuit clarified that clarified that plaintiffs must merely allege a conspiracy to commit any type of anti-competitive activity and that plaintiffs purchased directly from a co-

conspirator, specifically noting the more recent decision in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019). *Id.* at 840. The Seventh Circuit held, however, that plaintiffs had still failed to adequately allege a conspiracy in their amended complaint. *Id.* at 843. The Seventh Circuit noted that plaintiffs seeking to allege an antitrust conspiracy must show that "the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 841. Where an alleged conspiracy involves participants at different levels of the market, however, plaintiffs must allege not merely that the manufacturer conspired with individual distributors, but also that the distributors coordinated amongst themselves.

The Seventh Circuit found that Plaintiffs in this action failed to accomplish this and remanded the case with the instruction that "the Providers should have an opportunity to file an amended complaint, provided that they believe they can adequately plead that the distributors were part of the putative conspiracy." *Id.* at 843.

On August 21, 2020, Plaintiffs introduced their Second Amended Complaint, listing only BD and two distributors as defendants (Doc. 150). BD and the distributors filed separate motions to dismiss on November 6, 2020, arguing that Plaintiffs have still failed to adequately plead the existence of a conspiracy. Plaintiffs filed timely responses, and the Court held a hearing on February 23, 2021 (*see* Docs. 167-170).

## LEGAL STANDARD

Defendants bring their motions pursuant to Federal Rule of Civil Procedure 12(b)(6). The purpose of a Rule 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case or decide whether a plaintiff will ultimately

prevail. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff only needs to allege enough facts to state a claim for relief that is plausible on its face. *Twombly*, 550 U.S. 570. A plaintiff need not plead detailed factual allegations, but must provide "more than labels and conclusions, and a formulaic recitation of the elements." *Id.* For purposes of a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and draw all possible inferences in favor of the plaintiff. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 (7th Cir. 2012).

## ANALYSIS

Both BD and Distributors argue that the action should be dismissed because Plaintiffs fail to allege a conspiracy and fail to allege that Distributors had market power. Distributors further argue that Plaintiffs lack standing against Cardinal. As standing against Cardinal appears to be the simplest of these issues, the Court will address it first before looking to the arguments against the Second Amended Complaint as a whole.

### I. Standing against Cardinal

Distributors argue that Plaintiffs lack standing to sue Cardinal because they do not allege any purchases from Cardinal, arguing that as Plaintiffs allege two separate conspiracies, they can no longer argue that Cardinal contributed to their injury as a co-conspirator but must rather separately show injury from each of the separate conspiracies.

In antitrust actions, plaintiffs bear the burden of showing both general standing as well as an antitrust injury, though these two requirements may overlap considerably.

*Weit v. Continental Illinois Nat'l Bank & Trust Co.*, 641 F.2d 457, 469 (7th Cir. 1981). For both general standing and antitrust injury, the harm alleged need not be direct, and the defendant need not be the sole actor involved in inflicting harm. *See, e.g.*, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339-42 (1979); *Lac Du Flambeau Band v. Norton*, 422 F.3d 490, 500 (7th Cir. 2005); *Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002). Plaintiffs must at the least allege, however, "a sufficient nexus between the defendant's alleged actions and an injury to plaintiffs" *Weit*, 641 F.2d at 469.

Here, as two separate conspiracies are alleged, Cardinal's actions have had not any direct impact on Plaintiffs. Rather, the only connection between Cardinal and the injury to Plaintiffs is the general effect that Cardinal's supposedly anticompetitive activity may have had at the market at large. This connection is vague and tenuous. Ultimately, in the absence of any showing relating to Cardinal's market power, it is difficult to say how significant any effect on the greater market might have been, and the connection between Cardinal and Plaintiffs is too attenuated. The Court finds that Plaintiffs have failed to allege a sufficient nexus between Cardinal's alleged actions and the injury in question, and they lack standing against Cardinal.

## II. Alleging a Conspiracy

Even if Plaintiffs did not lack standing against Cardinal, the Court would dismiss regardless, for it finds that Plaintiffs have failed to adequately allege a conspiracy.

In order to show that there was an antitrust conspiracy, Plaintiffs must be able to show that "the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service*

*Corp.*, 465 U.S. 752, 768 (1984). Conspiracies can take different forms, however. Specifically, the Supreme Court has distinguished between "agreements made up and down a supply chain, such as between a manufacturer and a retailer ('vertical agreements'), and agreements made among competitors ('horizontal agreements')." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015). A horizontal conspiracy is inherently anticompetitive, and in many situations no inquiry into the intent of the parties to the conspiracy or the conspiracy's effect on the market is required. *Id.* But when analyzing a vertical conspiracy, courts should use the rule of reason and look at "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed," in order to determine the effect on competition, as some vertical restraints may have procompetitive justifications. *Nat'l Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

Plaintiffs' First Amended Complaint alleged the existence of a "hub-and-spokes conspiracy," a type of conspiracy that combines elements of a vertical and horizontal conspiracy. In the Second Amended Complaint, Plaintiffs abandoned the "hub-and-spokes" theory and instead have chosen to allege the existence of two separate conspiracies, between BD and each of the distributor-defendants. The Seventh Circuit indicated that Plaintiffs previous allegations were not sufficient to allege a conspiracy between BD and distributors, specifically noting that they "have made no argument that the distributors played any role in setting the anticompetitive pricing or that there was any quid pro quo according to which Becton compensated them for participating in the

alleged antitrust conspiracy[.]" *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020).

In alleging that Distributors consciously participated in the two alleged conspiracies, Plaintiffs point to the following factors:

> i. Distributors take steps to suppress demand for non-BD products beyond their contractual obligations, *e.g.* through cutting off lines of credit, increasing delivery fees, embedding sales staff with providers to monitor exclusive-dealing terms, giving only BD info on providers' purchasing history and competitors' prices.
>
> ii. Distributors have a motive to conspire with BD because of BD's dominance in the market and its restrictive exclusive-dealing terms. BD further rewards the Distributors by providing bonuses and incentive programs for sales staff and giving higher distribution fees and guaranteed purchasing volume from long-term, exclusive Net Dealer Contracts.
>
> iii. Distributors operate in an industry structure that facilitates collusion, as BD has dominant market share, there are high barriers to enter that deter competitors to BD, and lack of transparency makes it difficult for providers to tell if prices are competitive.
>
> iv. Distributors' actions are contrary to self-interest – distributors naturally should prefer upstream competition, so their actions supporting BD's monopoly imply payments from BD to do so.
>
> v. Distributors' contracts with BD imply conscious conspiracy, as they have agreed to enforce contracts excluding BD's rivals.
>
> vi. Distributors' frequent communication with BD suggests collusion – employees of the defendants communicate regularly about what products are being bought and what attempts BD's rivals are making to sell products. This communication goes beyond what is necessary to merely buy and sell products.

These factors can be broken down into two categories—factors that indicate quid pro quo, and factors that indicate conscious commitment.

As to quid pro quo, it appears that all Distributors receive from the alleged conspiracy is bonuses and incentive programs for sales staff and higher distribution fees and guaranteed purchasing volume from long-term contracts. These look like standard features of any distributorship relationship. It is hardly remarkable that a manufacturer would create bonus programs to encourage salespeople working for distributors to sell more of their products. Similarly, it seems commonplace for a manufacturer to encourage a distributor to enter a longer contract by offering higher fees and guaranteed volume, as both parties benefit from the security that a longer contract provides. These features of the relationship between BD and Distributors simply do not indicate a quid pro quo for participation in an anticompetitive scheme, but rather look like the ordinary course of business for a manufacturer and two distributors.

As for conscious commitment, the facts alleged again seem insufficient to support the complaint. To start, Plaintiffs repeat facts about the market, noting BD's significant market share and the high barriers to entry that deter competitors. To a certain extent, these facts seem to cut against the argument that distributors were consciously committed to assisting BD in anticompetitive activities, rather reinforcing the perception that Distributors would naturally be motivated to work with a manufacturer that had such a commanding position in the market. Indeed, had any single Distributor chosen to reject BD's terms, it seems likely that BD could easily have found another distributor, while Distributors would have been hard-pressed to find another manufacturer with

similar volume. Similarly, Plaintiffs state that Distributors' actions are contrary to their self-interest and that they "naturally should prefer upstream competition[,]" but Plaintiffs have already conceded that there simply is very little upstream competition in the sector in question and that Distributors have little ability to encourage it. Accordingly, it is logical that Distributors would cultivate close ties with BD and that those connections are clearly in Distributors' self-interest.

Instead, it seems evident that Distributors took rational, commercially motivated steps to curry favor with an important manufacturer. As BD was able to offer better terms to Distributors due to its market share, Distributors enforced BD's exclusive-dealing contract terms and took steps to improve their relationship with BD by encouraging information sharing. There is no indication that Distributors would not have performed similar acts for other manufacturers if any of them had been able to offer a deal similar to that offered by BD. Indeed, many of the restrictive provisions that Plaintiffs complain of were set by contracts made between BD and the GPOs, and Distributors had no role in setting the terms or otherwise encouraging the allegedly anticompetitive state of the market.

In short, the facts alleged by Plaintiffs are simply insufficient to support an inference that Distributors had a conscious commitment to an anticompetitive scheme, or that they received any quid pro quo from BD for anticompetitive acts. Based on these facts, the claim is implausible on its face, and it must be dismissed.

As the Court has determined that the complaint fails to adequately allege a conspiracy, it will not consider the arguments presented by the parties on whether

Plaintiffs should have alleged the market power of Distributors.

## Conclusion

For the reasons set forth above, the Motions to Dismiss (Docs. 151, 152) are **GRANTED**, and the action is **DISMISSED with prejudice**. The Clerk of Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: March 12, 2021

*[signature]*

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**